UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

KEVIN PAROT, Individually and on Behalf of
All Others Similarly Situated,

                Plaintiff,

vs.

CLARIVATE PLC, JERRE STEAD,
RICHARD HANKS, CHRISTIE
ARCHBOLD, MUKHTAR AHMED,
JEFFREY ROY, STEEN LOMHOLT-
THOMSEN, GORDON SAMSON, SHERYL
VON BLUCHER, KOSTY GILIS,
BALAKRISHNAN S. IYER, NICHOLAS
MACKSEY, ANTHONY MUNK, JANE
OKUN BOMBA, CHARLES J. NERAL,
RICHARD W. ROEDEL, VALERIA
ALBEROLA, USAMA N. CORTAS, ADAM
T. LEVYN, ROXANE WHITE,
PRICEWATERHOUSECOOPERS LLP,
CITIGROUP GLOBAL MARKETS INC.,
ONEX CORPORATION, and BARING
PRIVATE EQUITY ASIA GROUP LIMITED,

                Defendants.

———————————————————— x

Civil Action No. 1:22-cv-00394-ENV-RLM

(Consolidated with Case Nos.:
1:22-cv-01371-CBA-RER and
1:22-cv-01372-ENV-RLM)

CLASS ACTION

DEMAND FOR JURY TRIAL

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................2

    A.    Defendants' Scheme and Fraudulent Statements and Omissions ............2

    B.    Defendants' Violations of the Securities Act of 1933 ............................7

II.    JURISDICTION AND VENUE ....................................................................8

III.    PARTIES ......................................................................................................8

IV.    CONFIDENTIAL WITNESS ACCOUNTS ..............................................19

V.    BACKGROUND TO THE FRAUD ...........................................................27

    A.    Special Purpose Acquisition Companies ..............................................27

    B.    Creation of Clarivate Through a SPAC .................................................31

    C.    Background Information About Clarivate ..............................................32

        1.    History of Clarivate...................................................................32

        2.    Clarivate's Segments and Revenue Streams..............................33

        3.    Acquisitions ..............................................................................34

VI.    DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS...............35

    A.    Churchill Capital Corporation...............................................................35

    B.    Promises of Growth from the "Jerre Stead Playbook" .........................37

    C.    Clarivate Attempts to Implement the "Jerre Stead Playbook"..............40

    D.    Self-Inflicted Chaos at Clarivate..........................................................42

    E.    Defendants' Cost-Cutting Hampers Revenue Growth..........................46

    F.    Defendants' Artifices ............................................................................48

        1.    Claiming "Cross-Selling" and "Revenue Synergies" as Organic Growth .........................................................................51

        2.    Shifting to Inside Sales Undermines Growth and Allows Defendants to Mask Disappointing Growth with Growth from Acquisitions ..............................................................................54

3.      Stringing Investors Along Through the End of the Year ..........................56

4.      Pulling Forward Revenue from the Second Half of 2021 but Still
        Promising a Big Fourth Quarter ................................................................60

5.      Padding Pipeline Reports and Using Inflated Reports to Reassure
        Investors ....................................................................................................63

VII.    DEFENDANTS FAILED TO DISCLOSE "KNOWN TRENDS OR
        UNCERTAINTIES" IN VIOLATION OF ITEM 303 OF REGULATION S-K ............66

A.      Following the DRG and CPA Global Acquisitions, Clarivate Made Major
        Structural Changes to Its Business Model and Sales Practices ............................68

        1.      Cost-Cutting Restructuring Programs ........................................................68

        2.      The Shift to an Inside Sales Model ............................................................70

        3.      The Transition from One-Off Transactional Sales to Subscription
                Sales ...........................................................................................................71

B.      Unbeknownst to Investors, the Changes to the Business Had a Significant
        Negative Impact on Clarivate's Revenue Trends ..................................................73

        1.      Significant Reduction to Outside Sales Force ............................................73

        2.      Inside Sales Force Had Limited Sales Capabilities ...................................75

        3.      Pulling Forward Transactional Sales Negatively Impacted Fourth
                Quarter Revenues .......................................................................................77

C.      The Changes to the Sales Force and Sales Model Contributed to
        Clarivate's Disappointing Q4 2020 and Q4 2021 Revenue Targets and
        Reduced 2022 Revenue Guidance ........................................................................78

D.      Defendants Failed to Disclose the Reasonably Likely Impact that the
        Significant Business and Sales Model Changes Would Have on
        Clarivate's Revenues, in Violation of Item 303 ...................................................79

VIII.   CLARIVATE'S RESTATEMENT CONFIRMS THAT NUMEROUS CLASS
        PERIOD STATEMENTS WERE MATERIALLY MISLEADING ................................81

A.      Clarivate's Restatement Is an Admission of Falsity ............................................83

Page

B. Defendants' GAAP Violations and Restatement Were Material............................84

C. Defendants' Disclosure of Material Weaknesses Is a Further Admission of Falsity .................................................................................................................85

IX. DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS ..........................89

A. Product Quality Statements.................................................................................89

B. Growth Statements ..............................................................................................95

    1. July 30, 2020 Q2 2020 Financial Results ................................................95

    2. September 10, 2020 Citi Global Technology Conference ........................98

    3. September 16, 2020 Barclays Global Financials New York Conference .............................................................................................100

    4. October 29, 2020 Q3 2020 Financial Results .........................................101

    5. November 10, 2020 Investor Day...........................................................103

    6. February 25, 2021 Q4 2020 Financial Results........................................107

    7. March 4, 2021 Morgan Stanley Technology, Media and Telecom Conference ...........................................................................................112

    8. March 18, 2021 Bank of America Information Services Conference ...........................................................................................114

    9. April 29, 2021 Q1 2021 Financial Results..............................................116

    10. May 19, 2021 Barclays Americas Select Franchise Conference ............120

    11. July 29, 2021 Q2 2021 Financial Results ...............................................122

    12. September 15, 2021 Barclays Financial Services Conference.................126

    13. October 28, 2021 Q3 2021 Financial Results .........................................128

    14. November 9, 2021 Investor Day..............................................................133

    15. November 17, 2021 RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference ...........................135

- iii -

16.    December 7, 2021 Barclays Global Technology, Media and Telecommunications Conference ...........................................137

C.    Omissions in Violation of MD&A Disclosure Rules ...........................................139

D.    Statements Regarding Financial Results and Internal Controls...........................140

    1.    Q4 2020 Financial Results ........................................................140

    2.    Amended Q4 2020 and FY 2020 Financial Results...............................143

    3.    Q1 2021 Financial Results ........................................................145

    4.    Q2 2021 Financial Results ........................................................147

X.    DEFENDANTS ACTED WITH SCIENTER ................................................149

A.    Defendants Were Hands-On Executives Who Closely and Frequently Tracked and Spoke About Sales and Revenue Metrics .........................149

B.    Stead's Role as a SPAC Sponsor Supports a Strong Inference of Scienter..........152

C.    Magnitude and Frequency of the Revenue Misses and Financial Misstatements .........................................................................152

D.    High-Level Departures and Reorganization of Clarivate's Leadership...............153

E.    The Restatement.............................................................................153

F.    Defendants' SOX Certifications .......................................................154

G.    Insider Stock Sales Support a Motive to Commit Fraud .....................154

XI.    LOSS CAUSATION............................................................................160

XII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FOTM DOCTRINE ..................................................................................164

XIII.    NO SAFE HARBOR .........................................................................166

XIV.    PLAINTIFFS' CLAIM FOR RELIEF UNDER THE SECURITIES ACT OF 1933 .................................................................................................167

A.    The June 2021 Offerings.................................................................167

**Page**

      B.      The September 2021 Offering ...........................................................168

      C.      The Offering Materials Contained Materially Misleading Statements and
            Omissions.................................................................................................169

XV.    CLASS ACTION ALLEGATIONS .................................................................173

XVI.   COUNTS.........................................................................................................174

COUNT I Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated
      Thereunder (Against the Exchange Act Defendants) .......................................174

COUNT II Violations of §20(a) of the Exchange Act (Against the Exchange Act
      Defendants).....................................................................................................177

COUNT III For Violations of §11 of the Securities Act (Against the Securities Act
      Defendants).....................................................................................................179

COUNT IV For Violations of §12(a)(2) of the Securities Act in Connection with the
      Offering (Against the Statutory Seller Defendants).........................................181

COUNT V For Violations of §15 of the Securities Act (Against Clarivate, Stead, Hanks,
      Archbold, and the Director Defendants (the "Section 15 Defendants").........183

XVII.  PRAYER FOR RELIEF .................................................................................185

XVIII. DEMAND FOR TRIAL BY JURY .................................................................185

4890-2434-9741.v2

Plaintiffs Pension Trust Fund for Operating Engineers, City of Birmingham Retirement and Relief System, Michigan Laborers' Pension Fund, and Town of Davie Police Pension Fund ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clarivate PLC ("Clarivate" or the "Company"), analysts' reports and advisories about the Company, statements by percipient witnesses, and other publicly available information.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

This action alleges claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired common stock of Clarivate between July 30, 2020, and February 2, 2022, inclusive (the "Class Period"), and who were damaged thereby.

This action also alleges claims under §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), on behalf of all persons or entities that purchased:

(a)     Clarivate's common stock in the public offering conducted on or about June 10, 2021 ("June 2021 Ordinary Shares Offering");

(b)     Clarivate's 5.25% Series A Mandatory Convertible Preferred Shares in the public offering conducted on or about June 10, 2021 ("June 2021 Preferred Shares Offering," and with the June 2021 Ordinary Shares Offering, the "June 2021 Offerings"); and/or

- 1 -

(c)      Clarivate's common stock in the public offering conducted on or about September 13, 2021 ("September 2021 Offering").

## I.      INTRODUCTION

### A.      Defendants' Scheme and Fraudulent Statements and Omissions

1.      Clarivate became a public company through a reverse merger with a "special purpose acquisition company," or a "SPAC."  In recent years, companies that have gone public via SPACs – because of the pressure to go public, the lack of due diligence, and the misaligned incentives among SPAC sponsors and investors – have unsurprisingly become synonymous with financial underperformance, financial restatements, and outright fraud.  Unfortunately for investors in this case, Clarivate was no different.

2.      Like most SPACs, Clarivate was taken public on the promise that it, with noted businessman Jerre Stead at the helm, would be a revenue growth machine.  Based on the hailed "Jerre Stead Playbook," Defendants promised unrivaled products and exponential revenue growth for Clarivate.  But none of this was true.  Rather, Defendants engaged in a scheme to convince the market that Clarivate was delivering on the growth story sold to investors, stringing along investors in the fledgling company while numerous Defendants bailed out of their holdings of Clarivate stock at artificially inflated prices, collecting millions of dollars in ill-gotten gains along the way.

3.      Despite Defendants' promises of strong, sustained growth, according to multiple confidential witnesses ("CWs"), it was obvious to everyone inside the Company that there was no growth – the critical metric relied upon by investors to gauge Clarivate's financial health and prospects.  And although Defendants purported to separately report organic and acquisitive revenues, certain practices – moving to an "inside sales" model whereby sales personnel attempted to make sales over the phone rather than face-to-face, "cross-selling," and bundling legacy and acquired

4890-2434-9741.v2

products – rendered Defendants' growth statements misleading.  As CW-1 explained, the inside sales and bundling practices left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenues.  Further, Defendants claimed the shift to insides sales would save money while at the same time boost revenues, but in reality, the shift angered customers and led to lost sales and revenues.  This was not surprising – CW-4 explained that the employees hired for inside sales were ***inexperienced and ineffective "rookies."***  And CW-2 explained that as a result of Defendants' cost-cutting measures, "Clarivate lost numerous customers."  Similarly, Defendants fired many employees and did not backfill positions as part of the cost-cutting measures, further hampering Clarivate's ability to make sales and generate revenue.  CW-3 explained that many people leaving the Company as part of the cost-cutting measures "were subject matter experts in their respective disciplines and assigned product lines," which had a "negative impact on the Company's organic growth" and caused "revenue losses."  The result, according to CW-5, was that "there was ***no organic growth at Clarivate; it was all just wishful thinking*** by executive management."

4.     Defendants also overhauled Clarivate's sales model such that sales that would have traditionally occurred as individual transactions later in the year were pulled forward and recorded as subscription sales earlier in the year, further stringing along investors who expected – as had been the case in the past – that Clarivate would post outsized revenues in the fourth quarter.  Because of this shift in sales strategy, however, CW-2 stated, "***we knew that this transactional revenue would not come through in the fourth quarter.***"  Similarly, CW-3 said that certain deals that were typically closed at year-end were no longer available to meet sales targets because they had been converted to subscription services earlier in the year.  None of this was disclosed.  Quite the opposite

4890-2434-9741.v2

– Defendants specifically assured the market that the shift to subscription-based sales would not affect the late-in-the-year transaction sales.

5.      Finally, Defendants inflated the sales pipeline, which they claimed to review "every day," by encouraging sales people to record potential, "white space" deals as transactions to which customers had already committed.  CW-4 described that "executive management [*i.e.*, C-level executives and Group Presidents] ***counted their chickens before the eggs were hatched*** and recorded white space business opportunities to help meet quotas, forecasts, and projections which misled the investors."  CW-1 corroborated this account, stating that executive management "put things in commit status [*i.e.*, marked them as sales that customers had committed to] to show revenues" before Clarivate had a signed contract with the customer, resulting in an inaccurate picture of sales and revenues.  And CW-3 explained that management instructed people to record potential business as committed and to "***back into***" their sales quota, calling the practice "***garbage in, garbage out***."

6.      In addition to their scheme, Defendants also failed to disclose "known trends or uncertainties" and events "likely to cause a material change in the relationship between costs and revenues," in violation of Item 303 of SEC Regulation S-K.  Specifically, as described above, the:(i) cost-cutting restructuring programs; (ii) shift to an inside sales model; and (iii) transition from transactional sales to subscription sales earlier in the year, introduced the known risk of negatively impacted revenues and revenue trends, particularly the traditional fourth quarter revenue bump that would not occur because of the pull-forward practices.  As such, these known risks and uncertainties were required to be disclosed under Item 303.  But rather than disclose these known risks and trends, as required, Defendants assured investors that these actions would actually boost, rather than hurt, Clarivate's revenue prospects.

- 4 -

7.      Defendants also issued numerous misleading statements regarding financial results and misstatements concerning internal controls and disclosure procedures.  Indeed, Defendants have **admitted** to the falsity of these statements by way of a Restatement of previously issued financials, filed on February 3, 2022, in which Clarivate disclosed material accounting errors and control deficiencies.  As a result of the accounting errors – which affected Clarivate's annual results for 2020 and the quarterly results for the first, second, and third quarters of 2021 – Clarivate admitted that it had materially understated its previously reported expenses by more than ***$120 million*** and materially overstated net income and earnings-per-share ("EPS") during these periods.  Clarivate also admitted that it had material weaknesses in its internal controls and disclosure procedures, belying its statements to the contrary in the restated financials.

8.      Defendants also issued misrepresentations concerning the quality of Clarivate's product offerings.  Specifically, Defendants repeatedly touted Clarivate's "product renovations," its "new" and "enhanced" products, and its ongoing "invest[ment] in our products."  In truth, as part of Defendants' cost-cutting measures, Defendants did not improve or invest in Clarivate's products.  For example, CW-1 stated that Clarivate's executive management "did not provide the sales teams with the desired products, assigned unworkable target quota goals, ***didn't reinvest in their product lines, and neglected to create new products***, which led to sales people leaving."  CW-3 similarly explained that "Clarivate did not reinvest in their product lines or create new products," which negatively impacted sales and led to a reduction of sales personnel.  CW-4 reported that Clarivate "had very little upgrades in its product and technology platforms."  And CW-2, whose job at Clarivate included working with clients and engineers to execute new product features and monitoring the quality of the Company's current product offerings, reported that "there was a

4890-2434-9741.v2

deterioration of Clarivate's product quality" and Clarivate's executive management "neglected to create new products, which led to loss of clients."

9.     Finally, desperate to convince the market that it was growing and would continue to grow revenues, Defendants repeatedly misrepresented Clarivate's then-current growth and its growth targets.  These statements were misleading because, as described above, Clarivate blended its own products and sales with acquired company products and sales, rendering the segregation between organic and acquisitive growth misleading.  Moreover, the severe business model changes and draconian cost-cutting measures left Clarivate in chaos, which drove away key sales personnel and analysts and negatively impacted revenues.

10.     Defendants engaged in the scheme and made the Class Period false statements with knowledge or reckless disregard for the truth.  Clarivate's growth and product offerings were among the most important metrics for the Company's success.  Thus, these issues were high on the Defendants' radar and addressed by them on virtually every earnings call and investor conference during the Class Period.  And Defendants were – by their own admissions – hands-on executives who were intimately involved in executing the "Jerre Stead Playbook."  They received regular reports regarding sales and pipeline from the Company's tracking databases, which Defendants routinely referenced on conference calls as sources for their statements regarding growth.  Indeed, defendants Jerre Stead and Richard Hanks received a weekly "in the bag" report each Sunday night, "which shows what [Clarivate had] sold and contracted for delivery for rev[enue] rec[ognition] purposes."  In fact, Stead boasted that Defendants tracked new sales "*every day*," adding that "*[w]e review everything every week, upside-down and backwards*."  Moreover, the magnitude and frequency of the financial errors and the existence of the Restatement are further evidence of scienter.  And the suspicious, unexplained departure of four high-level Defendants further adds to

- 6 -

the inference of scienter.  Finally, certain Defendants' insider trades – often executed just after inflation-inducing false statements or shortly before negative corrective disclosures – provide strong evidence of motive.  Indeed, certain Defendants reaped more than ***$30 million*** in insider sales proceeds in outsized trades made mostly ***not*** pursuant to Rule 10b5-1 trading plans, and certain of these trades were executed ***in violation*** of Clarivate's insider trading policy.

11.     When the relevant truth was disclosed in a series of partial disclosures, Clarivate's stock price plummeted, causing billions of dollars in damages to Clarivate investors who bought Clarivate stock at inflated prices.  Plaintiffs seek to recover those damages on behalf of the putative Class through this action.

**B.     Defendants' Violations of the Securities Act of 1933**

12.     Plaintiffs also allege strict liability and negligence claims under the Securities Act based on statements in the offering materials – many of which Defendants have ***admitted*** were false at the time they were issued by way of the Restatement – for three offerings used to raise more than ***$3.2 billion***.

13.     Specifically, the offering materials for the June 2021 Offerings and September 2021 Offering incorporated the annual report for 2020 and the first three quarterly reports for 2021.  The Restatement confirms that numerous statements regarding reported financial metrics in those reports were materially misleading.  The Restatement also confirms that Defendants' certifications pursuant to the Sarbanes-Oxley Act ("SOX") relating to internal and disclosure controls and procedures and controls over financial reporting were materially misleading.  In addition, the offering materials failed to disclose information required to be disclosed therein under Item 303, rendering the offering materials materially misleading by omission.  Thus, there can be no doubt that Defendants are liable for Plaintiffs' strict liability and negligence claims under the Securities Act.

- 7 -

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l, and 77o) and §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

16.     Venue is proper in this Judicial District pursuant to §22 of the Securities Act, §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Clarivate's common and preferred shares trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Clarivate common stock located across the United States, some of whom likely reside in this Judicial District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

18.     Lead Plaintiff Pension Trust Fund for Operating Engineers ("Pension Trust Fund") is a multiemployer defined benefit pension plan established in 1959 for the purpose of providing pension and death benefits to eligible participants and beneficiaries.  During the Class Period, the Pension Trust Fund purchased Clarivate common stock and Clarivate ordinary shares traceable to the September 2021 Offering, as set forth in the certification previously filed (*see* ECF 8-2) and incorporated herein, and was damaged thereby.

19.     Plaintiff City of Birmingham Retirement and Relief System ("City of Birmingham") is a public pension fund that was organized for the benefit of current and retired public employees of the City of Birmingham, Alabama.  During the Class Period, City of Birmingham purchased Clarivate common stock, as set forth in the attached certification, and was damaged thereby.

20.     Plaintiff Michigan Laborers' Pension Fund ("Michigan Laborers") is a defined benefit pension plan providing pension and death benefits to eligible participants and beneficiaries. During the Class Period, Michigan Laborers purchased Clarivate common stock and 5.25% Series A mandatory convertible preferred shares in the June 2021 Preferred Shares Offering, as set forth in the attached certification, and was damaged thereby.  On June 10, 2021, Michigan Laborers purchased convertible preferred shares of Clarivate pursuant to the June 2021 Preferred Shares Offering.

21.     Plaintiff Town of Davie Police Pension Fund ("Davie Police") is a defined benefit pension plan that provides pensions to eligible retirees and beneficiaries.  During the Class Period, Davie Police purchased Clarivate common stock, as set forth in the attached certification, and was damaged thereby.  On June 10, 2021, Davie Police purchased ordinary shares of Clarivate pursuant to the June 2021 Ordinary Shares Offering.

22.     Defendant Clarivate is an information services and analytics company.  Clarivate became a publicly traded company in 2019 through a merger with Churchill Capital Corp ("CCC"), a special purpose acquisition company, or "SPAC."  Clarivate's ordinary shares and 5.25% Series A mandatory convertible preferred shares trade on the NYSE under the tickers "CLVT" and "CLVT-PA," respectively.

23.     Defendant Jerre Stead became Executive Chairman of Clarivate's Board of Directors ("Board") in May 2019 and the Chief Executive Officer ("CEO") in June 2019.  Prior to becoming CEO of Clarivate, Stead had led the special purpose acquisition company known as Churchill

- 9 -

Capital Corp.  Throughout the Class Period, Stead made materially false and misleading statements and omissions contained in SEC filings and made during investor conferences, as alleged herein. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Stead signed and certified the Company's Forms 10-Q, 10-K, and 10-K/A (Amendment No. 1) filed with the SEC.  Stead also signed the Form S-3 filed with the SEC on June 19, 2020 (the "2020 Shelf Registration Statement") used for the June 2021 Offerings and the September 2021 Offering, and signed the Form S-3 filed with the SEC on July 1, 2021 (the "2021 Shelf Registration Statement") used for the September 2021 Offering.  On July 11, 2022, the Company announced that Stead would be stepping down from his role as Clarivate's CEO.

24.     Defendant Richard Hanks was Clarivate's Chief Financial Officer ("CFO") starting in March 2017.  Throughout the Class Period, Hanks made materially false and misleading statements and omissions contained in SEC filings and made during investor conferences, as alleged herein. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Hanks signed and certified the Company's Forms 10-Q, 10-K, and 10-K/A (Amendment No. 1) filed with the SEC.  Hanks also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and signed the 2021 Shelf Registration Statement used for the September 2021 Offering.  As a statutory seller under §12(a)(2) in the June 2021 Ordinary Shares Offering, he sold 124,297 shares, or 28.5% of his holdings, and earned proceeds of $3,134,770.34.  On December 1, 2021, Clarivate announced Hanks was departing the Company.

25.     Defendant Christie Archbold was Clarivate's Chief Accounting Officer starting in December 2019.  Throughout the Class Period, Archbold made materially false and misleading statements and omissions contained in SEC filings, as alleged herein.  Archbold also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the 2021 Shelf Registration

- 10 -

Statement used for the September 2021 Offering.  During the Class Period, Archbold made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K, 2020 Form 10-K/A (Amendment No. 1), the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and signed the 2021 Shelf Registration Statement used for the September 2021 Offering.  The Company announced that effective October 5, 2021, Archbold was taking a temporary leave of absence.  On March 7, 2022, Archbold stepped down from her role at the Company.

26.     Defendant Mukhtar Ahmed became Clarivate's President of the Science Group in January 2019, having joined the Company in January 2018 as President of Life Sciences.  During the Class Period, Ahmed made materially false and misleading statements and omissions during Clarivate's investor calls and conferences, as alleged herein.  On January 10, 2022, Clarivate announced that Ahmed would be leaving the Company.

27.     Defendant Jeffrey Roy was Clarivate's President of the Intellectual Property ("IP") Group.  During the Class Period, Roy made materially false and misleading statements and omissions during Clarivate's investor calls and conferences, as alleged herein.  As a statutory seller under §12(a)(2) in the June 2021 Ordinary Shares Offering, he sold 89,648 shares, or 30.5% of his holdings, and earned proceeds of $2,260,922.56.  On July 6, 2021, Clarivate announced that Roy would be leaving the Company.

28.     Defendant Steen Lomholt-Thomsen became Clarivate's Chief Revenue Officer in August 2021.  During the Class Period, Lomholt-Thomsen made materially false and misleading statements and omissions during Clarivate's investor calls and conferences, as alleged herein.

29.     Defendant Gordon Samson, who was previously head of Clarivate's APAC Strategy & Growth, became President of Clarivate's IP Group on July 6, 2021.  During the Class Period,

- 11 -

Samson made materially false and misleading statements and omissions during Clarivate's investor calls, as alleged herein.

30.     Defendant Sheryl von Blucher became a member of Clarivate's Board in May 2019. During the Class Period, von Blucher made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K, 2020 Form 10-K/A (Amendment No. 1), the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 221 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.  As a statutory seller under §12(a)(2) in the June 2021 Ordinary Shares Offering, she sold 500,000 shares, or 14.0% of her holdings, and earned proceeds of $12,610,000.

31.     Together, defendants Clarivate, Stead, Hanks, Archbold, Ahmed, Roy, Lomholt-Thomsen, Samson, and Von Blucher are referred to herein as the "Exchange Act Defendants."

32.     Defendant Kosty Gilis became a member of Clarivate's Board in January 2019.  Gilis was also a Managing Director of Onex, defined below, which he joined in 2004.  During the Class Period, Gilis made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and the September 2021 Offering.  Gilis also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

33.     Defendant Balakrishnan S. Iyer became a member of Clarivate's Board in May 2019. During the Class Period, Iyer made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Iyer also signed the 2020 Shelf

Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

34.     Defendant Nicholas Macksey became a member of Clarivate's Board in October 2016.  Macksey was also a Managing Director of Baring, defined below, a company he joined in 2006.  During the Class Period, Macksey made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Macksey also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

35.     Defendant Anthony Munk became a member of Clarivate's Board in October 2016. During the Class Period, Munk made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Munk also signed the 2020 Shelf Registration Statement used in for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

36.     Defendant Jane Okun Bomba became a member of Clarivate's Board in May 2020. During the Class Period, Bomba made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Bomba also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

37.     Defendant Charles J. Neral became a member of Clarivate's Board in July 2017. During the Class Period, Neral made materially false and misleading statements and omissions, as

- 13 -

alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Neral also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

38.     Defendant Richard W. Roedel became a member of Clarivate's Board in May 2020. During the Class Period, Roedel made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Roedel also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

39.     Defendant Valeria Alberola became a member of Clarivate's Board in May 2021. During the Class Period, Alberola made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and the September 2021 Offering.  Alberola also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

40.     Defendant Usama N. Cortas became a member of Clarivate's Board in October 2020. During the Class Period, Cortas made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Cortas also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

41.     Defendant Adam T. Levyn became a member of Clarivate's Board in October 2020. During the Class Period, Levyn made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by

- 14 -

reference in the June 2021 Offerings and the September 2021 Offering.  Levyn also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

42.     Defendant Roxane White became a member of Clarivate's Board in May 2021. During the Class Period, White made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  White also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

43.     The Defendants identified above in ¶¶23, 30, 32-42 are referred to herein as the "Director Defendants."

44.     Defendant PricewaterhouseCoopers LLP ("PwC") is the U.S. member firm of PricewaterhouseCoopers International Ltd., an international firm that provides independent audit, tax, and advisory services.  PwC has served as Clarivate's outside auditor since 2016.  PwC certified Clarivate's 2020 financial statements in its Report filed on February 26, 2021 with Clarivate's 2020 Form 10-K.  With the exception of the Company's treatment of the private placement warrants and the Company's "lack of an effectively designed control over the evaluation of settlement features used to determine the classification of warrant instruments," PwC consented to the incorporation by reference of its Report dated February 26, 2021 into the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

45.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as Sole Global Coordinator and Joint Book-Running Manager for the June 2021 Ordinary Shares Offering on or about June 10, 2021 of 44,230,768 ordinary shares of Clarivate and the June 2021 Preferred Shares Offering on or about June 10, 2021 of 14,375,000 of Clarivate's 5.25% Series A Mandatory

- 15 -

Convertible Preferred Shares.  Citigroup further acted as representative of the underwriters in the June 2021 Offerings.  Citigroup represented itself and the other participating underwriters, which were identical in both the June 2021 Offerings: BofASecurities, Inc., RBC Capital Markets, LLC, Barclays Capital Inc., HSBC Securities (USA) Inc., and J.P. Morgan Securities LLC.  On June 14, 2021, Clarivate filed with the SEC an Underwriter Agreement for the June 2021 Offerings that was confirmed and accepted by Citigroup "[f]or themselves and as representative of the other [u]nderwriters," and in which it was agreed and understood that the other participating underwriters in the offering had "authorized the Representative [Citigroup], for its account, to accept delivery of, receipt for, and make payment of the purchase price" the shares in the offerings.  According to the Prospectus Supplements for both the June 2021 Offerings: "The underwriters expect[ed] to deliver the ordinary shares to purchasers on or about June 14, 2021 through the book-entry facilities of The Depository Trust Company."  Additionally, Citigroup participated in the drafting and dissemination of the June 2021 Offering Materials (defined below in ¶350), as well as in the sale of the ordinary and preferred shares offered to Plaintiffs and the Class.  As an underwriter and the Global Coordinator of the June 2021 Offerings, Citigroup was responsible for ensuring the completeness and accuracy of the statements contained in or incorporated by reference into the June 2021 Offering Materials.

46.     On June 10, 2021, the underwriters exercised in full an option granted by the Selling Shareholders to purchase up to an additional 5,769,230 ordinary shares of Clarivate, bringing the total number of shares sold in the June 2021 Ordinary Shares Offering to 44,230,768.  Citigroup was paid approximately $19.9 million in connection with the June 2021 Ordinary Shares Offering.

47.     On June 10, 2021, the underwriters exercised in full an option granted by Clarivate to purchase up to an additional 1,875,000 preferred shares of Clarivate, bringing the total number of

- 16 -

shares sold in the June 2021 Preferred Shares Offering to 14,375,000.   Citigroup was paid approximately $24.9 million in connection with the June 2021 Preferred Shares Offering.

48.     Citigroup also served as Joint Book-Running Manager and "representative of the underwriters" in the September 2021 Offering on or about September 13, 2021 of 25,000,000 ordinary shares of Clarivate.   Citigroup represented itself and the other participating underwriter, which was Barclays Capital Inc.   On September 14, 2021, Clarivate filed with the SEC an Underwriter Agreement for the September 2021 Offering that was confirmed and accepted by Citigroup "[f]or themselves and as [r]epresentative of the other [u]nderwriters," and in which it was agreed and understood that the other participating underwriters in the offering had "authorized the Representative [Citigroup], for its account, to accept delivery of, receipt for, and make payment of the purchase price" the shares in the offering.   According to the Prospectus Supplement for the September 2021 Offering: "The underwriters expect[ed] to deliver the ordinary shares to purchasers on or about September 14, 2021 through the book-entry facilities of The Depository Trust Company."   The Prospectus Supplement also specified that there was no set offering price for the September 2021 Offering; rather, the underwriters would "offer the ordinary shares from time to time for sale in one or more transactions on the [NYSE], in the over-the-counter market, through negotiated transactions or otherwise, at market prices prevailing at the time of sale, at prices related to such prevailing market prices or negotiated prices, subject to their right to reject any order in whole or in part."   Additionally, Citigroup participated in the drafting and dissemination of the September 2021 Offering Materials (defined below in ¶354), as well as in the sale of the ordinary shares offered to Plaintiffs and the Class.   As an underwriter of the September 2021 Offering, Citigroup was responsible for ensuring the completeness and accuracy of the statements contained in or incorporated by reference into the September 2021 Offering Materials.

- 17 -

49.     Defendant Onex Corporation, together with various affiliated partnerships, including Onex Partners IV LP, Onex Partners IV PV LP, Onex Partners IV Select LP, Onex Partners IV GP LP, Onex Camelot Co-Invest LP, Onex US Principals LP, Onex Partners Holdings LLC, and New PCo A LP ("Onex") were record holders of Clarivate's ordinary shares. Onex Corporation, a private equity firm, was deemed the beneficial owner of the ordinary shares of Clarivate. Together, Onex held 71,418,266 ordinary shares of Clarivate before the June 2021 Ordinary Shares Offering. During the June 2021 Ordinary Shares Offering, Onex sold 10,562,882 of its ordinary Clarivate shares, or 14.8% of its holdings, and earned proceeds of $266,395,885, before expenses. Total expenses for the offering were expected to be $1.8 million.

50.     Before the September 2021 Offering, Onex held 60,855,384 ordinary shares of Clarivate. During the September 2021 Offering, Onex sold 18,000,000 ordinary shares, or 29.6% of its holdings, and earned proceeds of $454,500,000. Estimated expenses for the offering were $790,000.

51.     Defendant Baring Private Equity Asia Group Limited, which was an independent alternative asset management platform based in Asia, and its affiliated partnerships, The Baring Asia Private Equity Fund VI L.P.1 and The Baring Asia Private Equity Fund VI, L.P.2, as well as record holder Elgin Investment Holdings Limited (together, "Baring"), held 27,773,769 ordinary shares of Clarivate before the June 2021 Ordinary Shares Offering. During the June 2021 Ordinary Shares Offering, Baring sold 4,107,787 of its ordinary Clarivate shares, or 14.8% of its holdings, and earned proceeds of $103,598,388.14, before expenses. Total expenses for the offering were expected to be $1.8 million.

52.     Before the September 2021 Offering, Baring held 23,665,982 ordinary shares of Clarivate. During the September 2021 Offering, Baring sold 7,000,000 ordinary shares, or 29.6% of

its holdings, and earned proceeds of $176,750,000.   Estimated expenses for the offering were $790,000.

53.      Together, Clarivate, Stead, Hanks, Archbold, the Director Defendants, PwC, Citigroup, Onex, and Baring are referred to herein as the "Securities Act Defendants."

54.      Together, Onex, Baring, Roy, von Blucher, and Hanks are referred to herein as the "Selling Shareholders."  Clarivate did not receive any proceeds from the sale of any ordinary shares by the Selling Shareholders.  The Selling Shareholders, together with Clarivate and Citigroup, are referred to herein as the "Statutory Seller Defendants."  In the June 2021 Ordinary Shares Offering, Clarivate sold 28,846,154 shares while the Selling Shareholders sold 15,384,614 shares.  Motivated by financial gain, the Statutory Seller Defendants sold and assisted in the sale of shares in the June 2021 Ordinary Shares Offering and September 2021 Offering to Plaintiffs and other members of the Class by means of defective Preliminary Prospectuses and Prospectus Supplements that were issued to solicit investors' purchase of Clarivate shares in the June 2021 Ordinary Shares Offering and September 2021 Offering.

## IV.    CONFIDENTIAL WITNESS ACCOUNTS

55.      Several former Clarivate employees have provided information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements.  The CWs include individuals formerly employed at Clarivate during the Class Period.  Their accounts corroborate one another, other sources set forth herein, and facts now admitted by Clarivate.  The CWs provided information to Plaintiffs' counsel and/or their investigator on a confidential basis and are particularly described by job description, responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge.  As set forth below, the

information provided by the CWs supports an inference that Defendants' Class Period statements were false and misleading and that Defendants acted with scienter.

56.     Confidential Witness No. 1 ("CW-1") worked as a Commercial Account Manager and an Inside Account Manager between spring 2021 and winter 2022 in the Chandler, Arizona location.   CW-1 was responsible for promoting subscription-based services focused on pharmaceutical, biotech, and medical venture investment intelligence.   CW-1 stated they were required to meet assigned target quota goals, generate new subscription business, foster renewal sales, and acquire transactional revenues.   CW-1 stated that "executive management" at Clarivate included the CEO, CFO, Chief Operating Officer, Chief People Officer, Chief Compliance Officers, Presidents, and Vice Presidents.   CW-1 explained that Clarivate's acquisitions were "a challenge." Specifically, CW-1 explained that "delineation of responsibilities and duties between Clarivate and the newly acquired companies was not configured properly."   CW-1 stated that executive management based growth on improperly compiled forecasts and utilized unrealistic white space (*i.e.*, potential) business opportunity projections.   CW-1 explained that Clarivate's customers were gained through mergers and acquisitions and not organic growth.   CW-1 also explained that executive management did not provide the sales teams with the desired products, assigned unworkable target quota goals, did not reinvest in their product lines, and neglected to create new products, which led to sales people leaving.   CW-1 explained that sales people "started leaving in multitudes."   CW-1 added that Clarivate's executive management fired numerous sales people and members of the Company's go-to-market teams.   CW-1 noted: "Clarivate had a huge problem with price rates and billing matters," which caused the Company to "lose major clients and experience a decrease in new subscribers."   CW-1 noted that Clarivate "didn't reinvest in their product lines." CW-1 also confirmed that they were assigned both legacy Clarivate clients and products and those

- 20 -

from newly acquired companies.  CW-1 explained that moving clients to inside sales (*i.e.*, sales made remotely, including over the phone) and bundling acquired companies' products with legacy Clarivate products left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenues.  CW-1 also noted that executive management did intensive portfolio pipeline account reviews with sales people at the beginning of each quarter, a process Clarivate called "Review and Planning."  CW-1 reported that executive management encouraged sales people to record white space in the Company's customer relationship management ("CRM") system and that executive management "put things in commit status [*i.e.*, marked them as sales that customers had committed to] to show revenues" before Clarivate had a signed contract with the customer, resulting in an inaccurate picture of sales and revenues.  CW-1 reported that revenues and pipeline were tracked in real time in the Company's CRM software – Salesforce – and that reports from this software were frequently generated and presented to executive management.  CW-1 also reported that they met frequently with their supervisors to go over the reports, and that they understood that such meetings were held up the chain of command all the way to the executive management team. CW-1 explained that "at the beginning of each year, a detailed portfolio account review was conducted by the bosses with their subordinates to address each sales person's clients' portfolio accounts."  CW-1 added that there "were intense discussions held about the strength of each account as well as potential white space opportunities that could facilitate additional revenues.  The detailed portfolio account reviews were revisited each quarter in order to update the customers' activity accounts."

57.     Confidential Witness No. 2 ("CW-2") was Senior Director, Data Analytics at Clarivate and Decision Resource Group ("DRG") between 2017 and April 2021.  CW-2 worked with the commercial life science group and concentrated on the pharmaceutical and biotech areas.  CW-2

- 21 -

assisted in the construction of analytical platforms for clients and interfaced regularly with clients

and partnered with engineers to execute new product features.  CW-2 confirmed that they and many

other data analytics professionals left the Company and that this contributed to a "brain drain."  CW-

2, whose job at Clarivate included working with clients and engineers to execute new product

features and monitoring the quality of the Company's current product offerings, reported that "there

was a deterioration of Clarivate's product quality" and Clarivate's executive management "neglected

to create new products, which led to loss of clients."  CW-2 specifically reported that Clarivate's

executive management "wanted to cut costs," that "an emphasis was placed on reducing costs," and

that "Clarivate increased profits through cost cutting measures."  CW-2 added that the cost cutting

measures included failing to backfill vacant positions in key go-to-market teams and not providing

teams with funding needed to maintain and improve product quality, noting, "when presented with

an opportunity to invest in the products, Clarivate's executive management chose to cut costs."  CW-

2 added that "because of these cost savings approaches, Clarivate lost numerous customers."  CW-2

stated that they saw no organic growth at Clarivate and that customers and subscription portfolios

were gained through mergers and acquisitions and not organic growth.  CW-2 also stated that after

the acquisition of DRG, Clarivate started trying to transition some of DRG's transactional deals to a

subscription model. Because of Clarivate's attempts to transition this business to a subscription

model, some of this business was lost and CW-2 stated "we knew that this transactional revenue

would not come through in the fourth quarter."  CW-2 stated that executive management was "hands

on" and continuously reviewed and assessed the day-to-day operations.  According to CW-2,

executive management knew that subscriptions and renewal revenues were going down.  CW-2

added that they "provided weekly reports to their manager that showed there was a deterioration of

Clarivate's product quality."  CW-2 explained that their "reports were combined in a consolidated report and forwarded up the chain of command."

58.     Confidential Witness No. 3 ("CW-3") was Key Account Director, Strategic Partnerships at Clarivate and DRG between June 2016 and October 2021.  CW-3 worked with the commercial life sciences access team and identified new prospects and business opportunities and implemented territory-based strategies using Clarivate's products and services.  CW-3 stated that there were signs that the merger with DRG was problematic from the inception of the merger due to concerns from the employees that Clarivate used a subscription-based model and "tried to shoe horn our company [DRG] into their model which did not work."  CW-3 explained that certain deals that were typically closed at year-end were no longer available to meet sales targets because they had been converted to subscription services earlier in the year.  CW-3 explained that executive management had a "gross misunderstanding" of DRG's business model.  CW-3 reported that "a lot of attrition occurred in the sales groups," and that many of the "individuals who left the company were subject matter experts in their respective disciplines and assigned product lines," which had a "negative impact on the company's organic growth" and caused "revenue losses."  CW-3 also reported that, "a lot of the employees who originally worked in the product sections at DRG left shortly after the merger with Clarivate," and "Clarivate did not reinvest in their product lines or create new products," which negatively impacted sales and led to a reduction of sales personnel.  CW-3 stated that Clarivate "did not provide us with the desired products."  CW-3 explained that executive management did not hire sufficient employees and did not backfill positions when employees left the company, which had a "negative impact on the company's future business operations."  CW-3 stated that executive management directed sales people to record potential opportunities to help them meet their quotas and to help with Clarivate's forecasts – CW-3

- 23 -

commented, "garbage in, garbage out." CW-3 stated that because of unattainable target quota goals, Clarivate not reinvesting in their product lines, and Clarivate not creating new products, a lot of attrition occurred in the sales groups. CW-3 advised that as a result of the unattainable target quota goals, sales personnel were required to "back into the number (sales quotas) in order to meet the sales goals assigned." Finally, CW-3 reported that revenues and pipeline were tracked in real time in the Company's CRM software (Salesforce) and in sales manager spreadsheets and CW-3 believed that these reports were frequently generated and presented to executive management.

59.     Confidential Witness No. 4 ("CW-4") was a Commercial Account Manager between June 2020 and January 2021. CW-4 worked with the commercial life science group concentrating on the pharmaceutical and biotech areas where they promoted subscription-based services focused on pharmaceutical and biotech intelligence and identified new clients, subscriptions, and business opportunities. CW-4 stated that Clarivate did not invest in its product lines and did not create new products. CW-4 said that Clarivate "had very little upgrades in its product and technology platforms." According to CW-4, many clients began to question what they were getting from the subscription services provided by Clarivate. CW-4 reported, "a lot of my sales colleagues also left after I did; they jumped ship and had a major impact on sales and financial revenues." CW-4 noted that Clarivate "failed to backfill vacated positions" in the sales force. CW-4 added that Clarivate's executive management fired numerous field sales people and members of the Company's go-to-market teams. CW-4 reported: "Clarivate had a huge problem with pricing," and, "every client had different prices for the same or similar services and products. Believe me, clients talk among themselves." CW-4 stated that from the inception of acquisitions, there were concerns from the employees. CW-4 indicated that growth was based on poorly constructed projections and the utilization of unrealistic white space business growth opportunities reported by the sales people and

- 24 -

embellished by executive management.  CW-4 reported that "executive management counted their chickens before the eggs were hatched and recorded white space business opportunities to help meet quotas, forecasts and projections which misled the investors."  CW-4 described the process of shifting to inside sales in the Chandler, Arizona location, explaining that sales people were directed by executive management to stop going out into the field in order to reduce the submission of expense reports.  Instead, CW-4 explained that "we were now required to smile and dial."  CW-4 noted that many of the employees hired for inside sales were inexperienced and ineffective "rookies."  CW-4 explained that customers were gained through mergers and acquisitions and not organic growth.  CW-4 stated that sales quotas were unrealistic and "client retention was an issue."  CW-4 said that executive management was "hands on" and continuously reviewed and assessed reports and documents to keep track of the internal activities and transactions at the company.  According to CW-4, there was "absolutely no way management would not have an idea that subscriptions and renewals revenues were going down."  CW-4 reported that revenues and pipeline were tracked in real time in Salesforce and that reports from this software were frequently generated and presented to executive management.  CW-4 also reported that they met frequently with their supervisors to go over the reports, and that they understood that similar meetings were held by the executive management team.

60.     Confidential Witness No. 5 ("CW-5") was Senior Director, Global Accounts between December 2020 and February 2022.  CW-5 was responsible for managing consulting teams and worked with commercial organizations to develop solutions and provided IP innovation services to clients.  CW-5 was also responsible for analyzing financial data and customer activity and presenting that information to the Vice President and President, who would then roll up the data to executive management.  CW-5 stated that the "growth rate issued to the public by Clarivate was unrealistic"

and that "what representatives at Clarivate said to the public versus what the current market rates and industry standard percentages dictated was very different."  CW-5 stated that "there was no organic growth at Clarivate; it was all just wishful thinking by executive management."  CW-5 stated, "the sales quotas were unrealistic throughout the sales units and as a result of these unworkable target quota goals, Clarivate lost a lot of sales personnel."  CW-5 added that Clarivate fired numerous employees.  CW-5 stated that executive management told the market what it wanted to hear and not what the marketplace dictated.  CW-5 stated that "the information provided to the Street by executive management was not built on facts."  CW-5 said that the price increases "that executive management projected to the Street" were "not going to come about," and that "Clarivate's rate increases as compared to similar companies and competitors in the industry were unrealistic and much higher than what the market supported."  CW-5 stated that Clarivate "didn't reinvest in their product lines."  CW-5 explained that executive management directed sales people to record potential white space opportunities, and that sales people used this feature of the Company's CRM to help them meet unrealistic sales quotas.  CW-5 stated that executive management was "hands on" and reviewed reports to keep track of the operational activities.   According to CW-5, executive management knew that new subscriptions, renewals, and transactional revenues were going down and Clarivate would not meet its forecasts.  CW-5 reported that revenues and pipeline were tracked in real time in Salesforce and that reports from this software were frequently generated and presented to executive management.  CW-5 noted that part of their role was to consolidate financial data and information on customers' activities in another software program called Tableau, and that reports from this software were presented to their Vice President ("VP") and President who in turn rolled them up to the executive management team.  CW-5 also reported that, "at least once a week, all the information from the company's CRM Salesforce reports are loaded into Tableau," and that

"everyone had visibility into Tableau's dashboards including the executive management team." They said this process was called "roll-ups." Finally, CW-5 also reported that they met frequently with their supervisors to go over the reports, and that they understood that executive management had similar meetings.

## V.     BACKGROUND TO THE FRAUD

### A.     Special Purpose Acquisition Companies

61.     A "blank check" company is a company that has no specific established business plan or purpose but has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity, or person.

62.     One type of "blank check" company is a "special purpose acquisition company," or "SPAC." A SPAC is a publicly traded company created specifically to pool funds through an initial public offering ("IPO") to complete an acquisition or other business combination with an existing company. Generally, SPACs are founded by public companies or private asset managers.

63.     Since 2014, there has been a resurgent interest in SPAC IPOs.[1] In 2020 and 2021, 248 and 613 SPACs were brought to market raising over $83 billion and $160 billion in total funds, respectively.

64.     Because SPACs do not identify a target company at the time they conduct their IPO (and often not for months afterward), it is well-recognized that investors heavily rely on the

---

[1]     *See, e.g.*, Jon Markman, *Shock Bankruptcy Shows the Dark Side of Tech SPACs*, Forbes (July 6, 2022), https://www.forbes.com/sites/jonmarkman/2022/07/06/shock-bankruptcy-shows-the-dark-side-of-tech-spacs/?sh=10a880eb4d39 ("Many immature companies were being rushed to the public market with little more than an idea and a sales pitch.").

4890-2434-9741.v2

reputation, expertise, experience, and specified investment thesis of the SPAC management team in evaluating whether to invest in a particular SPAC.[2]

65.   To create a SPAC, founders – typically a group of private equity investors or a company formed by private equity investors – must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file IPO documentation, and premarket the investment offering to interested investors.  A target company cannot be identified before the SPAC IPO is completed.  Once capital is raised through the IPO, at least 90% of the proceeds must be deposited into a trust account.  An appointed management team (typically the SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.

66.   Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team.  Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination.  SPACs and the target companies routinely include financial projections in

---

[2]   *See, e.g.*, SEC, *What You Need to Know About SPACs – Updated Investor Bulletin* (May 25, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investorbulletin ("If you invest in a SPAC at the IPO stage, you are relying on the management team that formed the SPAC, often referred to as the sponsor(s), as the SPAC looks to acquire or combine with an operating company."); Fangzhou Lu, et al., *SPAC IPOs and Sponsor Network Centrality*, Harvard Law School Forum on Corporate Governance (July 20, 2021), https://corpgov.law.harvard.edu/2021/07/20/spac-ipos-and-sponsor-network-centrality/ (noting that "[s]ince the identity of the merged firm is not known prior to the IPO, and there is little other advance information, investors must place their trust in SPAC sponsors" and finding evidence that higher quality sponsors "are better at sourcing and picking target firms to work with," and "have a positive impact on the firms after the merger").

their proxy statements.[3]  Because target companies are private entities wishing to go public, they generally have not published prior financial information.  Investors in SPACs accordingly must depend on management to honestly provide accurate information about any contemplated transactions in their proxy solicitation materials.

67.    In anticipation of the shareholder vote, each SPAC shareholder has three options: they can: (i) approve the transaction by voting in favor of it; (ii) elect to sell their shares in the open market; or (iii) vote against the transaction and redeem their shares for a pro-rata share of the trust account.  However, "shareholders routinely approve mergers, even bad mergers, since a failed merger vote prevents shareholders from redeeming their shares and keeps their cash tied up as the SPAC seeks a better target under greater time pressure."[4]

68.    If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of SPAC securities.  However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC is automatically dissolved and the money held in trust is returned to investors.  Accordingly, the founders and management team of a SPAC, who typically own approximately 20% or more of the company through initial stockholder shares and who invest significant resources both in the formation of the SPAC and identifying acquisition targets, are highly incentivized to get a transaction approved within the operating deadline.

---

[3]   Michael Klausner et al., *A Sober Look at SPACs*, European Corporate Governance Institute – Finance Working Paper No. 746/2021 (Jan. 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3720919 (noting "aggressive projections could be one of the reasons SPAC shareholders go along with mergers that leave them with losses").

[4]   Andrew F. Tuch & Joel Seligman, *The Further Erosion of Investor Protection: Expanded Exemptions, SPAC Mergers and Direct Listings*, Wash. Univ. in St. Louis Legal Studies, Research Paper No. 22-01-03 (Apr. 1, 2022) ("*The Further Erosion*"), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4020460#.

69.     Indeed, leaders in the finance industry have explained that SPAC management teams have an incentive to spend the money they have raised no matter what so that they can collect fees and pay themselves in salary and stock options at the company they purchase – even if the company does not perform as stated.  As SEC Chairman Gary Gensler recently stated: "'[SPACs] have on average been pretty costly and not performed up to the marketing. . . .  There's an awful lot of fees in here for the sponsors.  There's an awful lot of fees for bankers and lawyers as well.'"[5]

70.     Because of the incentive to support a deal (specifically, the reward of paying themselves a handsome salary and obtaining shares of the SPAC at a steep discount prior to the SPAC IPO), SPAC management teams are concomitantly disincentivized to perform adequate due diligence on the SPAC's potential target company.  Thus, as Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated: "SPACs are the most egregious example in the industry of executive misalignment with investors."[6]

71.     SEC Chairman Gary Gensler recently expressed concern over the disclosure, marketing practices, due diligence, and liability issues surrounding SPACs and said he has asked his staff to prepare associated recommendations.  In a speech given on or about December 9, 2021, Gensler said he wants to address the differences in protections for investors between traditional IPOs and the two-step process for SPACs.  According to one media outlet:

> Gensler also said some SPAC merger announcements are made without full disclosures or proxy statements and with slide decks and celebrity endorsements.

---

[5]     Kiernan, Paul, *SEC Proposes New Disclosure Requirements for SPACs*, Wall St. J. (Mar. 30, 2022), https://www.wsj.com/articles/sec-considers-new-disclosure-rules-for-spacs-11648654298.

[6]     Christopher M. Matthews, *Investors Handed an Oilman a 'Blank Check' Company. Here's How It Turned Out.*, Wall St. J. (Apr. 15, 2019), https://www.wsj.com/articles/investors-handed-an-oilman-a-blank-check-company-heres-how-it-turned-out-11555328147.

4890-2434-9741.v2

"SPAC sponsors may be priming the market without providing robust disclosures to the public to back up their claims.  Investors may be making decisions based on incomplete information or just plain old hype," he said.

\*       \*       \*

"There may be some who attempt to use SPACs as a way to arbitrage liability regimes.  Many gatekeepers carry out functionally the same role as they would in a traditional IPO but may not be performing the due diligence that we've come to expect," he said.[7]

72.     Additionally, the shortened timeframe for SPACs reduces the available time for the target company to be ready for public financial reporting.  The slapdash due diligence as well as lower oversight from regulators and underwriters often results in lower financial reporting quality and internal control weaknesses.[8]  Post-merger SPACs are more likely to restate their financial statements than post-IPO companies.[9]

73.     As set forth herein, Clarivate exemplifies the problems inherent in post-merger SPACs.

**B.     Creation of Clarivate Through a SPAC**

74.     Churchill Capital Corp ("Churchill") was a public investment vehicle formed for the purpose of effecting a merger, acquisition, or similar business combination in the information

---

[7]     McCord Pagan, *SEC's Chair Expresses Concern Over SPAC Deals*, LAW360 (Dec. 9, 2021), https://www.law360.com/articles/1447310/sec-s-chair-expresses-concern-over-spac-deals.

[8]     Andrew F. Tuch & Joel Seligman, *The Further Erosion of Investor Protection: Expanded Exemptions, SPAC Mergers and Direct Listings*, Wash. Univ. in St. Louis Legal Studies Research Paper No. 22-01-03 ("*The Further Erosion*") ("Today, traditional IPOs may be on the wane as firms increasingly turn to mergers with special purpose acquisition companies (SPACs) and direct listings, novel alternatives that provide routes to public markets entirely or partially without an underwriter or due diligence.").

[9]     Jaewoo Kim et al., *Not Ready for Primetime: Financial Reporting Quality After SPAC Mergers*, Lundquist College of Business, Univ. of Or., Forthcoming at Management Science (Apr. 8, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4079131 ("Our estimates suggest SPACs are about 9.4 percent more likely to restate than IPO firms.").

services segment of the broader technology services and software industry – a SPAC. Churchill was led by defendant Stead as its CEO. Churchill raised $690 million of cash proceeds in an initial public offering in September 2018.

75.     According to the Proxy Statement, prior to the consummation of its IPO, neither Churchill, nor anyone on its behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with Churchill. After its IPO, Churchill's officers and directors commenced an active search for prospective businesses or assets to acquire in its initial business combination. During this search process, Churchill reviewed several business combination opportunities and evaluated five potential transactions.

76.     In January 2019, Churchill announced that it would combine with Clarivate. On May 13, 2019, Churchill's shareholders voted to approve the merger. According to the Proxy Statement, the board of directors did not obtain a third-party valuation and investors would be relying solely on the judgment of Churchill Capital Corp's board of directors and advisors. On May 14, 2019, Clarivate became a publicly traded company on the NYSE after the completion of the merger with Churchill.

**C.     Background Information About Clarivate**

**1.     History of Clarivate**

77.     Clarivate is an information services and data analytics company that serves the scientific research, intellectual property, and life sciences industries. Clarivate sells its products to customers such as universities, government agencies, pharmaceutical corporations, and law firms. For example, one of Clarivate's flagship product suites is called Cortellis. Cortellis is a set of proprietary databases that provides users with information about drug programs, clinical trial

- 32 -

records, and relevant regulations.  Companies in the life sciences industry, such as pharmaceutical companies, use Cortellis to inform the research, development, and regulatory strategy for new drugs. Other Clarivate products similarly provide end users with information and analytical tools in the science and intellectual property spaces.

78.     Clarivate's predecessor companies date back to the 1950s – Derwent World Patent Index was a British patent database founded in 1951, and Institute for Scientific Information was a database of scientific research founded in 1957.  Thomson Reuters acquired these companies in 1984 and 1992, respectively.

79.     In 2015, Thomson Reuters decided to divest these companies and related divisions providing intellectual property and science services.  Thomson Reuters sold the divisions to a pair of private equity firms, Onex and Baring, who formed Clarivate in 2016 out of the former Thomson Reuters divisions.  From 2016 to 2019, under Onex and Baring's ownership, Clarivate built a new senior executive management team, completed a number of acquisitions, and worked on fully transitioning the business away from reliance on Thomson Reuters.

## 2.      Clarivate's Segments and Revenue Streams

80.     During the Class Period, Clarivate's business was divided into two main segments or "Groups," loosely based on the original two businesses dating back to the 1950s: the Intellectual Property Group and the Science Group.  All of Clarivate's various products fall under these Groups. Each Group was led by a President, a high-level executive who was considered part of Clarivate's executive management team and who would often speak directly to investors on conference calls.

81.     Clarivate's revenues also break out into two categories: subscription and transactional.  Subscription revenues (and what Clarivate calls "re-occurring transactional" revenues – contracts with evergreen (*i.e.*, automatic extension) clauses or those requiring advance notice of

- 33 -

termination, mostly associated with CPA Global, a company Clarivate acquired in October 2020) were the largest piece.  Subscription revenues made up roughly 80% of Clarivate's total revenue, and were a key part of Clarivate's value proposition for investors, as the subscription model was supposed to generate free cash flow that could be directed towards growth.  The dependability of Clarivate's subscription revenues hinged on customer renewal rates, a closely tracked and highly material metric for investors.  Transactional revenues are earned at a given point in time from the discrete sale of, for example, a data set, professional service, or other specific product.

### 3.    Acquisitions

82.    Once Clarivate was a public company, it made a number of acquisitions.  These can be divided into two categories: small, "add-on" or "tuck-in" acquisitions, and "significant" acquisitions of larger companies.  Between when its shares started trading on the public markets in May 2019 and the end of 2021, Clarivate completed the following acquisitions:

- December 2, 2019: Darts-ip, a "tuck-in" acquisition in the IP Group;

- February 28, 2020: DRG, a significant acquisition in the Science Group;

- October 1, 2020: CPA Global, a significant acquisition in the IP Group;

- October 26, 2020: Beijing IncoPat, a "tuck-in" acquisition in the IP Group;

- November 30, 2020: Hanlim, a "tuck-in" acquisition in the IP Group;

- August 4, 2021: Bioinfogate, a "tuck-in" acquisition in the Science Group;

- December 1, 2021: ProQuest, a significant acquisition in the Science Group; and

- December 22, 2021: Patient Connect, a "tuck-in" acquisition in the Science Group.

## VI.    DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS

83.    Leading up to and throughout the Class Period, Defendants engaged in a fraudulent scheme through various means and methods that operated as a deception on the investing public concerning the growth and revenue prospects of the Company.

### A.    Churchill Capital Corporation

84.    Churchill was the first of what would be a series of SPACs founded by Michael Klein, a well-known investment banker and banking executive.[10] Churchill completed an IPO on the NYSE on September 11, 2018, raising a total of $690 million.  Klein was able to purchase 17,250,000 shares of the newly public company for $25,000; equivalent shares bought by retail investors in the IPO would cost $172.5 million, or *$172.475 million more* than Klein paid for them.[11]

85.    Like all SPACs, Churchill completed its IPO as nothing more than an executive management team and investment vehicle in search of a company to run.  Churchill's executive management team – and co-founders – were defendants Stead and von Blucher, who had worked

---

[10]   The Office of Senator Elizabeth Warren profiled Klein in a report titled: "The SPAC Hack: How SPACs Tilt the Playing Field and Enrich Wall Street Insiders," dated May 2022 (available at https://www.warren.senate.gov/imo/media/doc/SPACS.pdf).   In a section titled: "Rampant Self-Dealing by SPAC Creators and Sponsors Hurts Retail Investors and The Market," Senator Warren's office wrote: "Many serial SPAC sponsors use the blank-shell companies as ways to pad their own company's revenue.  In one instance, Michael Klein, the CEO of SPAC sponsor The Churchill Company, funneled more than $50 million from Churchill SPACs into consulting and advisory fees for his company, The Klein Group [$12 million of those fees came from the Churchill SPAC at issue in this case].   In addition, Klein appointed his own family members and employees as board members of companies his SPACs were taking public.  MultiPlan, which merged with Klein's Churchill Capital III, included on its board Klein and three other members of the SPAC's leadership, as well as members of Klein's family.  In a class action suit against MultiPlan, investors alleged that the board of directors of Churchill Capital III and MultiPlan failed to conduct a rigorous review of the company, in part because Klein and his associates, including family members, were already guaranteed a profit through fees given to Churchill Capital and The Klein Group."  *Id.* at 16-17.

[11]   *Id.* at 8-9.

together for many years running a company called IHS (later, IHS Markit).  Stead was IHS's and IHS Markit's Chairman and Chief Executive Officer from 2000 through 2017.  Von Blucher was initially Senior Vice President of Planning and Corporate Development and later Advisor to the Chairman & CEO (*i.e.*, to Stead).

86.    Churchill was formed specifically for the purpose of effecting a merger with a company in the information services segment of the broader technology services and software industry.  Churchill's eventual merger with Clarivate is hailed on the website for Churchill Capital V (Klein's fifth consecutive "Churchill" branded SPAC) as "The Churchill Success Story."[12]  While Churchill may have been a success for investors in its own IPO, newly-public Clarivate was ill-equipped to be a public company.

87.    Churchill and Clarivate announced their reverse merger on January 14, 2019, only one quarter after Churchill's IPO.  In other words, Churchill spent just four months locating a potential target company, performing due diligence to make sure the target – a large, complex company with nearly $1 billion in annual revenues – was suitable, and negotiating a merger agreement before announcing its intention to take Clarivate public through a reverse merger.  Additionally, Clarivate still had not completed its carve out from Thomson Reuters when the reverse merger with Churchill was announced – meaning that it had never had a single quarter of standalone operations.

88.    The reverse merger provided a perfect opportunity for Churchill as well as both of Clarivate's private equity owners, Onex and Baring.  For Churchill, Clarivate was a willing target in the right industry at the right time – as Churchill V's "Success Story" web page notes: "Investors in Churchill Capital Corp's initial public offering who held the stock and warrants through May 13,

---

[12]    https://vi.churchillcapitalcorp.com/success/.

2019, the closing date of the initial business combination, saw a total return of approximately 51% and a 1.5x multiple on their invested capital over the 8 month hold period." For Onex and Baring, the reverse merger offered a perfect exit. Churchill bought Clarivate at a valuation of $4.2 billion – Onex and Baring had bought the company from Thomson Reuters for approximately $3.5 billion – and Onex and Baring were enabled to sell hundreds of millions of dollars' worth of shares in a series of offerings over the next several years, reducing their ownership from more than 70% initially to less than 10% by the end of 2021. As Stead plainly put it: "This was so interesting because it was a totally cooperative due diligence if you think about it because we both had so much to gain."

### B.   Promises of Growth from the "Jerre Stead Playbook"

89.     "Organic" growth refers to growth a company achieves through methods other than mergers and acquisitions, *i.e.*, by increasing revenues generated by legacy business. Organic growth is a desirable trait in a company from an investor's perspective because growth from mergers and acquisitions is not sustainable over the long term, but a company can theoretically continue to grow organically more or less in perpetuity. Clarivate ostensibly segregated growth from acquisitions for one full year; thus, an acquired company's revenues would not "anniversary" into Clarivate's general revenues until one full year after the acquisition was completed.

90.     From the initial announcement of the reverse merger that would take Clarivate public, the Company was billed to investors as a growth machine, with particular emphasis placed on organic growth. Stead announced on the January 15, 2019 conference call about the merger: "I'd like you to think about Clarivate as a fantastic platform for us to grow from," and, "[c]onsistent sales growth, one of the things I'm most excited about is the work that Jay [Nadler, then-CEO of Clarivate] and his team have done to prepare us for ever increasing revenue sales growth." The presentations shown to investors at the announcement of the merger and on the roadshow touted

Clarivate as a "[n]ewly focused company ramping up its topline growth – expecting 4% to 6% annual organic growth by 2020E exit," with a "Foundation Set for Attractive Growth: Organic Topline and Acquisitions."  At this point, Clarivate still had not yet fully separated from Thomson Reuters to become a full standalone company.

91.     Furthermore, Stead himself was an important selling point.   The investor presentations for the announcement of the reverse merger and the roadshow contain slides touting, "Jerre Stead's Track Record," "Clarivate Delivers on the Jerre Stead Playbook," and "Strong Operating Performance Drove Significant Value Creation at IHS."  The presentations told investors, "Jerre Stead has delivered significant shareholder value through strong operational performance, ***organic growth and margin expansion, resulting in strong cash flow generation to fuel business growth***."  Elsewhere, the presentations again noted the "4.0% - 6.0% Organic Revenue Growth" for "Expected 2020E Exit Rate," and compared this to "IHS Markit: 6.0% - 7.0%."

92.     This organic growth projection – of 4%-6% organic growth exiting 2020 – was meant to attract investors, whom Defendants enticed with promises of running the "Jerre Stead Playbook" for growth.  Defendants had no realistic basis for this level of growth.  However, as intended, Stead's promotion and the promises of running his "Playbook" of revenue growth at Clarivate did attract investors.  For example, in a report dated December 11, 2019, RBC Capital Markets initiated coverage on Clarivate with an "Outperform" rating, commenting: "Hitch a ride to Jerre's Wagon; initiate Outperform," and:

> We rate Clarivate Analytics Outperform.   We like the potential for the company to show improving revenue, EBITDA, and cash flow growth now that it is unshackled from its prior parent and under new management, which includes well-respected industry veteran Jerre Stead.
>
> Over time, we see solid/improving mid-single-digit (or better) organic revenue growth.

- 38 -

Similarly, in a report dated May 15, 2019, William Blair initiated coverage on Clarivate with an "Outperform" rating, commenting: "Improving Growth Story with Proven Management and Strong Business Model; Initiating Coverage with Outperform Rating," and "Clarivate's growth was modest in the past, but management's goal is 4%-6% organic growth by the end of 2020."

93.     Clarivate completed its separation from Thomson Reuters in the first quarter of 2019, after the merger with Churchill had already been announced and due diligence completed.  The separation was "a major undertaking involving many people in the Company for 2.5 years to create standalone functions such as accounting, tax, and a technology support capability," according to Jay Nadler at Clarivate's first conference call as a public company, on May 15, 2019.  He continued: "We migrated nearly every product to the cloud and modernized the search technology in many of the products simultaneously.  And we implemented all new cloud-based business systems."  Nadler also noted: "We spent the past two years carving the Company from its former parent, which consumed a lot of management bandwidth and hundreds of millions of dollars of one-time costs."  In other words, Churchill's growth projections for the newly-public Clarivate were based on a few months of due diligence on a large (nearly $1 billion in annual revenues) and rapidly changing company that had never had a single quarter of standalone operations.

94.     Two important events happened in May 2019.  First, on May 13, Churchill's merger with Clarivate closed, taking the fledgling company public.  Second, on May 20, the newly-public Clarivate issued a press release informing investors that Stead would "expand his role at the company and become Chief Executive Officer (CEO) effective June 30."

95.     Stead's expanded role doubled down on the Company's promise of growth based on the "Jerre Stead Playbook."  The press release noted that: "As CEO, Jerre will focus on accelerating growth and profitability for Clarivate."  It quoted Stead as saying:

> Clarivate has enormous potential for high levels of sustainable, profitable growth . . . .  I am excited to join this talented executive team as we continue to identify and act upon the multitude of new opportunities for growth and profitability . . . . [T]hrough the due diligence process and merger with Clarivate, I have learned a lot about the current state of the business and the even greater opportunities that exist for growth. . . .  We remain focused on driving profitable growth.

96.     Stead laid out how he planned to achieve the promised revenue growth in a conference call on November 13, 2019.  He described a five part plan: (1) pricing increases for Clarivate subscription products; (2) a shift to inside sales; (3) cross-selling; (4) establishing global account teams; and (5) growth in the Asia-Pacific region.  As he explained at another conference call on December 12, 2019, his goal with Clarivate from the start was to move fast: "If you go back and read then what I said when we did the SPAC.  I said I wanted to find something that I could do twice as fast and as good or better from a shareholder return as we did at IHS."

97.     Unfortunately for investors, the accelerated implementation of drastic changes at Clarivate created chaos and stagnating sales – the opposite of the promises made by Defendants during the Class Period.  Furthermore, the combination of Defendants' big promises – and big investments – with Clarivate's under-the-hood chaos created the perfect motive and opportunity for Defendants' scheme to conceal the lack of promised growth for as long as possible.

**C.     Clarivate Attempts to Implement the "Jerre Stead Playbook"**

98.     From inception, Clarivate told the market that it would achieve growth of 4%-6% at the end of 2020.  Nadler explained on Clarivate's first earnings call as a public company (while he was still CEO), in May 2019:

> There are a number of drivers to accelerate revenue growth, including increasing subscription retention rates, improving pricing, expansion with existing customers, acquiring new customers, increasing penetration in high-growth markets such as Asia-Pacific, expansion into adjacent markets, launching new products.  ***All these initiatives are expected to drive higher organic revenue growth into the 4% to 6% range exiting 2020***.

- 40 -

This was meant to, and did, entice investors to purchase shares of Clarivate stock.

99.    Clarivate spent the rest of 2019 organizing under its new leadership and rehauling its operations, but it reiterated 4%-6% organic growth exiting 2020 on *every single conference call that year*. As CFO Hanks explained at the company's first Investor Day, on November 12, 2019:

> What we're doing now is we're now transitioning from that internal sort of mechanistic approach to really focusing on the outside world, the outside markets, providing great, great product experiences for our clients and driving growth. . . . [Y]ou're starting to see that underlying book of business growing at over 4%, and that's important to us because *we gave a public commitment that we would grow this business exiting 2020 in the 4% to 6% growth range*.

He reiterated: "So, carve-outs behind us, reverse mergers behind us.  We're now in the public markets, we're now transitioning very quickly into that external focus and driving growth."

100.    At the 2019 Investor Day, Hanks also explained how Clarivate was implementing the Jerre Stead Playbook, adding more detail to some elements of the five-part plan described above: "Pricing. . . .  We're looking for 100 basis points improvement on pricing in 2020."  In other words, Clarivate said it would increase revenue by charging its customers more for its products.  In fact, Clarivate was already using price increases to drive revenue in 2019.  Hanks disclosed on the November 5, 2019 Q3 2019 earnings call, "adjusted subscription revenues increased by 3.7% at constant currency for the 9-month period ended September 30, 2019 . . . .  The increase in subscription revenues was driven in part by price increases."

101.    "In terms of the front office," Hanks continued at the 2019 Investor Day:

> [W]e mentioned earlier the 3 centers of excellence for inside sales.  We have a sort of very nominal inside sales capability today.  We have this very long tail of customers that is uniquely positioned to be supported by an inside sales organization.  We'll have more touch points with customers, we'll have better pricing, we'll get better retention rates, simply by touching those customers through an inside sales model more frequently.

\*        \*        \*

- 41 -

*This is all focused on getting us to that commitment of 4% to 6% revenue growth, sustained revenue growth exiting 2020*.

102.     Jeffrey Roy, President of the IP Group, on the same call, explained other elements of the drastic changes Clarivate's leadership was making: "in some cases, we have one product suite that is much more deeply penetrated within a particular client than another product suite, and there's an opportunity for us to upsell, cross-sell to strengthen that offering."  Roy also noted: "[T]here's opportunities for us to deepen account penetration by just simply merging contracts – our sales guys hate when I say that, but that's one of the things we're going to do," and:

> [A]s we start to break down the silos, which we've already done, but start to package our products together, we're going to have a much more opportunity – much greater opportunity to sell bigger deals into customers in a blended sort of solution for our customers that our competitors can't touch.

He summarized:

> [W]e have a huge opportunity to capitalize on our existing relationships.  That is both in terms of cross-selling where we have one product with a stronger footprint in an account, but very importantly, what we're calling smart contracting, which is really starting to merge some of those contracts.  Those are the kind of things we can do right out of the gate.  We're already starting to look at this at the end of the year here.

### D.     Self-Inflicted Chaos at Clarivate

103.     All of these changes brought adverse consequences for Clarivate in the critical years to come, including alienating the Company's existing customers and precipitating a mass exodus of the Company's subject matter experts and sales force, which in turn further hampered Clarivate's ability to grow revenues.

104.     The drastic changes that Defendants began making to Clarivate as soon as they acquired it left the Company disorganized and drove away key sales people, subject matter experts, and the analysts needed to provide strategic insights to Clarivate's customers.  Defendants failed to backfill these important positions, leading to significant "brain drain" at the Company.  Defendants also terminated a significant number of employees following acquisitions in an effort to achieve

- 42 -

promised cost-cutting measures.  This meant that Clarivate lacked the resources to drive revenues to create the promised level of growth.

105.    Confidential witnesses universally reported that the changes Defendants wrought at Clarivate drove away employees and that this hurt the Company's ability to generate revenue growth.  CW-3 reported that, "a lot of attrition occurred in the sales groups," and that many of the "individuals who left the company were subject matter experts in their respective disciplines and assigned product lines," which had a "negative impact on the company's organic growth" and caused "revenue losses."  CW-4 reported, "a lot of my sales colleagues also left after I did; they jumped ship and had a major impact on sales and financial revenues."  CW-1 noted that sales people "started leaving in multitudes."  CW-5 stated, "the sales quotas were unrealistic throughout the sales units and as a result of these unworkable target quota goals, Clarivate lost a lot of sales personnel."  CW-2 confirmed that they and many other data analytics professionals left the Company and that this contributed to a "brain drain."

106.    Additionally, Defendants did not adequately invest in new products that could drive organic revenue growth.  The failure to invest in Clarivate's products resulted in losing customers (and revenues from those customers) and made things more difficult for the sales staff, contributing to their exodus.  This point was also echoed by every confidential witness.  CW-1 reported that Clarivate's executive management "did not provide the sales teams with the desired products, assigned unworkable target quota goals, didn't reinvest in their product lines, and neglected to create new products, which led to sales people leaving."  CW-5 echoed this sentiment: Clarivate "didn't reinvest in [its] product lines" CW-3 reported that, "a lot of the employees who originally worked in the product sections at DRG left shortly after the merger with Clarivate," and "Clarivate did not reinvest in their product lines or create new products," which negatively impacted sales and led to a

- 43 -

reduction of sales personnel.  CW-4 reported that Clarivate did not reinvest in their product lines and did not create new products, stating that Clarivate "had very little upgrades in its product and technology platforms."  CW-2, whose job at Clarivate included working with clients and engineers to execute new product features and monitoring the quality of the Company's current product offerings, reported that "there was a deterioration of Clarivate's product quality" and Clarivate's executive management "neglected to create new products, which led to loss of clients."

107.    At the same time Defendants were diminishing customer service and failing to invest in new products or product improvements, they also immediately began arbitrarily increasing prices for Clarivate's customers to prop up the Company's lagging growth.  These price increases were not sustainable – they angered Clarivate's customers, many of whom left the Company, further hindering the Company's efforts to drive organic growth.  CW-4 reported: "Clarivate had a huge problem with pricing," and, "every client had different prices for the same or similar services and products.  Believe me, clients talk among themselves."  CW-1 noted: "Clarivate had a huge problem with price rates and billing matters," which caused the Company to "lose major clients and experience a decrease in new subscribers."  CW-5 reported that the price increases "that executive management projected to the Street" were "not going to come about," and that "Clarivate's rate increases as compared to similar companies and competitors in the industry were unrealistic and much higher than what the market supported."

108.    Throughout 2020 and 2021, as the promised organic growth failed to materialize, Defendants used various tactics to string investors along, including acquiring large companies like DRG and CPA Global and passing off the growth from these acquisitions as organic, encouraging sales employees to make up and record "white space" potential business opportunities in the company's CRM software, Salesforce, as "committed" sales that investors could count on to

contribute to organic growth, and pointing to the Company's historical seasonality to tell investors that the promised growth would occur in the fourth quarter. As CW-1 explained, executive management would identify business as "committed" or in "commit status" before Clarivate had a signed contract with the customer, resulting in an inaccurate picture of sales and revenues.

109. Clarivate missed its growth targets for exiting 2020, causing the stock price to decline precipitously. Defendants blamed the miss on an unexplained "deferred revenue adjustment" and carried on the scheme, issuing even more aggressive organic growth projections of 6%-8% organic growth exiting 2021 and 5.5%-6.5% organic growth for the full year of 2021. Like Defendants' growth figures for exiting 2020, these figures were meant to attract investors, who Defendants had enticed with promises of running the "Jerre Stead Playbook" for growth, and to maintain the Company's fraudulently inflated stock price. Defendants knew they would not achieve this level of growth exiting 2021.

110. As a result of the effects of the scheme, Clarivate missed its growth targets exiting 2021, despite reaffirming those targets as late as ***December 7, 2021***, when Defendants assured investors that "[i]t all happens in Q4." After Clarivate missed its organic growth projections two years in a row, the market realized that Defendants' promises of organic growth were nothing more than a scheme to attract and retain investors in the young company. The unraveling of the scheme caused Clarivate's stock price to drop precipitously and investors to suffer significant monetary damages, but not before many of the Company's insiders had sold their own stock for massive profits.

4890-2434-9741.v2

### E.      Defendants' Cost-Cutting Hampers Revenue Growth

111.      In addition to driving revenue growth, Defendants also promised to increase the Company's profits.  For example, on Clarivate's very first earnings call as a public company, Stead announced: "We have many levers to improve organic growth *and profitability*."

112.      There are, of course, two ways to increase profits: (1) increase revenue; and (2) decrease costs.  In addition to their promises of increased revenue described above, Defendants promised both.  For example, on the Company's Q4 2019 earnings call on February 27, 2020, Stead stated: "We took a series of steps to improve our margins and cash flow through organizational efficiency initiatives, actions which will deliver $70 million to $75 million of annual run rate cost savings exiting 2020."  Hanks echoed: "As Jerre mentioned, we are focused on improving margins and expect to see them to continue to improve in 2020 as we deliver on our revenue targets and realize the benefits of our cost-saving initiatives."   At the Company's 2020 Investor Day on November 10, 2020, Hanks stated:

> We reviewed our cost base at the very beginning of March in anticipation of potential headwinds in our transactional revenue stream.  That was the area of the business which we felt could be impacted by the COVID pandemic.  We responded by examining our cost base, in particular, discretionary costs, and we made budget adjustments as a consequence.  That was so important to ensure that we continue to deliver to our investors the commitments we gave in respect of adjusted EBITDA, adjusted EPS and adjusted free cash flow for this year.

113.      Defendants also touted the savings they could achieve in connection with acquisitions, which they referred to as "cost synergies" or "expense synergies."  For example, at the January 17, 2020 conference call announcing the acquisition of DRG, Hanks stated: "[W]e identified $30 million of synergies.  That will be a combination of head count, facilities, some modest technology savings and then areas such as audit fees, insurance, the customary procurement areas that you'd expect."  At the July 29, 2020 conference call announcing the acquisition of CPA Global,

- 46 -

Stead stated: "We expect to achieve significant cost synergies of approximately $75 million within 18 months of close.  Additionally, we currently expect to benefit from $900 million of present value tax assets, which will drive about – around $90 million in annual cash tax savings from the transaction structure."

114.    Defendants continued to slash costs throughout the Class Period in an effort to show investors they were performing well in key profitability metrics, such as earnings before interest, taxes, depreciation, and amortization ("EBITDA").  In fact, the shift to move both legacy Clarivate customers and acquired customers to inside sales was essentially a cost-cutting measure that Defendants spun as a driver of revenue growth.  Defendants also cut costs by simply firing or laying people off, failing to backfill vacated positions, and failing to adequately invest in product quality and new products.  For example, CW-4 specifically noted that Clarivate "failed to backfill vacated positions" in the sales force, and CW-1 and CW-5 stated that Clarivate did not reinvest in its product lines, leading to a loss of sales people.  CW-2 specifically reported that Clarivate's executive management "wanted to cut costs," that "an emphasis was placed on reducing costs," and that "Clarivate increased profits through cost cutting measures."  CW-2 added that the cost cutting measures included failing to backfill vacant positions in key go-to-market teams and not providing teams with funding needed to maintain and improve product quality, noting, "when presented with an opportunity to invest in the products, Clarivate's executive management chose to cut costs." They added that "because of these cost savings approaches, Clarivate lost numerous customers."

115.    Because they closely tracked the Company's sales figures, Defendants knew in real time that their under-resourcing of the sales and go-to-market teams had hamstrung the Company's ability to drive revenue – yet they continued to assure investors that organic revenue growth was just around the corner.

116.    When Clarivate missed its year-end organic growth projection for the second year in a row in 2021, in the presentation for the Q4 2021 earnings call, Defendants said the miss was caused by the "Omicron variant creat[ing] continued uncertainty and staffing gaps in go-to-market and fulfillment teams," and the "[t]ight labor market dr[iving] higher vacancies late in the year and le[ading] to missed opportunities."  Indeed, the miss was caused by staffing issues at Clarivate, but these staffing issues were primarily caused by the cost-cutting measures and other changes Defendants had brought about.  Moreover, Defendants knew well before the miss in Q4 2021 that there had been an exodus among the sales force and subject matter experts at the Company and had been refusing to backfill these positions for years – all of which had a real-time impact on Clarivate's revenues.

### F.    Defendants' Artifices

117.    Defendants employed a number of artifices throughout 2020 and 2021 to conceal the lack of growth from investors, while Company insiders sold millions of dollars of their personally-held stock – with the majority of the sales not made pursuant to 10b5-1 plans – at key times throughout the Class Period.  Significantly, Defendants used certain devices – such as product bundling, cross-selling, and changes in Clarivate's sales structure – to pass off growth from acquisitions as organic growth.  Defendants also encouraged their sales force to record unrealistic "white space" opportunities in the company's CRM software as customer "commitments," and then relied on these inaccurate figures to reassure investors that the Company would meet its aggressive growth projections.

118.    The first three quarters of 2020 went by with below-expectations growth, and Defendants relied heavily on Clarivate's purported historical seasonality to string investors along, stating that the promised growth would come in the fourth quarter.

119.    Instead, organic revenue grew only 1% in Q4 2020 and 1.2% for the full year – well below the 4%-6% exit rate that Defendants were still promising as late as November 2020. Defendants blamed the miss on an unexplained "deferred revenue adjustment" to buy time, putting even more pressure on the Company to deliver on its organic growth promises in 2021.  As one analyst put it at the Company's Q4 2020 earnings call on February 25, 2021, "this year [*i.e.*, 2021] is really where the rubber is supposed to meet the road in terms of getting the organic growth to accelerate."

120.    Defendants continued to lead on investors, promising 6-8% organic growth exiting 2021 and 5.5%-6.5% organic growth for the full year of 2021.  Clarivate reported 6% organic growth in the first half of 2021 (7% in Q1 and 5% in Q2), and Defendants continued to assure investors that the second half of the year, and Q4 in particular, would be even better.  As the Company's stock was up on the purportedly good news about growth, Company insiders started selling out.  Science Group President Ahmed sold *over 90%* of his holdings in March of 2021, for proceeds of well over $4 million.  CFO Hanks sold *65%* of his holdings on a single day in June 2021, for proceeds of $3.2 million.  And IP Group President Roy sold *78%* of his holdings in the first half of 2021, for proceeds of well over $4 million – shortly before his sudden and suspicious resignation from the Company in July 2021.  Finally, Director von Blucher, one of the leaders of the Churchill SPAC and an advisor to Stead, sold 14% of her holdings as part of the June 2021 Ordinary Shares Offering while the stock price was high in June 2021 for proceeds of *$13 million*.

121.    Clarivate achieved only 3% growth in the third quarter of 2020.  Nevertheless, as late as November 9, 2021 – nearly halfway through the fourth quarter – at the Company's 2021 Investor Day, Stead remarked: "[O]ne thing I'm tremendously proud of is that we expect to close the year at 6% to 6.5% organic revenue growth for the year and very excited to do that."  Company insiders

- 49 -

took advantage of these late false statements and sold more of their personal holdings just before the bottom fell out: Ahmed sold another 14,500 shares in December 2021, and new IP Group President Samson sold 20% of his holdings in November 2021 and January 2022 – almost immediately after his promotion – for proceeds of ***over $5 million***.

122.     As the year wore on, more suspicious executive departures signaled that all was not well.  Clarivate announced Hanks' abrupt and unexplained departure in December 2021, and Ahmed's sudden exit was announced in January 2022.  This turnover concerned investors; as one analyst explained on January 24, 2022:

> Mukhtar Ahmed will be stepping down from his role as President of the Science group and leaving the company in October 2022.  Given the length of time he plans on staying with the company and assistance he is offering with the integration of the ProQuest deal, we think the split is amicable and not indicative of underperformance in the Science group which we think some investors were reading in to.  We also point out that investors did not see this coming as the company did not telegraph any such moves.  Given that CLVT is now an organic growth show me story any unexpected changes have been viewed negatively by the market.

Another analyst retrospectively noted in a February 3, 2022 report: "Over the past few weeks, several investors we spoke with voiced concerns with management turnover over the past year (in addition to Ahmed's departure, the company replaced the head of IP in July 2021 and its CFO in December 2021)."  Defendants, however, continued to assure the market that the Company was on track to meet its organic growth targets exiting 2021.

123.     But Clarivate achieved only 4% organic growth in Q4 2021 and a disappointing full year growth rate of 4.5%, attributed to missed transactional sales in the Science Group.  This second miss caused Clarivate's stock price to drop significantly as the market finally lost confidence in Clarivate's business and value proposition as a growth company.  For example, in a report dated February 3, 2022, Barclays downgraded Clarivate's rating to "Equal weight" and commented:

While we have been clear that the CLVT story was mostly about M&A and building scale, ***we have been disappointed by the spotty organic execution*** – critical for Info Services stocks and their valuations.  In particular, ***missing two back-to-back 4Q expectations (CLVT's largest quarter) has lowered our confidence further***.

### 1. Claiming "Cross-Selling" and "Revenue Synergies" as Organic Growth

124.    Clarivate artificially boosted its organic growth numbers by passing off growth from acquisitions as organic growth.  As multiple confidential witnesses report, it was obvious to everyone inside the Company that "there was no organic growth," and that any new customers Clarivate gained came from acquisitions.  Clarivate purported to keep growth from acquisitions separate from organic growth, but certain practices – particularly "cross-selling" or "revenue synergies," merging contracts, and creating bundled products out of combined legacy and acquired products – rendered this impossible, allowing revenue that should have been attributed to acquired companies to be categorized as organic.

125.    One of Clarivate's most significant acquisitions came in February 2020, when it acquired DRG.  Defendants touted the synergies expected from the DRG transaction on the January 17, 2020 conference call during which the acquisition was announced.  Hanks noted that "we have a terrific platform that can drive not just consulting services but their other products, including analytics, through our channels in EMEA and Asia Pacific," and that the transaction "enables us to pull through the sale of other products and services within the portfolio, not just DRG's, but I think very importantly, Clarivate."  In prepared remarks, Stead noted: "[B]y leveraging the expertise, content and technologies of both companies, our science group will pursue significant growth opportunities through new product development and gaining deeper market penetration in our expanded customer base," and later added that:

> [W]e know based on everything they accomplished in 2019 what we can expect in 2020, 2021, '22 as we get our arms around it.  And it will also pull through – and

- 51 -

we've not said anything about that, just what Richard commented a minute ago, it will pull through an organic growth increase of significance with our Life Science business in Clarivate.

126.   Another significant acquisition – CPA Global – was announced in July 2020 and ultimately consummated in October 2020.  Defendants similarly touted the purported greater-than-the-sum-of-the-parts aspect of this acquisition on the conference call at which the acquisition was announced.  Roy, President of the IP Group, noted:

> [T]he customers are – the overlap is complementary as opposed to something that's going to prevent growth, so we see a little bit of overlap in certain segments.  But by and large, we see a tremendous opportunity to cross-sell, to put broader solutions together for our customers.  So we see some real good growth opportunities.

Stead noted: "[A]s we bundle our total offerings together, as a I said, this one potentially has the best I've seen for the ability to move relatively quickly with the cross-selling."  Roy, again, noted: "I think the combination of products creates a great opportunity for bundling and packaging . . . .  So again, complimentary fit, great bundling opportunities, nice customer base with very limited overlap except in some strategic areas."

127.   Defendants touted these features of the DRG and CPA Global transactions publicly because, of course, there is nothing inherently wrong with combining acquired products with legacy products.  But multiple confidential witness stated that Clarivate did not reinvest in new product development to create growth organically, and that instead, Clarivate's customers were gained through acquisitions.  Defendants used these acquisitions to create the appearance of organic growth: as they combined DRG and CPA Global products with legacy Clarivate products, Defendants misleadingly accounted for revenues from these efforts, using them to pad the Company's organic growth rate instead of segregating the revenue for a full year.  For example, CW-1 explained that moving clients to inside sales (*i.e.*, sales made remotely, including over the phone) and bundling acquired companies' products with legacy Clarivate products left Clarivate unable to accurately

- 52 -

segregate organic revenues from acquisition-driven revenues. CW-2, who came to Clarivate from DRG, confirmed that their DRG consulting services team was lumped in with Clarivate legacy sales people and product teams before DRG anniversaried into Clarivate's organic growth.

128.    Similarly, Defendants actually bragged that acquired companies were instantly integrated into Clarivate's operations, omitting that this blending resulted in inaccurate reporting of revenues from legacy Clarivate and the acquired companies. For example, on the Q2 2020 earnings conference call, Stead noted: "Integration of DRG is well advanced. We are delivering on cost synergies and have initiated revenue synergy opportunities." Ahmed, head of the Science Group to which DRG was added, noted: "Yes, the integration went very smoothly. . . . We've realized not only our cost synergies, but also our revenue synergies. A fair amount of cross-selling has also occurred, and we've reaped benefit from the initiatives associated with that."

129.    Defendants added additional detail at the 2020 Investor Day on November 10, 2020. Michael Morhardt, Executive Vice President of Commercial Performance and Operation, noted:

> Earlier this year, we launched a team selling program to promote coordination and collaboration to accelerate our cross-sell efforts. . . . This program was launched in February and leveraged existing products as well as some of our new acquisitions. For example, shortly after we finalized the CPA transaction, the sales teams were trained and incented to promote CPA and Clarivate products into their respective accounts. We had a similar program at DRG. Since launch, we have generated over $20 million of incremental new pipeline and closed 3x this amount cross-sales that we did in 2019.

> These cross-sell programs, combined with the work that we're doing in the Global Business Centers, are designed to accelerate our organic growth.

Roy added:

> [W]e started really this summer before the deal closed with CPA, thinking about how we can package the solutions together to help our customers solve problems more easily. And one of the things I want to emphasize here on why we have such a high degree of confidence is that the product mix is really more focused on data going forward into 2021 than it was in past years. And that's really going to enable us to put solutions together using and sharing the data from the Web of Science Group

- 53 -

[one of Clarivate's Science Group products], along with our patent intelligence and some of our other data sets to build complete solutions for our customers.

130. Indeed, at the Investor Day, an analyst directly asked, "how much of the medium-term growth outlook for high single-digit organic growth are you anticipating to come from revenue synergies from DRG and CPA?" Hanks responded: "[S]o we obviously didn't include in our valuation, the opportunity for cross-sell from DRG and CPA," meaning that the realization of any revenue synergies would be in addition to the organic growth that Defendants already promised for 2020 and 2021. Roy noted: "We've spent a considerable amount of effort already, creating packages from the customer backwards on things that are going to help our customers be successful." Ahmed added: "With our DRG portfolio, we've been very successful in terms of incorporating the products into our various offerings, various bundles. We've started to certainly see some traction in the marketplace." And Stead added: "We – this is the first year that Clarivate, historically, has included cross-selling ever for commissions. In fact, historically, they were penalized. We track it every week, Mi[chael] Morhardt's team. Michael does a great job. It's continued to increase as the year goes on." Thus, Defendants were already bundling acquired products with legacy products in November 2020 – when DRG had been owned by Clarivate for only nine months, and CPA Global for only one month – but they misleadingly failed to disclose that certain of the revenues from these sales were being claimed as organic.

### 2. Shifting to Inside Sales Undermines Growth and Allows Defendants to Mask Disappointing Growth with Growth from Acquisitions

131. Another practice that allowed Defendants to claim growth from acquisitions as organic growth was a drastic shift to "inside sales." Inside sales are simply sales made remotely, *e.g.*, over the phone. Defendants set up three regional "Global Business Centers," which were, essentially, call centers. Most of Clarivate's customers – some 80%, the "long tail" of smaller

customers that accounted for only 20% of the Company's revenue – transitioned to being serviced by representatives from these centers, rather than having a dedicated field sales person.

132.    The shift to inside sales was planned from the start and was well underway during 2020, before DRG had anniversaried and even before the acquisition of CPA Global was consummated.   At a conference call with investors on September 10, 2020, for example, Stead provided an update on this process:

> The 3 [Global Business Centers] will be 100% up and running with inside sales as we go into 2021.   Great centers in Penang, London, and Chandler, Arizona. . . .   And we're shifting so that – and by the way, this will apply with CPA as we go forward too, there – it's interesting, their numbers are similar to ours.   We have about 18,000 customers today including DRG.   If you think about that, about 80% of those customers will shift to inside sales and about 20% of the revenue will shift to inside sales.

Hanks added:

> [W]e've had a relatively traditional go-to-market model, firstly, through a field force – through an account management field force organization.   We've now pivoted that through the establishment of inside sales in 3 global business centers in Chandler, Arizona for the Americas, London for EMEA and Penang, Malaysia for Asia Pac. . . .   So that's now in place.

133.    Defendants said these changes would improve customer experiences for those customers transitioned to the inside sales model, keeping them happy and willing to renew their subscriptions at higher prices.   As Hanks explained on the Q3 2020 earnings call:

> The expectation is that, that will increase the velocity of new business because we'll have a broader interface with the market.   And we'll also have more regular touch points with the long tail of those – the long tail in the account base, and that will hypothesis that will [sic] absolutely improve the retention rate as well, simply because we'll have more frequent interactions with our clients.   So that pivot will drive organic subscription growth, and it also complement[s] our renewal rates as well.

134.    In reality, however, as reported by confidential witnesses, these changes angered many of Clarivate's customers.   But the handoff from the field sales agents handling DRG and CPA

Global's customers before those acquisitions to inside sales people in Clarivate's global business centers immediately afterwards also contributed to the smokescreen that Defendants used to mask the lack of organic growth throughout 2020 and again throughout 2021, as Defendants continued to promise organic growth would pick up in the fourth quarter of both of those years.

135.    Similar to the strategy applied to the revenue synergies, described above, Defendants took advantage of this change to claim revenue from newly acquired companies as organic.  As CW-1, who worked in the Chandler, Arizona center observed, the "delineation of responsibility between Clarivate and the newly acquired companies was not configured properly."  This led to, for example, clients being charged for licenses for the same products from both Clarivate's inside sales people and from the newly acquired companies.  CW-1 also confirmed that she was assigned both legacy Clarivate clients and products and those from newly acquired companies and that this "bundling" left Clarivate unable to segregate organic revenues from acquisitive revenues.  By shifting responsibility for the acquired company's customers to its own inside sales teams before the acquired companies had anniversaried, Defendants blurred the lines between organic and acquisitive revenues to their own advantage, allowing them to claim that new customers from acquisitions were contributing to the Company's organic growth.

### 3.    Stringing Investors Along Through the End of the Year

136.    An important part of Defendants' scheme was encouraging investors to stay the course on the promise that revenues would accelerate in the fourth quarter.  This allowed the scheme to continue despite disappointing growth numbers in both 2020 and 2021.  For example, at Clarivate's Q3 2020 earnings call on October 29, 2020, an analyst noted that transactional revenues in the important Asia-Pacific market were flat.  Hanks responded: "I would add this, that the fourth quarter from a transactional perspective, and this comment applies to not just Asia Pac, but the other

- 56 -

regions as well, Americas and EMEA, is the largest quarter for us in terms of absolute transactional revenue growth."

137.    When Clarivate announced disappointing organic growth numbers in the fourth quarter of 2020 – just 1% overall organic revenue growth – Defendants continued to focus investors' attention on the future.  Stead said:

> Back in 2019, when we did our first Investor Day, Richard and I representing our entire team said we expected to operate between 6% and 8% organic growth in 2021. . . .  But if you think about that, and we'll report it, by the way, so you can see it, I feel very good about the upside of that 6% to 8% range.
>
> I also am really pleased with, when I look back now at what happened in the pandemic, when I look back at a lot of our customers, I couldn't be more pleased with where we're at from a growth standpoint.  Two huge things, Richard said we would see organic growth increase in the second half, which we will.  A big piece of that, of course, is being able to have DRG only for 10 months and have CPA in for 3 months of our organic growth in the second half.  But a big piece is where we'll also see the inside sales effort taking place.
>
> Hang on and you'll see that happen as the year goes on.

138.    In the first half of 2021, Defendants did manage to post in-range organic growth numbers; organic growth was 7% overall in Q1 and 5% overall in Q2, for an average of 6% in the first half of 2021, with notable organic growth in transactional revenues of 10% in Q1 and 16% in Q2.  Analysts certainly took note; the first question on the Q1 2021 earnings call was:

> [O]rganic constant currency revenue growth accelerated to 7% in the quarter from 2.4% in 4Q.  Can you elaborate on what drove the significant acceleration in growth?  And if there were any unusual onetime benefits to organic growth?

Hanks responded:

> [N]othing onetime.  We executed very well in the first quarter, particularly with subscription renewals, 93% renewal rate, but we renewed more of the book as compared to, as I said in my script, last year.  And transactional growth, 10% in Q1 as compared to 6% in Q4 last year.  So we're seeing sequential quarterly improvements in transactional volumes.  And I think that bodes well for the rest of the year for Q2 and Q3 and Q4, rest of year.

An incredulous analyst doubled down:

- 57 -

Let me ask the first question in a different way.  The 10% growth in science was clearly above what we thought.  And I think what you had guided us to.  So maybe one-time is not the right way to ask the question, but perhaps it's timing.  And if you could just help us what the cadence for the growth in the next quarter should be otherwise, like I don't think we should be modeling 10% for the rest of the year.

Stead answered: "Just as a reminder, we said we'd do 6% to 6.5% all in organic for all of 2021.

We're a bit ahead of that, that's why we raised the guidance from the bottom a bit on revenue."

Hanks added: "I think what's really important is the revenue profile, 48% H1 [first half], 52% H2

[second half].  So I think that's what – in terms of the models, that's what you should be using. . . .

And we're confident in execution rest of the year."

139.    In the third quarter of 2021, however, transactional revenues dried up.  Clarivate posted transactional revenue organic growth of 10% and 16% in the first two quarters of 2021, respectively, for a first half average of 13%.  But transactional revenue growth in the third quarter of that year was only 3%, bringing the year-to-date average down to 9%.  And after a disappointing the fourth quarter, the full year transactional revenue organic growth number came in under 6%.

Throughout the second half of 2021, Defendants continually reassured the market – on nearly every conference call – that growth would accelerate again in the fourth quarter because of the Company's traditional and oft-touted seasonality.  At the Q2 2021 earnings call, on July 29, 2021, Stead announced:

Organic revenue in the first half was up almost 6%.  We currently expect to deliver 6.5% to 7% plus in the second half of this year, with a big pickup in fourth quarter compared to the second and third quarters.  What's driving the increase?

As an important reminder, 60% of DRG's business comes in the second half of the year, with 60% of this in the fourth quarter. . . .  Additionally, transactional revenue is seasonally strongest in the fourth quarter.  These items together will drive our organic growth rate into the upper end of our 6% to 8% target rate exiting 2021.

140.    During the Q3 2021 earnings call, on October 28, 2021, Stead noted:

- 58 -

You've heard us highlight many times this year that we expect a strong fourth quarter with organic revenue growth between 6% and 8%.  We are realizing the many benefits from the transformative acquisitions of DRG and CPA Global and the many operational improvement initiatives that have been put in place, including our inside sales structure and field sales realignment.  With a strong fourth quarter, organic revenue growth for the full year of 2021 is currently expected to be in the 6% to 6.5% range.

He added: "I feel really good about where we're at, the things we have going on and look forward to reporting in February next year great results that we're going to get in Q4."  Ahmed added:

[T]ypically, DRG, which, of course, now we refer to as Healthcare and Data Solutions, HDS, typically, Q4 is very strong in data analytics and also in consulting. We have a consulting backlog that we typically deliver in Q4.  And there's also typically a number of deals that are coming through that we convert in the quarter as well, and this is typical of the Healthcare segment.

141.    At the Company's 2021 Investor Day on November 9, 2021, Defendants defended the Company's poor third quarter organic growth numbers by pointing to the fourth quarter.  Stead noted: "I just want to remind everybody, since we were fortunate enough to acquire DRG, they grow historically.  36% of their total revenue is fourth quarter revenue.  And, Mukhtar, [give] a reason why and then what we expect Q4 versus Q3, please."  Ahmed responded: "[T]ypically, the latter half of the year is where there's typically a pickup.  It's a hockey stick effect here in terms of deals coming through in conversion into revenue."  Stead again noted later in the call: "[R]emember, Q4, 36% of total DRG revenue comes into Q4 and always CPA is their highest quarter, most of all of that, in both cases, heavy transaction."

142.    At the Company's next conference call, on November 17, 2021, Hanks reiterated this point, noting:

The pickup in Q4 is principally driven by transactional revenue growth, in particular in the Science Group. . . .

And as a reminder, the business that we acquired in February 2020, being DRG in the life sciences space, that has a significant back-end loading of revenue into Q4, where 36% of their annual revenue was booked in Q4, driven by those

- 59 -

custom data deals and consulting.  So those are the drivers of Q4 growth in particular.

Stead added:

> We said early this year that we would see 48% revenue growth in first half, 52% in the second half.  We're on target.  That's where we reaffirmed the guidance, et cetera.  And that actually will be a norm for us because of what Richard described so well, truly not a hockey stick of our business, it's a hockey stick of the industries we're in.

143.    As late as December 7, 2021 – almost at the end of Q4 2021 – Defendants promised a big Q4, particularly for organic growth of transactional revenue.  Ahmed noted:

> [T]ypically, what happens in Q4 is when they [Clarivate's Science Group customers] need access to data to drive decision-making so that they can then determine their portfolios for the subsequent calendar year.  That's what typically happens.  That's why Q4 is a time when there's a lot of demand for data, for reports, for expertise.  And that's why with DRG, historically, you've seen that Q4 ramp up.  It all happens in Q4.

Gordon Samson, then Head of APAC Strategy & Growth and President of IP Group after Roy's abrupt departure, added: "The IP team are always very jealous of Mukhtar's quarter 4 big one-off deals.  We're delighted, but we're very envious of those big one-off deals."

144.    But Clarivate posted disappointing organic growth numbers for the fourth quarter of 2021 – dragging the entire year's organic growth below expectations – precisely because these transactional revenues from DRG were not delivered.

### 4.    Pulling Forward Revenue from the Second Half of 2021 but Still Promising a Big Fourth Quarter

145.    One reason the promised fourth quarter surge never occurred was that Defendants posted such strong numbers in the first half of 2021 by pulling sales from the second half of the year forward, particularly within DRG.  Analysts even started to suspect that such a timing shift was afoot, but as described above, Defendants assuaged those concerns, reiterating that the fourth quarter would be the strongest quarter, particularly for the Science Group transactional revenues.

- 60 -

146. When Clarivate first purchased DRG, roughly 70% of the company's revenues were subscription or reoccurring, and 30% were transactional. Defendants indicated from the start that they intended to restructure the business so that some of the transactional revenues would become more predictable and cost-efficient subscription revenues. At the conference call for the announcement of the DRG acquisition on January 17, 2020, for example, Hanks noted: "We have a plan to, over time, migrate some of the reoccurring and onetime revenues onto a platform capability, which will be subscription-based."

147. An analyst followed up on this during the Company's Q2 2020 earnings call on July 30, 2020, asking: "[C]an you comment on the progress of continuing to transition the revenue to more of a subscription base than the kind of transactional base that they have had beforehand that was ongoing before you guys bought them?" Ahmed answered:

> [S]o as part of that shift, we started really taking a number of the assets, particularly that customers use, our analytical tools and software products in particular. And we're shifting those over to 100% cloud subscription. And we'll continue with that effort as we build out the products and we productize those various use cases.

148. The Company reported strong revenue growth, particularly in the Science Group, in Q1 2021. At that quarter's earnings call, on April 29, 2021, Ahmed noted: "[W]e've executed on all of our product plans. A lot of precision around commercial focus and go to market. And those are the reasons why we've enjoyed the growth that we've reported today. And ***the bulk of that is in subscription and reoccurring revenue***."

149. On July 29, 2021, at the Company's Q2 2021 earnings call, an analyst said:

> I noticed there's a change in kind of the 1 half, 2 half fallout of the EBITDA. It was supposed to be at 42-58. It is now moving to 44-56. Is there something changing operationally in the business that's making it that you're having more of the EBITDA in the first half of the year than expected? Or is there just some kind of timing issues that are happening? I'm trying to understand, because like the strong EBITDA in the quarter, it implies a little bit on the forward basis that maybe things

- 61 -

would go down a little bit.  I'm trying to understand if there's a pull forward or a shift or just what the dynamics are there.

Stead denied the existence of such a pull forward, answering: "What you should have heard from my comments was Q3 will be pretty close to where we are – with where we were with Q2.  ***And Q4 will be very strong as we exit***."  He continued:

> [T]hanks for asking because that shift in place is one that will really reflect in Q4.  You're going to see what this business model can do when we get the kind of top line growth that we expect to get.  And you'll see very significant improvement with the margins as we exit 2021.

150.   In Q3 2021, organic growth slowed.  Defendants fielded questions at the Company's 2021 Investor Day on November 9, 2021, such as: "Can you talk about why DRG slowed in the third quarter and why you expect it to reaccelerate in the fourth quarter?"  Defendants repeated their promises of a big fourth quarter for DRG because that was a "typical" feature of the business, and then explained how they had actually been working to change that feature: Ahmed noted:

> [W]e have rolled out a number of analytical products that our customers can use on a Saas [software as a service] and subscription basis.  This will allow those customers that have typically procured the data and procured those assets in the manner that we've just described.  It will allow them to smooth[] that out through the year through a subscription process.  So as more of those tools are adopted by our customers, we'll see that even out through the course of the year.

151.   Ahmed repeated this at the Company's December 7, 2021 conference call, noting:

> [W]hat we've done here since we've acquired them is we've invested in particularly the data assets.  So rather than onetime at the end of the year, we move them more into a Data-as-a-service offering.  We've laid on analytics.
>
> So it's not a one-time transactional deal in Q4 to meet that budgeting cycle, but we try and provide that intelligence through the form of our software, which – as a service and to the Data-as-a-service.  So that means that we can bring that forward.  It becomes equalized through the year so that we are part of the strategy planning in pharma.

152.   Defendants attempted to have it both ways by claiming that 36% of DRG's revenues would occur in the fourth quarter, in line with its history, but that they were also working to smooth

- 62 -

out this effect in the future.   In reality, however, Defendants had already cannibalized much of DRG's fourth quarter revenue to fuel their organic growth in the first half of 2021, and were pointing to DRG's historical seasonality profile to falsely assure investors that Q4 2021 would bring the significant organic growth that Defendants had promised for years but failed to deliver.   Indeed, because of Clarivate's attempts to transition this business to a subscription model, some of this business was lost and CW-2 stated "we knew that this transactional revenue would not come through in the fourth quarter."   Similarly, CW-3 explained that certain deals that were typically closed at year-end were no longer available to meet sales targets because they had been converted to subscription services earlier in the year.

### 5. Padding Pipeline Reports and Using Inflated Reports to Reassure Investors

153.    As detailed above, Defendants falsely promised investors that Q4 2021 would bring accelerated organic revenue growth even as the quarter wore on.   To bolster these claims, Defendants pointed to internal reports that supposedly gave them a detailed view of the sales pipeline.   For example, Lomholt-Thomsen, Chief Revenue Officer, noted during the Q3 2021 earnings call on October 28, 2021:

> [W]e are obviously very, very focused on the strategic transactions that's going to drive the revenue outcome that we're looking for as well.   And we have a very targeted list of those opportunities that both Gordon [Samson, Head of IP Group], Mukhtar and I are following with the sales force on a daily basis to make sure that we close the deals that's going to maximize revenue for Q4.

154.    In fact, Hanks mentioned these reports as early as March 18, 2021, noting during a conference call:

> Jerre and I have been speaking to each of our individual top sellers over the last quarter as we focus on organic growth in 2021.   And just giving them the capabilities, if I'm a government academic salesperson, I can now sell life science products into that portfolio, it's just terrific.   Broadens the portfolio, they can see their cross-sell opportunities.   And what we're down to now is just really good

- 63 -

execution, and **we get a biweekly report to measure our progress against that objective because we consider it to be [a] significant opportunity**.

155.  Hanks highlighted Defendants' visibility into the sales pipeline for the second half of 2021 again during the Company's Q2 2021 earnings call on July 29, 2021, noting: "[M]ost importantly, the pipeline for the life sciences business is looking particularly strong for the second half of the year."

156.  Defendants particularly leaned on their supposed visibility into the sales pipeline for Q4 2021 after posting disappointing growth numbers in the third quarter of that year.  In addition to Lomholt-Thomsen's remarks from the Q3 2021 earnings call on October 28, 2021 quoted above, Hanks said: "I'd add that we've got a good order book going into the fourth quarter."  Stead noted: "You can believe that **we look at it every week – actually, every day** to make sure we're on track with new sales, et cetera," and added: "I think most important is we get a view every week of what we got to go to to hit the number that will deliver the kind of results we expect in Q4."  Ahmed also appealed to the reports, noting:

> **We have direct insight into the backlog.  And going into Q4, that backlog is pretty strong as well as line of sight to key deals that upon conversion, we plan to then subsequently convert to revenue**.  So that cadence, that focus, the controls, those are all in place, and that's the reason why we have confidence in our HDS [Clarivate's new name for DRG] business in Q4.

157.  According to numerous confidential witnesses, however, Defendants were padding their pipeline reports by encouraging sales people to record **potential**, "white space" deals as transactions that customers had already committed to.  As CW-4 described, "executive management [*i.e.*, C-level executives and Group Presidents] counted their chickens before the eggs were hatched and recorded white space business opportunities to help meet quotas, forecasts and projections which misled the investors."  Another former employee, CW-1, independently noted that executive management did intensive portfolio pipeline account reviews with sales people in January and

- 64 -

August, a process Clarivate called "Review and Planning." CW-1 reported that executive management encouraged sales people to record white space in the Company's CRM and that executive management "put things in commit status [*i.e.*, marked them as sales customers had committed to] to show revenues" before Clarivate had a signed contract with the customer, resulting in an inaccurate picture of sales and revenues.

158. Other confidential witnesses independently corroborated these accounts. CW-5 also reported that executive management directed sales people to record potential white space opportunities, and that sales people used this feature of the Company's CRM to help them meet unrealistic sales quotas. CW-3 also independently reported that executive management directed sales people to record potential opportunities to help them meet their quotas and to help with Clarivate's forecasts – they commented, "garbage in, garbage out." CW-3 went on to explain that management instructed employees to "back into the number (sales quotas) in order to meet the sales goals assigned."

159. Thus, the same pipeline reports that Defendants highlighted to convince investors that significant organic transactional revenue growth would come in Q4 2021 were actually inflated by the practice of recording *potential* sales as committed sales that investors could count on.

160. The artifices described above were part of Defendants' scheme, which caused investors to purchase Clarivate stock at prices that were artificially inflated by Defendants' scheme. When the truth underlying the scheme became generally known through disclosures revealing disappointing growth and revenues, investors suffered massive functional losses.

## VII.   DEFENDANTS FAILED TO DISCLOSE "KNOWN TRENDS OR UNCERTAINTIES" IN VIOLATION OF ITEM 303 OF REGULATION S-K

161.     Clarivate's SEC filings, including the Forms 10-Q and Forms 10-K filed during the Class Period, failed to disclose information required to be disclosed therein under Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303 ("Item 303").  Item 303 requires certain revenue disclosures in the "Management's Discussion and Analysis of Financial Condition and Results of Operations," or MD&A, section of a public company's SEC filings.  The SEC created specific rules governing the content of MD&A disclosures to provide material historical and prospective disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.  The SEC has stated:

> [T]he Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.
>
> . . . "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

162.     Among other things, Item 303(a)(3) required Clarivate to disclose the following in the MD&A of its Class Period SEC filings:

> (a)     [M]aterial events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;
>
> (b)     [A]ny known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations; and
>
> (c)     If . . . events that are reasonably likely to cause a material change in the relationship between costs and revenues, the change in the relationship must be disclosed.

- 66 -

17 C.F.R. §229.303.[13]

163.    As detailed below, during the Class Period, Clarivate made significant structural changes to its business model and the business models of the companies it had acquired, namely DRG and CPA Global.  These changes included: (1) cost-cutting restructuring plans, totaling hundreds of millions of dollars, that included material reductions to outside sales force; (2) shifting 80% of Clarivate's customer base to the new "inside sales" model that materially differed from the historical sales practices of Clarivate and DRG; and (3) modifying its transactional sales model, whereby certain one-off transactional data sales were pulled forward and sold as new cloud-based subscription products.  These changes constituted: (i) "known events, trends and uncertainties" that management reasonably expected to have a material negative impact on Clarivate's revenues; and (ii) events that were likely to cause a material change in the relationship between Clarivate's costs and revenues, including the seasonality of such revenues.  Accordingly, Clarivate had an affirmative obligation under Item 303 to disclose information relating to these trends, uncertainties, and events.

---

[13]   In November 2020, the SEC adopted certain amendments to simplify and enhance the financial disclosure requirements in Regulation S-K including Item 303.  The November 2020 release (No. 33-10890) codifies the MD&A objectives from the SEC's 2003 and 1989 interpretive releases as 303(a), requiring that a registrant must provide a discussion and analysis that allows an investor to see the company "from management's perspective."  Such a disclosure must, on the basis of "management's assessment," address matters that are reasonably likely to have a material impact on future operations.  The November 2020 release also codifies Item 303(b)(2)(ii) which requires a registrant to disclose: (1) any known trends or uncertainties that have had or are reasonably likely to have a material impact on revenues or income; and (2) any known events that are "reasonably likely to cause a material change in the relationship between costs and revenues."  17 C.F.R. §229.303(b)(2)(ii).  Under the "reasonably likely" requirement, the registrant must disclose a known trend or uncertainty if it: (1) is reasonably likely to occur; and (2) would be material to the registrant if it did occur.

A.    **Following the DRG and CPA Global Acquisitions, Clarivate Made Major Structural Changes to Its Business Model and Sales Practices**

164.    Following the announcements of the DRG and CPA Global acquisitions in 2020, Defendants announced several major restructuring initiatives as well as material changes to Clarivate's historical sales model.  The changes were designed to slash costs, primarily through reducing head count, and boost the Company's profitability.  The Company also announced its plan to transition data sales that were previously recorded as one-off "transactional" deals to cloud-based products that would be recorded as subscription sales.  By instituting the restructuring changes, Defendants introduced the risk that significantly-reduced outside sales forces would disrupt the long-standing business models – especially at the newly acquired DRG and CPA Global – and negatively impact revenue.  Meanwhile, by changing the transactional sales model, Defendants were likely to deviate from the Company's historical revenue trends and, in particular, negatively impact the fourth quarter revenue spike that Defendants repeatedly promised to investors.  Rather than disclose these known risks and trends, Defendants assured investors that the restructuring actions, shift to inside sales, and transactional sales model change would boost, rather than hurt, the Company's revenue prospects.

1.    **Cost-Cutting Restructuring Programs**

165.    During the Class Period, Clarivate announced numerous cost-cutting restructuring programs designed to cut hundreds of millions of dollars of expenses and make the business more profitable.  Following each acquisition that was announced, Clarivate quickly moved to strip out as many costs as possible.  The primary source of cost savings generated by the restructuring plans were centered around headcount reduction, including the elimination of outside sales personnel.  Clarivate described the cost-cutting programs as follows:

- 68 -

4890-2434-9741.v2

During 2020 and 2019, we engaged a strategic consulting firm to assist us in optimizing our structure and cost base.  As a result, we have implemented several cost-saving and margin improvement programs designed to generate substantial incremental cash flow including the Operation Simplification and Optimization Program, the DRG Acquisition Integration Program and the CPA Global Acquisition Integration and Optimization Program.  During 2021, we approved the One Clarivate restructuring plan, which streamlines operations within targeted areas of the Company [and the ProQuest Acquisition Integration Program].  The programs are expected to result in a reduction in operational costs, with ***the primary driver of the cost saving being from a reduction in workforce***.

166.    The cost-cutting restructuring programs announced during the Class Period, including the anticipated cost savings and the restructuring charges recorded by the Company, included:

***Operation Simplification and Optimization Program***

- Announced in Q4 2019.

- $75 million in anticipated cost savings.

- The Company recorded $44.5 million in restructuring charges between 2019 and 2021, of which 76 % related to employee severance and related benefit costs.

***DRG Acquisition Integration Program***

- Announced as part of DRG acquisition in Q1 2020.

- $30 million in anticipated cost savings.

- The Company recorded $6.8 million in restructuring charges during 2020 and 2021, of which 78% related to employee severance and related benefit costs.

***CPA Global Acquisition Integration and Optimization Program***

- Announced as part of CPA Global in Q2 2020.

- $100 million in anticipated cost savings.

- The Company recorded $128 million in restructuring charges during 2020 and 2021, of which 43% related to employee severance and related benefit costs.

***One Clarivate Program***

- 69 -

- Announced in April 2021.

- The Company recorded $20 million in restructuring charges during 2021, of which 86% related to employee severance and related benefit costs.

***ProQuest Acquisition Integration Program***

- Announced as part of ProQuest Acquisition in May 2021.

- More $100 million in anticipated cost savings.

- The Company recorded $2 million in restructuring charges during 2021, of which 100% related to employee severance and related benefit costs.

167.    Defendants highlighted the success of the cost-cutting restructuring programs throughout the Class Period and assured investors that the significant cost-cutting would not negatively impact Clarivate's ability to grow revenues.  For example, on September 16, 2020, Hanks stated: "[W]e have a very methodical integration process, and we're very thorough during due diligence of quantifying where we can take out costs.  But at the same time, ***making sure that we're preserving growth and in fact, making sure we've got the investments in place to propel growth forward***."

## 2.    The Shift to an Inside Sales Model

168.    Meanwhile, as part of the cost-cutting restructuring plans and salesforce reduction, Clarivate announced that it was shifting the vast majority of its accounts from traditional outside, go-to-market sales to a new "inside sales" structure that would be run out of three global business centers.  This shift represented a major change to Clarivate's historical sales practices, and the sales practices of the companies it had recently acquired, including DRG and CPA Global.  Defendants highlighted the shift and provided updates throughout the Class Period.  On September 16, 2020, Hanks provided an update:

- 70 -

4890-2434-9741.v2

What we have done at Clarivate in terms of the front office is we had – we've gone through a pivot where we have established three global business centers, Chandler Arizona [at] the Americas, London for EMEA and Penang Malaysia for Asia Pac, and those capabilities include inside sales, customer service and some back-office functions.  ***So we're currently in the process of pivoting the sales organization, moving our long tail of accounts out of the field force into inside sales***.

169.    On February 25, 2021, Stead stated:

We're in the process, really important to understand, we'll exit 2021 with about 75%, almost ***80% of our total worldwide customers, existing 30,000 base, that will be managed by inside sales***.

170.    Importantly, Defendants assured investors that the shift to an inside sales model would be beneficial to the Company's revenues.  On February 27, 2020, Stead stated:

[W]e are setting up 3 global centers of inside sales. . . .  That will be the next huge step because we'll take about 80% of our customers . . . into inside sales. . . . ***And we will see a positive impact in 2021 because of that***, which is part of the reason we said 6% to 8% organic growth in – at the end of 2021.

171.    On February 25, 2021, Stead again reassured investors: "The realignment of our sales force and new global business centers will play a leading role in capitalizing on the upsell and cross-sell opportunities in front of us."

### 3.    The Transition from One-Off Transactional Sales to Subscription Sales

172.    When Clarivate first purchased DRG, roughly 70% of DRG's revenues were subscription or reoccurring, and 30% were transactional.  Defendants indicated from the start that they intended to restructure the sales model so that some of the transactional revenues would become more predictable subscription revenues.  At the conference call for the announcement of the DRG acquisition on January 17, 2020, Hanks noted: "We have a plan to, over time, migrate some of the reoccurring and onetime revenues onto a platform capability, which will be subscription-based."  But Defendants assured that the shift to subscription-based sales would not negatively impact transactional revenues.

- 71 -

173.    On the July 30, 2020 conference call, an analyst asked, "can you comment on the progress of continuing to transition the revenue to more of a subscription base than the kind of transactional base that they have had beforehand that was ongoing before you guys bought them?" Ahmed responded:

> So as part of that shift, we started really taking a number of the assets, particularly that customers use, our analytical tools and software products in particular. And we're shifting those over to 100% cloud subscription. And we'll continue with that effort as we build out the products and we productize those various use cases. So over time, we'll see some of that recurring revenue shift over to cloud subscription.

174.    Importantly, Defendants concealed from investors the significant impact of the change to the sales model. Specifically, as a result of the change, sales that would have otherwise been recorded as one-off transactional sales later in the year were being pulled forward and recorded as subscription sales earlier in the year, which negatively impacted and meaningfully changed the Company's historical revenue trends. Nevertheless, Defendants routinely assured investors that they could still expect the Company's customary spike in fourth quarter revenues, with a particular emphasis on transactional sales. On February 25, 2021, Hanks stated:

> As we've previously stated, DRG **revenue is much more heavily weighted to the back half of the year**. Approximately 60% of its revenues occur in the second half, with about 60% of that occurring in the fourth quarter or, said differently, more than 35% of DRG revenue for the year comes in the fourth quarter.
>
> **Transactional revenue typically has seasonality within the portfolio, with the fourth quarter historically being the strongest**. Budgets reset at the beginning of the year so we normally see a pullback in backfile sales and volumes at the start of the year, and then it picks up as we transition through 2021.
>
> **We expect organic revenue growth to be back half weighted** as the operational improvements really start to take hold, and we begin to realize the benefits of the strategic acquisitions. Additionally, we currently believe we will start to see some economic recovery from the COVID pandemic later in 2021.
>
> Taking all of these factors into consideration and including the recent addition of CPA Global, **our full year revenue profile is weighted at approximately 47% first half and approximately 53% second half**.

- 72 -

175.     On the July 29, 2021 earnings call, an analyst questioned whether the strong results for the first two quarters of fiscal year 2021 were an indication that revenues had been pulled forward from later in the year, causing expected revenues to be lower in the second half of the fiscal year.  The analyst asked:

> [I]s there just some kind of timing issues that are happening?  I'm trying to understand, because like the strong EBITDA in the quarter, it implies a little bit on the forward basis that maybe things would go down a little bit.  I'm trying to understand if there's a pull forward or a shift of just what the dynamics are there?

Stead denied the existence of such a pull forward, answering: "What you should have heard from my comments was Q3 will be pretty close to where we are – with where we were with Q2.  *And Q4 will be very strong as we exit*."  He continued:

> [T]hanks for asking because that shift in place is one that will really reflect in Q4.  You're going to see what this business model can do when we get the kind of top line growth that we expect to get.

**B.     Unbeknownst to Investors, the Changes to the Business Had a Significant Negative Impact on Clarivate's Revenue Trends**

176.     Unbeknownst to investors, due to Defendants' assurances to the contrary, the significant cost-cutting restructuring plans, reduction of the outside sales force, and the shift to an inside sales model had a negative impact on Clarivate's revenue-generating capabilities and eventually caused its revenue trends to decline.  Meanwhile, the changes to the transactional sales model in order to pull forward revenues had a negative impact on, and meaningfully altered, Clarivate's historically strong fourth quarter revenues.

**1.     Significant Reduction to Outside Sales Force**

177.     The cost-cutting restructuring plans and shift to an inside sales model resulted in a significant reduction in the outside sales forces of Clarivate and the companies it had recently acquired, including DRG and CPA Global.  The abrupt reduction in the outside sales teams caused a steep drop-off in Clarivate's revenue-generating capabilities and resulted in lost sales opportunities

across the Company.  As detailed blow, the outside sales force (also referred to as field sales force), including those in charge of "Key Accounts" and "Field Accounts," was responsible for generating high growth revenue opportunities.

178.    As detailed above in ¶166, the numerous restructuring plans announced during the Class Period were centered on headcount reduction.  For example, according to CW-2, Clarivate did not backfill vacant positions in key go-to-market teams and did not provide teams with the funding needed to maintain and improve product quality.  CW-2 stated that these cost-cutting measures caused Clarivate to lose "numerous customers."  Similarly, CW-3 indicated that executive management did not hire sufficient employees and did not backfill positions when employees left the Company, which had a "negative impact on the company's future business operations."  And CW-4 added that Clarivate's executive management fired numerous field sales people and members of the Company's go-to market teams.

179.    Meanwhile, the shift to inside sales converted more and more customers who had traditionally been served by outside sales teams to the hands-off inside sales model.  In early 2021, Stead touted: "[It's] really important to understand, . . . almost *80% of our total worldwide customers, existing 30,000 base, that will be managed by inside sales*."  According to CW-4, this shift to less experienced inside sales representatives was akin to ineffective "smil[ing] and dial[ing]" for sales.  CW-4 added that many of the employees hired for inside sales were inexperienced and ineffective "rookies."

180.    As described below in ¶¶187-188, Defendants ultimately admitted at the end of the Class Period that the lack of sufficient outside and field sales personnel caused a significant revenue miss.  Notably, the Company's plans to reverse the sales decline following the Class Period included "hiring aggressively."

### 2.   Inside Sales Force Had Limited Sales Capabilities

181.   In combination with the reduction in the outside sales force, Clarivate shifted the vast majority of its customers to a new inside sales model.  Inside sales had significantly diminished sales capabilities, as compared to the outside sales force model that Clarivate, DRG, and CPA Global had traditionally employed.  In particular, the inside sales force was not designed to focus on cross-selling sales opportunities or high-value consulting sales opportunities – sales that Defendants had repeatedly emphasized as key drivers of revenue growth following the DRG and CPA Global acquisitions.  For example, in October 2020, Jeffrey Roy stated: "So we're very excited about that and *a big part of our strategy is cross-sell* and upsell as we move forward."  On February 25, 2021, Stead stated:

> One of the many appealing attributes of this addition to our industry-leading portfolio of products is the abundant *opportunities we have for cross-selling* and upselling across our entire customer base.

182.   Meanwhile, following the announcement of the DRG acquisition on January 17, 2020, Defendants touted DRG's strength in consulting services and emphasized to investors that the combined entity would generate further consulting revenue growth from cross-selling as it leveraged DRG's consulting customer relationships.  Defendant Hanks stated:

> So on the revenue mix . . . 30% transactional, partly from the consulting services business that they have.  I mean this is an organization that has very deep and tenured relationships with the top 50 global pharmaceutical and biotech companies.  We're at the view that *we can expand that consulting services channel*. . . .  *So we're very confident about the growth outlook*.
>
> *In terms of consulting services, I think that, number one, that enables us to capture a greater share of wallet*.  And secondly, it enables us to pull through the sale of other products and services within the portfolio, *not just DRG's, but I think very importantly, Clarivate*.

183.   Despite the importance of these revenue growth areas, the inside sales force, which covered 80% of Clarivate's total customer base, was not designed to maximize cross-selling

- 75 -

opportunities or consulting sales opportunities, which were to be the drivers of the promised revenue growth.  In fact, as shown in the slide below (notations in red added), the Company acknowledged in a Class Period investor presentation that that critical high-value consulting revenues and cross-selling revenues were of "low focus" to the inside sales team:



Indeed, the same presentation stated that the Company's strategy was to "allow [outside] Field Sales to concentrate on high growth opportunities" and to "drive further growth revenue amongst very largest accounts" that were covered by the outside "key accounts" sales force.  Thus, the Company's most important revenue growth areas were the responsibility of a greatly diminished outside sales force, while the inside sales team, which had grown to cover over 30,000, or 80%, of the Company's total customers, was not focused on cross-selling or high-value consulting.  As a result, the Company's cost-cutting strategy and drastic sales force changes had devastating effects on Clarivate's ability to grow revenues.

4890-2434-9741.v2

### 3.   Pulling Forward Transactional Sales Negatively Impacted Fourth Quarter Revenues

184.   The transition of the transactional sales model to a subscription-based model allowed Clarivate to pull forward revenues earlier in the fiscal year, which Defendants reasonably expected to have a negative impact on fourth quarter revenues – particularly transactional revenues. Defendants attempted to have it both ways by pulling forward revenue earlier into the fiscal year but also continuing to claim that 53% of the Company's revenues would occur in the second half of the year, and 36% of DRG's revenues would occur in the fourth quarter due to strong year-end transactional sales as Clarivate capitalized on customers' spending the remainder of their fiscal budgets.   In reality, however, Defendants had already cannibalized much of DRG's fourth quarter transactional revenue, and exhausted its customers' fiscal budgets, by pulling forward the revenue as subscription sales throughout the year.   As expected, the revenue split between the first half of the year and the second half of the year in 2021 was 49% vs 51%, a stark contrast from Defendants' earlier assurances of 47% vs 53% – the difference amounted to a shortfall in the second half of the year totaling tens of millions of dollars in sales.[14]   Late in the Class Period, Ahmed contradicted Stead's earlier representation that revenue had not been pulled forward into the first half of the year, acknowledging:

> [W]hat we've done here since we've acquired them is we've invested in particularly the data assets.  ***So rather than onetime at the end of the year, we move them more into a Data-as-a-service offering***.  We've laid on analytics.  ***So it's not a one-time transactional deal in Q4 to meet that budgeting cycle***, but we try and provide that intelligence through the form of our software, which – as a service and to the Data-as-a-service.  ***So that means that we can bring that forward***.  It becomes equalized through the year so that we are part of the strategy planning in pharma.

---

[14]   Excluding impact of ProQuest acquisition in Q4 2021.

4890-2434-9741.v2

**C.    The Changes to the Sales Force and Sales Model Contributed to Clarivate's Disappointing Q4 2020 and Q4 2021 Revenue Targets and Reduced 2022 Revenue Guidance**

185.    The reduction in critical outside sales personnel stemming from the significant cost-cutting programs and significant shift in sales model to inside sales negatively impacted Clarivate's revenue trends.   In addition, the pull-forward of transactional revenues negatively impacted Clarivate's fourth quarter revenue trends.

186.    First, on February 26, 2021, Clarivate announced disappointing Q4 2020 revenues, including organic revenue growth of only 1.1%.  The impact of the cost-cutting measures and shift to the inside sales model was even more significant to DRG's results.  DRG's Q4 2020 revenues actually declined from the prior year, when it had been a standalone company.[15]  By contrast, Defendants stated at the time of the acquisition of DRG that DRG would grow meaningfully following the acquisition.[16]

187.    On February 3, 2022, Clarivate announced a significant miss on its Q4 2021 revenue target and slashed revenue guidance for the following year, 2022, by $65 million.  The Q4 miss was blamed primarily on a decline in one-off transactional sales in the life sciences space, with a focus on disappointing DRG transactional sales in particular.  The cause of the sales miss was attributed to not having enough outside sales representatives in the field.  In particular, the Company cited

---

[15]    Specifically, DRG's full year 2019 revenues were $207 million.  According to Defendants, 35%-36% of that revenue came in the fourth quarter, meaning that Q4 2019 DRG revenue was approximately ***$73.5 million***.  By contrast, full year 2020 revenue were $186.4 million and Defendants reported year-to-date DRG revenues through Q3 2020 of $113.2 million, meaning DRG's Q4 2020 revenue was only ***$73.2 million***.  DRG generated 9% revenue growth as a standalone company in 2019.

[16]    For example, on the January 17, 2020 call announcing the DRG acquisition, Defendants stated: "[W]e expect to see this double-digit growth for the years to come . . . good growth in 2019, great momentum in the business going into 2020, we're very confident with double-digit sustained growth rates."

4890-2434-9741.v2

"staffing gaps in the go-to-market and fulfillment teams" and "higher [sales force] vacancies late in the year" that "led to missed opportunities."[17]  Defendants also blamed the miss on customers not having room in their "year-end budgets for transactional purchases (*i.e.* data sets)."[18]

188.   Notably, the Company's plan to remediate the sales shortfall was to "hir[e] aggressively in 2022," thereby acknowledging that the significant sales force reduction over the prior 18 months had negatively impacted revenues.  The new hiring plan included "more than 100 new business sellers . . . to drive new business and to drive strategic cross-sell by industry and by vertical. And through that collaboration between account managers and sales specialists, we have a dedicated engine to drive the growth that we're looking for, especially around cross-sell."  On March 10, 2022, CFO Collins further acknowledged the need for additional sales force representatives:

> So we're taking some unprecedented actions.  We are hiring for positions that aren't vacant yet, taking some different approaches to bringing people in to really get those staffing levels up.
>
> Because *as Jerre touched on, that is a key element of getting those deals closed or converted from the pipeline to a real sale, is having people that are building these relationships and driving these deals to closures.  And we've got to have people in those positions*.

**D.     Defendants Failed to Disclose the Reasonably Likely Impact that the Significant Business and Sales Model Changes Would Have on Clarivate's Revenues, in Violation of Item 303**

189.   Defendants violated the affirmative disclosure duties imposed by Item 303, and thus §10(b) of the Exchange Act, by failing to disclose, in the Company's Forms 10-Q and 10-K filed during the Class Period, the following material information that was known to management:

---

[17]   Defendants blamed the lack of outside sales personnel on the COVID pandemic rather than Clarivate's own cost-cutting actions.

[18]   Defendants blamed the lack of space in customers' budgets to make customary year-end transactional data set purchases on "accelerating inflation," rather than Clarivate's own decision to accelerate the same data sales earlier in the fiscal year.

(a)     The significant cost-cutting restructuring programs that resulted in drastic cuts to the outside sales forces of Clarivate and of DRG and CPA Global, following their acquisitions by Clarivate, was reasonably expected to adversely impact Clarivate's revenues, and caused a material change in the relationship between Clarivate's costs and revenues;

(b)     The rapid shift to an inside sales model covering 80% of the Company's 30,000 customers, and the limitations of the inside sales force's sales capabilities in generating high-value cross-selling and consulting sales, was reasonably expected to adversely impact Clarivate's revenues, and caused a material change in the relationship between Clarivate's costs and revenues;

(c)     The abrupt shift and resulting disruption to the long-standing sales models of Clarivate and of DRG and CPA Global, following their acquisitions by Clarivate, was reasonably expected to adversely impact Clarivate's revenues; and

(d)     The changes to the transactional sales model to a subscription-based model in order to pull forward revenues earlier in the fiscal year was reasonably expected to adversely impact Clarivate's seasonal revenue trends, negatively impacting fiscal fourth quarter revenues in particular.

190.    The foregoing concealed facts regarding the adverse revenue impacts stemming from: (i) the significant cost-cutting restructuring programs; (ii) the drastic cuts to the outside sales force; (iii) the shift to an inside sales model that was not designed to focus on high-value revenue growth opportunities; (iv) the abrupt shift and resulting disruption to the long-standing sales models of Clarivate and the companies it acquired; and (v) the pull forward of revenues associated with shifting year-end transactional sales to subscription sales, were required to be disclosed in accordance with SEC MD&A disclosure rules, because they were, among other things:

(a)    "material events and uncertainties known to management that would cause [Clarivate's] reported financial information not to be necessarily indicative of future operating results or of future financial condition";

(b)    "known trends or uncertainties that [Defendants] reasonably expect[ed] [to] have a material . . . unfavorable impact on [Clarivate's] net sales or revenues"; and

(c)    "events that [were] likely to cause a material change in the relationship between [Clarivate's] costs and revenues."

## VIII. CLARIVATE'S RESTATEMENT CONFIRMS THAT NUMEROUS CLASS PERIOD STATEMENTS WERE MATERIALLY MISLEADING

191.    On December 27, 2021, Defendants filed a Form 8-K with the SEC disclosing that Clarivate's previously issued financial statements for the year ended December 31, 2020, and quarterly periods ended March 31, 2021, June 30, 2021, and September 30, 2021 (the "Affected Periods"), should no longer be relied upon because of material accounting errors in those financial statements.  Defendants further disclosed that as a result of the accounting errors, Clarivate had materially understated its previously reported expenses by more than $120 million during the Affected Periods.  The Form 8-K also stated that to correct the errors, each of Clarivate's previously issued financial statements for the affected periods would need to be restated in accordance with FASB ASC Topic 250, *Accounting Changes and Error Corrections*.  In connection with the accounting errors and the required restatement, Defendants also disclosed in the Form 8-K that Clarivate had identified material weaknesses in its internal controls over financial reporting ("ICFR") during the Affected Periods.  The existence of material weaknesses during the Affected Periods rendered the Company's prior attestations covering ICFR and disclosure controls and procedures ("DC&P") false.

192.    On February 3, 2022, Defendants finalized and issued the Restatement, filing an amended annual report on Form 10-K/A with the SEC for the year ended December 31, 2020 and amended quarterly reports on Forms 10-Q/A for the quarters ended March 31, June 30, and September 30, 2021.  The Restatement identified and corrected the following accounting errors:

(a)    Clarivate incorrectly accounted for an equity plan included in the CPA Global business combination, which was consummated on October 1, 2020.  In the affected financial statements, certain awards made by CPA Global under such equity plan and a related trust were incorrectly included as part of the acquisition accounting for the CPA Global transaction.  The Company concluded that the majority of the expenses associated with such equity plan should have been recognized as share-based compensation charges ranging primarily from the vesting period of October 1, 2020 to October 1, 2021, with only a portion of the liability recorded as part of acquisition accounting.  In addition, ordinary shares that were transferred to an Employee Benefit Trust established for the CPA Global Equity Plan should have been excluded from the purchase price consideration in the amount of $196,038,000, or 6,325,860 ordinary shares; and

(b)    Separate from the CPA Global Equity Plan restatement, the Company understated deferred tax liabilities, with an offset to goodwill, relating to the CPA Global acquisition opening balance sheet on October 1, 2020 and the DRG acquisition opening balance sheet on February 28, 2020.

193.    As detailed below in ¶196, these accounting errors had a material impact on Clarivate's reported financial results during the Affected Periods.  In total, Clarivate overstated its net income by more than $120 million from Q4 2020 through Q2 2021.

194.    The Restatement also identified the following material weaknesses in Clarivate's internal controls, including its ICFR and DC&P, that existed as of December 31, 2020:

- 82 -

(a)     The lack of an effectively designed control over the communication of modifications to pre-existing compensation agreements in an acquisition transaction between the legal function and the accounting function to ensure the accounting impact of the modifications could be evaluated; and

(b)     The lack of an effectively designed control with a sufficient level of precision to allow for an appropriate review of the tax balances associated with the opening balance sheet of acquired entities.

### A.     Clarivate's Restatement Is an Admission of Falsity

195.     The fact that Clarivate has restated its financial results, including its expenses, net income, and EPS is an admission that its prior financial statements for the Affected Periods were materially false and not prepared in accordance with GAAP.[19]   In accordance with Accounting Standards Codification Topic 250, *Accounting Changes and Error Corrections* ("ASC 250"), GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, there is a change in reporting entity, there is a change in accounting principles used, or ***to correct an error in previously issued financial statements***.   The type of restatement and revisions announced by

---

[19]   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) ("Regulation S-X") states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).   On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*.   FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.

Clarivate were to correct for *material errors* in previously issued financial statements.  Further, under ASC 250, a restatement of previously issued financial statements is only allowed when a Company makes:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that *existed at the time the financial statements were prepared*.

ASC 250-10-20.  Thus, the restatement is an admission by Defendants that Clarivate's previously issued financial results, including its Form 10-K and Form 10-K/A (Amendment No. 1) for the fiscal year ended December 31, 2020 and Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2021, and Defendants' public statements regarding those results, were materially false and misleading.

### B.      Defendants' GAAP Violations and Restatement Were Material

196.     The Restatement is an admission that the accounting errors were material.  Under ASC 250, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, *to correct a material error in previously issued financial statements*.  As part of the Restatement, Defendants stated: "We . . . concluded that the impacts *were material* to the Company's financial statements prepared according to U.S. generally accepted accounting principles."  The correction of the accounting errors had a material impact on numerous balance sheet line items during each of the Affected Periods, including restricted cash, prepaid expenses, goodwill, accrued expenses, other current liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit.  In addition, as detailed in the chart below, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated in each of the Affected Periods:

4890-2434-9741.v2

|  | FY 2020 | Q4 2020 | Q1 2021 | Q2 2021 |
|---|---|---|---|---|
| Expenses (as reported) | $ 1,251,242 | $ 426,064 | $ 462,637 | $ 457,397 |
| Restatement Impact | $ 39,152 | $ 39,152 | $ 35,303 | $ 52,018 |
| Expenses (restated) | $ 1,290,394 | $ 465,216 | $ 497,940 | $ 509,415 |
| **% understated** | **3.1%** | **9.2%** | **7.6%** | **11.24%** |
|  |  |  |  |  |
| Net Income (Loss) (as reported) | $ (311,869) | $ 25,031 | $ (23,954) | $ (82,210) |
| Restatement Impact | $ (38,756) | $ (38,756) | $ (31,997) | $ (49,357) |
| Net Income (Loss)  (restated) | $ (350,625) | $ (13,725) | $ (55,951) | $ (131,567) |
| **% overstated** | **12.4%** | **>100%** | **133.6%** | **60.0%** |
|  |  |  |  |  |
| EPS (as reported) | $ (0.73) | $ 0.04 | $ (0.04) | $ (0.13) |
| Restatement Impact | $ (0.09) | $ (0.09) | $ (0.05) | $ (0.08) |
| EPS (restated) | $ (0.82) | $ (0.05) | $ (0.09) | $ (0.22) |
| **% overstated** | **12.3%** | **>100%** | **125.0%** | **61.5%** |

**C.    Defendants' Disclosure of Material Weaknesses Is a Further Admission of Falsity**

197.    As described above, as part of the Restatement, Defendants disclosed the existence of material weaknesses in Clarivate's ICFR and DC&P related to equity compensation accounting and deferred tax accounting.  The disclosure of the material weaknesses was an admission that the Defendants' prior assertions regarding the effectiveness of the Company's ICFR and DC&P were false.

198.    A material weakness, as defined in the PCAOB, Auditing Standard No. 5 ("AS 5") is:

[A] deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[20]

199.    Control deficiencies that are determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of ICFR and DC&P contained in the Form 10-K.  Material weaknesses in ICFR or ineffective DC&P are also required to be

---

[20]    An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements, AS 5.A7.

disclosed  in the SOX certifications signed by Defendants in each Form 10-Q and Form 10-K. Specifically, the Defendants' certifications  purport to contain:

> ***All significant deficiencies and material weaknesses*** in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information.

200.    On February 3, 2022, Defendants admitted for the first time that the following material weaknesses in Clarivate's internal controls, including its ICFR and DC&P, existed as of December 31, 2020:

(a)    The lack of an effectively designed control over the communication of modifications to pre-existing compensation agreements in an acquisition transaction between the legal function and the accounting function to ensure the accounting impact of the modifications could be evaluated; and

(b)    The lack of an effectively designed control with a sufficient level of precision to allow for an appropriate review of the tax balances associated with the opening balance sheet of acquired entities.

201.    The existence of these material weaknesses rendered Defendants' prior ICFR and DC&P disclosures and certifications in the Affected Periods false.  These prior assertions were included in Clarivate's Form 10-K and Form 10-K/A (Amendment No. 1) for the year-ended December 31, 2020 and Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2021.

202.    Clarivate's original Form 10-K for the year-ended December 31, 2020, issued on February 26, 2021,  stated, in relevant part:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2020.  Based on the evaluation of our disclosure

controls and procedures *as of December 31, 2020, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective*.

\*      \*      \*

Clarivate's management assessed the effectiveness of Clarivate's internal control over financial reporting as of December 31, 2020. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (2013). Based on management's assessment and those criteria, *management has concluded that Clarivate's internal control over financial reporting was effective as of December 31, 2020*.

203. The Form 10-K also included internal control SOX certifications signed by Defendants Stead and Hanks. The certifications stated:

### CERTIFICATION

I, Jerre Stead, certify that:

1.      I have reviewed this annual report on Form 10-K of Clarivate Plc;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

- 87 -

preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

       c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

       d)      Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

       a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

       b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2021

/s/ Jerre Stead
Jerre Stead

Executive Chairman and Chief Executive Officer

204.     On May 10, 2021, Clarivate issued a Form 10-K/A (Amendment No. 1) that amended Defendants prior assertions on ICFR and DC&P to disclose a control deficiency related to the accounting for warrant liabilities and related accounts. The Form 10-K/A also included SOX internal control certifications signed by defendants Stead and Hanks. Clarivate's disclosures regarding controls, including Defendants' SOX certifications, limited the reported weakness to accounting for warrant liabilities and failed to disclose the material weaknesses in IFCR and DC&P

- 88 -

related to equity compensation accounting and deferred tax accounting, as later disclosed in the Company's Form 10-K/A on February 3, 2022.

205. In each of Clarivate's Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2021, Defendants' disclosures and SOX certifications included the control deficiency related to the accounting for warrant liabilities, but failed to disclose the material weaknesses in IFCR and DC&P related to equity compensation accounting and deferred tax accounting, as later disclosed in the Company's Form 10-K/A on February 3, 2022. The Restatement is an admission that Defendants' DC&P statements and SOX certifications were materially misleading.

## IX. DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS

206. In addition to the scheme and fraudulent course of business, violations of Item 303, and false financial statements, described above, at various times within the Class Period, Defendants issued specific misrepresentations and omissions concerning the quality of Clarivate's product offerings, growth, trends and uncertainties, and financial metrics. Defendants' misstatements and omissions misrepresented the true state of affairs at the Company. Clarivate is liable for the material misstatements and omissions of its employees alleged herein. Likewise, Stead, Hanks, Archbold, Ahmed, Roy, Lomholt-Thomsen, Samson, and von Blucher are liable for the material misstatements and omissions of Clarivate employees alleged below.

### A. Product Quality Statements

207. On July 30, 2020, Stead and other members of Clarivate's senior management participated in a Q2 2020 conference call. In his prepared remarks, Hanks stated: "[W]e are enjoying the benefits of the *product renovations* flowing through to even higher renewal rates." In response to an analyst question, Stead stated: "*[W]e introduced a tremendous amount of new products* in life science in Q2." Roy added: "On the product side, I mean, with Q2, the work from

- 89 -

home in the environment really hasn't slowed us down at all. . . .  And we continue to focus on our data initiatives to improve and expand the scope of our content across the product."

208.    On September 10, 2020, Defendants attended a Citi Global Technology Conference. During the conference, Stead stated:

> We've then also done a great job of introducing the **new products** that we laid out. Just as a reminder, there wasn't – when Richard arrived, there was not a new product pipeline.  **Built that, have most of those products in place** and now are adding a lot more and have done the work that we needed to on user enface – user interface.  So that's significant.  Those pieces, like I said, I think you can count on 3% organic growth year after year with that, **plus the new products being introduced**.

Hanks added: "[T]here's been a significant amount of product renovation."

209.    On October 29, 2020, Stead and other members of Clarivate's senior management participated in a Q3 2020 earnings call.  In his prepared remarks, Stead stated: "In addition to the CPA Global acquisition, **we continued to deliver new product offerings and enhancements across the IP and Science portfolio**."

210.    On November 10, 2020, Stead and other members of Clarivate's senior management participated in Clarivate's 2020 Investor Day.  In his prepared remarks, Ahmed noted: "You only need to observe our press releases over the last year to see that **we've made really substantial progress with all of our new and our enhanced products**."  Roy added: "[W]e have to continue to enhance our data products, and we continue to make new investments in our data ecosystem," and, "[w]e've also maintained a strong product development team, not just to continue to enhance the core customer experience on our heritage platforms, but to begin to assemble the platform of the future."  Hanks added:

> **[W]e continue to invest in our products**.  It's important for us to continue to refine and polish our UI and our UX through the product platforms which our clients use in order to access our content, our data and analytical tools.  This is important for 2 reasons.  Firstly, to drive up the retention rates of our products to the 95% level, which we have discussed on a frequent basis.  And then secondly, associated with the

high retention rates is our ability to generate additional yield. We've locked in price increases for our products at 4%, just over 4% in 2021, reflecting the significant renovation of our product portfolio over the last 2 to 2.5 years.

Hanks also noted: "***We're deploying that cash to improve our products***, to drive retention and to drive growth and to drive pricing."

211.    On February 25, 2021, Stead and other members of Clarivate's senior management participated in a Q4 2020 earnings call. In his prepared remarks, Hanks stated:

> Capital expenditures in 2020 were $108 million, an increase of $38 million over 2019. The increase is a combination of the addition of DRG and CPA Global as well as a higher level of product application development as ***we accelerated the delivery of new products to our clients and drove improvements across the product portfolio***.

Ahmed added:

> [A]ll of the investments that we've made in our products, and of course, we released those at the tail end of last year. Typically with products, our focus is on peak adoption of those products. And that typically takes sort of 6 months or so in a normal market. And in 2021, we expect to very much sort of pursue those opportunities.

Stead also added: "And so the renewal rates, particularly, I think you can see ***plus all the other changes we've made in the new products offering***, we're going to see pretty excited about 2021."

212.    On March 4, 2021, Stead and other members of Clarivate's senior management participated in a Morgan Stanley Technology, Media and Telecom conference. During the conference, Stead stated: "[L]ast year, we introduced 19 new products, most of them in the second half. Last year, we introduced ease-of-use product changes of over 50. All of those get live and well in 2021." He added: "***[W]hat we're providing our customers is truly new product***."

213.    On March 18, 2021, Stead and other members of Clarivate's senior management participated in a Bank of America Information Services conference. During the conference, Stead

- 91 -

stated that "we're investing about $100 million a year now, and we'll continue to, on new product development" and that there were:

> 19 major new products in the second half introduced in 2020 plus dozens of enhancements. When Richard arrived just over 4 years ago, a couple of years before I did, there was no new product portfolio, no new product pipeline. . . . We've built a really great development team. As I said, we're spending about $100 million a year on new product and product enhancements.

Hanks added:

> 4 years ago, when I joined the business just 5 months after the carve-out from TR, since that time, we have done a lot of product renovation. The fidelity and the quality and the heritage of our content assets and analytical tools are second to none. What we've really focused on is UI and UX and improving the user experience.

Stead concluded: "[T]hese are real products being sold as we speak today."

214.   On September 15, 2021, Stead and other members of Clarivate's senior management participated in the Barclays Financial Services conference. During the conference, Hanks stated:

> We've got a significant – *we've done a lot on new product development in the last 2 years*. Our product road map 4 years ago was very, very light as we took – carved the business out from TR. It's just night and day in terms of what we want to bring to market now.

215.   On October 28, 2021, Stead and other members of Clarivate's senior management participated in a Q3 2021 earnings call. In his prepared remarks, Stead stated:

> We *continue to invest heavily* on improving our customer interface and experience and ensuring that we are providing the best products and services in the industry. This year alone, we have introduced more than 60 product enhancements or new product launches that are expected to improve our revenues and profits in the quarters and years ahead.

Later, in response to an analyst's question, Stead stated:

> I said in my script that we've actually made and we've probably not done as good a job as we should be on public reporting, but we've added 60 significant either new products or enhanced products during 2021. That is the result of the investments we've been making. We're going to see a lot of that play out.

Ahmed added:

So you only have to look at our press releases over the last 12 months or so, and you'll see just all of the products that Jerre has just mentioned, over 60 releases. These are major versions or brand-new products. And so let me just pick out a couple as examples because it does, of course, take time to release a new product and drive adoption as well as major versions, but we've made fantastic traction with those products.

Samson added:

First of all, it's making sure that the fundamentals of these leading products are sound and future-proof. So that's doing those hard yards, *investing in the sort of feature and function, making sure that the service provision that's offered by these household names like Derwent and CompuMark are actually not just current today but also future-proof*. A lot of that is internal. You don't see that.

The second thing which you're beginning to see in the marketplace, and some of our success is driven by this now, is the investment in integration and making sure that we're using our data assets across our product suite. And those data integrations bring greater insights and analysis for our customers, and that's definitely beginning to yield dividends.

216.    On November 9, 2021, Stead and other members of Clarivate's senior management participated in Clarivate's 2021 Investor Day. In prepared remarks, Hanks stated:

Now as we look ahead to our near-term outlook, we see our renewal rates increasing to between 92% and 93%, so at least 100 basis points improvement in the renewal rates that we've enjoyed in the trailing 12-month period. *That stems from the continued investment we've made in products*, the reorganization of the front office, in particular, the investment in inside sales, which broadens our interface with the client – with the customers that we serve as well as the investment in regional customer care that Kerri also covered.

He continued: "Management has real conviction of delivering price realization of at least 4% on our subscription book in 2022. *We've made significant investments in product, significant investments in capabilities and that is what we expect to deliver*."

217.    On November 17, 2021, Stead and other members of Clarivate's senior management participated in the RBC Capital Markets Global Technology, Internet, Media and Telecommunications conference. During the conference, Stead stated: "We've actually introduced 60 new products or improvements in 2021 period." He later added:

- 93 -

> And Richard deserves a lot of that credit because he was – when he arrived, there was 0 pipeline of new products, improvements, et cetera.
>
> And I stayed particularly heavy on top of that to support, make sure they got all of the tools they needed and all of the expenses they need.

Hanks added:

> And just back to Jerre's earlier remarks around the product innovation, absolutely right, we've got a – in terms of our product platforming, our product road maps, it is absolutely night and day compared to where we were 3 years ago, 4 years ago.  So we've got extensive road maps to drive growth, good road maps to drive improved retention rates up to that 92.5%, 93% level that Jerre quoted earlier.

218.   Defendants' misstatements and omissions regarding the quality of their product offerings, as set forth in ¶¶207-217, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)   Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive organic revenue growth;

(b)   Since Defendants took over Clarivate in May 2019, the quality of Clarivate's existing products declined due to a lack of investment and the exodus of key product team personnel;

(c)   Since taking over Clarivate in May 2019, Defendants had been arbitrarily raising prices on Clarivate's customers but not providing sufficient additional value through improved product offerings to justify the raised prices, resulting in unhappy customers and lost sales; and

(d)   Confidential witnesses CW-1, CW-2, CW-3, CW-4, and CW-5 all confirmed that Defendants did not invest in new products and allowed the quality of Clarivate's existing products to decline, which resulted in lost customers and sales, and negatively impacted revenue growth.

B.      **Growth Statements**

219.    In addition to the product quality statements above, Defendants also issued specific misrepresentations concerning Clarivate's revenue growth.

1.      **July 30, 2020 Q2 2020 Financial Results**

220.    On July 30, 2020, the Company filed a Form 10-Q with the SEC and issued a press release, both reporting its financial results for Q2 2020, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.  In the Form 10-Q and the press release, and during the conference call, Defendants made materially false and misleading statements and omitted material facts regarding the Company's organic growth.

221.    The Form 10-Q and the press release indicated that the Company's organic subscription revenues grew 3.6%, and that overall organic net revenues grew 1.2%.  Stead stated on the conference call: "[T]he growth strategy we outlined at our Investor Day last November 12 is coming to life ahead of schedule," and reported that "sales growth was driven by a 4% increase in organic subscription revenue from new businesses and annual prices – price increases."  Hanks added: "Organic business revenue, excluding acquisitions, divestitures and foreign exchange, increased 1% as higher subscription revenue was partially offset by lower transactional revenue," and "[o]rganic business subscription revenue growth was almost 4%, driven by new business, including several large contract renewals entered into during the quarter as well as annual price increases."

222.    During the conference call, Stead stated:

January 14, 2019, we said we expected to close 2020 between 4% to 6% organic revenue growth.  We feel very good about that target.  If anything, if you included the organic growth in DRG, *which we won't*.  But if you included that, it would be even higher at the top end of that.

- 95 -

And:

> We had said last year that we hope to be north of 3% with price realization. ***We're very much on track with that***. We had a great meeting in the last week or 2 with Mukhtar, Jeff, Richard, myself and others, and ***we'll be loading, as we've said consistently, our renewal information somewhere north of 4% expected growth***. And I think I don't use the word price because I don't think of it that way. I use the word of value increase. And just for openers, if you think of everything we provide for annual subscription base, what you get at the beginning of the year versus what you continue to receive from us at the end of the year is a significant enhancement when we talk about all the new products, et cetera, we've done.

223.    Analysts reacted positively to Defendants' statements made during the Q2 2020 earnings call. For example:

(a)     In a report dated July 30, 2020, William Blair maintained its "Outperform" rating and commented: "Organic, constant-currency revenue growth of 1.1% was modestly above our expectation for 0.7%, although the negative impact from currency was a bit higher than we expected and the inorganic contribution from DRG ($47 million; up about 2% year-over-year) was lower than we expected";

(b)     In a report dated July 30, 2020, Barclays maintained its "Overweight" rating and commented: "Improving organic trends (6-8% target), margin expansion (40%+ target), and expectations for consistent M&A make CCC an attractive total return story"; and

(c)     In a report dated July 30, 2020, RBC Capital Markets maintained its "Outperform" rating and commented: "CCC also reiterated its prior 2021 exit targets, including +6-8% organic revenue growth . . . ."

224.    Defendants' misstatements and omissions on July 30, 2020, as set forth in ¶¶221-222, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)  The discrete categorization of revenues as organic that Defendants presented to investors masked that the drastic changes Defendants made to Clarivate had left the Company disorganized and unable to accurately account for revenue as either organic or from acquisitions;

(b)  Certain revenues that were being claimed as organic growth were in fact revenues from acquisitions, such as that of DRG in February 2020, which should have been segregated from legacy Clarivate revenues for a full year;

(c)  CW-1 confirmed that the drastic changes that Defendants made to Clarivate, such as moving all clients to inside sales and bundling acquired companies' products with legacy Clarivate products, left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenue;

(d)  Clarivate's organic revenues were not on track to grow 4%-6% exiting 2020. Defendants had crafted this range to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(e)  The drastic changes that Defendants made to Clarivate as soon as they acquired it (starting in May 2019) had left the Company disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue to create the promised level of growth;

(f)  Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(g)  The price increases that Defendants used to prop up Clarivate's lagging growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth; and

- 97 -

(h)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 2.     September 10, 2020 Citi Global Technology Conference

225.    On September 10, 2020, Stead and other members of Clarivate's senior management attended the Citi Global Technology Conference and fielded questions from analysts. An analyst led off the conference call by asking about Clarivate's organic growth:

> I wanted to kick off, Jerre, maybe with one of the more frequent questions we get is with regards to – as we look forward, the pathway to improving organic growth. Could you maybe delve into that topic a little bit, what should investors expect over the next couple of years.

Stead responded:

> When we laid out what we had to do to be able to execute consistently 8% to 10% organic growth. And we've laid that out in several components. First one is pricing. 1 year ago, we did a little less than 2%. This year will be 3%. We have just loaded the plans now for all of our annual subscription-based renewals at over 4%. . . . You should think about us going forward, including after CPA merger, acquisition close. Think about us going forward at somewhere between 4% and 5% organic, years after years, 4.5%. As you'll remember, at IHS, 18 years I ran 10% organic compound. This one has that kind of potential. But think about 4.5% to make it easy, on revenue. Think about retention improving from where we started at the end of 2018 at 90% to improving in total, over 95% and being that for years to come. It makes a huge difference.

He continued:

> We've then also done a great job of introducing the new products that we laid out. Just as a reminder, there wasn't – when Richard [Hanks] arrived, there was not a new product pipeline. Built that, have most of those products in place and now are adding a lot more and have done the work that we needed to on user enface – user interface.

Stead wrapped up: "When we announced this reverse merger with [Churchill] in January of 2019, we said we'd exit 4% to 6% organic growth in 2020. *We're going to do that plus some*."

226.    Defendants' misstatements and omissions on September 10, 2020, as set forth in ¶225, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    Clarivate's organic revenues were not on track to grow 4%-6% exiting 2020. Defendants had made up this range to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)    The drastic changes that Defendants made to Clarivate had left the Company disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue to create the promised level of growth;

(c)    Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)    The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth; and

(e)    CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

4890-2434-9741.v2

3.      **September 16, 2020 Barclays Global Financials New York Conference**

227.      On September 16, 2020, Stead and other members of Clarivate's senior management attended the Barclays Global Financials New York Conference and fielded questions from analysts. During the conference, Stead stated:

Richard [Hanks] and I that day [in January 2019, when the reverse merger was announced] gave guidance for what we thought we would do as we ***exited 2020 with organic growth 4% to 6%***, adjusted EBITDA 35% to 37%. ***We're going to end up outperforming those***, which makes me very happy and very pleased.

228.      Defendants' misstatements and omissions on September 16, 2020, as set forth in ¶227, *supra¸* were materially false and misleading and omitted material facts for the following reasons:

(a)      Clarivate's organic revenues were not on track to grow 4%-6% exiting 2020. Defendants had made up this range to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)      The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue to create the promised level of growth;

(c)      Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)      The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth; and

4890-2434-9741.v2

(e)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

**4.     October 29, 2020 Q3 2020 Financial Results**

229.    On October 29, 2020, the Company filed a Form 10-Q with the SEC and issued a press release, both reporting its financial results for Q3 2020, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.  In the Form 10-Q and the press release, and during the conference call, Defendants made materially false and misleading statements and omitted material facts regarding the Company's organic growth.

230.    The Form 10-Q and the press release indicated that the Company's organic subscription revenues grew 3.5%, and that overall organic net revenues grew 0.2%.   On the conference call, Stead stated: "Organic subscription revenue grew 4%, driven by new business and annual price increase."   Hanks added: "Organic business revenue, excluding acquisitions, divestitures and foreign exchange, was up slightly versus the prior year period as higher subscription revenue was offset by lower transactional revenue," and "[o]rganic subscription revenue increased by $7 million or almost 4% driven by higher sales and price increases for the Web of Science, life science products, Techstreet and CompuMark compared to last year's third quarter."

231.    Stead and other senior executives also made false and misleading statements about the Company's organic growth projections for exiting 2020 during the conference call.  An analyst posed a question about the Company's organic growth:

- 101 -

I wanted to dive deeper into organic revenue growth performance. Subscription revenue was up 3.5% organically in 3Q. This compares with 3.6% organic subscription growth in 2Q. Can you elaborate on the puts and takes that caused subscription organic revenue growth to moderate and some specific initiatives that will help reaccelerate subscription organic revenue growth next quarter?

Stead responded: "***All the things we've laid out that will get us that organic growth are in place today and being executed***."

232.    Analysts reacted positively to Defendants' statements made during the Q3 2020 earnings call.  For example, in a report dated October 29, 2020, RBC Capital Markets maintained its "Outperform" rating and commented: "Eye on the prize.  With pricing, new offerings, and cross-selling, we expect Clarivate to message expectations to exit 2021 at 6-8% organic rev growth, with ultimate goal 8-10% (above peers)."

233.    Defendants' misstatements and omissions on October 29, 2020, as set forth in ¶¶230-232, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    The discrete categorization of revenues as organic that Defendants presented to investors masked that the drastic changes Defendants made to Clarivate had left the Company disorganized and unable to accurately account for revenue as either organic or from acquisitions;

(b)    Revenues that were being claimed as organic growth were in fact revenues from acquisitions, such as those of DRG in February 2020 and CPA Global in October 2020, which should have been segregated from legacy Clarivate revenues for a full year;

(c)    CW-1 confirmed that the drastic changes that Defendants made to Clarivate, such as moving all clients to inside sales and bundling acquired companies' products with legacy Clarivate products, left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenue;

- 102 -

4890-2434-9741.v2

(d)     Clarivate's organic revenues were not on track to grow 4%-6% exiting 2020. Defendants had crafted this range to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(e)     The drastic changes that Defendants made to Clarivate had left the Company disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(f)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(g)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth; and

(h)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 5.     November 10, 2020 Investor Day

234.     On November 10, 2020, the Company held its 2020 Investor Day.  Stead and other members of Clarivate's senior management gave presentations on behalf of the Company.  In his prepared remarks, Stead stated:

> I said in January of 2019, Richard and I announced that we were merging the 2 companies that we would exit 2020 at 4% to 6% organic.  Obviously, did not expect the pandemic.  But I got to tell you, I couldn't feel better.  We've had some softness

- 103 -

> in the transaction business.  We're starting to see that come back.  And ***I expect us to end in that 4% to 6%***.

Stead made this statement nearly halfway through the fourth quarter, with only a month and a half remaining in the year.

235.    Defendants also used the 2020 Investor Day to announce organic revenue growth guidance for 2021.  This guidance was even more aggressive and similarly untethered from the Company's reality.  Defendants' statements about the organic growth investors could expect from Clarivate in 2021 were false and misleading and omitted material facts.  In particular, Defendants failed to disclose that the 5.5%-6.5% organic growth projection for the full year of 2021 and the 6%-8% organic growth projection for exiting 2021 were baseless and unrealistic, that they had been concealing the true state of the Company's organic growth by misclassifying revenue from the acquisitions of DRG and CPA Global as organic, and that they were actively changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales.

236.    Stead and other senior executives made materially false and misleading statements about the Company's organic growth projections for exiting 2021.  As he continued his prepared remarks on the 2020 Investor Day conference call, Stead stated:

> Perhaps even more importantly, as we said, we'd be in the 6% to 8% when we exited 2021.  I have a very strong belief that we'll be there, and it will be at the upper percentage of that because the addition of DRG and CPA gives us great strength in end-to-end solutions no company in the world has.
>
> So you're going to see that.

In the question-and-answer portion of the event, an analyst asked: "What is the organic growth expectation that is embedded in the 2021 guidance to the range and to the guidance bracket your expectations for organic growth next year?"  Stead responded:

- 104 -

It is in ***the 6% to 8% that we committed to doing***.  Over a year ago, we said we'd exit 2021, 6% to 8%.  The assumptions that are built in there cover that.  By the way, they also include improvement year-over-year in all of our acquisitions too.  So I think that helps you think through, yes, and we have a great deal of confidence.  The other thing I would say is we're not assuming with the plan we laid out from the 15% that is transactional, we're – what we've built into the plan is that it will get back close to our actuals in 2019.  So not being overly optimistic, and it could be an upside for us.

237.     Analysts reacted positively to Defendants' statements made during the 2020 Investor Day conference call.  For example:

(a)     In a report dated November 11, 2020, William Blair maintained its "Outperform" rating and commented: "The medium- and long-term outlooks for growth were largely in line with our expectations . . . ."  William Blair also noted: "Stead has strong conviction in reaching the high end of the 6%-8% organic growth range exiting 2021";

(b)     In a report dated November 11, 2020, Morgan Stanley commented: "Clarivate reiterated its 6-8% organic growth target for 2021" and noted, "we view valuation as fair, given organic growth acceleration";

(c)     In a report dated November 10, 2020, RBC Capital Markets maintained its "Outperform" rating and commented: "Messaging from the 2020 Investor Day was consistent with our expectations.  Clarivate is on track with its transformation to deliver accelerating organic rev growth . . . ."  The report also noted: "Clarivate anticipates 6-8% organic rev growth rate exiting 2021, inc 4%+ pricing"; and

(d)     In a report dated November 10, 2020, Barclays maintained its "Overweight" rating and commented: "This one-stop shop strategy [Clarivate's 'end-to-end portfolio'] should help [Clarivate] achieve its MSD pricing goals and already assumes 4%+ within the +6-8% organic growth guidance for 2021E."

238.    Defendants' misstatements and omissions on November 10, 2020, as set forth in ¶¶234-236, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    Clarivate's organic revenues were not on track to grow 4%-6% exiting 2020 and Defendants knew that organic growth of 6%-8% exiting 2021 was unattainable.  Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)    The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(c)    Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)    The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)    Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(f)    CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions,

- 106 -

implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 6.  February 25, 2021 Q4 2020 Financial Results

239.    On February 25, 2021, the Company filed a Form 8-K with the SEC and issued a press release, both reporting its financial results for Q4 2020, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.  In the Form 8-K and the press release, and during the conference call, Defendants made materially false and misleading statements and omitted material facts regarding the Company's organic growth.

240.    The Form 8-K indicated that the Company's:

> [O]rganic revenues increased 2.6% on a reported basis, and up 1.0% on a constant currency basis, due to higher transactional and subscription revenues.  The increase in organic revenue was partially offset by a one-time $3.5 million deferred revenue adjustment not related to the purchase accounting adjustment, which decreased fourth quarter revenue by 1.4%, for which there was no comparable amount in the prior year period.

The press release indicated that the Company's organic subscription revenues grew 0.3%, that organic transactional revenues grew 4.1%, and that overall organic net revenues grew 1.2%.  The press release also quoted Stead stating:

> **We completed operational improvements, which helped to drive organic growth**, and enhanced our IP and Science businesses with two transformative acquisitions. Our growth in the fourth quarter and full year 2020 reflects the benefits of these actions.

Hanks stated on the conference call:

> Organic revenue grew 2.6% on a reported basis and 1% at constant currency in this year's fourth quarter compared to the prior year period, driven by the rebound in transactional revenues.  The organic growth rate was negatively impacted by a onetime $3.5 million deferred revenue adjustment in this year's fourth quarter, which was no comparable amount last year.  This adjustment is not related to the previously mentioned purchase price accounting deferred revenue adjustments of $16 million.

- 107 -

This onetime adjustment of $3.5 million lowered the fourth quarter growth rate on a onetime basis by 1.4%.

241.    Stead and other senior executives  also made false and misleading statements about the Company's organic growth projections for exiting 2021 during the conference call.  An analyst started the question-and-answer portion of the conference call with a question about the Company's organic growth:

> Jerre, you outlined several initiatives to accelerate organic growth in 2021, including new product introductions and a realigned sales force.  Can you elaborate on what you believe will be top drivers of organic growth acceleration this year and what your latest expectations are for organic growth exiting 2021?

Stead responded:

> Back in 2019, when we did our first Investor Day, Richard and I representing our entire team said we expected to operate between 6% and 8% organic growth in 2021.  And we feel very good today, particularly if you think of our pro forma because we'll have only 1 quarter of organic growth of CPA because we didn't close to the fourth quarter.  But if you think about that, and we'll report it, by the way, so you can see it, I feel very good about the upside of that 6% to 8% range.

He continued:

> I am also really pleased with, when I look back now at what happened in pandemic, when I look back at a lot of our customers, I couldn't be more pleased with where we're at from a growth standpoint.  Two huge things, Richard said we would see organic growth increase in the second half, which we will.

242.    Analysts reacted positively to Defendants' statements made at the Q4 2020 earnings call.  For example:

(a)    In a report dated February 26, 2021, William Blair maintained its "Outperform" rating and commented: "Stock Sell-off Signals Investor Frustration, but We Believe Patience Will Be Rewarded as We Progress Into the Second Half," noting: "[W]e believe the sharply negative reaction in the stock price (-16%) was driven by investors' frustration with a lack of tangible progress on the organic growth front," and concluding:

- 108 -

> While we understand investors' frustration with middling organic growth throughout 2020, and the jump from 2.4% growth (adjusted for the one-time deferred revenue write-down) in fourth quarter 2020 to the 6%-8% target range exiting 2021 appears ambitious at first glance, ***we remain believers in the wide array of growth initiatives in place heading into 2021*** and recommend adding to positions in Clarivate on Thursday's weakness.

The report then added detail regarding those growth initiatives:

> Our conviction in the achievability of management's 6%-8% target is derived from several key factors.  First, we expect the acquisitions of DRG and CPA Global, both of which will be included in organic growth in fourth quarter 2021, to maintain their historical growth rates in the upper-single-digit range.  Second, management noted at its November 10 investor day that it had already "locked in price increases . . . at just over 4% in 2021."  If we conservatively assume DRG and CPA Global represent 45% of 2021 revenue (it is likely to be closer to 50% in the fourth quarter given DRG's seasonality) and are growing at 8% in the aggregate, Clarivate would need its legacy business to grow roughly 6% in the fourth quarter to reach the midpoint of its exit rate guidance (7%).  We already know at least 4% will come from price, which is locked in, leaving only 2% of "unaccounted for" growth.  We feel confident the company can capture this 2% (equal to roughly $20 million of annualized revenue) from a combination of 1) a rebound in transactional revenue, which was at least modestly impacted by pandemic specific headwinds; 2) improved retention, which grew 100 basis points year-over-year to 91% in 2020 despite marginal budget pressures in some of Clarivate's key end-markets; 3) better sales productivity resulting from the firm's transition to its often-discussed inside sales model; and 4) early benefits from up- and cross-sell efforts tied to its latest acquisitions.  At 23.5 times our 2022 free cash flow estimate (which is unchanged from our pre-quarter model), we believe the prevailing valuation severely discounts the likelihood of management achieving its 6%-8% growth target exiting 2021; a company with Clarivate's highly predictable revenue stream, strong renewal rates, solid FCF conversion, diversified customer base, limited exposure to end-market cyclicality, and what we consider to be a large M&A opportunity set, growing at a 7% clip on the top line with 45%-plus long-term margins, deserves a FCF multiple in the upper-20s at a minimum, in our view.  With this in mind, we reiterate our Outperform rating.

In short, William Blair's analyst was persuaded by Defendants' misrepresentations regarding Clarivate's ability to deliver on Defendants' organic growth for 2021, even though the Company had just missed its organic growth target for exiting 2020;

(b)     In a report dated February 26, 2021, Morgan Stanley maintained its "Equal-weight" rating and commented:

- 109 -

We attribute the -16% stock performance today to lighter-than-expected organic growth, raising concerns on CLVT's ability to reach its 2021 exit organic growth target of 6-8%.  While we were similarly underwhelmed by the organic growth of subscription revenue and Science, growth was better than it first appeared after adjusting for a one-time $3.5M deferred revenue adjustment and factoring a much tougher comp for both subscription and Science,

and continued: "*[W]e are confident in Clarivate's ability to accelerate its organic growth profile*";

(c)     In a report dated February 25, 2021, Barclays maintained its "Overweight" rating and commented:

[T]he pullback in the shares (-12.5% vs. SPX +0.6%) is primarily due to the organic growth miss of 1% vs. our 4% expectation; most of it came from Science, where even after some 1x adjustments, +2.4% was short of our +4-5% expectation.  Several moving pieces and perhaps lack of specific guidance can be blamed here, *but importantly, FY21's 6-8% exit rate (likely 5-6% reported) was reconfirmed* . . . .

243.    Defendants' misstatements and omissions on February 25, 2021, as set forth in ¶¶240-241, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)     The discrete categorization of revenues as organic that Defendants presented to investors masked that the drastic changes Defendants made to Clarivate had left the Company disorganized and unable to accurately account for revenue as either organic or from acquisitions;

(b)     Revenues that were being claimed as organic growth were in fact revenues from acquisitions, such as those of DRG in February 2020 and CPA Global in October 2020, which should have been segregated from legacy Clarivate revenues for a full year;

(c)     CW-1 confirmed that the drastic changes that Defendants made to Clarivate, such as moving all clients to inside sales and bundling acquired companies' products with legacy Clarivate products, left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenue;

- 110 -

(d)     Clarivate's organic revenues were not on track to grow 6%-8% exiting 2021. Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(e)     The drastic changes that Defendants made to Clarivate had left the Company disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(f)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(g)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(h)     Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(i)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

7.    **March 4, 2021 Morgan Stanley Technology, Media and Telecom Conference**

244.    On March 4, 2021, Stead and other members of Clarivate's senior management attended the Morgan Stanley Technology, Media and Telecom Conference and fielded questions from analysts.  In the question-and-answer portion of the conference call, an analyst asked the following question about the Company's organic growth:

> I did want to spend a lot of time on the main question that I've been getting from investors, which is around getting to the organic growth targets.  And we saw you accelerate growth in Q4 to 2.4% organic constant currency, excluding the deferred revenue adjustment.  And I believe we're expecting 6 to 8 organic exiting 2021.  Can you talk about your full year organic constant currency growth target for '21?  And just help us out with the bridge for achieving that from where we are today.

Before passing the question to Hanks, Stead responded: "What's built into our guidance, which we give the annual guidance, as you know, is 5.5% to 6.5% organic all-in for the year, and it's a combination of pieces. . . .  The likelihood, in my view, Toni, just so you know, of making that happen is 80%, 85% in 2021."  Hanks added: "DRG, which is the business that we acquired in February 2020, that will also be in our Q4 comps, of course, for the first time from an organic perspective.  That will be a double digit grower in 2021."  Stead continued:

> If you think about the traditional Clarivate business, if you will, excluding DRG and CPA, both great assets, think about price realization [*i.e.*, price increases], think about moving us – last year, we introduced 19 new products, most of them in the second half.  Last year, we introduced ease-of-use product changes of over 50.  All of those live and well in 2021.

> And then the last piece is, that I feel so good about, as we shift – 80% will exit – of our customers into inside sales will exit 2021.  It's a huge upside for us as we move to global account bundling, all of our products into global markets that we're focused at.  So ***that's why Richard and mine and our whole team's confidence level of the 5.5% to 6.5% organic for the year is as strong as it is***.

> I couldn't feel better about where we're at because it – people ask me, Toni, what's the biggest issue that I get concerned about, one thing: execution.  All the pieces are there.  And ***when we execute as I know we will, in 2021***, we'll look back and say, "Well, that was a good step forward."

Later in the call, Stead stated: "In May of 2019, when we announced the goals, Richard and I said we'd grow – we'd exit 2021 6% to 8%. *That's going to happen*. And then you should think about us at that upper end of that 6% to 8% for years to come. *It's there*."

245.    Analysts reacted positively to Defendants' statements made during the Morgan Stanley Technology, Media and Telecom Conference. For example:

(a)    In a report dated March 5, 2021, Morgan Stanley maintained its "Equal-weight" rating and commented: "Built into Clarivate's 2021 exit organic growth target of 6-8% (which it confirmed is organic constant currency) is 5.5%-6.5% organic growth for 2021, and CEO Jerre Stead believes the likelihood of reaching the organic targets is 80-85%." The report also noted: "Clarivate's 'in the bag' report, which management reviews every weekend, reflects new sales that it has completed or near completion, is trending above 2020, leaving CLVT confident in its 2021 targets"; and

(b)    Then, in a report dated March 8, 2021, Morgan Stanley upgraded Clarivate to an "Overweight" rating and commented: "We upgrade CLVT to OW post a 24% pullback because *we see levers to accelerating organic revenue growth*." The report added:

> Shares dropped as organic growth slowed to 2.4% – missing management's 4Q20 organic growth target of 4%. This has brought increased skepticism of whether CLVT will be able to achieve its 6-8% organic growth target exiting 2021, leading to a 24% decline in the stock price following its earnings announcement. *We believe this is an over-reaction, and expect CLVT to be able to achieve the low end of its target this year*.

246.    Defendants' misstatements and omissions on March 4, 2021, as set forth in ¶244, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021. Defendants made up these ranges

- 113 -

to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)     The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(c)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)     Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from being a "double-digit grower in 2021" with respect to the fourth quarter; and

(f)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

**8.     March 18, 2021 Bank of America Information Services Conference**

247.    On March 18, 2021, Stead and other members of Clarivate's senior management attended the Bank of America Information Services Conference and fielded questions from analysts. An analyst started the call with the following question about the Company's organic growth:

- 114 -

So if I can just start with your 2021 organic growth guidance.  So I believe you guys are forecasting 5.5% to 6.5% organic growth for the year with an exit rate of 6% to 8%.  This compares to about 2.5% growth in the fourth quarter of 2020.  So can you just help us think through the levers that will drive acceleration over the course of the year?  And just what are the most important factors here?

Stead responded:

For a quick background, back in June of 2019, after we announced that we've done the reverse merger and [Churchill] took Clarivate public, Richard and I said that we hope to exit 2020 at 4% to 6% organic growth in the last quarter and that we hope to exit 2021 at 6% to 8%. . . .

. . . We said and we reaffirmed actually the guidance – and you're right, David, we said organic would be 5.5% to 6.5% for the year in 2021, and we reaffirmed that we expected to exit 2021 at 6% to 8%.  Strong feeling about how that will get there.

Hanks contributed:

So we look at – when we think about the 6% to 8% exit rate in Q4 this year, so firstly, we'll have – the faster-growing assets that we acquired last year will anniversary into our Q4 comps.  So DRG in the life sciences space, which we are expecting to be a double-digit grower this year, will be in our Q4 comps.  And then also CPA Global, acquired the 1st of October last year, will be in our Q4 comps as well.  That will be [a] 6% to 7% grower.  So those 2 faster-growing assets will obviously benefit our Q4 exit rate. . . .

. . . And then on transactional [revenues], we have some really interesting assets around custom data sales, backfile sales.  Some of the brand search that we do around trademark searches, that was obviously – suffered some headwinds, in particular, in Q2 and Q3 last year with COVID, but we're seeing that business improve.  So all in all, we're expecting transactional growth [to] be in this about 7% exiting this year.  So that's sort of [the] sum of the parts that gets us to the 6% to 8% Q4 growth exiting this year.

Stead wrapped up: "And I'd just add . . . that, as I said recently, my confidence level, our confidence level is very high with our ability to execute that.  We're off to a great start."

248.    Defendants' misstatements and omissions on March 18, 2021, as set forth in ¶247, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021.  Defendants made up these ranges

- 115 -

to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)     The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(c)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)     Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(f)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 9.     April 29, 2021 Q1 2021 Financial Results

249.     On April 29, 2021, the Company filed a Form 8-K with the SEC and issued a press release that reported its financial results for Q1 2021, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and

fielded questions from analysts.  In the Form 10-Q, later filed on May 10, 2021, the press release

filed on Form 8-K, and during the conference call, Defendants made materially false and misleading

statements and omitted material facts regarding the Company's organic growth.

250.     The Form 10-Q and the press release indicated that the Company's organic

subscription revenues grew 6%, that organic transactional revenues grew 10%, and that overall

organic net revenues grew 8%.  The press release quoted Stead as stating:

> While the COVID pandemic impacted our business for most of 2020, we are very
> pleased to see a recovery in organic subscription and transactional revenue growth.
> With the solid start to the year, we have updated our 2021 financial outlook and
> continue to see a pathway to achieving 6% to 8% organic revenue growth exiting
> 2021.

251.     During the Q1 2021 earnings call, Stead stated:

> We're off to a very, very good start in 2021.  As expected, our organic revenue
> growth is improving following last year's challenges due to the pandemic. . . .
>
>         . . . Adjusted organic revenue at constant currency grew 7%, with
> subscription revenue increasing 6% and transactional revenue up 10%.   This
> represents our best organic growth quarter since going public 2 years ago.
>
>         While we do expect some timing impacts on our quarterly organic revenue
> growth this year, our first quarter results demonstrate that ***we are absolutely on the
> pathway to achieving 6% to 8% organic growth exiting 2021***.

Hanks added:

> [I]n terms of the DRG acquisition end of February last year, we're frankly delighted
> with the performance of the business in the first quarter.  ***But more importantly, the
> outlook for the rest of [the] year***.  The market is growing at 12% per annum.  And
> our expectations are that we will grow at the double-digit rates this year, which the
> company delivered in 2019 pre-acquisition.  Obviously, there was some impact from
> COVID last year, but the business is performing very well.  ***And importantly, our
> optics into the rest of the year are favorable***.

Stead later stated: "Just as a reminder, we said we'd do 6% to 6.5% all in organic for all of 2021.

We're a bit ahead of that, that's why we raised the guidance from the bottom a bit on revenue."

Stead closed the call by stating:

- 117 -

[I]f you think about what Mukhtar [Ahmed, President of the Science Group] was delivering last year in Q3 '18, '19 new products, Jeff [Roy, President of the IP Group] is doing the same, plus some.  Just couldn't be happier, couldn't be more proud or more pleased of our team.  *We're on track to do what we've said we're going to do*.

252.   Analysts reacted positively to Defendants' statements made during the Q1 2021 earnings call.  For example:

(a)   In a report dated April 29, 2021, William Blair maintained its "Outperform" rating and commented: "Organic Growth Upside Drives Better-Than-Expected First-Quarter Results," noting: "First-quarter results were a nice change of pace following two straight quarters of underwhelming (even if mostly expected) organic revenue growth, which should help to alleviate investors' concerns about the acheivability [sic] of the company's 6%-8% growth target exiting 2021";

(b)   In a report dated April 29, 2021, Morgan Stanley maintained its "Overweight" rating and commented: "CLVT posted a strong 1Q21 print with revenue and adj. EBITDA beats and posting 7% organic growth.  *Following the quarter, we continue to have conviction about CLVT reaching its 6-8% target by the end of 2021*";

(c)   In a report dated April 29, 2021, Jefferies maintained its "Buy" rating and commented (as a "Key Takeaway"): "What to do with CLVT shares: Buy more if you believe the company can exit 2021 with organic growth rate in the range of 6-8% and that 2023 targets are achievable based on more M&A to come.  We continue to believe this is a multiple catch up story to higher growth info services peers"; and

(d)   In a report dated April 29, 2021, Barclays maintained its "Overweight" rating and commented: "Importantly, CLVT sounds confident in exiting the year at its stated 6-8% organic growth rate – and likely on the high end since the full year guide is 6-6.5%."

253.    Defendants' misstatements and omissions on April 29, 2021, as set forth in ¶¶250-251, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    The discrete categorization of revenues as organic that Defendants presented to investors masked that the drastic changes Defendants made to Clarivate had left the Company disorganized and unable to accurately account for revenue as either organic or from acquisitions;

(b)    Revenues that were being claimed as organic growth were in fact revenues from acquisitions, such as those of DRG in February 2020 and CPA Global in October 2020, which should have been segregated from legacy Clarivate revenues for a full year;

(c)    CW-1 confirmed that the drastic changes that Defendants made to Clarivate, such as moving all clients to inside sales and bundling acquired companies' products with legacy Clarivate products, left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenue;

(d)    Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021.  Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(e)    The drastic changes that Defendants made to Clarivate had left the Company disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(f)    Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(g)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(h)     Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(i)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 10.     May 19, 2021 Barclays Americas Select Franchise Conference

254.     On May 19, 2021, Stead and other members of Clarivate's senior management attended the Barclays Americas Select Franchise Conference and fielded questions from analysts. During the conference, Stead stated:

> And so what we'll be focused on is getting ourselves at, I believe we have all the things in place today to be able to operate consistently at that 8% to 10%, maybe higher organic growth complemented by tuck-ins [*i.e.*, smaller acquisitions] for years to come.

This prompted an analyst to ask the following question about the Company's organic growth:

> I mean, 6% to 8% is your kind of exit rate this year.  And that's I think the range that most investors are looking at.  Earlier in the call, you talked about consistently doing 8% to 10%.  What is the gap in those 2 ranges?  Like what do you need to get done at Clarivate to be able to successfully do 8% to 10% because that's quite ambitious?

Stead responded:

- 120 -

So the 8% to 10%, think about the targets we've got. Inside sales will add 1.5% to 2%, our organic growth as we focus and harvest those smaller customers. Price realization all-in consistently will be, I'll be conservative and say, 4%. So I get to 6%.

New product offerings between the 2 business, ours and ProQuest [a new significant acquisition announced on May 17, 2021] is at least worth 2%. We'll have continued to increase our renewal rates. We expect to get north of 95%. We will also complement that as we continue to grow our professional services, which has become a great business because what that gives us is, for every dollar we spend about 2 years later, we'll get $20 of pull-through, almost for sure, of annual subscription base. So that's another 2%. And that – then the new names that we go after is probably another 1%, 1.5%.

So I just gave you 12% of what is there for us to execute. We have to execute it, of course. But that's why I think the 8% to 10% is the realistic number, and our team has signed up for that.

Later in the call, in response to a question about DRG, Stead stated:

There's no question in Q4, which is historically, their biggest 35% of their revenue has been historically in Q4. And *we're well on track*. . . . I think *you should think about very strong double digits in DRG in – not think about it, I know it's going to happen in 2021* and you'll see that cross-selling as we move to those 5 global markets in the healthcare and life science. You'll see that growing equal to at least 11%, 12% to 14% global, and a big piece of that is because of DRG, Manav.

255.     Defendants' misstatements and omissions on May 19, 2021, as set forth in ¶254,

*supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)     Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic

growth for the full year of 2021 or to grow 6%-8% exiting 2021. Defendants made up these ranges

to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for

organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)     The drastic changes that Defendants made to Clarivate had left the Company

very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the

resources to drive revenue organically to create the promised level of growth;

- 121 -

(c)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)     Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(f)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

**11.     July 29, 2021 Q2 2021 Financial Results**

256.     On July 29, 2021, the Company filed a Form 10-Q with the SEC and issued a press release, both reporting its financial results for Q2 2021, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.  In the Form 10-Q and the press release, and during the conference call, Defendants made materially false and misleading statements and omitted material facts regarding the Company's organic growth.

257.     The Form 10-Q and the press release indicated that the Company's organic subscription revenues grew 1.4%, that organic transactional revenues grew 15.8%, and that overall

- 122 -

organic net revenues grew 5.8%.  The press release quoted Stead as stating: "With our solid first half results including almost 6% organic revenue growth at constant currency, we tightened the range of our 2021 financial outlook.  We currently expect to exit the fourth quarter of 2021 with organic revenue growth towards the upper-end of our 6% to 8% target."

258.    On the Q2 2021 earnings call, Stead stated:

Adjusted revenue for the second quarter was up 57% to $447 million on a constant currency basis, driven by the acquisition of CPA Global and organic revenue growth of 5%.

Organic transactional revenue increased 16%, and organic subscription revenue increased 1.5% in constant currency. . . .  For the first 6 months, adjusted organic revenue increased 6%, which is a better reflection on our performance and normalizes COVID-related events in 2020.

*As a result of the favorable first half, we've tightened the range of our 2021 outlook.  We currently expect to exit the fourth quarter with organic revenue growth towards the upper end of our 6% to 8% organic growth target.*

Stead continued:

Organic revenue in the first half was up almost 6%.  We currently expect to deliver 6.5% to 7% plus in the second half of this year, with a big pickup in fourth quarter compared to the second and third quarters.  What's driving the increase?

As an important reminder, 60% of DRG's business comes in the second half of the year, with 60% of this in the fourth quarter.  We will also benefit from a full quarter of organic growth from CPA Global in the fourth quarter and realize the benefits of the cost synergies that will drive significant margin expansion in the fourth quarter.  Additionally, transactional revenue is seasonally strongest in the fourth quarter.  *These items together will drive our organic growth rate into the upper end of our 6% to 8% target rate exiting 2021*.

An analyst started the question-and-answer portion of the call with the following question:

Just wanted to delve a little bit more into the science organic growth.  You grew 5% this quarter there.  And embedded in that, you have DRG, which is growth-accretive.  So is that implying the legacy business is growing roughly around, let's say, 4% and, mostly, all from pricing?  Just wanted to understand the different pieces going on within science.

Hanks responded:

- 123 -

We acquired in February 2020 the DRG business, which we've now renamed HDS. As you can see from the 10-Q that we filed premarket, HDS grew 18% in the second quarter. It is a faster-growing asset in that very attractive life sciences space.

*     *     *

But all in, we're very satisfied with the Science Product Group performance. And as you said, 5% growth for the quarter, impressive results. And *most importantly, the pipeline for the life sciences business is looking particularly strong for the second half of the year*.

Later in the call, Stead stated:

Just I'd add one thing to that because what we've tried to point out is that fourth quarter is the way this model plays out, our strongest quarter will be. That's why *we've got the high confidence in ending – exiting 2021 at the upper end of the 6% to 8% organic. We're tracking that by the day, and confidence increases each day*.

259. Analysts reacted positively to Defendants' statements made during the Q2 2021 earnings call. For example:

(a)     In a report dated July 29, 2021, William Blair maintained its "Outperform" rating and commented (as a "Key Takeaway"):

Management also reiterated its target of the upper end of 6%-8% organic, constant-currency growth target exiting 2021, primarily driven by a seasonally strong fourth quarter (with a higher proportion of rapidly growing DRG revenue). Further, management continues to expect sustainable 6%-8% organic growth from CPA Global once it enters organic growth in the fourth quarter (though its full-year growth target is closer to the 5%-6% range);

(b)     In a report dated July 29, 2021, Morgan Stanley maintained its "Overweight" rating and commented: "Following the quarter, we continue to have conviction about CLVT reaching its 6-8% target by the end of 2021"; and

(c)     In a report dated July 29, 2021, Barclays maintained its "Overweight" rating and commented: "[W]e stay OW since: a) CLVT reaffirmed its expectation to exit 4Q21 at the higher end of the 6%-8% organic growth range."

260.    Defendants' misstatements and omissions on July 29, 2021, as set forth in ¶¶257-258, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    The discrete categorization of revenues as organic that Defendants presented to investors masked that the drastic changes Defendants made to Clarivate had left the Company disorganized and unable to accurately account for revenue as either organic or from acquisitions;

(b)    Revenues that were being claimed as organic growth were in fact revenues from acquisitions, such as those of DRG in February 2020 and CPA Global in October 2020, which should have been segregated from legacy Clarivate revenues for a full year;

(c)    CW-1 and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving all clients to inside sales and bundling acquired companies' products with legacy Clarivate products, left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenue;

(d)    Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021.  Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of growth was unattainable;

(e)    The drastic changes that Defendants made to Clarivate had left the Company disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(f)    Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

- 125 -

(g)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(h)     Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth;

(i)     Defendants were padding the pipeline of new business in their CRM by encouraging sales people to record potential sales as committed sales, thereby rendering Defendants' statements regarding the "pipeline . . . looking particularly strong" misleading; and

(j)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 12.     September 15, 2021 Barclays Financial Services Conference

261.   On September 15, 2021, Stead and other members of Clarivate's senior management attended the Barclays Financial Services Conference and fielded questions from analysts.  During the conference, an analyst posed the following question regarding the Company's organic growth:

> I just wanted to touch on some of the organic growth and specifically your exit rate that you've talked about of 6% to 8% exiting the fourth quarter of this year.  Can you just help us walk through your confidence behind that?  And also, clearly, the comps were easier.  So is that 6% to 8% sustainable?

Stead responded: "Yes, the 6% to 8% is sustainable and will be for years to come.  ***A high degree of confidence of exiting, as we said we would, 6% to 8%.***"

- 126 -

262.    Defendants' misstatements and omissions on September 15, 2021, as set forth in ¶261, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)     Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021. Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)     The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(c)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)     Defendants were in the process of changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(f)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions,

implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 13.   October 28, 2021 Q3 2021 Financial Results

263.   On October 28, 2021, the Company filed a Form 10-Q with the SEC and issued a press release, both reporting its financial results for Q3 2021, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.  In the Form 10-Q and the press release, and during the conference call, Defendants made materially false and misleading statements and omitted material facts regarding the Company's organic growth.

264.   The Form 10-Q and the press release indicated that the Company's organic subscription revenues grew 3.2%, that organic transactional revenues grew 2.7%, and that overall organic net revenues grew 3.9%  in the third quarter of 2021.

265.   During the Q3 2021 earnings call, Stead stated:

> For the first 9 months, adjusted organic revenue increased 5% with subscription increasing 4% and transactional up 9%.  You've heard us highlight many times this year that we expect a strong fourth quarter with organic revenue growth between 6% and 8%.  We are realizing the many benefits from the transformative acquisitions of DRG and CPA Global and the many operational improvement initiatives that have been put in place, including our inside sales structure and field sales realignment. With a strong fourth quarter, organic revenue growth for the full year of 2021 is currently expected to be in the 6% to 6.5% range.

He also noted: "This morning, we reaffirmed our 2021 outlook. . . .  With a strong fourth quarter, including organic revenue growth of 6% to 8%, we expect full year organic revenue growth to be in the 6% to 6.5% range."  Hanks added: "Organic revenue increased by 3% at constant currency, driven by increases in both subscription and transactional revenues," that "[t]he third quarter 3% organic subscription revenue increase was primarily due to an increase in subscription revenues in Life Sciences, Healthcare Data Solutions [*i.e.*, DRG] and CompuMark," and that, "[o]rganic

- 128 -

transactional revenues increased by 3% at constant currency primarily due to higher trademark search volumes though search volumes slowed during the quarter due to the summer period." During the question-and-answer portion of the call, an analyst posed the following question: "On an organic constant currency basis, the transaction revenue growth moderated to 2.7% year-over-year in 3Q. Can you elaborate on the factors other than seasonality that contributed to the deceleration in growth?" Hanks responded: "The principal drivers were slightly lighter Life Sciences and DRG transactional revenues [this] quarter. I'd add that we've got a good order book going into the fourth quarter." Another analyst posed a similar question: "I was just hoping – obviously, fourth quarter, I think, seasonally is usually a big quarter. I was just hoping you could help us just bridge to get a little bit more comfortable with both the organic growth and kind of the EBITDA number." Stead responded:

> Our fourth quarter is always up significantly. Last year, it was up $42 million. So that's the base that we will operate with as we move forward. It's the first time that we'll include the CPA in our organic revenue all-in, and that will add – that happens to be CPA's largest quarter for many reasons. . . .
>
> And DRG if you remember, 35% of their total revenue is a Q4 delivery. . . . So that will put us right smack on as we would expect to have at the $500 million to go in Q4, which would be the midpoint of the range.

Stead later stated:

> We did say late last year, actually on November 10 last year when we did Investor Day, that we expected to exit 6% to 8% organic growth all-in. With the numbers that we've now presented, I feel really good about where we're at, the things we have going on and look forward to reporting in February next year great results that we're going to get in Q4.

Another analyst posed the following question:

> [J]ust mathematically, I think it's important that DRG does very well in the fourth quarter just given that it is sort of weighted towards back half and especially fourth quarter. So I guess can you talk about how – DRG growth, what it was in the third quarter, how it's trended this year? Just to give us some increased confidence in the fourth quarter performance.

- 129 -

Ahmed responded:

> *We have direct insight into the backlog. And going into Q4, that backlog is pretty strong as well as line of sight to key deals that upon conversion, we plan to then subsequently convert to revenue*. So that cadence, that focus, the controls, those are all in place, and that's the reason why we have confidence in our HDS [Clarivate's new name for DRG] business in Q4.

266. Analysts reacted positively to Defendants' statements made at the Q3 2021 earnings call. For example:

(a) In a report dated October 29, 2021, Jefferies maintained its "Buy" rating and commented (as a "Key Takeaway"):

> What to do with CLVT shares: Buy more if you believe the company can ramp organic growth to the higher end of 6-8% exiting Q4 and that the company can execute on its goals of doing 4-5 tuck-ins per year going forward. We find the current multiple attractive given the high single digit organic growth framework the company can execute on;

(b) In a report dated October 29, 2021, Morgan Stanley maintained its "Overweight" rating and commented: "Despite the lower-than-expected organic growth rate of 3.1% in 3Q21 (vs. MSe of 4.7%), management maintained its upper-end-of 6%-8% target for 4Q21, implying a significant 4Q ramp." The report also noted: "Management is confident in its ability to deliver organic growth at the upper end of its 6%-8% target for 4Q21";

(c) In a report dated October 28, 2021, BofA Securities maintained its "Buy" rating and commented: "Despite some Q3 softness, management expressed confidence of achieving the upper end of the 6-8% organic growth target for Q4. In our view, *hitting this target will be important in order for investors to gain confidence in the Clarivate acceleration story*";

(d) In a report dated October 28, 2021, William Blair maintained its "Outperform" rating and commented:

> Management reiterated all aspects of 2021 revenue guidance, as well as its expectation for reaching the upper end of its 6%-8% organic, constant-currency

- 130 -

growth target in the fourth quarter, primarily driven by seasonal strength with a higher proportion of rapidly growing DRG revenue and the introduction of CPA (which we believe has been growing in line with management's 6%-8% expectations) into organic growth; and

(e)    In a report dated October 28, 2021, RBC Capital Markets maintained its "Outperform" rating and commented: "Organic revenue growth moderated in 3Q21 and came in below expectations; however, the company reinforced organic growth acceleration in 4Q21 to higher end of the 6-8% driven by the seasonal strength in DRG as well as the CPA Global."

267.    Defendants' misstatements and omissions on October 28, 2021, as set forth in ¶¶264-265, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)    The discrete categorization of revenues as organic that Defendants presented to investors masked that the drastic changes Defendants made to Clarivate had left the Company disorganized and unable to accurately account for revenue as either organic or from acquisitions;

(b)    Revenues that were being claimed as organic growth were in fact revenues from acquisitions, such as those of DRG in February 2020 and CPA Global in October 2020, which should have been segregated from legacy Clarivate revenues for a full year;

(c)    CW-1 confirmed that the drastic changes that Defendants made to Clarivate, such as moving all clients to inside sales and bundling acquired companies' products with legacy Clarivate products, left Clarivate unable to accurately segregate organic revenues from acquisition-driven revenue;

(d)    Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021.  Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of growth was unattainable;

- 131 -

(e)     The drastic changes that Defendants made to Clarivate had left the Company disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(f)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(g)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(h)     Defendants had spent the previous year and a half changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth;

(i)     Defendants were padding the pipeline of new business in their CRM by encouraging sales people to record potential sales as committed sales; thus, their statements that "we've got a good order book going into the fourth quarter," or, "[w]e have direct insight into the backlog . . . [a]nd going into Q4, that backlog is pretty strong as well as line of sight to key deals that upon conversion, we plan to then subsequently convert to revenue" were misleading; and

(j)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

4890-2434-9741.v2

14.    **November 9, 2021 Investor Day**

268.    On November 9, 2021, the Company held its 2021 Investor Day.  Stead and other members of Clarivate's senior management gave presentations on behalf of the Company.  At the event, Defendants made materially false and misleading statements about the Company's organic growth.  In his prepared remarks to start the event, Stead stated: "[O]ne thing I'm tremendously proud of is that *we expect to close the year at 6% to 6.5% organic revenue growth for the year* and [are] very excited to do that."  He also noted: "[O]ur colleagues want to see *a company like we're delivering, the 6% to 6.5% organic growth*, complemented [sic] by acquisitions in the years to come."  He also added: "This is the current that we're reaffirming guidance, $1.8 billion to $1.84 billion revenue, adjusted revenue, 6% to 6.5% exiting 2021 into 2022 for all-in organic growth.  Remember, 1.2%, 1.3% in 2020, *6% to 6.5% for the year of organic growth as we exit 2021*."  Chief Revenue Officer Lomholt-Thomsen stated: "Now clearly, Clarivate has been re-architected as a business.  But even under those circumstances, *this year, we will deliver more than 6% organic growth*, which I think is pretty impressive."

269.    Analysts reacted positively to Defendants' statements made during the November 9, 2021 Investor Day.  For example:

(a)    In a report dated November 10, 2021, William Blair maintained its "Outperform" rating and commented: "On November 9, Clarivate hosted a virtual investor day to highlight the continued evolution of its core strategy ('One Clarivate'), the strength of its primary end-markets, and the steps being taken to enhance the productivity of its salesforce, *all of which are relevant in the company's pursuit of mid- to high-single-digit organic revenue growth*"; and

- 133 -

(b)     In a report dated November 9, 2021, Morgan Stanley maintained its "Overweight" rating and commented: "We continue to believe CLVT's stock will work once the company starts to deliver on its organic growth targets."

270.    Defendants' misstatements and omissions on November 9, 2021, as set forth in ¶268, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)     Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021.  Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)     The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(c)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)     Defendants had spent the previous year and a half changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(f)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or

- 134 -

terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 15. November 17, 2021 RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference

271.   On November 17, 2021, Stead and other members of Clarivate's senior management attended the RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference and fielded questions from analysts.

272.   During the conference, an analyst opened the question-and-answer portion of the event by asking the following question about Clarivate's organic growth:

> That's a great introduction, Jerre.  And then as you highlighted, we see very strong momentum in the business going into the fourth quarter.  And the organic growth is expected to accelerate to 6% to 8% in '21.  We've received a number of inbound questions from investors just trying to better understand the growth acceleration from 3% in the third quarter to 6% to 8%.  And I was wondering if you could help – if you or Richard could help us with the revenue bridge, how should we think about particularly the contribution from the acquisition, all of those things?

Hanks responded:

> So the objective is, as we said consistently, to get to 6% to 8% organic growth in the fourth quarter.  The pickup in Q4 is principally driven by transactional revenue growth, in particular in the Science Group.  So that is custom data sales in life sciences.  It is in academic and government.  It is backfile sales, where we sell chronological slices of information and also in professional services and consulting as we close out delivery of projects naturally consistent with the end of the year.  So it's very much driven by those elements of our revenue stream.

> And as a reminder, the business that we acquired in February 2020, being DRG in the life sciences space, that has a significant back-end loading of revenue into Q4, where 36% of their annual revenue was booked in Q4, driven by those custom data deals and consulting.  So those are the drivers of Q4 growth in particular.

> I'd also add in absolute terms that CPA in the IP Group, the business that we acquired in October last year, Q4 from a seasonality perspective in absolute terms is always their strongest quarter, just simply due to the timing of patent book, patent

renewals as we close out the calendar year.  So those are the main levers that we're pulling on to get into that range of outcomes.

273.   Analysts reacted positively to Defendants' statements made during the RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference.  For example, in a report dated November 17, 2021, RBC Capital Markets noted a "Sentiment Indicator" of "positive" and commented: "Jerre Stead, CEO of Outperform-rated Clarivate, and Richard Hanks, CFO *highlighted strong momentum in the business going into 4Q21 which should drive improvement in organic revenue growth*."  The report also noted: "Mr. Stead was optimistic on hitting the 6-8% target exiting FY21 and reminded investors that YTD organic growth has been ~5%, albeit 3% in 3Q21."

274.   Defendants' misstatements and omissions on November 17, 2021, as set forth in ¶¶272-273, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)   Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021.  Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)   The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(c)   Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

- 136 -

(d)     The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)     Defendants had spent the previous year and a half changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(f)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

### 16.     December 7, 2021 Barclays Global Technology, Media and Telecommunications Conference

275.     On December 7, 2021, Stead and other members of Clarivate's senior management attended the Barclays Global Technology, Media and Telecommunications Conference and fielded questions from analysts.

276.     During the conference, an analyst posed the following question regarding Clarivate's expected fourth quarter organic growth:

> Jerre, the other question we get a lot about, and perhaps you can help – with the help of Gordon and Mukhtar, help us appreciate it, is the big fourth quarter ramp that's required to meet the guidance that you set for this year, for 2021.
>
> And part of that obviously is the heavy weight to fourth quarter or second half from DRG, part of that is, I think, the transaction business from CPA Global.  But maybe, if you can just give us the high level, and if I could just ask Gordon and Mukhtar, from their perspective, to help us appreciate why – or at least appreciate the visibility that you guys have for that.

- 137 -

Ahmed responded:

> So typically, what happens in Q4 is when they need access to data to drive decision-making so that they can then determine their portfolios for the subsequent calendar year. That's what typically happens. That's why Q4 is a time when there's a lot of demand for data, for reports, for expertise. And that's why **with DRG, historically, you've seen that Q4 ramp up. It all happens in Q4**.

277. Defendants' misstatements and omissions on December 7, 2021, as set forth in ¶276, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)   Clarivate's organic revenues were not on track to achieve 5.5%-6.5% organic growth for the full year of 2021 or to grow 6%-8% exiting 2021. Indeed, by this late in the quarter, Defendants knew that the promised fourth quarter organic revenue growth was not materializing and would not materialize. Defendants made up these ranges to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate knowing that this level of organic growth was unattainable;

(b)   The drastic changes that Defendants made to Clarivate had left the Company very disorganized and had driven away key sales people and analysts, such that Clarivate lacked the resources to drive revenue organically to create the promised level of growth;

(c)   Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth;

(d)   The price increases that Defendants used to prop up Clarivate's lagging organic growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth;

(e)   Defendants had spent the previous year and a half changing DRG's revenue profile by pulling DRG's historically fourth quarter weighted transactional sales forward and

4890-2434-9741.v2

switching customers to a subscription model, thus cannibalizing DRG's fourth quarter sales and preventing DRG from delivering the promised fourth quarter growth; and

(f)     CW-1, CW-2, CW-3, CW-4, and CW-5 confirmed that the drastic changes that Defendants made to Clarivate, such as moving clients to inside sales, driving away or terminating field sales agents and subject matter experts without backfilling their positions, implementing arbitrary price hikes that angered customers, and failing to adequately invest in new products, left Clarivate unable to drive growth.

**C.     Omissions in Violation of MD&A Disclosure Rules**

278.    As detailed above at §VII., Clarivate's SEC filings, including its Forms 10-Q and Forms 10-K filed during the Class Period, failed to disclose information required to be disclosed therein under Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303.  In particular, Clarivate was required to disclose known material events and uncertainties reasonably likely to affect its future revenues in in the MD&A section of its SEC filings.  Defendants' omissions, in violation of Item 303 as described above in §VII., rendered the following Class Period SEC filings materially false and misleading:

(a)     July 30, 2020 Form 10-Q for the quarter ended June 30, 2020;

(b)     October 29, 2020 Form 10-Q for the quarter ended September 30, 2020;

(c)     February 26, 2021 Form 10-K for the year ended December 31, 2020;

(d)     May 10, 2021 Form 10-K/A for the year ended December 31, 2020;

(e)     May 10, 2021 Form 10-Q for the quarter ended March 31, 2021;

(f)     July 29, 2020 Form 10-Q for the quarter ended June 30, 2021; and

(g)     October 28, 2021 Form 10-Q for the quarter ended September 30, 2021.

D.      **Statements Regarding Financial Results and Internal Controls**

279.    As described above at §VIII., Clarivate's Restatement confirms that its financial statements and statements regarding internal controls for the Affected Periods were materially misleading.

1.      **Q4 2020 Financial Results**

280.    On February 25, 2021, the Company issued a press release announcing its financial results for Q4 2020 and FY 2020, followed by a conference call the same day to discuss those results.  On the following day, February 26, 2021, the Company filed a Form 10-K with the SEC reporting its financial results for the year ended December 31, 2020.  In the press release, on the conference call, and in the Form 10-K, Defendants made materially false and misleading statements and omitted material facts regarding the Company's Q4 2020 financial results.

281.    As detailed above in ¶¶191-193, *supra*, the Company later restated the Q4 2020 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP.  As described in ¶¶195-196, *supra*, the Restatement was an admission that the Q4 2020 financial results were materially false, and in violation of GAAP, when originally reported.  The accounting errors caused numerous financial statement line items to be materially misstated as of December 31, 2020, including restricted cash, prepaid expenses, goodwill, accrued expenses, other current liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit.  In addition, as detailed in the chart below, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q4 2020:

|                                   | Q4 2020      |
|-----------------------------------|--------------|
| Expenses (as reported)            | $ 426,064    |
| Restatement Impact                | $  39,152    |
| Expenses (restated)               | $ 465,216    |
| **% understated**                 | **9.2%**     |
|                                   |              |
| Net Income (as reported)          | $    6,415   |
| Restatement Impact                | $ (38,756)   |
| Net Income (Loss)  (restated)     | $ (32,341)   |
| **% overstated**                  | **>100%**    |
|                                   |              |
| EPS (as reported)                 | $     0.01   |
| Restatement Impact                | $    (0.09)  |
| EPS (restated)                    | $    (0.05)  |
| **% overstated**                  | **>100%**    |

282.    The February 26, 2021 Form 10-K also contained false statements regarding the effectiveness of the Company's ICFR and DC&P.  As detailed above in ¶¶194, 197-205, *supra*, the Company later admitted, as part of the Restatement, that a material weakness in ICFR existed as of December 31, 2020 and that its DC&P were not effective as of that date.  The Restatement and acknowledgement of a material weakness was an admission that the following disclosures in the February 26, 2021 Form 10-K were materially false and misleading and omitted material facts.

(a)    Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2020.  Based on the evaluation of our disclosure controls and procedures *as of December 31, 2020, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective*.

(b)    Clarivate's management assessed the effectiveness of Clarivate's internal control over financial reporting as of December 31, 2020.  In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (2013).  Based on management's assessment and those criteria, *management has concluded that Clarivate's internal control over financial reporting was effective as of December 31, 2020*.

- 141 -

283.     The Restatement and acknowledgement of a material weakness was also an admission that the following SOX certifications, signed by Stead and Hanks in the February 26, 2021 Form 10-K, were materially false and misleading and omitted material facts:

**CERTIFICATION**

I, Jerre Stead, certify that:

1.     I have reviewed this annual report on Form 10-K of Clarivate Plc;

2.     Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.     Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

        a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

        b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

        d)     Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report)

that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2021

/s/ Jerre Stead
Jerre Stead

Executive Chairman and Chief Executive Officer

### 2.      Amended Q4 2020 and FY 2020 Financial Results

284.    On May 10, 2021, the Company filed a Form 10-K/A (Amendment No. 1) with the SEC reporting its amended financial results for the fourth quarter and year ended December 31, 2020.  The amended results corrected an accounting error related to the classification of warrants.  In the Form 10-K/A (Amendment No. 1), Defendants made materially false and misleading statements and omitted material facts regarding the Company's amended Q4 2020 financial results.

285.    As detailed above in ¶¶191-193, *supra*, the Company later restated the amended Q4 2020 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP.  As described in ¶¶195-196, *supra*, the Restatement was an admission that the amended Q4 2020 financial results were materially false, and in violation of GAAP, when originally reported.  As a result of the accounting errors and the resulting Restatement, the following statement in the Form 10-K/A (Amendment No. 1) was materially false:

- 143 -

[M]anagement has concluded that our audited financial statements included in this Annual Report on Amended Form 10-K/A are fairly stated in all material respects in accordance with GAAP for each of the periods presented herein.

286.    The accounting errors also caused numerous financial statement line items in the Form 10-K (Amendment No. 1) to be materially misstated as of December 31, 2020.  In particular, as detailed in the chart below, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q4 2020:

|  | Amended Q4 2020 |
|---|---|
| Expenses (as reported) | $          426,064 |
| Restatement Impact | $            39,152 |
| Expenses (restated) | $          465,216 |
| **% understated** | **9.2%** |
|  |  |
| Net Income (Loss) (as reported) | $            25,031 |
| Restatement Impact | $          (38,756) |
| Net Income (Loss)  (restated) | $          (13,725) |
| **% overstated** | **>100%** |
|  |  |
| EPS (as reported) | $                0.04 |
| Restatement Impact | $              (0.09) |
| EPS (restated) | $              (0.05) |
| **% overstated** | **>100%** |

287.    The May 10, 2021 Form 10-K/A (Amendment No. 1) also contained false statements regarding the effectiveness of the Company's ICFR and DC&P.  As detailed above in ¶¶194, 197-205, *supra*, the Company later admitted, as part of the Restatement on February 3, 2022, that a material weakness in ICFR related to accounting for equity compensation existed as of December 31, 2020 and that its ICFR and DC&P were not effective as of that date as a result of that material weakness.  Although the May 10, 2021 Form 10-K/A (Amendment No. 1) did disclose that the Company's ICFR and DC&P were not effective due to a material weakness related to accounting for warrants, the disclosures and certifications in the Form 10-K/A (Amendment No. 1) omitted any

- 144 -

mention of the material weakness in ICFR related to accounting for equity compensation that also existed as of December 31, 2020.  As a result, the following disclosures and SOX certifications in the May 10, 2021 Form 10-K/A (Amendment No. 1) were materially false and misleading and omitted material facts:

> [M]anagement has reassessed its conclusions regarding the effectiveness of the Company's disclosure controls and procedures ("DC&P") and internal control over financial reporting ("ICFR") as of December 31, 2020.  Management has concluded that the Company's DC&P and ICFR were not effective as of December 31, 2020, due to a material weakness as a result of a lack of an effectively designed control over the evaluation of settlement features used to determine the classification of warrant instruments.

288.    The Form 10-K/A (Amendment No. 1) included SOX certifications, similar in all material respects to the SOX certification presented in ¶¶202-205, *supra*, signed by Stead and Hanks on May 10, 2021.

### 3.    Q1 2021 Financial Results

289.    On April 29, 2021, the Company issued a press release announcing its financial results for Q1 2021, followed by a conference call the same day to discuss those results.  On May 10, 2021, the Company filed a Form 10-Q with the SEC reporting its financial results for the quarter ended March 31, 2021.   In the press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts regarding the Company's Q1 2021 financial results.

290.    As detailed above in ¶¶191-192, *supra*, the Company later restated the Q1 2021 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP.  As described in ¶¶195-196, *supra*, the Restatement was an admission that the Q1 2021 financial results were materially false, and in violation of GAAP, when originally reported.  The accounting errors caused numerous financial statement line items to be materially misstated as of

- 145 -

March 31, 2021 including restricted cash, prepaid expenses, goodwill, accrued expenses, other current liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit.  In addition, as detailed in the chart below, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q1 2021:

|  | Q1 2021 |
|---|---|
| Expenses (as reported) | $ 462,637 |
| Restatement Impact | $ 35,303 |
| Expenses (restated) | $ 497,940 |
| **% understated** | **7.6%** |
| | |
| Net Income (Loss) (as reported) | $ (23,954) |
| Restatement Impact | $ (31,997) |
| Net Income (Loss)  (restated) | $ (55,951) |
| **% overstated** | **133.6%** |
| | |
| EPS (as reported) | $ (0.04) |
| Restatement Impact | $ (0.05) |
| EPS (restated) | $ (0.09) |
| **% overstated** | **125.0%** |

291.   The May 10, 2021 Form 10-Q also contained false statements regarding the effectiveness of the Company's ICFR and DC&P.  As detailed above in ¶¶194, 197-205, *supra*, the Company later admitted, as part of the Restatement on February 3, 2022,  that a material weakness in ICFR related to accounting for equity compensation existed as of March 31, 2021 and that its ICFR and DC&P were not effective as of that date as a result of that material weakness.  Although the May 10, 2021 Form 10-Q did disclose that the Company's ICFR and DC&P were not effective due to a material weakness related to accounting for warrants, the disclosures and certifications in the Form 10-Q omitted any mention of the material weakness in ICFR related to accounting for equity compensation that also existed as of March 31, 2021.  As a result, the following disclosures and

- 146 -

SOX certifications in the May 10, 2021 Form 10-Q were materially false and misleading and omitted material facts:

> Management has identified a material weakness in our internal control over financial reporting related to a lack of an effectively designed control over the evaluation of settlement features used to determine the classification of warrant instruments, as disclosed in our Annual Report on Form 10K/A for the fiscal year ended December 31, 2020.
>
> *       *       *
>
> [O]ur Chief Executive Officer and Chief Financial Officer, concluded that, as of March 31, 2021, due to [that] material weakness in our internal control over financial reporting, . . . our disclosure controls and procedures were not effective . . . .

292.    The Form 10-Q included internal control SOX certifications, similar in all material respects, to the certification presented in ¶¶202-205, *supra*, signed by Stead and Hanks on May 10, 2021.

### 4.    Q2 2021 Financial Results

293.    On July 29, 2021, the Company issued a press release announcing its financial results for Q2 2021, followed by a conference call the same day to discuss those results. On the same day, the Company filed a Form 10-Q with the SEC reporting its financial results for the quarter ended June 30, 2021. In the press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts regarding the Company's Q2 2021 financial results.

294.    As detailed above in ¶¶191-192, *supra*, the Company later restated the Q2 2021 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP. As described in ¶¶195-196, *supra*, the Restatement was an admission that the Q2 2021 financial results were materially false, and in violation of GAAP, when originally reported. The accounting errors caused numerous financial statement line items to be materially misstated as of June 30, 2021 including restricted cash, prepaid expenses, goodwill, accrued expenses, other current

liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit.  In addition, as detailed in the chart below, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q2 2021:

|  | Q2 2021 |
|---|---|
| Expenses (as reported) | $ 457,397 |
| Restatement Impact | $ 52,018 |
| Expenses (restated) | $ 509,415 |
| % understated | 11.24% |
|  |  |
| Net Income (Loss) (as reported) | $ (82,210) |
| Restatement Impact | $ (49,357) |
| Net Income (Loss) (restated) | $ (131,567) |
| % overstated | 60.0% |
|  |  |
| EPS (as reported) | $ (0.13) |
| Restatement Impact | $ (0.08) |
| EPS (restated) | $ (0.22) |
| % overstated | 61.5% |

295.   The July 29, 2021 Form 10-Q also contained false statements regarding the effectiveness of the Company's ICFR and DC&P.  As detailed above in ¶¶194, 197-205, *supra*, the Company later admitted, as part of the Restatement on February 3, 2022, that a material weakness in ICFR related to accounting for equity compensation existed as of June 30, 2021 and that its ICFR and DC&P were not effective as of that date as a result of that material weakness.  Although the July 29, 2021 Form 10-Q did disclose that the Company's ICFR and DC&P were not effective due to an unrelated material weakness related to accounting for warrants, the disclosures and certifications in the Form 10-Q omitted any mention of the material weakness in ICFR related to accounting for equity compensation that also existed as of June 30, 2021.  As a result, the following disclosures and

SOX certifications in the July 29, 2021 Form 10-Q were materially false and misleading and omitted material facts:

> Management has identified a material weakness in our internal control over financial reporting related to a lack of an effectively designed control over the evaluation of settlement features used to determine the classification of warrant instruments, as disclosed in our Annual Report on Form 10K/A for the fiscal year ended December 31, 2020.
>
> \*       \*       \*
>
> [O]ur Chief Executive Officer and Chief Financial Officer, concluded that, as of June 30, 2021, due to [that] material weakness in our internal control over financial reporting, . . . our disclosure controls and procedures were not effective . . . .

296.     The Form 10-Q included internal control SOX certifications, similar in all material respects, to the certification presented in ¶¶202-205, *supra*, signed by Stead and Hanks on July 29, 2021.

## X.     DEFENDANTS ACTED WITH SCIENTER

### A.     Defendants Were Hands-On Executives Who Closely and Frequently Tracked and Spoke About Sales and Revenue Metrics

297.     Defendants were, by their own admissions and from descriptions provided by confidential witnesses, hands-on executives who were intimately involved in the Company's operations and aware of the current state of the Company's revenues, pipeline, and product offerings. Defendants' hands-on management style contributes to a strong inference of scienter.

298.     For example, CW-1, CW-3, CW-4, and CW-5 reported that revenues and pipeline were tracked in real time in the Company's CRM software – Salesforce – and that reports from this software were frequently generated and presented to executive management.  CW-5 noted that part of their role was to consolidate financial data and information on customers' activities in another software program called Tableau, and that reports from this software were presented to their VP and President who in turn rolled them up to the executive management team.  CW-5 also reported that,

"at least once a week, all the information from the company's CRM Salesforce reports are loaded into Tableau," and that "everyone had visibility into Tableau's dashboards including the executive management team." They said this process was called "roll-ups."

299.    CW-1, CW-4, and CW-5 also reported that they met frequently with their supervisors to go over the reports, and that they understood that such meetings were held up the chain of command all the way to the executive management team. CW-1 reported that "at the beginning of each year, in January, a detailed portfolio account review was conducted by the bosses with their subordinates and addressed each sales person's clients' portfolio accounts." CW-1 explained that there "were intense discussions held about the strength of each account as well as potential white space opportunities that could facilitate additional revenues. The detailed portfolio account reviews were revisited in August in order to update the customers' activity accounts." CW-2 added that they "provided weekly reports to [their] manager that showed operational business revenues had not improved and there was a deterioration of CLVT's product quality." CW-2 explained that their "reports were combined in a consolidated report and forwarded up the chain of command."

300.    Defendants' own statements throughout the Class Period corroborate the confidential witnesses' accounts. For example, at the 2020 Investor Day, Stead discussed a colleague engagement survey and noted: "By the way, what's so important with this is not just the survey, but *all the write-ins that we get back that tell us what our colleagues want us to keep doing, stop doing and start doing. I've read them all*. It's amazing, a great feedback." Later, on the same call, Stead noted: "We – this is the first year that Clarivate, historically, has included cross-selling ever for commissions. In fact, historically, they were penalized. *We track it every week*, Mike Morhardt's team. Michael does a great job." On the March 4, 2021 call, Hanks stated: "I would add this, that in terms of DRG, *Jerre and I get the – what we call the in-the-bag report each Sunday night, which*

***shows what have we sold and contracted for delivery for rev rec purposes*** in 2021.  And we obviously compare that each week to the same period prior year." On the March 18, 2021 call, Stead noted that the Company's customer delight survey included a space for client comments and "***I literally read them all***."  On the same call, Hanks described the Company's cross-selling objectives and stated: "And what we're down to now is just really good execution, and ***we get a biweekly report to measure our progress*** against that objective because we consider it to be significant opportunity." On the Company's October 28, 2021 Q3 2021 earnings call, Lomholt-Thomsen stated: "And then last but not least, we continue to improve our operational rigor and control so that ***we can track our execution on a daily basis and make sure that we can take any corrective actions to drive the outcome we're looking for in Q4***."  Stead added: "You can believe that ***we look at it every week – actually, every day to make sure we're on track with new sales***, et cetera."  At the Company's 2021 Investor Day on November 9, 2021, Stead stated: "We – with the tools we use, we know exactly what it takes to grow organic growth, actually by product and by customer.  And we see what we've done."  At a conference call on November 17, 2021, Stead stated: "***We review everything every week, upside-down and backwards***."

301.   Furthermore, Defendants spoke about Clarivate's product quality and growth prospects during nearly every single earnings call and investor conference throughout the Class Period, demonstrating that the topic was high on Defendants' radar and a key concern for analysts – and that Defendants knew or were reckless in not knowing that Clarivate's products and growth were not as represented.

302.   Accordingly, Defendants' hands-on management style and their role as spokespeople for the subject of the alleged fraud supports a strong inference of scienter.

## B. Stead's Role as a SPAC Sponsor Supports a Strong Inference of Scienter

303.     Stead was a founder or "sponsor" of the Churchill SPAC that brought Clarivate public through a reverse merger process in 2019.  Stead's involvement and role in the SPAC from its inception support a strong inference of scienter.  As explained above, Churchill was not even permitted to begin looking for a company for Stead to run until after it had completed its IPO, at which point Stead faced time pressure and financial pressure to successfully acquire a company.  Once Churchill combined with Clarivate, Stead faced even more pressure to deliver investors the success that was intricately linked to his professional reputation – Clarivate's purported recipe for growth was literally billed as the "Jerre Stead Playbook."

304.     Furthermore, as Stead told investors at the Company's 2020 Investor Day, "all of my shares are at risk entirely.  They're performance-based shares on 3 years and a large part of our top executives are, too, that are based on 3-year goals that the Board sets."  Thus, Stead needed the Company to perform well so that he could profit from the fraudulent scheme and false statements and omissions described herein.  These professional and financial pressures to succeed gave Stead a motive to defraud investors and therefore support a strong inference of scienter.

## C. Magnitude and Frequency of the Revenue Misses and Financial Misstatements

305.     Clarivate overstated its net income by more than $120 million from Q4 2020 through Q2 2021.  *See* ¶¶191, 193, *supra*.  Defendants admitted to this massive overstatement in the Restatement.  Moreover, Clarivate missed organic growth guidance two years in row – for 2020 and 2021.  Specifically, on February 25, 2021, Clarivate announced that organic revenue grew only 1% in Q4 2020 and 1.2% for the full year 2020 – well below the 4%-6% exit rate that Defendants had promised as late as November 2020.  Then, on February 3, 2022, Clarivate announced disappointing

2021 organic growth of 4.5%, well below its previously announced 6%-8% range that it had promised as late as December 2021.  The magnitude and frequency of Clarivate's misses contributes to the inference that Clarivate's organic growth problems existed, and were known by Defendants, during the Class Period.

### D.    High-Level Departures and Reorganization of Clarivate's Leadership

306.    The resignations of four of Clarivate's top personnel – Richard Hanks, Mukhtar Ahmed, Jeffrey Roy, and Christie Archbold further support a strong inference of scienter.  Hanks served as CFO and Executive Vice President until Clarivate announced his abrupt and unexplained departure on December 1, 2021.  Roy served as President of the Intellectual Property Group until July 6, 2021, when Clarivate announced his sudden resignation.  Ahmed served as President of the Science Segment until January 10, 2022, when Clarivate announced that he would be leaving the Company.  According to Clarivate's announcement, Ahmed was to work with Samson on the transition until April 1, 2022, and remain in an advisory role until October 1, 2022.  However, Ahmed's separation agreement with Clarivate states that Ahmed is not to attend his place of work and shall not contact or deal with any employee without prior written consent.  Additionally, Ahmed is bound to keep the circumstances surrounding the termination of his employment strictly confidential.  Archbold served as Chief Accounting Officer until Clarivate announced on October 5, 2021 that Archbold had taken a temporary leave of absence, and then on March 7, 2022, announced her unexplained departure from the Company.  Additionally, on July 11, 2022, Clarivate announced that Stead would be retiring from his role as CEO.

### E.    The Restatement

307.    Clarivate's filing of the Restatement supports an inference of scienter.  The Restatement admitted to material errors in Clarivate's previously issued financial statements,

including its Form 10-K and Form 10-K/A (Amendment No. 1) for the year ended December 31, 2020, and Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2021. This extensive Restatement further supports an inference that Defendants knowingly misled the market, or were reckless in making public statements, regarding the identified financial statements.

### F.    Defendants' SOX Certifications

308.    Defendants' scienter is also underscored by the Sarbanes-Oxley certifications signed by Stead and Hanks, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Clarivate was made known to them and that the Company's disclosure controls were operating effectively.

309.    During the Class Period, Stead and Hanks repeatedly certified that they had undertaken an assessment and evaluation of the Company's disclosure controls to ensure that their SEC filings did not contain any false information, including controls designed to ensure all relevant and material information is reviewed by Stead and Hanks prior to certifying those filings pursuant to Sarbanes-Oxley. This further establishes that Stead and Hanks knowingly misled the market, or were reckless in making such representations and executing such certifications, because Stead and Hanks were, at that time, aware and/or recklessly disregarded material weaknesses in Clarivate's system of internal controls concerning financial reporting and disclosures regarding the same that were not disclosed to the investing public.

### G.    Insider Stock Sales Support a Motive to Commit Fraud

310.    In addition, Defendants were motivated to engage in the alleged fraudulent course of conduct in order to collectively sell 1,221,675 shares of their personally-held Clarivate common stock during the Class Period, for gross proceeds of approximately ***$30.5 million***, under circumstances that were unusual and suspicious, as set forth below:

- 154 -

| Insider | Date | Price | Shares Sold | Proceeds | Est. Profit | % Sold |
|---|---|---|---|---|---|---|
| **Richard Hanks** (CFO, Executive VP) | 6/14/2021 | $26.00 | **124,297** | **$3,231,722** | $2,410,119 | **65.02%** |
| **Mukhtar Ahmed** (President, Science Segment) | 3/11/2021 3/12/2021 3/15/2021 12/8/2021 | $22.88 $23.28 $26.29 $24.80 | 107,616 41,573 43,913 14,578 **207,680** | $2,462,254 $967,819 $1,154,473 $361,534 **$4,946,080** | $3,239,400 | **96.19%** |
| **Jeffrey Roy** (President, Intellectual Property Group) | 3/11/2021 6/14/2021 | $22.70 $26.00 | 86,050 89,648 **175,698** | $1,953,335 $2,330,848 **$4,284,183** | $2,904,761 | **78.40%** |
| **Gordon Samson** (Head of Asia-Pacific & President, Intellectual Property Group) | 11/1/2021 11/1/2021 11/4/2021 11/15/2021 11/16/2021 1/3/2022 1/3/2022 | $23.27 $23.23 $24.00 $23.48 $24.00 $23.51 $24.46 | 90,000 25,000 25,000 33,000 33,000 1,600 6,400 **214,000** | $2,094,300 $580,750 $600,000 $774,840 $792,000 $37,616 $156,544 **$5,036,050** | $5,036,050 | **20.12%** |
| **Sheryl von Blucher** (Director) | 6/14/2021 | $26.00 | **500,000** | **$13,000,000** | $7,250,000 | **14.00%** |
| | **Total:** | | **1,221,675** | **$30,498,035** | | |

311.    Three of the five insiders who sold stock during the Class Period – Hanks, Ahmed, and Roy – sold the *majority* of their available shares at artificially inflated prices, for substantial proceeds, before unexpectedly leaving the Company:

(a)     Hanks, who served as CFO and Executive Vice President until Clarivate announced his abrupt and unexplained departure on December 1, 2021, sold **65%** of his personally-held Clarivate common stock during the Class Period, for proceeds of $3.232 million;

(b)     Roy, who served as President of the Intellectual Property Group until July 6, 2021, when Clarivate announced his sudden resignation, sold **78.4%** of his personally-held Clarivate common stock during the Class Period, for proceeds of $4.284 million; and

(c)     Ahmed, who served as President of the Science Segment until January 10, 2022, when Clarivate announced that he would be leaving the Company, sold **96.2%** of his personally-held Clarivate common stock during the Class Period, for proceeds of $4.946 million.

312.    Not only did these insiders' stock sales represent significant portions of their holdings, but they also resulted in unusually large profits – both objectively, and relative to their annual non-stock compensation:

(a)     Hanks' estimated net profit on his $3.232 million in stock sales was approximately $2.410 million – more than two-and-a-half times the $871,742 that Hanks had received in non-stock compensation in 2020;

(b)     Roy's estimated net profit on his $4.284 million in stock sales was approximately $2.905 million – more than three-and-a-half times the $775,101 that Roy had received in non-stock compensation in 2020; and

(c)     Ahmed's estimated net profit on his $4.946 million in stock sales was approximately $3.239 million, nearly triple the $1,084,015 that Ahmed had received in non-stock compensation in 2020.[21]

---

[21]   Non-stock compensation for 2020 is used for comparison purposes, because these insiders' 2021 non-stock compensation was impacted by their departures from Clarivate, and because the insiders knew the amount of their 2020 (but not their 2021) compensation at the time of their stock sales.

313.    In addition, just four months after he replaced Roy as President of the Intellectual Property Group, Samson began selling his personally-held Clarivate common stock, selling a total of 20.1% of his available shares during the Class Period, for proceeds of $5.036 million.  Because Samson acquired his shares at $0, his net profits were likewise $5.036 million – more than seven times the $686,490 that Samson received in non-stock compensation in 2021.

314.    Finally, von Blucher, who served as a Director of Clarivate during the Class Period, sold 14% of her personally-held Clarivate common stock in the June 2021 Ordinary Shares Offering, for proceeds of $13 million.  Von Blucher's estimated net profit on the sale was approximately $7.25 million – an amount that dwarfed the $105,000 that she received in non-stock compensation in 2021.

315.    The fact that four of the five insiders who sold stock during the Class Period – Hanks, Roy, Ahmed, and von Blucher – did not make *any of* their sales pursuant to Rule 10b5-1 trading plans further underscores the unusual and suspicious nature of the sales.

316.    While Samson did make insider sales pursuant to a Rule 10b5-1 trading plan, his first Class Period sale was *not* made pursuant to a trading plan.  On November 1, 2021, Samson made a discretionary sale of 90,000 shares – approximately three times as many shares as his next-largest Class Period sales.   Samson's proceeds on that sale, of $2.094 million, also represented approximately two-fifths of his total Class Period insider sales proceeds of $5.036 million.  While the Forms 4 for Samson's remaining Class Period insiders sales indicate that those sales were made pursuant to a Rule 10b5-1 trading plan, the Forms 4 do not disclose when the plan was adopted.  Thus, it is plausible that Samson's trading plan was adopted during the Class Period – possibly on November 1, 2021 – and therefore the trading plan does not provide a defense to his insider trading.

317.    In addition, the timing of the sales was unusual and suspicious in that they were made in the course of the fraudulent scheme and oftentimes shortly after Defendants issued materially

- 157 -

false and misleading statements while in possession of material, non-public information concerning, *inter alia*, Clarivate's financial results, product quality, and organic growth.

318.   For example, during the Morgan Stanley Technology, Media and Telecom Conference on March 4, 2021, Stead falsely assured investors that the "whole team's confidence level" in Clarivate's ability to achieve "5.5% to 6.5% organic [growth] for the year" was "strong" – despite knowing, but failing to disclose, that Defendants were pulling sales from the second half of the year, particularly within DRG, in order to achieve their organic growth projections.  During the conference, Stead also falsely represented that Clarivate was "providing [its] customers [with] truly new product," when in truth, according to CW-2, Clarivate's executive management had "neglected to create new products, which led to loss of clients."  The following week, on March 11, 2021, Ahmed and Roy capitalized on these false statements by selling shares, with Ahmed making two additional sales on March 12 and 15, 2021.

319.   Similarly, Hanks, Roy, and von Blucher each cashed out their personally-held shares in the June 2021 Ordinary Shares Offering, at $26.00 per share, at a time when Defendants were, among other things: (i) managing to post in-range organic growth numbers by pulling sales from the second half of the year – a tactic they knew was unsustainable; and (ii) failing to invest in new products and allowing the quality of Clarivate's existing products to decline, resulting in lost customers and lost sales, and negatively impacting revenue growth.

320.   During Clarivate's Q3 2021 earnings call on October 28, 2021, Defendants repeatedly assured investors that a strong fourth quarter would enable the Company to achieve its expected organic growth for full year 2021.  On the call, Stead also falsely represented that Clarivate was "continu[ing] to invest heavily" in product enhancements and launches.  Two business days later, Samson began selling stock, making two separate sales on November 1, 2021, and an additional sale

- 158 -

on November 4, 2021.  Samson continued making insider sales shortly after the Company's November 9, 2021 Investor Day – during which Defendants reaffirmed their 2021 organic growth projections and falsely represented that they had "made significant investments in product" – selling shares on November 15 and 16, 2021.

321.    On December 7, 2021, during an investor conference, an analyst directly questioned Ahmed about "the big fourth quarter ramp that's required to meet the [organic growth] guidance . . . for 2021."  Ahmed assured investors that the "typical[] . . . Q4 ramp up" at DRG would be forthcoming, declaring that "[i]t all happens in Q4."  The following day, on December 8, 2021, Ahmed sold virtually all of his remaining available shares.

322.    Finally, Ahmed's sale on March 15, 2021, and Samson's two sales on January 3, 2022, were unusual and suspicious because they were made during "Blackout Periods" when insider sales were explicitly prohibited under Clarivate's insider trading policy.

323.    Clarivate's insider trading policy, which the Company adopted on February 3, 2021, prohibits insiders such as Defendants from purchasing or selling the Company's stock during any "Blackout Period," which "begin[s] on the 15th calendar day of the last month of each fiscal quarter of the Company and end[s] upon completion of the second full trading day after the public release of earnings data for such fiscal quarter."

324.    Thus, Ahmed made his March 15, 2021 stock sale – for which he received proceeds of over $1.1 million – during the first day of the "Blackout Period" that ran from March 15, 2021 (the 15th calendar day before the end of Q1) to "the second full trading day" after Clarivate announced its financial results for Q1 2021 on April 29, 2021 – in clear violation of Clarivate's insider trading policy.[22]  It is also unlikely that Ahmed sought and obtained "Pre-Clearance" for his

---

[22]    Clarivate's fiscal quarters end on March 31, June 30, September 30, and December 31.

sale from Clarivate's General Counsel or CFO, as required for sales not made pursuant to Rule 10b5-1 trading plans, since the General Counsel or CFO presumably would not have approved a sale during the "Blackout Period." The absence of a required "Pre-Clearance" underscores the suspicious nature of Ahmed's sale.

325. Likewise, Samson made his two sales on January 3, 2022 – for which he received proceeds (and profits) of $194,160 – during the "Blackout Period" that ran from December 15, 2021 to "the second full trading day" after Clarivate announced its financial results for Q4 2021 on March 10, 2022 – in clear violation of Clarivate's insider trading policy.

## XI.   LOSS CAUSATION

326. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. Plaintiffs' claims for securities fraud are asserted under the fraud-on-the-market and *Affiliate Ute* theories of reliance. The markets for Clarivate's common stock were open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants engaged in a scheme and made materially misleading statements and omissions regarding Clarivate's products, growth, and its key financial metrics. Defendants' conduct artificially inflated the price of Clarivate common stock and operated as a fraud or deceit on the Class.

327. The Class Period inflation in Clarivate's stock price was removed when information concealed by Defendants' scheme and misleading statements and omissions was revealed to the market. The information was disseminated through partial disclosures that revealed the nature and effect of Defendants' alleged conduct. These disclosures, as more particularly described below, removed artificial inflation from Clarivate common stock, causing economic injury to Plaintiffs and other members of the Class.

328.    The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued scheme and misleading statements and omissions that continued to conceal the true nature of Defendants' fraud.  Each partial disclosure did not on its own fully remove the inflation from Clarivate's stock price, because it only partially revealed the nature and extent of the fallout from Defendants' previously misrepresented and concealed conduct.   Defendants' continued scheme and misrepresentations and omissions maintained the price of Clarivate common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Clarivate even after Defendants' partial disclosures.

329.    The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors. The following stock price declines and descriptions thereof are not necessarily comprehensive because fact and expert discovery are not complete.

330.    A partial disclosure entered the market on February 25, 2021, when Clarivate filed disappointing Q4 2020 financial results and disclosed disappointing Q4 2020 revenue and organic growth of just 1% due to weakness in subscription and Science Group revenue, raising concerns about Clarivate's revenue prospects and ability to reach its stated organic growth target of 6%-8% exiting 2021.  As a result of this partial disclosure, the price of Clarivate stock declined 19% on volume of more than 14.6 million shares to close at $22.75 per share on February 26, 2021. Analysts commented on this disappointing news and attributed Clarivate's stock price decline to

- 161 -

disappointing revenues.  In contrast to the 19% decline in Clarivate common stock, the Standard & Poor's Composite Stock Index ("S&P 500 Index") declined a modest 2.9% during this period.[23]

331.    On December 27, 2021, Clarivate issued a press release on Form 8-K announcing that it would restate its financial statements for the year ended December 31, 2020 and the quarterly periods ended March 31, June 30, and September 30, 2021.  Clarivate advised that these prior financial statements "should no longer be relied upon because of an error in those financial statements."  As a result of the announcement of the forthcoming restatement, the price of Clarivate stock declined 7.5% on volume of more than 5.5 million shares to close at $22.88 per share on December 28, 2021.  An analyst at William Blair attributed the decline in Clarivate's stock price to the December 27, 2021 Form 8-K, "in which Clarivate disclosed an accounting error tied to the treatment of equity awards in the CPA Global employee equity plan."  In contrast to the 7.5% decline in Clarivate common stock, the S&P 500 Index increased over this same period.

332.    On January 10, 2022, Clarivate issued a press release on Form 8-K announcing that Ahmed would step down from his position as President of the Science Group.  As a result of the announcement of this termination, the price of Clarivate stock declined 19.5% on volume of more than 37.3 million shares to close at $18.00 per share on January 14, 2022.  Analysts attributed the declines in Clarivate's stock price to the abrupt departure of Ahmed and the failure to reiterate fiscal year 2021 or fiscal year 2022 guidance.  For example, an analyst at Barclays stated that the termination could indicate weak Q4 2021 financial results.  In contrast to the 19.5% decline in Clarivate common stock, the S&P 500 Index was flat during this period.

---

[23]   For purposes of comparing its stock performance vis-à-vis its peers and relevant market, Clarivate referred investors to the S&P 500 Index.

333.    On February 3, 2022, before the market opened, Clarivate filed disappointing 2021 financial results and revised 2022 revenue guidance downward by $65 million.  Clarivate also announced disappointing 2021 organic growth of 4.5%, well below its previously announced 6%-8% organic range, due in part to disappointing transaction revenues in the DRG business.  Clarivate also issued its restatement of 2020 annual results and Q1 2021, Q2 2021, and Q3 2021 quarterly results and disclosed material weaknesses relating to equity compensation accounting and deferred tax balances associated with acquired entities.  As a result of this disclosure, the price of Clarivate stock declined 16.4% on volume of more than 22.2 million shares to close at $14.81 per share on February 3, 2022.  Analysts commented on this disappointing news and attributed Clarivate's stock price decline to disappointing Q4 2021 revenue and organic growth, reduced fiscal 2022 revenue guidance, and a loss of confidence in Defendants' credibility given the repeated financial misses and the Restatement.  For example, an analyst at Barclays stated: "[O]rganic growth is now set to come [in] at ~4.5%, well short of the 6%+ guidance; and implies that 4Q21E organic growth would be ~4% vs. the 7-8% exit rate that management had so confidently guided to (even as early as mid-December during our TMT conference)" and identified the restatement as a "dent to confidence." An analyst at Morgan Stanley highlighted the disappointing growth rates: stating "This is the second year in a row CLVT has failed to achieve its organic growth exit rates."   And according to *Bloomberg*, an analyst at Citi downgraded Clarivate stock: "[S]tating that he was 'surprised and disappointed' by the company's revised guidance" and noting that due to "the 'inconsistent communication in recent weeks,' he sees 'credibility clouded' and thinks investors will question if management has appropriate visibility into underlying trends."  In contrast to the 16.4% decline in Clarivate common stock, the S&P 500 Index declined a modest 2.4% during this period.

## XII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FOTM DOCTRINE

334.    A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

335.    A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Plaintiffs and other members of the Class (defined in ¶367 below) purchased or otherwise acquired the Company's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Clarivate, and have been damaged thereby.

336.    At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     as a regulated issuer, Clarivate regularly made public filings with the SEC and related press releases;

(b)     Clarivate regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)     Clarivate was followed by several securities analysts employed by major brokerage firms, such as William Blair and Company, RBC Capital Markets, BofA Securities, Morgan Stanley, Jefferies, and Barclays, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace; and

(d)     Clarivate's common stock met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

337.     As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding Clarivate from all publicly available sources and reflected such information in the prices of the Company's common stock.

338.     Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices.

339.     At the times they purchased or otherwise acquired the Company's common stock, Plaintiffs and other members of the Exchange Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

340.     As a result of the above circumstances, the presumption of reliance applies.

4890-2434-9741.v2

341.    In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XIII.   NO SAFE HARBOR

342.    Many (if not all) of Defendants' false and misleading statements during the Class Period were not forward-looking statements and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

343.    Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

344.    Defendants are also liable for any false or misleading forward-looking statement pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Clarivate who knew that the forward-looking statement was false or misleading.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future

- 166 -

economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## XIV.   PLAINTIFFS' CLAIM FOR RELIEF UNDER THE SECURITIES ACT OF 1933

345.     In this part of the complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of purchasers in or traceable to the June 2021 Ordinary Shares Offering, the June 2021 Preferred Shares Offering, and the September 2021 Offering. Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct.

### A.      The June 2021 Offerings

346.     First, on or about June 8, 2021, Clarivate announced that it would commence the June 2021 Ordinary Shares Offering – a $750 million offering of ordinary shares, alongside a $250 million offering of ordinary shares by its selling shareholders, beneficially-owned affiliates of Onex and Baring.

347.     Second, on or about June 8, 2021, Clarivate announced that it would commence the June 2021 Preferred Shares Offering – a $1.25 billion offering of Series A Mandatory Convertible preferred shares.

348.     The June 2021 Offerings were conducted pursuant to the 2020 Shelf Registration Statement.   Under the shelf registration process, Clarivate could sell any combination of the securities described in the 2020 Shelf Registration Statement in one or more offerings.   The securities described in the 2020 Shelf Registration Statement were ordinary shares, preferred shares, debt securities, warrants, purchase contracts, and units.   On July 1, 2020, the SEC issued a Notice of Effectiveness of the 2020 Shelf Registration Statement.   The 2020 Shelf Registration Statement was signed by defendants Stead, Hanks, Archbold, von Blucher, Gilis, Iyer, Klein, Macksey, Munk, Bomba, Neral, and Roedel.

- 167 -

349.     On May 10, 2021, as part of Clarivate's Form 10-K/A (Amendment No. 1), PwC provided its consent to the incorporation by reference in the 2020 Shelf Registration Statement of its report dated February 26, 2021, except for the items specified in the Form 10-K/A (Amendment No. 1), which related to the accounting treatment of private placement warrants, a control deficiency related to a "lack of an effectively designed control over the evaluation of settlement features used to determine the classification of warrant instruments," "and the critical audit matter related to the accounting for and valuation of private placement warrants, as to which the date is May 10, 2021, relating to the financial statements and the effectiveness of internal control over financial reporting." PwC also consented to the reference to them as "Experts" in the 2020 Shelf Registration Statement.

350.     In addition to the 2020 Shelf Registration Statement, the June 2021 Ordinary Shares Offering was conducted pursuant to preliminary prospectus supplements filed with the SEC on June 8, 2021 and June 10, 2021, and a prospectus supplement filed on June 11, 2021.  Likewise, the June 2021 Preferred Shares Offering was conducted pursuant to preliminary prospectus supplements filed with the SEC on June 8, 2021 and June 10, 2021, and a prospectus supplement filed on June 11, 2021.  The prospectus supplements incorporated by reference Clarivate's Form 10-K/A (Amendment No. 1), filed on May 10, 2021, and Form 10-Q, filed on May 10, 2021.  Collectively with the 2020 Shelf Registration Statement, these filings are referred to as the "June 2021 Offering Materials."

**B.     The September 2021 Offering**

351.     On or about September 9, 2021, Clarivate announced the September 2021 Offering – a $631 million public offering of ordinary shares by Onex and Baring.

352.     The September 2021 Offering was conducted pursuant to the 2020 Shelf Registration Statement and the 2021 Shelf Registration Statement.  On July 9, 2021, the SEC issued a Notice of Effectiveness of the 2021 Shelf Registration Statement.  The 2021 Shelf Registration Statement was

- 168 -

signed by Stead, Hanks, Archbold, von Blucher, Alberola, Cortas, Gilis, Iyer, Levyn, Macksey, Munk, Neral, Bomba, Roedel, and White.

353.    On June 9, 2021, as part of Clarivate's Form S-3, PwC provided its consent to the incorporation by reference in the 2021 Shelf Registration Statement of its report dated February 26, 2021, except for the effects of the items specified in the Form 10-K/A (Amendment No. 1), which related to the accounting treatment of private placement warrants, a control deficiency related to a "lack of an effectively designed control over the evaluation of settlement features used to determine the classification of warrant instruments," "and the critical audit matter related to the accounting for and valuation of private placement warrants, as to which the date is May 10, 2021, relating to the financial statements and the effectiveness of internal control over financial reporting." PwC also consented to the reference to them as "Experts" in the 2021 Shelf Registration Statement.

354.    In addition to the 2020 Shelf Registration Statement and 2021 Shelf Registration Statement, the September 2021 Offering was conducted pursuant to preliminary prospectus supplement filed with the SEC on September 13, 2021, which included the prospectus dated July 9, 2021. The prospectus supplement incorporated by reference Clarivate's Form 10-K/A (Amendment No. 1), filed on May 10, 2021, Form 10-Q, filed on May 10, 2021, and Form 10-Q, filed on July 29, 2021. Collectively with the 2020 Shelf Registration Statement and 2021 Shelf Registration Statement, these filings are referred to as the "September 2021 Offering Materials." The June 2021 Offering Materials and the September 2021 Offering Materials are collectively referred to herein as the "Offering Materials."

### C.    The Offering Materials Contained Materially Misleading Statements and Omissions

355.    The June 2021 prospectus supplements contained "Summary Historical Financial Information," including financial results for the year ended December 31, 2020 and the quarter

4890-2434-9741.v2

ended March 31, 2021. As detailed above in ¶¶191-192, 280-281, 284-286, the Company has admitted that due to accounting errors, Clarivate's reported financial results for these periods were materially misstated, in violation of GAAP, and were required to be restated.

356. The 2020 Form 10-K/A (Amendment No. 1), filed on May 10, 2021, reported amended and restated financial results for the year ended December 31, 2020 and the quarter ended December 31, 2020. The 2020 Form 10-K/A (Amendment No. 1) stated: "management has concluded that our audited financial statements included in this Annual Report on Amended Form 10-K/A are fairly stated in all material respects in accordance with GAAP for each of the periods presented herein." As detailed above in ¶¶191-192, 195-196, 280-281, 284-286, as part of the Restatement, the Company has admitted that due to accounting errors, Clarivate's reported financial results for these periods were materially misstated, in violation of GAAP, and were required to be restated.

357. The 2020 Form 10-K/A (Amendment No. 1), acknowledged that, subsequent to filing the 2020 Form 10-K on February 26, 2021, Defendants had identified a material weakness in Clarivate's internal controls over financial reporting that existed as of December 31, 2020, but limited the scope of the material weakness to Clarivate's accounting for warrants. As detailed above in ¶¶194, 197-205, 282-283, 287-288, as part the Restatement, the Company has admitted that additional material weaknesses existed as of December 31, 2020, related to equity compensation accounting and accounting for tax balances of acquired entities. As a result, the Company's disclosures and certifications regarding ICFR and DC&P in the 2020 Form 10-K/A (Amendment No. 1) were materially misleading.

358.    As detailed above in ¶¶189, 278, the 2020 Form 10-K/A (Amendment No. 1) also failed to disclose information required to be disclosed therein under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303.  The omissions rendered the 2020 Form 10-K/A materially misleading.

359.    The Q1 2021 Form 10-Q included financial results for the quarter ended March 31, 2021.  As detailed above in ¶¶191-192, 195-196, 289-290, as part of the Restatement, the Company has admitted that due to accounting errors, Clarivate's reported financial results for this period were materially misstated, in violation of GAAP, and were required to be restated.

360.    The Q1 2021 Form 10-Q again identified a material weakness in Clarivate's internal controls over financial reporting, but, as in the 2020 Form 10-K/A (Amendment No. 1), limited the scope of the material weakness to Clarivate's accounting for warrants.  As detailed above in ¶¶194, 197-205, 291-292, as part the Restatement, the Company has admitted that additional material weaknesses existed as of March 31, 2021, related to equity compensation accounting and accounting for tax balances of acquired entities.  As a result, the Company's disclosures and certifications regarding ICFR and DC&P in the Q1 2021 Form 10-Q were materially misleading.

361.    As detailed above in ¶¶189, 278, the Q1 2021 Form 10-Q also failed to disclose information required to be disclosed therein under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303.  The omissions rendered the Q1 2021 Form 10-Q materially false and misleading.

362.    The Q2 2021 Form 10-Q included financial results for the quarter ended June 30, 2021.  As detailed above in ¶¶191-192, 195-196, 293-294, as part of the Restatement, the Company has admitted that due to accounting errors, Clarivate's reported financial results for this period were materially misstated, in violation of GAAP, and were required to be restated.

363.    The Q2 2021 Form 10-Q again identified a material weakness in Clarivate's internal controls over financial reporting, but, as in the 2020 Form 10-K/A (Amendment No. 1), limited the

- 171 -

scope of the material weakness to Clarivate's accounting for warrants. As detailed above in ¶¶194, 197-205, 295-296, as part the Restatement, the Company has admitted that additional material weaknesses existed as of June 30, 2021, related to equity compensation accounting and accounting for tax balances of acquired entities. As a result, the Company's disclosures and certifications regarding ICFR and DC&P in the Q2 2021 Form 10-Q were materially misleading.

364.    As detailed above in ¶¶189, 278, the Q2 2021 Form 10-Q also failed to disclose information required to be disclosed therein under Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303. The omissions rendered the Q2 2021 Form 10-Q materially false and misleading.

365.    For the reasons set forth in ¶¶191-192, 195-196, 280-296, as part of the Restatement, Defendants have admitted that the Offering Materials were materially misleading in that they contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the statements made there not false or misleading. Defendants' material weakness in its internal controls over financial reporting was not limited to how the Company accounted for warrants. In fact, Clarivate continued to maintain defective internal controls over financial reporting and defective disclosure controls. As a result of Defendants' ineffective internal controls, Defendants materially misstated Clarivate's reported financial results in the 2020 Form 10-K/A, Q1 2021 Form 10-Q, and Q2 2021 Form 10-Q, including expenses, net loss, and earnings per share, as confirmed by the Restatement.

366.    As registrant, Clarivate is strictly liable for misstatements and omissions in the Offering Materials and statements incorporated therein. Moreover, none of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.

Had they exercised reasonable care, these Defendants could have known of the material misstatements and omissions alleged herein.

## XV.    CLASS ACTION ALLEGATIONS

367.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Clarivate securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

368.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Clarivate securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Clarivate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

369.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.

370.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

- 173 -

371.     Common questions of law and fact predominate and include: (i) whether Defendants violated the Exchange Act and Securities Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false and misleading; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of Clarivate securities and the extent and appropriate measure of damages.

372.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XVI.   COUNTS

**COUNT I**
**Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against the Exchange Act Defendants)**

373.     Plaintiffs repeat and reallege each and every allegation in ¶¶1-344 above as if fully set forth herein.

374.     This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

375.     During the Class Period, the Exchange Act Defendants, during the time with which they held their positions at Clarivate, engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in

- 174 -

order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Clarivate securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Clarivate securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

376.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Clarivate securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Clarivate's finances and business prospects.

377.    By virtue of their positions at Clarivate, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions were committed willfully or with reckless disregard for the truth.  In addition,

- 175 -

each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

378.   Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Clarivate, the Exchange Act Defendants had knowledge of the details of Clarivate's internal affairs.

379.   The Exchange Act Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Defendants were able to and did, directly or indirectly, control the content of the statements of Clarivate.  As officers and/or directors of a publicly held company, the Exchange Act Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Clarivate's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Clarivate securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Clarivate's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Clarivate securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

380.   During the Class Period, Clarivate securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of

Clarivate securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Clarivate securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Clarivate securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

381.    By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

382.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**
**Violations of §20(a) of the Exchange Act**
**(Against the Exchange Act Defendants)**

383.    Plaintiffs repeat and reallege each and every allegation in ¶¶1-344, 373-382 above as if fully set forth herein.

384.    During the Class Period, the Exchange Act Defendants, during the time with which they held their positions at Clarivate, participated in the operation and management of Clarivate, and conducted and participated, directly and indirectly, in the conduct of Clarivate's business affairs.

- 177 -

Because of their senior positions, they knew the adverse non-public information about Clarivate's business as alleged herein.

385.    As officers and/or directors of a publicly owned company, the Exchange Act Defendants had a duty to disseminate accurate and truthful information with respect to Clarivate's financial condition and results of operations, and to correct promptly any public statements issued by Clarivate which had become materially false or misleading.

386.    Clarivate had the power to control and influence the other Exchange Act Defendants, and other Company executives through its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations.  By virtue of the foregoing, Clarivate had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Exchange Act Defendants, including the content of their public statements.

387.    Because of their positions of control and authority as senior officers, the Exchange Act Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Clarivate disseminated in the marketplace during the Class Period concerning Clarivate's business and results of operations.  Throughout the Class Period, the Exchange Act Defendants exercised their power and authority to cause Clarivate to engage in the wrongful acts complained of herein.  The Exchange Act Defendants, therefore, were "controlling persons" of Clarivate within the meaning of §20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Clarivate securities.

388.    Each of the Exchange Act Defendants, therefore, acted as a controlling person of Clarivate.  By reason of their senior management positions and/or being directors of Clarivate, each of the Exchange Act Defendants had the power to direct the actions of, and exercised the same to

- 178 -

cause, Clarivate to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Defendants exercised control over the general operations of Clarivate and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

389.    By reason of the above conduct, the Exchange Act Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Clarivate.

**COUNT III**
**For Violations of §11 of the Securities Act**
**(Against the Securities Act Defendants)**

390.    Plaintiffs repeat and reallege each and every allegation in ¶¶345-366 above relating to the Securities Act claims as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.  Plaintiffs do not allege, and do not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

391.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is asserted against the Securities Act Defendants.

392.    This Count is asserted by Plaintiffs and members of the Class who purchased or acquired Clarivate securities traceable to the Offering Materials.

393.    The Offering Materials were defective and inaccurate, contained untrue statements of material fact and omitted to state facts necessary to make the statements in the Offering Materials made not misleading, and omitted to state material facts required to be stated therein.

394.    Clarivate is the registrant for the Offering Materials.  As such, Clarivate is strictly liable for the materially inaccurate statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate.  By virtue of the Offering Materials containing

material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Clarivate is liable under §11 of the Securities Act to Plaintiffs and the Class.

395. The Securities Act Defendants caused the issuance of the Offering Materials and/or signed the Offering Materials, either personally or through an Attorney-in-Fact. The Securities Act Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. The Securities Act Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omission of any material facts, and/or were not misleading. Because the Securities Act Defendants besides Clarivate, who is strictly liable as alleged above in ¶394, did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omission of any materials facts, and/or were not misleading, the Securities Act Defendants are liable under §11 of the Securities Act to Plaintiffs and the Class.

396. None of the untrue statements or omissions of material fact in the Offering Materials alleged herein were forward-looking statements. Rather, each such statement concerned existing facts. Moreover, the Offering Materials did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

397.    At the time they purchased shares in the June 2021 Offerings and September 2021 Offering, neither Plaintiffs nor any member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements and omissions alleged herein.

398.    In connection with the June 2021 Offerings, the September 2021 Offering, and sale of Clarivate common stock and preferred shares, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and a national securities exchange.

399.    This claim was brought within one year after the discovery of the untrue statements in the Registration Statement and within three years after the Clarivate securities were sold to Class members in connection with the June 2021 Offerings and September 2021 Offering.

400.    By reason of the misconduct alleged herein, the Securities Act Defendants violated §11 of the Securities Act and are liable to Plaintiffs and the members of the Class who acquired Clarivate securities in the June 2021 Offerings and September 2021 Offering, each of whom has been damaged as a result of such violations.

**COUNT IV**
**For Violations of §12(a)(2) of the Securities Act in Connection with the Offering**
**(Against the Statutory Seller Defendants)**

401.    Plaintiffs repeat and reallege each and every allegation in ¶¶345-366, 390-400, above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this Count, Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct.

402.    This claim is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77k, against the Statutory Seller Defendants on behalf of members of the Class who purchased or

- 181 -

otherwise acquired Clarivate securities pursuant to the Offering Materials, including the Prospectuses and Prospectus Supplements, and were damaged by acts alleged herein.

403.    By means of the Offering Materials and by using the means and instruments of transportation and communication in interstate commerce and of the mails, the Statutory Seller Defendants, through a public offering, solicited, sold, and assisted in the sale of Clarivate securities to members of the Class, and they did so for personal gain.

404.    The Offering Materials materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.  The Statutory Seller Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in Prospectuses and Prospectus Supplements issued for the June 2021 Offerings and the September 2021 Offering, and did not possess reasonable grounds for believing that the statements therein were not false or misleading.

405.    Members of the Class purchased Clarivate securities by means of the materially misstated Offering Materials, including the Prospectuses and Prospectus Supplements.  At the time they purchased shares in the June 2021 Offerings and September 2021 Offering, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the Offering Materials, including the Prospectuses and Prospectus Supplements.

406.    By virtue of the conduct alleged herein, the Statutory Seller Defendants violated §12(a)(2) of the Securities Act.

407.    Accordingly, members of the Class who purchased or otherwise acquired Clarivate securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to the Statutory Seller Defendants.  Members of the Class

4890-2434-9741.v2

who have sold their Clarivate securities issued in the June 2021 Offerings and September 2021 Offering are entitled to rescissory damages.

408.    This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Materials and within three years after the June 2021 Offerings and September 2021 Offering.

**COUNT V**
**For Violations of §15 of the Securities Act**
**(Against Clarivate, Stead, Hanks, Archbold,**
**and the Director Defendants (the "Section 15 Defendants")**

409.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, excerpt for any allegations of fraud, recklessness, or intentional misconduct.  Plaintiffs do not allege, and do not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

410.    This Count is brought against the Section 15 Defendants pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired Clarivate securities pursuant to the June 2021 Offerings and September 2021 Offering and who were damaged thereby.

411.    As set forth more specifically above in ¶¶355-366, the Offering Materials included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

412.    Plaintiffs and the members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Offering Materials.

413.    Stead, Hanks, Archbold, and the Director Defendants acted as controlling persons of Clarivate within the meaning of §15 of the Securities Act by virtue of their positions as a director and/or senior officer of Clarivate.  By reason of their senior management positions and/or

- 183 -

directorships at the Company, as alleged above, Stead, Hanks, Archbold, and the Director Defendants, individually and acting pursuant to a common plan, had the power to influence and exercise the same to cause Clarivate to engage in the conduct complained of herein.

414. Clarivate had the power to control and influence Stead, Hanks, Archbold, the Director Defendants, and other Company executives through its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations. By virtue of the foregoing, Clarivate had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Individual Defendants, including the content of their public statements.

415. The Section 15 Defendants were able to and did control the contents of the Offering Materials, which contained materially false statements and omitted material financial information. By reason of such conduct, the Securities Act Defendants are liable pursuant to §15 of the Securities Act to Plaintiffs and other members of the Class.

416. The Section 15 Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. The Section 15 Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.

417. This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Materials and within three years after the June 2021 Offerings and September 2021 Offering.

4890-2434-9741.v2

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.  Determining that this action is a proper class action, and certifying Lead Plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Plaintiff's counsel as Class Counsel;

B.  Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## XVIII. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  August 8, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
SCOTT H. SAHAM
DARRYL J. ALVARADO
ASHLEY M. PRICE
MEGAN A. ROSSI

DARRYL J. ALVARADO

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
dalvarado@rgrdlaw.com
aprice@rgrdlaw.com
mrossi@rgrdlaw.com

- 185 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ERIN W. BOARDMAN
T. ALEX B. FOLKERTH
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
eboardman@rgrdlaw.com
afolkerth@rgrdlaw.com

Lead Counsel for Lead Plaintiff

WATKINS, PAWLICK, CALATI & PRIFTI, PC
LAUREN CRUMMEL
1423 East Twelve Mile Road
Madison Heights, MI  48071
Telephone:  248/658-0797
248/658-0801 (fax)
lcrummel@wpcplaw.com

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
STUART A. KAUFMAN
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
stu@robertdklausner.com

Additional Counsel

<u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

City of Birmingham Retirement and Relief System ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. (a) Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Bleier v. A.O. Smith Corporation, et al.*, No. 2:19-cv-00786 (E.D. Wis.)
*City of Sterling Heights General Employees Ret. Sys. v. Anheuser-Busch InBev SA/NV, et al.*, No. 1:19-cv-05854 (D.N.J.)
*City of Sterling Heights Police & Fire Retirement System v. Reckitt Benckiser Group PLC*, No. 2:19-cv-15382 (D.N.J.)
*Marechal v. Acadia Pharmaceuticals Inc.*, No. 3:21-cv-00762 (S.D. Cal.)

(b) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Koch v. Healthcare Services Group, Inc., et al.*, No. 2:19-cv-01227 (E.D. Pa.)
*In re Nutanix, Inc. Sec. Litig.*, No. 5:19-cv-01651 (N.D. Cal.)
*Batter v. Hecla Mining Company, et al.*, No. 1:19-cv-04883 (S.D.N.Y.)
*City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Pluralsight, Inc.*, No. 1:19-cv-00128 (D. Utah)
*In re Wells Fargo & Company Sec. Litig., No.* 1:20-cv-04494 (S.D.N.Y.)

CLARIVATE

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _14th_ day of March, 2022.

City of Birmingham Retirement and Relief System

By: _____
Jay P. Turner, Assistant City Attorney

CLARIVATE

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|:---:|:---:|:---:|
| 11/15/2021 | 2,306 | $23.70 |
| 11/15/2021 | 10,567 | $23.88 |
| 11/16/2021 | 219 | $24.00 |
| 11/16/2021 | 1,045 | $23.97 |
| 11/16/2021 | 12,410 | $24.04 |
| 11/17/2021 | 1,095 | $24.16 |
| 11/17/2021 | 10,075 | $24.23 |
| 11/18/2021 | 13,141 | $23.80 |
| 11/19/2021 | 4,161 | $23.94 |
| 12/14/2021 | 18,671 | $24.52 |
| 01/20/2022 | 5,653 | $16.39 |
| 01/20/2022 | 6,550 | $16.34 |

| Date<br>Disposed | Amount of<br>Shares Disposed | Price |
|:---:|:---:|:---:|
| 01/21/2022 | 4,986 | $16.87 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

MICHIGAN LABORERS' PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of March, 2022.

MICHIGAN LABORERS' PENSION FUND

By: _____
Alex Zurek, Chairman

MICHIGAN LABORERS' PENSION FUND

By: _____
Robert Coppersmith, Secretary

CLARIVATE

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 12/03/2020 | 195 | $27.70 |
| 12/03/2020 | 594 | $27.97 |
| 12/03/2020 | 1,291 | $27.92 |
| 12/04/2020 | 269 | $27.97 |
| 12/04/2020 | 343 | $27.98 |
| 12/04/2020 | 1,344 | $27.98 |
| 12/07/2020 | 232 | $27.90 |
| 12/07/2020 | 538 | $27.98 |
| 12/07/2020 | 807 | $27.99 |
| 12/08/2020 | 70 | $28.00 |
| 12/08/2020 | 548 | $28.88 |
| 12/08/2020 | 807 | $28.88 |
| 12/09/2020 | 482 | $28.89 |
| 12/09/2020 | 794 | $28.84 |
| 12/10/2020 | 631 | $29.12 |
| 01/28/2021 | 55 | $29.17 |
| 01/28/2021 | 280 | $28.38 |
| 01/28/2021 | 319 | $29.28 |
| 01/28/2021 | 1,716 | $28.57 |
| 01/29/2021 | 6 | $29.20 |
| 01/29/2021 | 832 | $28.98 |
| 01/29/2021 | 1,179 | $28.94 |
| 12/10/2021 | 321 | $24.59 |

**pfd stock-5.25%, Ser. A, EP0598771**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 06/10/2021 | 870 | $100.00 |
| 11/29/2021 | 446 | $88.37 |

| Date<br>Disposed | Amount of<br>Shares Disposed | Price |
|---|---|---|
| 08/06/2021 | 380 | $92.68 |
| 08/09/2021 | 72 | $92.33 |
| 08/09/2021 | 418 | $92.21 |

Prices listed are rounded to two decimal places.

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Town of Davie Police Pension Fund ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of Warren Police and Fire Retirement System v. World Wrestling Entertainment, Inc.*, No. 1:20-cv-02031 (S.D.N.Y.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of August, 2022.

Town of Davie Police Pension Fund

By:  _____

Paul Ortenzo, Chairman

CLARIVATE

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/10/2020 | 50 | $28.28 |
| 08/10/2020 | 360 | $28.64 |
| 08/10/2020 | 490 | $28.59 |
| 08/11/2020 | 60 | $27.98 |
| 08/11/2020 | 130 | $27.95 |
| 08/11/2020 | 670 | $28.35 |
| 08/11/2020 | 40 | $27.81 |
| 08/12/2020 | 270 | $28.49 |
| 08/12/2020 | 430 | $28.54 |
| 08/13/2020 | 70 | $29.51 |
| 08/13/2020 | 200 | $29.48 |
| 08/13/2020 | 130 | $29.27 |
| 08/14/2020 | 260 | $29.09 |
| 08/14/2020 | 40 | $29.17 |
| 08/20/2020 | 40 | $29.92 |
| 08/20/2020 | 160 | $29.89 |
| 11/13/2020 | 787 | $28.01 |
| 11/13/2020 | 213 | $27.98 |
| 02/25/2021 | 940 | $24.28 |
| 06/09/2021 | 1,110 | $29.11 |
| 06/10/2021 | 1,190 | $26.00 |
| 10/29/2021 | 400 | $23.08 |
| 10/29/2021 | 600 | $23.41 |
| 11/18/2021 | 800 | $23.77 |
| 11/19/2021 | 138 | $23.73 |
| 11/19/2021 | 162 | $23.74 |
| 11/19/2021 | 100 | $23.94 |
| 12/01/2021 | 950 | $22.75 |
| 12/02/2021 | 644 | $24.11 |
| 12/02/2021 | 56 | $24.31 |
| 01/14/2022 | 915 | $17.79 |
| 01/14/2022 | 585 | $17.82 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 02/24/2021 | 40 | $28.49 |

Prices listed are rounded to two decimal places.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on August 8, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  DAlvarado@rgrdlaw.com

4890-2434-9741.v2

## Mailing Information for a Case 1:22-cv-00394-ENV-RLM Parot v. Clarivate Plc et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **Erin Whitney Boardman**
  eboardman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Chui-Lai Cheung**
  chui-lai.cheung@davispolk.com

- **Timothy A.B. Folkerth**
  afolkerth@rgrdlaw.com

- **J. Alexander Hood**
  ahood@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com,ipareja@pomlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com,fgravenson@pomlaw.com

- **James Michael LoPiano**
  jlopiano@pomlaw.com

- **Ashley M Price**
  aprice@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,2879289420@filings.docketbird.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com,bengfelt@rgrdlaw.co

- **Megan Allison Rossi**
  megan.rossi@usdoj.gov

- **James Paul Rouhandeh**
  rouhande@dpw.com,ecf.ct.papers@davispolk.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Daniel J. Schwartz**
  daniel.schwartz@davispolk.com,ecf.ct.papers@davispolk.com,zohaib.chida@davispolk.com

- **Brian Stryker Weinstein**
  brian.weinstein@davispolk.com,ecf.ct.papers@dpw.com,chui-lai.cheung@davispolk.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)