UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN PAROT, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    - against -<br><br>CLARIVATE PLC, JERRE STEAD, RICHARD HANKS, CHRISTIE ARCHBOLD, MUKHTAR AHMED, JEFFREY ROY, STEEN LOMHOLT-THOMSEN, GORDON SAMSON, SHERYL VON BLUCHER, KOSTY GILIS, BALAKRISHNAN S. IYER, NICHOLAS MACKSEY, ANTHONY MUNK, JANE OKUN BOMBA, CHARLES J. NERAL, RICHARD W. ROEDEL, VALERIA ALBEROLA, USAMA N. CORTAS, ADAM T. LEVYN, ROXANE WHITE, PRICEWATERHOUSECOOPERS LLP, CITIGROUP GLOBAL MARKETS INC., ONEX CORPORATION, and BARING PRIVATE EQUITY ASIA GROUP LIMITED,<br><br>                Defendants. | 1:22-cv-00394-ENV-RLM<br><br>(Consolidated with Case Nos.: 1:22-cv-01371-ENV-RLM and 1:22-cv-01372-ENV-RLM)<br><br><br>Date of Service: October 7, 2022<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW OF CLARIVATE PLC, THE INDIVIDUAL DEFENDANTS AND CITIGROUP GLOBAL MARKETS INC. IN SUPPORT OF <u>MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .....................................................................................................5

    A.   The Parties. ...................................................................................................5

    B.   Clarivate's Experienced Executives and Proven Growth Plan. .............................6

    C.   The Alleged Misrepresentations and Clarivate's Detailed Disclosures.................8

ARGUMENT ....................................................................................................................12

  I.    Plaintiffs Fail to Plead Facts Giving Rise to a Strong Inference of Scienter. .............13

    A.   Plaintiffs' Confidential Witness Allegations Are Insufficient To
Plead Scienter...........................................................................................14

    B.   Plaintiffs Fail To Plead That Defendants Had a Motive or Opportunity To
Commit Fraud. ...........................................................................................19

    C.   Plaintiffs' Remaining Allegations Likewise Fail To Plead a Strong
Inference of Scienter on the Part of Defendants. .................................................23

  II.   Plaintiffs' Section 10(b) and Rule 10b-5 Fraud Claims Fail Because Plaintiffs
Fail To Adequately Plead Any Actionable Misstatements or Omissions..................26

    A.   Plaintiffs Cannot Plead Falsity Based on Vague, Non-Particularized
Allegations by Confidential Witnesses Who Offer No Concrete Facts and
Were Not in a Position To Know Whether the Challenged Statements
Were False or Misleading. .............................................................................26

    B.   Defendants' Statements and Projections Regarding Clarivate's Organic
Growth Were Not Misleading and Are Not Actionable. .......................................30

      1.   Plaintiffs' Allegations of Mismanagement, Even if True, Do Not Amount
to Securities Fraud and Do Not Support the Conclusion That There Was
a Breach of Any Disclosure Duty. ..................................................................30

      2.   Defendants' Projections of Organic Revenues and Growth Are
Inactionable Forward-Looking Statements.......................................................31

      3.   The Challenged Projections Are Inactionable Opinions................................35

      4.   General Statements of Optimism Are Not Actionable. ...............................36

      5.   Clarivate Disclosed That Organic Revenues Include Revenues From
Cross-Selling............................................................................................38

C.    Clarivate's Statements About Product Quality Are Not False or Misleading Because Clarivate *Did* Release New Products, and the Confidential Witnesses Do Not Provide Specific Allegations to the Contrary ............................................39

D.    Statements Regarding Internal Controls Are Inactionable Opinions....................40

E.    Plaintiffs Fail to Plead Any Actionable Omissions Under Item 303 ...................41

III.   Plaintiffs' Securities Act Claims Fail for the Same Reasons As Their Section 10(b) and Rule 10b-5 Claims..........................................................................42

IV.   Plaintiffs Fail to State a Claim for Control Person Liability Under Section 20(a) or Section 15.....................................................................................47

CONCLUSION.......................................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

*Acito v. IMCERA Grp., Inc.*,
 47 F.3d 47 (2d Cir. 1995) ...................................................................................20

*Am. Realty Cap. Props. Realty, Inc. Litig.*,
 2015 WL 6869337 (S.D.N.Y. Nov. 6, 2015)........................................................43

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
 28 F. 4th 343 (2d Cir. 2022) ...................................................................12, 14, 39

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ......................................................................................12, 43

*In re AT&T/DirecTV Now Sec. Litig.*,
 480 F. Supp. 3d 507 (S.D.N.Y. 2020) .................................................................21

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007) ....................................................................................7

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ...............................................43, 44, 45, 46

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................12

*In re BioScrip, Inc. Sec. Litig.*,
 95 F. Supp. 3d 711 (S.D.N.Y. 2015) ...................................................................43

*In re BISYS Sec. Litig.*,
 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ...........................................................18, 25

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ........................................................42

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
 506 F. App'x 32 (2d Cir. 2012) ...........................................................................19

*In re Bristol-Myers Squibb Sec. Litig.*,
 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................................................13, 24

*Campo v. Sears Holding Corp.*,
 371 F. App'x 212 (2d Cir. 2010) ....................................................................18, 47

*Chapman v. Mueller Water Prods., Inc.*,
 466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...........................................................22, 27

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
 2022 WL 541891 (E.D.N.Y. Feb. 23, 2022) ...............................................13, 20, 44

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  2022 WL 2872671 (E.D.N.Y. July 21, 2022) ........................................................43

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) ..........................................................38, 40

*In re Citigroup Inc. Bond Litig.*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010) .................................................................47

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................17, 18, 31

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) .................................................................27

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008) ..........................................................17, 24

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch, Ltd.*,
  565 F. Supp. 3d 478 (S.D.N.Y. 2021) .................................................................22

*City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*,
  374 F. App'x 83 (2d Cir. 2010) .............................................................................28

*City of Pontiac Policeman's & Fireman's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ..................................................................................13

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005) .................................................................43

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
  519 F. Supp. 3d 99 (E.D.N.Y. 2021) ...................................................................39

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..........................................................25, 40

*Davison v. Ventrus Biosciences, Inc.*,
  2014 WL 1805242 (S.D.N.Y. May 5, 2014) .................................................38, 40

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ..................................................................................18

*DeAngelis v. Corzine*,
  17 F. Supp. 3d 270 (S.D.N.Y. 2014) ...................................................................18

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ............................................................................20, 37

*Emerson v. Mut. Fund Series Tr.*,
  393 F. Supp. 3d 220 (E.D.N.Y. 2019) .................................................................47

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ....................................................................................................13

*In re Farfetch Ltd. Sec. Litig.*,
   2021 WL 4461264 (S.D.N.Y. Sept. 29, 2021) ......................................................23

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018) *aff'd*, 779 F. App'x 69 (2d Cir. 2019) ........35

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) ..................................................................44

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ............................................................17, 18

*In re Glob. Brokerage, Inc.*,
   2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019)........................................................25

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020) ..................................................................33

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
   1998 WL 283286 (S.D.N.Y. June 1, 1998) .....................................................22, 23

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012) ..................................................................35

*In re IAC/InterActive Corp Sec. Litig.*,
   695 F. Supp. 2d 109 (S.D.N.Y. 2010) ..................................................................10

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................................20

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..............................................20, 21, 22, 39

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021) ....................................................24

*Koppel v. 4987 Corp.*,
   167 F.3d 125 (2d Cir. 1999) ................................................................................31

*Lachman v. Revlon, Inc.*,
   487 F. Supp. 3d 111 (E.D.N.Y. 2020) ............................................................19, 38

*Lasker v. N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ...............................................................................36, 38

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) ..................................................................40

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) ...................................................................26

*Malin v. XL Cap. Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) *aff'd*, 312 F. App'x 400 (2d Cir. 2009); ...............27, 28

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021) ...............................................................17

*In re Marsh & McClennon Cos. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...............................................................46

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017) .............................................................25, 40

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020) ...............................................................28

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) .............................................................................46

*In re MSC Indus. Direct Co.*,
  283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...............................................................24

*In re Nielsen Holdings Plc Sec. Litig.*,
  510 F. Supp. 3d 217 (S.D.N.Y. 2021) ...............................................................24

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................................26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ....................................................................................35, 36

*O'Brien v. Nat'l Prop. Analysts Partners*,
  936 F.2d 674 (2d Cir. 1991) .............................................................................46

*Pinter v. Dahl*,
  486 U.S. 622 (1988) .........................................................................................46

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ...............................................................40, 41

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009) ...............................................................10

*Rapoport v. Asia Elec. Holding Co.*,
  88 F. Supp. 2d 179 (S.D.N.Y. 2000) ...............................................................38

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...........................................................17, 18

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) .......................................................22

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998) ......................................................................37

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................... *passim*

*Rosi v. Aclaris Therapeutics, Inc.*,
    2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ...................................................... 25

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) ..................................................................20

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ...................................................................................37

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ..............................................................................................31

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ..................................................................25

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ...............................................................................47

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) .................................................................................13

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ....................................................................31, 33, 35

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017) ...................................................................................42

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ...................................................................................14

*In re SunEdison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y 2018) ........................................................ 32, 35, 42

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................13

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 359 (2d Cir. 1993), *aff'd*, 189 F.3d 460 (2d Cir. 1999) ............................. 37

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .................................................................................36

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ................................................................17, 33

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) .......................................................................17

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ........................................................................................................ 31

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020) .................................................................................34

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) ................................................................. 25, 26, 27, 29

*Yung v. Lee*,
  432 F.3d 142 (2d Cir. 2005) ..............................................................................................43

*In re Yunji Inc., Sec. Litig.*,
  2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021) .......................................................................42

## Statutes & Rules

15 U.S.C. § 78u-4(b) ........................................................................................................... 1
15 U.S.C. § 78u-4(b)(1) ................................................................................................. 12, 14
15 U.S.C. § 78u-4(b)(2)(A) .................................................................................................. 13
15 U.S.C. § 78u-5(i)(1) ....................................................................................................... 32
Fed. R. Civ. P. 9(b) ..................................................................................................... *passim*

Defendants Clarivate Plc ("Clarivate" or the "Company"), the Individual Defendants[1] and Citigroup Global Markets Inc. ("CGMI")[2] respectfully move, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), for an order dismissing Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint") (ECF No. 30).[3]

## PRELIMINARY STATEMENT

Plaintiffs, purported purchasers of Clarivate common and preferred stock, level a broadside, kitchen-sink attack on nearly every aspect of the Company's business based on little more than the vague assertions of five unnamed, lower-level, former Clarivate employees.  On the face of the Complaint, these confidential witnesses ("CWs") express dissatisfaction with changes to Clarivate's business model that Clarivate *disclosed*, along with the risks relating to those changes.  Plaintiffs allege that those disclosed changes led to the Company missing growth targets in the fourth quarters of 2020 and 2021.  Even if that were true, complaints about the eventual outcome of disclosed changes to the business do not support a claim that Defendants committed securities fraud, or that Defendants' statements were false.  Accordingly, Plaintiffs'

---

[1] The "Individual Defendants" are Jerre Stead, Richard Hanks, Christie Archbold, Mukhtar Ahmed, Jeffrey Roy, Steen Lomholt-Thomsen and Gordon Samson (the "Officer Defendants"), and Sheryl von Blucher, Kosty Gilis, Balakrishnan S. Iyer, Nicholas Macksey, Anthony Munk, Jane Okun Bomba, Charles J. Neral, Richard W. Roedel, Valeria Alberola, Usama N. Cortas, Adam T. Levyn and Roxane White (the "Director Defendants").  The Officer Defendants together with Ms. von Blucher are the "Exchange Act" Defendants.

[2] CGMI served as the managing underwriter for the offerings.

[3] Defendants Onex Corporation ("Onex") and Baring Asia Private Equity Fund VI, L.P.1, Baring Asia Private Equity Fund VI, L.P.2 and Elgin Investment Holdings Limited (the "Baring Fund Entities") join in this motion and will be filing a separate motion and supporting memorandum of law to address additional arguments in support of dismissal.  The Baring Fund Entities were substituted as defendants for Baring Private Equity Asia Group Limited on September 15, 2022.

claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")
(Count One) and Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act")
(Counts Three and Four) must be dismissed.  Because Plaintiffs have failed to plead primary
violations under the Exchange Act or the Securities Act, Plaintiffs' Section 20(a) and Section 15
"control person" claims (Counts Two and Five) necessarily fail as well.

The Complaint does not allege that any of the CWs ever had a single communication
with, or ever attended a meeting with, a single one of the Officer Defendants regarding the
matters at issue, which is not surprising given the CWs' roles within the Company.  As the
Complaint makes clear, the CWs were several layers removed from the Officer Defendants and
were not in a position to know what the Officer Defendants knew or believed when making the
alleged misstatements and omissions.  The statements by the CWs therefore cannot support the
Plaintiffs' burden under the PSLRA to plead with particularity facts giving rise to a strong
inference of fraudulent intent, or scienter.

Because they cannot point to any factual allegations regarding the Officer Defendants'
intent, or even any interactions with them, the CWs default to the generalized assertions that
"executive management" was "hands on," had "access to" sales reports that they "understood"
executive management reviewed and "must have" acted with fraudulent intent.  The allegation
that a defendant "must have" known a fact is the polar opposite of the fact-based pleading
demanded by the PSLRA.  Here, the CWs provide no factual allegations whatsoever as to what
each of the Exchange Act Defendants actually knew.  For these reasons, time and again, the
Second Circuit and the district courts in this circuit have rejected such generalized allegations as
plainly insufficient under the PSLRA.

Plaintiffs' other strained allegations of scienter fare no better. The fact that certain executives left the company, without any allegation by Plaintiffs as to the reason, clearly does not plead scienter, nor does the fact that certain executives sold shares before leaving the company, particularly given that the company's CEO and Chairman—who Plaintiffs allege was the leader of the "fraud"—did not sell a single share.

Plaintiffs' Section 10(b) claims fail not only because they fail to plead a strong inference of scienter, but also because they do not plead any actionable misstatement or omission. Again, the Complaint relies on the CWs, but it does not plead any actual facts supporting the conclusion that the statements at issue were false or misleading when made, and such allegations therefore fall well short of the particularized allegations of fact required by the PSLRA. With respect to the Complaint's central claim that the Officer Defendants made false or misleading statements as to the likelihood that Clarivate would hit its growth targets, the CWs—based on the Complaint's own allegations about their roles within the Company—were not in a position to evaluate the ability of the Company as a whole to achieve its growth targets at any point in time. In place of particularized facts, the CWs simply make generalized assertions that changes to Clarivate's business model—which were *disclosed* by the Company, along with their risks—were ill-conceived or were not well executed. But allegations of "mismanagement"—unfounded as they are—do not amount to securities fraud, as the Supreme Court has held for decades. Moreover, the statements regarding Clarivate's growth targets are inactionable because they are either forward-looking statements that fall within the PSLRA's safe-harbor provision, statements of opinion that Plaintiffs have not alleged were disbelieved by the speakers when made or inactionable general statements of corporate optimism.

Plaintiffs' other alleged misstatements or omissions also fail on the face of the Complaint and the documents incorporated by reference therein. The suggestion that Clarivate secretly and improperly included cross-selling revenues (i.e., revenues from marketing legacy products together with newly acquired products) in its reported organic revenue numbers contradicts the Complaint's own allegations, which confirm that Clarivate *disclosed* the inclusion of these revenues in organic growth. Plaintiffs' allegations as to another category of purported misstatements—concerning the adequacy of Clarivate's internal controls—are likewise inactionable opinions that Plaintiffs have no basis to allege were disbelieved by the speakers. And their allegations that Clarivate falsely claimed that it was developing new products—based on vague suggestions by the CWs that the Company was not doing so—cannot stand, both because of the lack of any factual basis for the CWs' allegations and because the Complaint itself (and documents referenced therein) confirms that Clarivate released dozens of new products and product enhancements in 2020 and 2021. Finally, Plaintiffs' attempt to plead actionable omissions under Item 303 of Regulation S-K is derivative of their false statement claims because it is based on the same disclosure issues, and it fails for the same reasons.

Plaintiffs also attempt to plead claims based on Sections 11 and 12(a)(2) of the Securities Act, but those claims are part and parcel of the overall "fraud" that Plaintiffs' scattershot Complaint alleges. Under governing law, Securities Act claims are subject to the standards that apply to securities fraud claims if they "sound in fraud" when the complaint is viewed as a whole. That is the case even where a plaintiff includes an explicit disclaimer that the Securities Act claim is not alleging fraud. Plaintiffs' Securities Act claims, which sound in fraud, fail because they do not adequately plead fraud, and also fail for the same reasons as Plaintiffs' Section 10(b) claims.

For these reasons and those below, the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS[4]

**A.      The Parties.**

Plaintiffs allegedly purchased Clarivate common stock between July 30, 2020 and February 2, 2022 (the "Class Period").  (Compl. at 1; ¶¶ 18-21.)[5]  Certain Plaintiffs also conclusorily allege that they bought Clarivate shares pursuant to or traceable to registered public offerings of Clarivate common stock on June 10, 2021 and September 13, 2021 (¶¶ 18, 21), and of mandatory convertible preferred stock on June 10, 2021 (¶ 20).

Defendant Clarivate is a leading information services and data analytics company that sells products to academic, scientific and other communities. (¶¶ 22, 77.)  Clarivate went public in 2019 when it merged with a special purpose acquisition company ("SPAC") led by Defendant Jerre Stead, who subsequently became Clarivate's CEO.  (¶¶ 23, 74, 76, 94.)[6]  Other Defendants include various current and former senior Clarivate executives (the Officer Defendants) (¶¶ 24-29); current and former Clarivate directors who allegedly signed the registration statements for the June and September common and preferred stock offerings (the Director Defendants) (¶¶ 30-42); CGMI, as the managing underwriter for those offerings (¶¶ 45-48); PricewaterhouseCoopers LLP, Clarivate's independent auditor (¶ 44); and Onex and the Baring

---

[4] The allegations in this section are drawn from the Complaint and the documents integral to it or incorporated therein by reference, or other materials relied upon by Plaintiffs or otherwise subject to judicial notice.  The Complaint's well-pleaded factual allegations are assumed true solely for purposes of this motion.

[5] Citations in the form "¶ __" refer to paragraphs in the Complaint.

[6] Plaintiffs dedicate a portion of their Complaint to criticizing SPACs (*see, e.g.*, ¶¶ 61-73), but the nature and structure of SPACs are entirely irrelevant to Plaintiffs' claims.

Fund Entities, which had allegedly invested in a pre-public Clarivate and later sold some of their common stock in the June and September 2021 offerings (¶¶ 49-52, 88).[7]

## B.   Clarivate's Experienced Executives and Proven Growth Plan.

Prior to Clarivate, Mr. Stead had a successful track record of increasing shareholder value at other public companies through strong operational and financial performance.  (¶¶ 85, 91-92.) In November 2019, Clarivate and Mr. Stead announced a five-part plan to boost revenue growth, expand margins and cut costs, consistent with an approach that Mr. Stead had successfully utilized at a prior company.  (¶ 96.)  This plan, which Plaintiffs refer to as the "Jerre Stead Playbook," consisted of the following components: (1) increasing subscription prices, (2) shifting to an "inside sales" model, under which Clarivate's sales force would service customers out of regional business centers, allowing them to more frequently contact customers remotely and more rapidly address their needs, (3) "cross-selling" legacy products with product offerings from acquired business, (4) establishing global account teams and (5) growing the Asia-Pacific business.  (¶¶ 3, 89, 95-96, 101-02.)

Utilizing this plan, Clarivate achieved substantial organic revenues and revenue growth. As alleged in the Complaint, Clarivate reported organic revenue growth in *every* quarter from the second quarter of 2020 through the fourth quarter of 2021.  (¶¶ 221, 230, 240, 250, 257, 264-65, 305, 333.)  Plaintiffs acknowledge, in fact, that in the first two quarters of 2021, the strong growth rate outpaced management's expectations.  (¶ 138.)  However, growth rates in the fourth quarter and full year 2020 and 2021 ultimately fell below Clarivate's projected guidance. (¶¶ 109-10, 119, 123, 330.)

---

[7] In addition to Onex and the Baring Fund Entities, the Complaint alleges that Individual Defendants Mr. Hanks, Ms. von Blucher and Mr. Roy also sold Clarivate stock in the June and September common offerings.  (¶¶ 24, 27, 30.)

In addition, during the Class Period, Clarivate completed a number of acquisitions that expanded its product offerings, including an acquisition of CPA Global on October 20, 2020. (¶¶ 81-82, 125-26.)  On December 27, 2021, Clarivate announced that it would restate its prior financial results for the fourth quarter of and year-end 2020 and the first three quarters of 2021 due to an error in accounting for an equity plan included in the CPA Global acquisition and tax liability for the CPA Global acquisition.  (¶¶ 191-92.)  Clarivate promptly disclosed the need for this restatement five days after it first recognized the accounting error (*see* Ex. A (Clarivate Plc, Current Report (Form 8-K) (Dec. 27, 2021)) at 2),[8] and disclosed that the restatement would increase expenses over the affected period by up to $185 million but "will not impact previously reported GAAP revenues or long-term debt, or the non-GAAP metric Adjusted EBITDA" (*id.*). [9] The restated financials were released on February 3, 2022.  (¶ 192.)  In connection with the restatement, Clarivate disclosed that it had identified associated material weaknesses in its internal controls for financial reporting ("ICFR") and its disclosure controls and procedures ("DC&P") relating to these issues.  (¶ 194.)[10]

---

[8] Citations in the form "Ex. __" refer to exhibits to the Declaration of Brian S. Weinstein, dated October 7, 2022, filed contemporaneously herewith.

[9] Plaintiffs cite this 8-K in their Complaint.  (¶ 191.)  On a motion to dismiss, this Court may consider documents that are (i) relied on, integral to or incorporated by reference in a complaint, (ii) filed with the SEC or (iii) otherwise subject to judicial notice.  *See ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[10] Clarivate had earlier reported material weakness in ICFR and DC&P in connection with a different purchase accounting error relating to warrants issued by CPA Global.  In May 2021, Clarivate filed an amended annual report for the year ended 2020 that restated financial results and disclosed that Clarivate's CEO and CFO "have concluded that our disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2020." Ex. B (Clarivate Plc, Amended Annual Report (Form 10-K/A) (May 10, 2021)) at 6, 186-87.

C.      The Alleged Misrepresentations and Clarivate's Detailed Disclosures.

Plaintiffs' claims in this case principally take issue with various business decisions made by Clarivate's management and the manner in which these decisions were implemented. Plaintiffs allege that during the Class Period, Clarivate purportedly failed to disclose that: (i) it would not hit fourth-quarter and year-end organic growth targets in 2020 and 2021; (ii) it was unable to segregate organic from inorganic growth purportedly due to the use of an inside-sales model and the practice of cross-selling legacy products with acquired products; (iii) it would not have higher fourth-quarter revenues in 2021 because it had already pulled forward certain revenues and converted customers to subscription plans; (iv) "drastic changes" flowing from Clarivate's business plan, such as moving to an inside-sales model and instituting other cost-cutting measures, "left the Company disorganized" and caused many employee departures; (v) unjustified price increases angered and drove away customers; (vi) the Company did not invest in new and improved products, slowing growth; and (vii) the Company's targets based on its sales pipeline included transactions that were expected but not yet closed.  (*See, e.g.*, ¶¶ 3, 8, 56, 109, 243.)  For this laundry list of allegations, Plaintiffs rely exclusively on the assertions of five CWs—former Clarivate employees who held junior or mid-level sales and data analytics positions at the Company—who do not allege that they ever interacted with any of the Individual Defendants and do not make *any* allegations about any particular Defendant's conduct, knowledge or intent.  (¶¶ 55-60.)

Based on the CWs' contentions, Plaintiffs allege that Clarivate made four categories of purportedly false or misleading statements during the Class Period.  First, Plaintiffs allege that Clarivate—through Officer Defendants Stead, Hanks, Roy, Ahmed and Samson—made statements on earnings calls and at investor conferences about its new product offerings and the quality of its product portfolio that allegedly were misleading because, according to the CWs,

"Defendants did not invest in new products and allowed the quality of Clarivate's existing products to decline."  (¶ 218(d); *see* ¶¶ 207-18.)  Second, they allege that Clarivate—through Officer Defendants Stead, Hanks, Ahmed and Lomholt-Tomsen—issued overly optimistic, forward-looking projections about the Company's expected organic revenues and growth rate in its quarterly earnings calls and at various investor conferences,[11] and that Clarivate also included such statements in the financial statements it filed with the SEC in its quarterly reports on Forms 10-Q and associated press releases filed on Form 8-K.  (¶¶ 220-24, 229-33, 239-43, 249-53, 256-60, 263-67.)  Third, Plaintiffs allege that Clarivate failed to disclose "significant structural changes" to its business model that purportedly constituted material, known "trends" required to be disclosed in the management discussion and analysis ("MD&A") sections of its annual and quarterly reports filed with the SEC under Item 303 of Regulation S-K.  (¶¶ 161-90.) Fourth, Plaintiffs claim that the registration statements for the June and September 2021 offerings contained materially false and misleading statements because they incorporated by reference Clarivate's allegedly deficient 10-Q and 10-K/A reports.  (¶¶ 355, 365-66.)

In fact, however, Clarivate made substantial disclosures about each of the business issues, and the associated risks, that Plaintiffs allege were omitted:

***Disclosures regarding new products and product enhancements.***  Contrary to the CWs' allegations that Clarivate did not invest in new products and allowed existing products to decline (*see, e.g.*, ¶¶ 57-59, 207-18), it is clear from the face of the Complaint that the Company did indeed release substantial new products and product enhancements during the Class Period, and

---

[11] Plaintiffs allege that Defendants made these statements at certain conferences that occurred on September 10, 2020, September 16, 2020, March 4, 2021, March 18, 2021, May 19, 2021, September 15, 2021, November 17, 2021 and December 7, 2021 (¶¶ 225-28, 244-48, 254-55, 261-62, 271-77), and during the Company's 2020 and 2021 Investor Days, held on November 10, 2020 and November 9, 2021 (¶¶ 234-38, 268-70).

disclosed to investors that it had done so.  (*See, e.g.*, ¶¶ 212, 215 (alleging that Clarivate disclosed the release of 19 new products in 2020 and 60 new products and product enhancements in 2021).)[12]

> ***Disclosures regarding Clarivate's growth and revenue projections.***  Clarivate repeatedly disclosed that its projections were forward-looking and might not be achieved.  Each of Clarivate's SEC filings during the Class Period included,[13] and each of Clarivate's investor calls and presentations began with,[14] a disclosure noting that known or unknown risks, uncertainties and other factors may cause the actual results, performance or achievements of the business to differ materially from projections and anticipated results.  And in particular, Clarivate emphasized that its ability to achieve its cost restructuring program, integrate its acquisitions and accomplish its planned restructuring initiatives would play a significant role in determining whether it could meet its anticipated revenue and growth numbers.  Among many other risks,

---

[12] *See also* Ex. C (Clarivate, Annual Report (Form 10-K) (Feb. 26, 2021)) at 16 (describing new products and enhancements in section on "New Product Development"); Ex. D (Clarivate Plc, Q3 2020 Earnings Call Tr. (Oct. 29, 2020)) at 5-6 (referencing launch of generics intelligence product); Ex. E (related press release); Ex. F (Clarivate Plc, Q3 2021 Earnings Call Tr. (Oct. 28, 2021)) at 11 (discussing "brand-new version of Web of Science"); Ex. G (related press release); Ex. H (Clarivate Plc, Q2 2020 Earnings Call Tr. (July 30, 2020)) at 11 (discussing expansion to Derwent product); Ex. I (related press release).  The Court may take judicial notice of the Company's press releases concerning new and enhanced products, as they are "integral" to the Complaint (*see, e.g.*, ¶¶ 210-17).  *See e.g.*, *In re IAC/InterActive Corp Sec. Litig.*, 695 F. Supp. 2d 109, 123 n.8 (S.D.N.Y. 2010); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 518 n.9 (S.D.N.Y. 2009).

[13] *See, e.g.*, Ex. J (Clarivate Plc, Quarterly Report (Form 10-Q) (May 10, 2021)) at 3 (warning that "***all matters that are not historical facts***"—including, specifically, "***projections regarding . . . future results***," ***should be considered*** "***forward-looking statements***"); Ex. K (Clarivate Plc, Quarterly Report (Form 10-Q) (July 29, 2021)) at 3 (same); Ex. L (Clarivate Plc, Quarterly Report (Form 10-Q) (Oct. 28, 2021)) at 3 (same); Ex. C at 26.

[14] *See, e.g.*, Ex. F at 4; Ex. H at 4.

Clarivate highlighted risks to its projections from the very matters Plaintiffs claim were not

disclosed, including:

- "our ability to maintain revenues if our products and services do not achieve and maintain broad market acceptance" (Ex. C at 26);

- "our loss of, or inability to attract and retain, key personnel" (*id.*);

- that "[w]e may be unable to derive fully the anticipated benefits from organic growth, existing or future acquisitions, joint ventures, investments or dispositions, including anticipated revenue and cost synergies" (*id.* at 23); and

- that "[i]f we are unable to successfully execute on our strategies to achieve our growth objectives, drive operational efficiencies, realize our anticipated cost or revenue synergies . . . our growth rates and profitability could be adversely affected and the market price of our ordinary shares may decline" (*id.*).

  ***Disclosures regarding transition to subscription-based revenues.***  Clarivate disclosed

that some of its revenues would shift from a transaction-based model to a subscription-based

one.  (¶ 146 ("Defendants indicated from the start that they intended to restructure the business

so that some of the transactional revenues would become more predictable and cost-efficient

subscription revenues."); ¶ 164 (in 2020, Clarivate "announced its plan to transition data sales

that were previously recorded as one-off 'transactional' deals to cloud-based product that would

be recorded as subscription sales").)  Clarivate also disclosed that subscription-based revenues

were subject to meaningful risks, including the loss of customers due to price increases and other

factors.  (*See* Ex. C at 23, 40.)

  ***Disclosures regarding the transition to an "inside sales" model, cost-cutting and a***

***reduction in head count.***  Clarivate disclosed to investors that it was transitioning to an "inside

sales" model whereby most sales would be run out of three global centers (¶¶ 131-33, 168-71),

and that these measures were "designed to slash costs, primarily through reducing head count,

and boost the Company's profitability."  (¶ 164; *see also* Ex. K at 48; Ex. L at 55.)  Clarivate

likewise disclosed that the shift to an inside sales model and the associated reduction in headcount posed risks, including the risk of being unable to secure adequate replacements.  (*See, e.g.*, ¶¶ 132, 168; Ex. C at 21-22; Ex. M (Clarivate Plc, Rule 424(b)(5) Prospectus Supplement for 38,461,538 Ordinary Shares (June 11, 2021)) at S-14, S-18.)

   ***Disclosures regarding cross-selling and its contribution to organic revenues.***  Finally, Clarivate informed investors that part of its growth strategy was growth in organic revenues from legacy products attributable to cross-selling opportunities associated with new acquisitions (¶¶ 125-26).  Clarivate also warned that its cross-selling efforts might fail to drive the projected revenue growth.  (*See, e.g.*, Ex. C at 23 ("We seek to achieve our growth objectives by optimizing our offerings to meet the needs of our customers through organic development, including by delivering integrated workflow platforms, [and] cross-selling our products across our existing customer base . . . . However, we may not be able to achieve the expected benefits of our acquisitions, including anticipated revenue, cost synergies or growth opportunities and we may not succeed in cross-selling our products and services.").)

## ARGUMENT

   To survive a motion to dismiss, Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiffs' Exchange Act claims must additionally satisfy Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA's heightened pleading standards, which require Plaintiffs to specify each statement alleged to be misleading, explain why it is misleading and further allege facts sufficient to raise a "strong" inference of scienter as to each defendant.  15 U.S.C. §§ 78u-4(b)(1)-(2)(A); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F. 4th 343, 353 (2d Cir. 2022).  As described

below, Plaintiffs' Securities Act claims must also satisfy Rule 9(b)'s heightened pleading

standards because they sound in fraud.  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.

2004).  As a result, Plaintiffs must also plead a strong inference of scienter with respect to those

claims.  *See, e.g.*, *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891, at *14

(E.D.N.Y. Feb. 23, 2022) ("*Chembio I*") (citing *City of Pontiac Policeman's & Fireman's Ret.*

*Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)).

      Plaintiffs fail to meet their pleading burden.  The Complaint fails to allege that any of the

Defendants acted with the requisite scienter, and fails even to allege any actionable false or

misleading statements or omissions.  These failures each provide an independent basis on which

Plaintiffs' Section 10(b) and Rule 10b-5, Section 11 and Section 12(a)(2) claims must be

dismissed.  And because Plaintiffs have failed to plead a primary violation of the securities laws,

their Section 20(a) and Section 15 control person claims must also be dismissed.

## I.    Plaintiffs Fail to Plead Facts Giving Rise to a Strong Inference of Scienter.

      The Complaint should be dismissed because Plaintiffs fail to adequately plead that any

Defendant acted with scienter.  Under Rule 9(b), "a fraud plaintiff must 'allege facts that give

rise to a strong inference of fraudulent intent.'"  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.

Supp. 2d 549, 556 (S.D.N.Y. 2004) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124,

1128 (2d Cir. 1994)).  Moreover, the PSLRA makes clear that Plaintiffs must, for each alleged

misstatement or omission, "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind" in order to succeed on a Section 10(b) claim.

15 U.S.C. § 78u-4(b)(2)(A).  To plead the requisite state of mind, Plaintiffs must allege that

Defendants possessed "a mental state embracing intent to deceive, manipulate, or defraud."

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  In the Second Circuit, a plaintiff cannot plead

scienter without factual allegations demonstrating (1) a motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior. *See, e.g.*, *Ark. Pub. Emps. Ret. Sys.*, 28 F. 4th at 355. Furthermore, plaintiffs must allege such facts to support an inference that "each defendant" acted with scienter. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015). Where an allegation is made on information and belief, Plaintiffs must also "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

A.     **Plaintiffs' Confidential Witness Allegations Are Insufficient To Plead Scienter.**

In an attempt to plead scienter, Plaintiffs rely primarily on conclusory statements made by the five CWs, but those allegations fail because the CWs do not, and are not in a position to, provide facts concerning the Exchange Act Defendants' state of mind. As the Complaint itself makes clear, each CW is a lower-level employee far removed from Defendants:

- CW-1 allegedly worked as a Commercial Account Manager and Inside Account Manager in Arizona, and was "responsible for promoting subscription-based services focused on pharmaceutical, biotech, and medical venture investment intelligence." (¶ 56.) Plaintiffs allege that CW-1 "understood" that meetings to review unidentified revenue and pipeline reports "were held up the chain of command all the way to the executive management team." (¶¶ 56, 299.) Plaintiffs neither allege the basis of CW-1's belief nor provide any indicia that CW-1 would know what meetings were held at the executive management level or what was discussed there or when. The Complaint makes no factual allegation that anyone from the executive management team held the same views as CW-1, much less that any of the Exchange Act Defendants did. CW-1 defined the "executive management" team to include a broad category of people who are not

14

defendants in this lawsuit, including, among others, all Company "Vice Presidents."  (¶ 56.)

- CW-2 worked as a data analytics professional in the Decision Resource Group ("DRG")—an acquired subunit of the Life Sciences Product Line within Clarivate's Sciences Division (*see* Ex. N (Clarivate Plc, Annual Report, Amend. No. 2 (Form 10-K/A) (Feb. 3, 2022)) at 4-5)—and "concentrated on the pharmaceutical and biotech areas."  (¶ 57.)  Plaintiffs rely on CW-2's allegations to conclusorily allege that "executive management knew that subscriptions and renewal revenues were going down," but do not allege any factual details as to how or why or when Defendants knew this, or what the magnitude allegedly was. (¶ 57.)  Instead, Plaintiffs rely solely on CW-2's statement that data analytics "reports were combined in a consolidated report and forwarded up the chain of command."  (*Id.*)

- CW-3 likewise held a nonexecutive role in the DRG—as a Key Account Director for Strategic Partnerships—and "worked with the commercial life sciences access team."  (¶ 58.)  Plaintiffs allege only that "CW-3 believed that [revenue] reports were frequently generated and presented to executive management."  (*Id*.)  At no point do Plaintiffs allege that "executive management," much less any of the individual Exchange Act Defendants, interpreted these reports the same way that CW-3 allegedly did.  Moreover, at no point do Plaintiffs allege that CW-3 believed management was knowingly misrepresenting the Company's financial position and outlook—the allegations solely focus on CW-3's critiques of what executive management was doing.

- CW-4 was a Commercial Account Manager who "worked with the commercial life science group concentrating on the pharmaceutical and biotech areas." (¶ 59.) Plaintiffs allege only that CW-4 met frequently with supervisors and "understood that similar meetings were held by the executive management team"—again, without alleging any basis and without alleging the timing or content of any such meetings. (*Id.*) Plaintiffs allege that, "[a]ccording to CW-4, there was 'absolutely no way management would not have an idea that subscriptions and renewals revenues were going down'" (*id.*), but Plaintiffs offer no specifics, much less any allegations to rebut the equally strong inference that any such declines in revenues were simply a temporary result of the Company's initiatives to strengthen the business.

- CW-5 was Senior Director, Global Accounts—by Plaintiffs' own admission, at least two levels removed from executive management. (¶ 60.) Plaintiffs allege that CW-5 presented financial data to supervisors, "who would then roll up the data to executive management." (*Id.*) However, Plaintiffs allege no details regarding management's actual review of, or opinions about, the rolled-up financial data. Additionally, CW-5 makes various allegations that management "told the market what it wanted to hear" and "knew that new subscriptions, renewals, and transactional revenues were going down and Clarivate would not meet its forecasts" (*id.*), but no concrete basis for these allegations is ever provided.

Not one of the CWs claims ever to have interacted with any of the Exchange Act Defendants (or any of the other Individual Defendants). None of them even attempts to explain

how Clarivate's organic growth targets were set or what components they incorporated.  Instead, the CWs—who worked in various sales capacities (CWs 1, 3, 4 and 5) and in data analytics for one business segment (CWs 2 and 5)—simply assert that they "understood" or "believed" that "executive management" had meetings to discuss sales reports (¶¶ 56, 58-60), were "hands on," had access to data systems and reviewed "reports and documents" (¶¶ 57, 59-60, 297), and that "there was absolutely no way management would not have an idea" about declining revenue drivers (¶ 59).  These allegations essentially boil down to the conclusory allegation that the Exchange Act Defendants "should have known" or "must have known" they were allegedly misleading the market solely on account of their positions at the Company.  Courts have repeatedly rejected these types of allegations as inadequate for pleading scienter.  *See, e.g.*, *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (holding that allegations that executives "must have been aware" of issues because they were "tight-knit" and "hands-on" are insufficient alone to establish scienter); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient."); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (holding that scienter cannot be inferred solely from a defendant's "board membership or executive managerial position").[15]

---

[15] *See also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *46 (S.D.N.Y. Sept. 2, 2022) (collecting cases); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *23 (S.D.N.Y. Sept. 21, 2021) (declining to find an inference of scienter where plaintiffs merely pled that executives were "hands-on" and "had access to extensive raw data"); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (finding that confidential informants' claims that knowledge of weaknesses was "widespread" within the company and senior executives were "hands on" were inadequate to support an inference of scienter); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381-82 (S.D.N.Y. 2004)

The CWs' inability to link their assertions to the Exchange Act Defendants—let alone to *each* Defendant—confirms that they simply were not in a position to know what the Exchange Act Defendants knew or believed when making the statements challenged in the Complaint. This is an independent reason for rejecting the CWs' contentions.  *See, e.g.*, *Campo v. Sears Holding Corp.*, 371 F. App'x 212, 217-18 (2d Cir. 2010) (affirming district court's discounting of CW allegations where CWs had no direct contact with defendants and no personal knowledge of their opinions); *Glaser*, 772 F. Supp. 2d at 589-91 (collecting cases).  Ultimately, the allegations attributed to the CWs simply reflect the witnesses' *own* views that Clarivate's changes to its business—which it disclosed—were ill-advised or were causing difficulties within the Company.  These allegations do not plead a strong inference as to the state of mind of any of the Exchange Act Defendants.

Finally, the CW statements essentially amount to an improper use of "group pleading" to demonstrate scienter.  Plaintiffs relying on group pleading must still "plead circumstances providing a factual basis for scienter for ***each*** defendant."  *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281-82 (S.D.N.Y. 2014) (emphasis added) (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)).  The doctrine "merely gives plaintiffs the benefit of a presumption that certain kinds of statements were made by certain kinds of defendants."  *Refco*, 503 F. Supp. 2d at 645 (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005)).  "It does not permit plaintiffs to presume the state of mind of those defendants."  *Id.*; *see also Citigroup I*, 330 F. Supp. 2d at 381-82 ("Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the

---

("*Citigroup I*") (finding allegations of a defendant's position as an officer alone to be insufficient to support an inference of scienter).

time they were made.").  Plaintiffs here make no attempt to plead scienter with respect to each Exchange Act Defendant, and instead rely on undifferentiated allegations that CWs "understood" that revenue reports were "forwarded up the chain of command" to "executive management"—a broadly defined group that extends well beyond the Exchange Act Defendants.  (¶¶ 56-57, 299.) Plaintiffs do not allege which, if any, of the Exchange Act Defendants received the alleged reports, let alone any specific allegations as to the timing or content of any report or the reaction of any Defendant to any such report.  Plaintiffs "invoke the same set of 'adverse facts . . .' as the basis for inferring scienter with respect to each misrepresentation and each defendant," but it is not enough for a complaint to merely "alleg[e] 'true facts' that were 'then known to or recklessly disregarded by each of the Defendants'" without also "identify[ing] or clearly cross-referenc[ing] any facts demonstrating a strong inference of scienter."  *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 128 (E.D.N.Y. 2020) (alterations in original) (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012)).

## B.    Plaintiffs Fail To Plead That Defendants Had a Motive or Opportunity To Commit Fraud.

Plaintiffs cannot plead that Defendants had the motive and opportunity to commit fraud because they fail to allege any facts supporting such an inference.  Plaintiffs primarily allege that Clarivate's alleged failure to deliver on its projected growth rates "created the perfect motive and opportunity for Defendants' scheme to conceal the lack of promised growth for as long as possible" (¶ 97), but this is a generic corporate motive that is insufficient as a matter of law to support a strong inference of scienter.  Plaintiffs' conclusory allegation that Mr. Stead in particular faced pressure "to deliver investors the success that was intricately linked to his professional reputation" (¶ 303) does not change this conclusion.

"To plead motive with sufficient particularity, plaintiffs must allege that defendants 'benefitted in some concrete and personal way from the purported fraud.'" *Chembio I*, 2022 WL 541891, at *8 (citing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)).  Courts in the Second Circuit have repeatedly held that "[m]otives common to most corporate officers, including the desire for the corporation to appear profitable, to keep stock prices high to increase officer compensation, or even to enhance their own prestige do not suffice for scienter" as they are not sufficiently "concrete and personal." *Id.* (collecting cases); *see also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (holding that motive must be a "specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders"); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (finding allegations that defendants were motivated by a desire to maintain or increase executive compensation insufficient for scienter); *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011) (finding allegation of executives' desire to successfully execute a stock offering in order to "protect and enhance [their] executive positions and the substantial compensation and prestige obtained thereby" to be "too general to support a strong inference of scienter").

These common corporate motives are what Plaintiffs allege here.  That Mr. Stead and the other Officer Defendants would be "motivated by the [C]ompany's financial prospects," including its growth trajectory and the resultant positive effects on its stock price, is "precisely the sort of commonplace and hence unsuspicious motive that courts have routinely found insufficient to establish scienter." *Chembio I*, 2022 WL 541891, at *9 (quoting *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003)).  The same is true of the allegations that Mr. Stead, in his capacity as a founder and sponsor of the Churchill SPAC that brought

20

Clarivate public, faced "pressure to deliver investors the success that was intricately linked to his professional reputation," and that he owned Clarivate shares. (¶¶ 303-04.) These allegations are not qualitatively different from the types of motives that courts have repeatedly found to be inadequate to plead scienter. *See also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 530 (S.D.N.Y. 2020) (finding the prospect of harm to "professional reputations" "insufficient as a matter of law" to allege motive).

Plaintiffs' attempt to plead scienter through alleged stock sales by certain Individual Defendants likewise fails. The Complaint alleges stock sales during the Class Period by five of the Officer/Director Defendants (Messrs. Hanks, Ahmed, Roy and Samson, and Ms. von Blucher), but there are *no* allegations of stock sales by any of the other Officer/Director Defendants—including Mr. Stead, the CEO and Chairman of Clarivate, who Plaintiffs allege was the architect of the "fraud." (¶¶ 310-33.) Insider sales do not raise a strong inference of scienter where, as here, so many of the officers and directors are not alleged to have sold any shares. *See, e.g.*, *Keyspan*, 383 F. Supp. 2d at 384 (finding it "both relevant and appropriate to consider" that eight officers who were required to file public records of their stock holdings and who were not named as defendants did not sell any stock during the period at issue).

It is telling that Mr. Stead is not alleged to have sold *any* shares during the Class Period. Plaintiffs place extraordinary importance on Mr. Stead's role at Clarivate. Most of the purported "misstatements" alleged by Plaintiffs were made by Mr. Stead (*see* ¶¶ 206-77), and Mr. Stead is alleged to have played the leading role in taking Clarivate public and articulating a strategy to deliver growth and profitability for the Company (¶¶ 85-96). Mr. Stead is also repeatedly alleged to be a "hands-on" executive who was "intimately involved in the Company's operations" during the Class Period. (*See, e.g.*, ¶¶ 10, 57, 59-60, 297, 302.) For someone so

intimately involved in a purported "fraud" to refrain from selling any shares fatally undermines the notion that the insider sales demonstrate any intent to commit fraud, let alone the "strong inference" of scienter that Plaintiffs are required to plead.  *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) (finding the fact that defendant CFO sold no shares during the Class Period "undermines plaintiff's claim that defendants delayed notifying the public so that they could sell their stock at a huge profit").

Moreover, of the five Defendants who are alleged to have sold shares, two— Ms. von Blucher and Mr. Samson—sold only 14% and 20% of their available shares, respectively.  (¶ 310.)  Where, as here, a defendant retains a sizeable stake in the company following the stock sale, such sales will not sustain a strong inference of scienter.  *See, e.g.*, *Keyspan*, 383 F. Supp. 2d at 382-83; *City of Coral Springs Police Officers' Ret. Plan v. Farfetch, Ltd.*, 565 F. Supp. 3d 478, 487-88 (S.D.N.Y. 2021) (declining to find scienter where defendant sold off 50% of his shares); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (declining to find scienter where defendants sold off 44.6% and 65.6% of their shares); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (declining to find a strong inference of scienter where defendant sold 44% of his shares).

For the remaining *three* executives (Messrs. Hanks, Ahmed and Roy) who allegedly sold the majority of their shares before "abrupt[ly]" and "unexpectedly leaving the Company" (¶ 311), Plaintiffs' own allegations reveal that there is nothing suspicious as to the timing or volume of these sales.  Plaintiffs allege that Mr. Hanks sold 65% of his shares in June 2021, approximately six months before he left the Company, but he held on to the remaining 35% of his shares.  (¶¶ 310, 311(a).)  Mr. Roy allegedly sold 78% of his shares before "sudden[ly] resign[ing]" from the Company on July 6, 2021, but, in fact, he sold nearly half of

the total shares sold in March 2021, four months before he left.  (¶¶ 310, 311(b).)  And while

Mr. Ahmed is alleged to have sold 96% of his shares, he sold the overwhelming majority (93%)

of those shares in March 2021, ten months before he ultimately departed the Company in January

2022.  (¶¶ 310, 311(c).)  Plaintiffs have failed to plausibly explain why Messrs. Hanks, Roy and

Ahmed would continue to retain shares for months prior to their departure from the Company

(and even afterwards) had they known of, or perpetuated, an intentional fraudulent scheme.  In

any event, it is hardly surprising or uncommon that executives who were leaving the Company

would sell a significant portion of their shares in connection with their departure.  Indeed, courts

in this circuit have rejected the premise that such allegations can support a strong inference of

scienter because it is not surprising or suspicious that departing executives would sell stock.

Accordingly, the fact that an employee "left the company shortly after the trades were made," far

from making the trades suspicious, actually helps to explain them and "undermines any

otherwise available inference of fraudulent intent." *In re Farfetch Ltd. Sec. Litig.*, 2021 WL

4461264, at *5 (S.D.N.Y. Sept. 29, 2021); *see also Health Mgmt. Sys., Inc.*, 1998 WL 283286,

at *6 n.3 (reasoning that while defendant's sale of 81.9% of his shares during the alleged class

period was "quite high," it was "most likely" on account of the fact that the defendant was

resigning from his position at the company and "was divesting himself of his shares").

### C. Plaintiffs' Remaining Allegations Likewise Fail To Plead a Strong Inference of Scienter on the Part of Defendants.

Plaintiffs' remaining scienter allegations are likewise insufficient to establish that any of

the Exchange Act Defendants acted with the requisite scienter.  First, Plaintiffs claim that the

Company's restatement of its financial results for 2020 and the first three quarters of 2021

"supports an inference that Defendants knowingly misled the market, or were reckless in making

public statements, regarding the identified financial statements."  (¶¶ 290, 307.)  But "it is well

settled that [the] mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *City of Brockton Ret. Sys.*, 540 F. Supp. 2d at 472-73 (citing *Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 560); *see In re MSC Indus. Direct Co.*, 283 F. Supp. 2d 838, 849 (E.D.N.Y. 2003) ("A restatement, by itself, is insufficient to plead a securities fraud claim."). Plaintiffs here offer *zero* factual basis connecting the issuance of the restatement to any scienter on the part of Defendants. Plaintiffs do not, for example, offer any theory—compelling, cogent or otherwise—to explain why Defendants would have intentionally accounted incorrectly for an equity shares plan offered by a company Clarivate acquired (CPA Global). The far more compelling inference is that, consistent with what was disclosed in Clarivate's 8-K, Defendants promptly took steps to correct errors in the Company's financial statements relating to the CPA Global equity plan as soon as they learned of those errors, as any prudent corporation and its executives would be expected to do.

Plaintiffs also allege that the "magnitude and frequency" of the revenue misses and financial misstatements support an inference of scienter. (¶ 305.) As an initial matter, falling short of growth projections in two quarters in a seasonal business, alongside other quarters where the business met or exceeded expectations, hardly supports the bald inference of scienter proposed by Plaintiffs. But in any event, the attempt to plead fraud based on a company's failure to meet projections is nothing but a classic example of "fraud by hindsight" that courts have routinely rejected. *See, e.g.*, *In re Nielsen Holdings Plc Sec. Litig.*, 510 F. Supp. 3d 217, 232 (S.D.N.Y. 2021) ("[T]he fact that [defendant] later reported unexpectedly negative results is nothing more than fraud by hindsight."); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2021 WL 4482151, at *5 (S.D.N.Y. Sept. 30, 2021) (finding that claims that defendant "misled investors

24

with financial projections and guidance" were "allegations of fraud by hindsight [and] cannot survive a motion to dismiss").

Plaintiffs' allegations that there were several high-level departures and a reorganization of Clarivate's leadership (¶ 306) likewise fails to plead a strong inference of scienter.  Plaintiffs do not make any allegations regarding the basis for those departures, much less any allegations that would plead a strong inference of fraud.  It is well-established that departures of executives, without more, cannot sustain an inference of scienter as required under the PSLRA.  *See, e.g.*, *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020) ("Terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter."); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) ("[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind."); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018) (resignations are "insufficient alone" to establish scienter, because "there are any number of reasons that an executive might resign, most of which are not related to fraud" (quoting *BISYS*, 397 F. Supp. 2d at 446)).

Finally, Plaintiffs cannot demonstrate scienter on the part of Messrs. Stead and Hanks simply by asserting that they signed the Company's Sarbanes-Oxley ("SOX") certifications. "SOX certifications do not 'constitute a standalone basis for liability.'"  *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019) (quoting *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017)); *accord Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *21 (S.D.N.Y. Mar. 29, 2021).  If signing a SOX certification were sufficient to establish a strong inference of scienter, then *any* certified financial

25

statement would indicate scienter, thereby rendering the scienter requirement essentially meaningless.

## II.  Plaintiffs' Section 10(b) and Rule 10b-5 Fraud Claims Fail Because Plaintiffs Fail To Adequately Plead Any Actionable Misstatements or Omissions.

Plaintiffs' Section 10(b) and Rule 10b-5 claims must be dismissed for the additional, independent reason that Plaintiffs fail to plead with particularity any false or misleading statements or omissions of material fact concerning the Company's growth, financial results, product quality or internal controls.[16]

### A.  Plaintiffs Cannot Plead Falsity Based on Vague, Non-Particularized Allegations by Confidential Witnesses Who Offer No Concrete Facts and Were Not in a Position To Know Whether the Challenged Statements Were False or Misleading.

Just like their scienter allegations, Plaintiffs' allegations of falsity rely on the nonspecific, generalized statements they attribute to the five purported CWs.  The CWs, and hence the Complaint, offer no particularized factual allegations supporting the conclusion that the challenged statements were false, nor are the CWs—based on their roles within the Company— in a position to provide such allegations.  *See supra* at Point I.A.

Courts in this circuit have held that "[w]here a plaintiff relies on allegations from confidential witnesses, as here, those sources must be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"  *Woolgar*, 477 F. Supp. 3d at 218-19 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)); *see also, e.g.*, *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579-80 (S.D.N.Y. 2014).  "Mere rumors" and generic allegations that information was

---

[16] As to Ms. von Blucher and Ms. Archbold, Plaintiffs do not even allege that they made any statements about Clarivate's growth or product quality, and the Exchange Act claims against them to such extent must be dismissed for that independent, additional reason.

"known" or "common knowledge" within the company "cannot reasonably satisfy the requirement that the facts alleged provide an adequate basis for believing that defendants' statements were false." *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007) (internal quotation marks and citation omitted) (allegation that purported accounting deficiencies were "well known" was insufficient to plead falsity), *aff'd*, 312 F. App'x 400 (2d Cir. 2009); *see also Chapman*, 466 F. Supp. 3d at 399-400 (allegations that "pretty much everyone" knew of problems at company were "rumors" that could not "reasonably satisfy the requirement that the facts alleged provide an adequate basis for believing that the defendants' statements were false"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (statements made by purported confidential witnesses that information was "known or common knowledge within the company" were "too vague and conclusory" to plead falsity).

Plaintiffs rely on the CWs to allege that the Company was "unable to accurately segregate organic revenues from acquisition-driven revenue" and "unable to drive growth" (*see, e.g.*, ¶¶ 224(h), 226(e), 233(c)), but Plaintiffs do not allege that any of the CWs were involved in or had any familiarity with the Company's process for calculating revenue or projecting growth (or even that any of them had an understanding across the Company's various lines of business). *See Woolgar*, 477 F. Supp. 3d at 219 (finding CWs allegations insufficient to establish falsity where CWs are not alleged to have specific relevant experience or knowledge of the subject matter of the challenged statements). Instead, as discussed above (*see supra* at Point I.A), the CWs each allegedly worked in sales positions or in data analytics in specific departments or subunits. Plaintiffs have alleged no facts to demonstrate that any of these CWs— lower-level employees with no involvement in the Company's financial reporting, acquisitions or strategic decision-making—had any basis to evaluate whether executive management was able to

27

accurately segregate organic revenues from acquisition-driven revenues, or whether it utilized unrealistic projections, as they allege (*see, e.g.*, ¶¶ 224(c), 233(c); *see also* ¶¶ 56, 60).  *See In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 204-05 (S.D.N.Y. 2020) (allegations made by purported CW who "lacked insight into the Company as a whole" due to his role at the company were inadequate).

The generality of the CWs' purported statements further underscores their lack of knowledge about the matters alleged in the Complaint and provides an independent reason why their assertions cannot establish—let alone with particularity—that any of the challenged statements was false or misleading.  *See Malin*, 499 F. Supp. 2d at 140 (holding that "[g]eneric and conclusory allegations" by CWs are insufficient to allege falsity (alteration in original) (citation omitted)).  The CW allegations that the Company could not accurately segregate organic revenues (*see, e.g.*, ¶ 56) are vague and conclusory, and lack any factual support.[17]  The Complaint generally alleges the CWs' belief that "executive management" set "unrealistic," "unattainable," "poorly constructed" and "unworkable" internal sales targets and business growth goals (¶¶ 56-59), but provides no specifics of any kind.  The CWs likewise fail to explain with any particularity the connection, if any, between these internal targets and Clarivate's public guidance about its organic revenue growth, other than one CW's unsupported and conclusory assertion that such guidance "was not built on facts."  (¶ 60.)  The "opinions of confidential witnesses" without "any factual underpinnings for those opinions," however, does not suffice to plead fraud.  *City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010).

---

[17] This includes the allegation that CW-2—who worked on constructing analytical platforms for clients, not in sales, budgeting or finance—personally "saw no organic growth," and CW-5's bald conclusion that "there was no organic growth."  (¶¶ 57, 60.)

The CWs' other claims are equally conclusory and deficient.  Plaintiffs allege that CW-1 and CW-4 (who left in January 2021—11 months before Q4) told them that salespeople were "encouraged" to record "white space business growth opportunities" as committed sales before contracts were signed, and that sometimes management "put things in commit status" within Clarivate's customer relationship management system.  (¶¶ 56, 59.)  Neither CW, however, offers any details or quantification of the "*things*" that supposedly were treated as committed. They provide no facts about how frequently these practices occurred or how widespread they purportedly were, or any attempt to measure the impact—if any—they had on Clarivate's projections.  These are simply insufficient, conclusory assertions.

Similarly deficient are Plaintiffs' vague allegations that some revenue in the DRG product line was "pulled forward" into earlier quarters when transactional deals were converted to subscription revenue.  In addition to the fact that, as described above, the shift from transaction sales to subscription sales was disclosed (*see supra* at Statement of Facts ("SOF"), § C), the CWs provide no details about how many customers these supposed practices affected, what the magnitude of the associated revenues were and whether these practices affected any other product lines at Clarivate.  Moreover, the CWs were not even at Clarivate through Q4 2021 to know what revenue opportunities were available—CW-2 left in April 2021 (¶ 57) and CW-3 in October 2021 (¶ 58), months before the end of Q4.  For this reason alone, their statements fail to support Plaintiffs' falsity allegations.  *See Woolgar*, 477 F. Supp. 3d at 221 (rejecting CW allegations based on "the critical deficiency . . . that the CWs' *allegations* are largely undated").

Similarly, while all of the CWs complain about reductions in force and low morale associated with the shift to an inside sales model (*see, e.g.*, ¶¶ 56-60, 178, 224(h)), there is no allegation in the Complaint that Defendants misrepresented the size of Clarivate's sales force,

and the reduction was, in any event, disclosed (*see, e.g.*, Ex. L at 55; Ex. K at 48; *supra* at SOF, § C). The CWs' allegations are, at best, complaints by lower-level employees that the Company was mismanaged (*see, e.g.*, ¶¶ 97, 104, 224, 226(b), 227(b), 233, 238(b), 243, 246(b), 248(b), 253, 255(b), 260, 262(b), 270(b), 274(b), 277(b)), but even if there were any truth to those allegations, such allegations are insufficient to support liability under the securities laws. *See infra* at Point II.B.1.

In short, the CWs' generic and conclusory assertions simply do not lift plaintiffs' allegations above the speculative level, much less plead fraud with the particularity the PSLRA requires. *See Rombach*, 355 F.3d at 169 (affirming dismissal of Section 10(b) claims where allegations "d[id] not sufficiently explain how any of the statements attributed to [d]efendants are false or misleading").

### B. Defendants' Statements and Projections Regarding Clarivate's Organic Growth Were Not Misleading and Are Not Actionable.

Plaintiffs' sprawling Complaint challenges *fifty-eight* statements about Clarivate's organic growth targets, its management's expressions of confidence in the Company's ability to achieve these targets and the Company's reported growth results for the fourth quarter of 2020 and for the fourth quarter and full year of 2021. (¶¶ 219-76.) None of these statements are false or misleading. In addition to Plaintiffs' total reliance on legally deficient CW statements to plead falsity (*supra* Point II.A), these allegations fail for additional reasons.

#### 1. *Plaintiffs' Allegations of Mismanagement, Even if True, Do Not Amount to Securities Fraud and Do Not Support the Conclusion That There Was a Breach of Any Disclosure Duty.*

Plaintiffs allege that Clarivate made "drastic" changes to its business that were allegedly poorly implemented and left Clarivate unable to distinguish organic from other revenues and unable to meet its organic revenue targets. Such allegations cannot support a Section 10(b) claim

for the simple reason that, as set forth above, Clarivate and its executives *did* disclose the various changes to the business referred to by Plaintiffs, as the Complaint explicitly acknowledges. *See supra* at SOF, § C.  These changes to the business were expressly part of the Company's strategy to improve performance, and the CWs' allegations that they had the opposite effect are too conclusory and unspecific to plead securities fraud.  Moreover, even if Plaintiffs had actually pled any specific instances of mismanagement—which they have not—Section 10(b) does not cover alleged "instances of corporate mismanagement," *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977), and an issuer does not have a duty to accuse itself of mismanagement, *see, e.g.*, *Koppel v. 4987 Corp.*, 167 F.3d 125, 134 (2d Cir. 1999) ("The securities laws do not 'effectively require [an issuer] to accuse [it]sel[f] of breach of fiduciary duty.'" (alterations in original) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 n.7 (1991))); *Citigroup I*, 330 F. Supp. 2d at 375 ("[A]llegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b).").  The CWs' generalized grievances about the impact that *disclosed* changes to the business were having on the Company fall far short of what is necessary to plead a claim of securities fraud.

> 2.     *Defendants' Projections of Organic Revenues and Growth Are Inactionable Forward-Looking Statements.*

In addition, all of the organic growth projections (and management's expressions of confidence in them) are protected by the PSLRA's safe harbor for forward-looking statements. Under the PSLRA, a forward-looking statement is not actionable if the statement is "identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765-66 (2d Cir. 2010).  The PSLRA's safe harbor extends to projections

of revenue and income, statements about the plans and objectives of management for future operations and statements of future economic performance.  *See* 15 U.S.C. § 78u-5(i)(1).  So long as a company "adequately conveyed substantive information" of the associated risks, courts in this circuit find that the alleged misstatements are protected by the safe harbor.  *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 466 (S.D.N.Y. 2018).  Defendants did just that with respect to their projections regarding Clarivate's organic growth and revenues.

As an initial matter, each of the challenged statements regarding projected financial performance was forward looking.  As Plaintiffs themselves repeatedly allege, Clarivate's management told investors how they *expected* Clarivate to perform *going forward* relative to the target organic revenue and growth guidance.[18]  At the start of every earnings call and investor

---

[18] *See* ¶ 222 ("we said we *expected* to close 2020 between 4% to 6% organic revenue growth" and "we *hope* to be north of 3% with price realization"); ¶ 225 (investors "should think about us *going forward* somewhere between 4% and 5% organic" and that, with respect to 4% to 6% organic growth in 2020, "*[w]e're going to do that plus some*"); ¶ 227 ("gave guidance *for what we thought we would do*" and "*[w]e're going to end up outperforming those*"); ¶ 231 ("all the things we've laid out *that will get us that organic growth*"); ¶ 234 ("I *expect us to end* in that 4% to 6%"); ¶ 236 ("I have *a very strong belief* that we'll be" within guidance range); ¶ 241 ("I *feel very good about that upside*" and "Richard said we would see organic growth increase in the second half, *which we will*"); ¶ 244 ("The *likelihood, in my view*, . . . *of making that happen is 80%, 85%* in 2021"); ¶ 247 ("[we] said that we hope to exit 2020 at 4% to 6%," "*[s]trong feeling* about how that *will get there*," "all in all, *we're expecting* transactional growth [to] be in this about 7%" and "that's sort of [the] sum of the parts *that gets us to* the 6% to 8% Q4 growth"); ¶ 250 ("[we] *continue to see a pathway to achieving* 6% to 8% organic revenue growth exiting 2021"); ¶ 251 ("we are absolutely *on the pathway to achieving* 6% to 8% organic growth exiting 2021," discussing "*the outlook for the rest of [the] year*," "our *expectations are that* we will grow at double-digit rates this year" and "We're *on track to do* what we've said *we're going to do*"); ¶ 258 ("*We currently expect to exit the fourth quarter* with organic revenue growth towards the upper end of our 6% to 8% organic growth *target*" and noting that "the pipeline for the life sciences business *is looking particularly strong for the second half of the year*"); ¶ 261 (noting "*high degree of confidence*" that targets would be achieved); ¶ 265 ("organic revenue growth for the full year of 2021 *is currently expected to be* in the 6% to 6.5% range"); ¶ 268 ("we *expect to close the year* at 6% to 6.5% organic revenue growth for the year"); ¶ 272 ("the *objective* is  . . . to get to 6% to 8% organic revenue growth in the fourth quarter").

presentation, moreover, a Clarivate representative cautioned participants that management "may make certain forward-looking statements" and that "[s]uch forward-looking statements involve known and unknown risks, uncertainties and other factors and may cause actual results . . . to differ materially from the anticipated results."  (*See, e.g.*, Ex. F at 4; Ex. H at 4.)  Likewise, each of Clarivate's quarterly earnings reports and earnings press releases contained similar language. *See supra* at SOF, § C.

Additionally, each of the calls, presentations, 10-Q quarterly reports and earnings releases contained meaningful cautionary language.  To be "meaningful," cautionary language does not need to immediately precede or follow the forward-looking statements, nor does it need to disclose every risk or be phrased in minute detail.  *See Turquoise Hill Res.*, 2022 WL 4085677, at *36 (forward-looking statements that the project schedule was "on track" and capital costs were "in line" are inactionable because they were accompanied by meaningful cautionary language); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020) ("The cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful." (citing *Slayton*, 604 F.3d at 768-69)), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). The language need only be substantive and company-specific and convey the important factors as to why results might differ from the projections.  *Id.*  Clarivate's disclosures readily satisfy these standards.

As set forth in detail above (*see supra* at SOF, § C), Clarivate's securities filings expressly disclosed the risks that it would not achieve management guidance and projected results, including for many of the reasons focused on by Plaintiffs.  For example:

- ***Clarivate Might Not Achieve Organic Growth Targets.***  Clarivate disclosed that all "projections" were forward looking statements that might "***be materially different from***" actual results due to risks or other factors, including, specifically, the risk that the Company might be unable "to derive fully the anticipated benefits from organic growth"

because it "***may not succeed in cross-selling our products and services***" or because of the "impact of price increases" on customers' "limited budgets."[19]

- ***A Shift to Inside Sales Would Reduce Headcount and Could Negatively Impact the Business.*** Clarivate disclosed that it undertook a restructuring beginning in Q2 2021 to reduce costs, "with the primary cost savings driver being from a reduction in workforce," and also warned that its "future success depends to a large extent on the continued service of our employees, ***including our . . . colleagues in sales*** [and] ***marketing***," and that a failure to "***attract, motivate, and retain highly qualified colleagues in order to support our customers . . . could have a material adverse effect on our business, financial condition, and operating results***."[20]

- ***Subscriptions Could Pull Revenue Forward.*** Clarivate consistently disclosed that "***most of the revenues*** we report in each quarter are the result of subscription and re-occurring agreements entered into or renewed ***in previous quarters***," and that a decline in "in any one quarter may not affect our results in that quarter, ***but could reduce revenues in future quarters***."[21]

Clarivate reiterated these risks during its calls and presentations. For example, on the earnings call for the third quarter of 2021, a Clarivate representative specifically directed listeners to Clarivate's SEC filings, which covered "the factors that could cause actual results to differ materially from anticipated results or performance." Ex. F at 4.[22]

When faced with similar facts, courts in this circuit have applied the PSLRA's safe harbor and dismissed securities fraud claims. *See, e.g.*, *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 255 (S.D.N.Y. 2020) (finding safe harbor protected statements about management plans and objectives for future operations where statements contained language

---

[19] *See, e.g.*, Ex. C at 21, 23, 26, 40 (emphasis added).

[20] *Id.* at 20-21 (emphasis added).

[21] *See, e.g.*, *id.* at 23, 40 (emphasis added).

[22] *See also* Ex. H at 4; Ex. D at 4; Ex. O (Clarivate Plc, Q4 2020 Earnings Call Tr. (Feb. 25, 2021)) at 4; Ex. P (Clarivate Plc, Q1 2021 Earnings Call Tr. (Apr. 29, 2021)) at 4; Ex. Q (Clarivate Plc, Q2 2021 Earnings Call Tr. (July 29, 2021)) at 4; Ex. R (Clarivate Plc, Q4 2021 Earnings Call Tr. (Mar. 10, 2022)) at 4.

cautioning that business may not be successful in achieving its goals); *SunEdison*, 300

F. Supp. 3d at 466 (holding safe harbor applied to statement that company expected to have

sufficient liquidity accompanied by warning of "substantial liquidity problems" if company

could not "generate cash sufficient to service its debt"); *Ho v. Duoyuan Glob. Water, Inc.*, 887

F. Supp. 2d 547, 573 (S.D.N.Y. 2012) (applying safe harbor to future earnings projections

conveyed in earnings call that "were accompanied by cautionary statements that forward looking

statements would be made in the call, and that they were subject to change without being

updated").

Moreover, even if Clarivate's cautionary language were not sufficient, Defendants'

projections about organic revenues and growth rates, and their statements about their confidence

in achieving those projections, would still be protected by the statutory safe harbor because

Plaintiffs do not sufficiently allege that the challenged statements were "made with actual

knowledge that [they were] false or misleading."  *Slayton*, 604 F.3d at 766; *see also supra*

Point I.

### 3.     *The Challenged Projections Are Inactionable Opinions.*

The challenged projections and Defendants' statements about their level of confidence in

achieving those projections are also inactionable because they are statements of opinion, which

cannot form the basis of a securities fraud claim under the circumstances alleged in the

Complaint.  These statements are all classic statements of opinion—they are framed in terms of

what defendants "expect," "believe" and "feel" (*see* ¶¶ 222, 234, 236, 241, 244, 247, 251, 258,

265, 268).  *See, e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575

U.S. 175, 183 (2015) (phrases such as "'I *believe*' (or 'I think')" "transforms" factual statements

into opinions); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196,

209, 227 (S.D.N.Y. 2018) (statements that executives "feel we can get to the low end of the [full-

year guidance] range at least" and "we still expect . . . high single-digit growth" were statements of opinion), *aff'd*, 779 F. App'x 69 (2d Cir. 2019).

Opinions are actionable, if at all, only to the extent that the speakers: (1) subjectively disbelieved their stated opinion at the time they offered it; (2) stated an opinion that contained an embedded fact which the speaker knew to be untrue; or (3) omitted information needed to prevent the opinion from being misleading to the reasonable investor.  *Omnicare*, 575 U.S. at 184-86, 189; *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016).  Further, opinion speakers are not required to furnish every fact that may undercut their opinion.  The Supreme Court held in *Omnicare* that an opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  575 U.S. at 189.  Instead, speakers are "only tasked with making statements that 'fairly align[ed] with the information in the issuer's possession at the time.'"  *Tongue*, 816 F.3d at 212 (quoting *Omnicare*, 575 U.S. at 189).  Here, Plaintiffs allege nothing about what the Officer Defendants purportedly believed when they offered their challenged opinions regarding Clarivate's growth prospects.  And the Complaint affirmatively alleges facts—including Clarivate's outperformance of the growth targets for first and second quarters of 2021 (¶ 318)—that "fairly align" with Defendants' statements, which were at all times subject to ample disclosures about the factors that could cause Clarivate to fall short of its growth goals (*see supra* Point II.B.2; *infra* Point II.B.5)

### 4.    *General Statements of Optimism Are Not Actionable.*

Many of the challenged statements are nothing more than general statements of corporate optimism that the securities law treats as inactionable "puffery."  *See, e.g.*, *Lasker v. N.Y. State*

*Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996); *ECA, Loc. 134 IBEW*, 553 F.3d at 206.  For

example, the following general expressions of optimism are classic "puffery":

- **Q4 2020 Earnings Call**:  "I *couldn't be more pleased* with where we're at from a growth standpoint."  (¶ 241 (emphasis added).)

- **Q1 2021 Financial Results Press Release**:  "While the COVID pandemic impacted our business for most of 2020, *we are very pleased* to see a recovery in organic subscription and transactional revenue growth."  (¶ 250 (emphasis added).)

- **Q2 2021 Earnings Call**:  Referencing "the favorable first half" of 2021," and stating that "*we're very satisfied* with the Science Product Group performance," and that "the pipeline for the life sciences business is looking *particularly strong* for the second half of the year."  (¶ 258 (emphasis added).)

Statements such as these are "'soft' optimistic projections that . . . cannot give rise to a

securities fraud claim" because they "lack the sort of definite positive projections that might

require later correction."  *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 54 (E.D.N.Y. 1998)

(quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)), *aff'd*, 189 F.3d 460

(2d Cir. 1999).  Courts in this Circuit routinely dismiss Section 10(b) claims based on similar

statements by executives.  *See, e.g.*, *id.* at 51 n.3, 54 (statements that "more favorable business

trends and improving results in several of our divisions are expected to enable us to resume our

growth during the second half of the year," that profits were "expect[ed] . . . to show an increase

for all of 1993" and that they "still expect[ed] to be ahead with regard to earnings in the third and

fourth quarters" constitute inactionable puffery); *San Leandro Emergency Med. Grp. Profit*

*Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (company's statement "that

it was 'optimistic' about its earnings and 'expected' [a business line] to perform well" was

puffery); *Lasker*, 85 F.3d at 59 (statement that "business strategies [would] lead to continued prosperity" was puffery); *Lachman*, 487 F. Supp. 3d at 130-31 (statement that "initiatives are contributing to an aggressive transformation agenda for the company, which we expect to lead to better financial results over the next several years" was puffery). The declarations of optimism by Clarivate executives about the Company's ability to achieve its growth targets are no different. To the extent Plaintiffs base their claims on such statements, those claims must be dismissed.

<blockquote>

5.   *Clarivate Disclosed That Organic Revenues Include Revenues From Cross-Selling.*

</blockquote>

In addition to alleging that Clarivate's organic growth projections were known to be unattainable, Plaintiffs allege that Clarivate inflated the revenues attributable to organic growth by utilizing cross-selling "to pass off growth from acquisitions as organic growth." (¶¶ 117, 124-30.) As explained in Point II.A, *supra*, these allegations fail as a threshold matter because they are based entirely on the CWs' fatally deficient assertions. But insofar as Plaintiffs contend that Defendants "misleadingly failed to disclose that certain of the revenues from" cross-selling "were being claimed as organic" (¶ 130), this is contradicted by the face of the Complaint and the documents upon which it relies, and thus cannot be credited as true on a motion to dismiss. *See, e.g.*, *Davison v. Ventrus Biosciences, Inc.*, 2014 WL 1805242, at *10 (S.D.N.Y. May 5, 2014) (explaining that when documents on which a complaint relies contradict the allegations in the complaint, "the documents control" (quoting *Rapoport v. Asia Elec. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000))); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 216 (E.D.N.Y. 2003). Plaintiffs expressly allege that Clarivate executives publicly stated that organic revenues could grow ***because*** acquisitions provided an opportunity to cross-sell. (*See* ¶¶ 125-26.) In fact, the Complaint alleges that market analysts understood that

Clarivate *was* including cross-selling revenues in its organic growth rate.  (*See, e.g.*, ¶ 232 (quoting RBC Capital Markets analyst as stating that Clarivate could meet "6-8% organic rev growth" expectations "[w]ith pricing, new-offerings, ***and cross-selling***" (emphasis added).)  And Defendants explicitly disclosed during the Class Period that cross-selling drove *organic growth*.  (*See* Ex. C at 23 ("We seek to achieve our growth objectives by optimizing our offerings to meet the needs of our customers through organic development, ***including by . . . cross-selling our products*** across our existing customer base." (emphasis added)); Ex. S (Clarivate Plc, Investor Day Presentation (Nov. 9, 2021)) at 39, 41-47.)

"Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."  *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) (quoting *Keyspan*, 383 F. Supp. 2d at 377).  And even if Defendants had not made these disclosures, Plaintiffs' assumption that organic growth would not include cross-selling revenues would not be an adequate basis to plead a fraud claim.  Plaintiffs do not allege that there was some "general understanding of what constituted" organic revenues or growth, or that Defendants ever stated that organic revenues or growth would exclude cross-selling revenues; there was thus "no reason for [Plaintiffs] to interpret" that term to mean something specific, "nor any reason why the [Defendants'] description was false or misleading."  *See Ark. Pub. Emps. Ret. Sys.*, 28 F. 4th at 353.

    **C.**    **Clarivate's Statements About Product Quality Are Not False or Misleading Because Clarivate *Did* Release New Products, and the Confidential Witnesses Do Not Provide Specific Allegations to the Contrary.**

Plaintiffs' reliance on the CWs for the proposition that Clarivate introduced no new products during the Class Period is also directly contradicted by materials incorporated by reference in the Complaint, which demonstrate that Clarivate *did* indeed introduce new and improved products during the Class Period.  *See supra* at SOF, § C.  As the Complaint

acknowledges, Clarivate announced dozens of new products and enhancements that it rolled out during the Class Period.  (*See, e.g.*, ¶¶ 212-13, 215, 217, 244.)  Where, as here, a complaint's allegations contradict or otherwise conflict with documents relied upon and incorporated by reference, they are not to be credited as true on a motion to dismiss.  *See, e.g.*, *Davison*, 2014 WL 1805242, at \*10; *Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d at 216.

D.     **Statements Regarding Internal Controls Are Inactionable Opinions.**

Plaintiffs also challenge the ICFR and DC&P statements in Clarivate's 2020 10-K, and relatedly, the SOX internal controls certifications signed by Messrs. Stead and Hanks in the Form 10-K and each of the Forms 10-Q for the first three quarters of 2021.  (*See* ¶¶ 199-204, 282-96.)  According to Plaintiffs, these materials were all false because they "failed to disclose the material weaknesses [in internal controls] related to equity compensation accounting and deferred tax accounting" in one of Clarivate's acquisitions (the CPA Global transaction).  (¶¶ 205, 282-296.)

But these challenged disclosures and certifications are statements of opinion based on available information and personal knowledge at the time they were issued, and therefore cannot satisfy either the falsity or the scienter prongs of a securities fraud claim.  *See, e.g.*, *Das*, 332 F. Supp. 3d at 812 (SOX certifications inactionable where they "contained an important qualification that the certifying officer's statements are true based on [his] knowledge" (internal quotation marks and citation omitted)); *Menaldi*, 277 F. Supp. 3d at 517 (same); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 807 (S.D.N.Y. 2020) ("[A] plaintiff 'cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements.'" (quoting *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015)))).  The challenged opinions clearly contained necessary

qualifications that they were conclusions reached based on the information known to management, rather than statements of absolute fact.  The 2020 Form 10-K, for example, states that "Clarivate's management assessed the effectiveness of Clarivate's internal control over financial reporting" and that "[*b*]*ased on management's assessment* . . . , *management has concluded* that Clarivate's internal control over financial reporting was effective as of December 31, 2020."  (¶ 202 (emphasis altered).)  Messrs. Stead's and Hanks's SOX certifications contain similar qualifying language.  (*See* ¶ 203.)  Plaintiffs offer no allegations that Mr. Stead or Mr. Hanks *disbelieved* their own opinions, or believed that they lacked necessary context to make the certification.  Thus, the challenged opinions were not materially false or misleading.

### E.   Plaintiffs Fail to Plead Any Actionable Omissions Under Item 303.

Plaintiffs separately claim that Defendants omitted required disclosures in the MD&A sections of quarterly and annual reports, pursuant to Item 303 of Regulation S-K ("Item 303").  Yet Plaintiffs fail to adequately allege that Defendants had any affirmative duty to disclose any purported "trends" or events under Item 303.  Plaintiffs' central contention is that, in the MD&A sections of quarterly and annual reports, Defendants were required to disclose that the "(i) cost-cutting restructuring programs; (ii) shift to an inside sales model; and (iii) transition from transactional sales to subscription sales earlier in the year, introduced the known risk of negatively impacted revenues and revenue trends."  (¶ 6.)  This argument fails because, as explained above, these changes to the business and the associated risks *were* disclosed.  *See supra* at SOF, § C.

A duty to disclose under Item 303 exists where a trend is presently known to management, and "[a]ccordingly, in order to state a claim arising from a violation of Item 303, sufficient factual allegations must be proffered to establish the requisite legal obligation."

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010).  But Plaintiffs do not adequately allege that Defendants knew that the planned changes to the business would prevent Clarivate from meeting its targets.  To the contrary, these changes to the business were *disclosed* as part of the Company's plan to improve its business performance, and the associated risks from these changes were also disclosed, including in Clarivate's annual filings.  *See e.g.*, Ex. C at 21-23.  While Defendants did not repeat these disclosures in the MD&A sections of Clarivate's Forms 10-Q and 10-K, the preface to the MD&A section in each filing instructed that "[o]ur future results and financial condition may differ materially from those we currently anticipate as a result of the factors we describe under Item 1A. Risk Factors." *See, e.g.*, *id.* at 36.  A "reasonable investor" would thus have had "ample warning" of the risks that the Company disclosed.  *See, e.g.*, *SunEdison*, 300 F. Supp. 3d at 468; *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39-40 (2d Cir. 2017).[23]

### III.    Plaintiffs' Securities Act Claims Fail for the Same Reasons As Their Section 10(b) and Rule 10b-5 Claims.

Plaintiffs' claims under Section 11 and Section 12(a)(2) of the Securities Act should be dismissed because the claims sound in fraud, but the Complaint fails to plead with particularity the circumstances constituting fraud or a strong inference of scienter.[24]  Moreover, Plaintiffs'

---

[23] Plaintiffs additionally fail to sufficiently allege the existence of a trend.  "[I]n considering whether a trend exists, the amount of time over which the events at issue are alleged to have developed is a factor the court must take into account."  *In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *7 (E.D.N.Y. Mar. 31, 2021).  A failure to hit organic growth targets in the fourth quarter of 2020 and 2021 is insufficient to plausibly establish a trend.  *See, e.g.*, *id.* (allegations that a shift in overall sales to a different business model resulted in a negative impact on net revenue during a period that overlapped with a disclosed "seasonal downturn" was insufficient to plausibly establish a trend).

[24] The Section 12(a)(2) claims, to the extent asserted by lead plaintiff Pension Trust Fund for Operating Engineers ("Pension Trust Fund") and named plaintiff City of Birmingham Retirement and Relief System ("City of Birmingham"), must be dismissed for the additional

claims based on opinion statements and alleged omissions under Item 303 fail for the additional

reason that the Complaint does not allege any actionable misstatement or duty to disclose, and

Plaintiffs thus fail to allege a plausible basis for their Securities Act claims, even under the more

relaxed pleading standards of Rule 8(a).  *See* Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 678.

Rule 9(b)'s heightened pleading standards apply to Section 11 and 12(a)(2) claims where,

as here, the complaint is "premised on allegations of fraud."  *Rombach*, 355 F.3d at 171.  These

standards require allegations supporting a strong inference of scienter, and "courts in the [Second

Circuit] have consistently applied *Rombach* to dismiss Securities Act claims that sound in fraud

but fail to plead scienter."  *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 2872671, at *7

(E.D.N.Y. July 21, 2022).  Where the plaintiff's Section 11 and 12(a)(2) claims are "inextricably

intertwined with the allegations underlying plaintiffs' fraud claims . . . , these claims

undisputedly sound in fraud."  *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d

576, 598 (S.D.N.Y. 2006). And in analyzing whether Securities Act claims sound in fraud, courts

"focus[] . . . on the conduct alleged, not the labels attached."  *In re Fuwei Films Sec. Litig.*, 634

---

reason that they do not allege that they purchased in any public offering.  Section 12(a)(2)
applies only to the direct purchase of shares in a public offering.  *See Yung v. Lee*, 432 F.3d
142, 149 (2d Cir. 2005).  City of Birmingham does not even attempt to allege that it purchased
in connection with a public offering.  Pension Trust Fund alleges only that it purchased
common shares "traceable to the September 2021 Offering" (¶ 18), but an allegation that a
plaintiff bought shares "traceable to" a public offering—which indicates a purchase in a
secondary market transaction—does not suffice, *see, e.g.*, *In re Cosi, Inc. Sec. Litig.*, 379 F.
Supp. 2d 580, 589 (S.D.N.Y. 2005) (dismissing Section 12 claim because allegation that
plaintiffs purchased shares "pursuant or traceable to" IPO was not sufficient to allege "that
they purchased shares" in public offering); *see also Am. Realty Cap. Props. Realty, Inc. Litig.*,
2015 WL 6869337, at *3 (S.D.N.Y. Nov. 6, 2015) (holding that allegations of purchase
"pursuant or traceable to" public offering was "too ambiguous to satisfy any pleading
standard" (citing *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 745 (S.D.N.Y. 2015)));
*BioScrip*, 95 F. Supp. 3d at 745 (collecting cases).  Because Pension Trust Fund is the only
plaintiff who asserts claims in connection with the September 2021 offering, the Section 12
claim as to that offering should be dismissed in its entirety.

F. Supp. 2d 419, 436 (S.D.N.Y. 2009). This means that plaintiffs cannot avoid Rule 9(b)'s pleading requirements for Securities Act claims premised on fraud simply by disclaiming fraud. *See Axis*, 456 F. Supp. 2d at 598 ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient.").

Plaintiffs' Complaint here is "rife with allegations of fraud." *Id.* at 597. Plaintiffs broadly and conclusorily allege throughout their Complaint that Defendants "engaged in a fraudulent scheme through various means and methods," including by issuing false and misleading statements and omissions. (*See, e.g.*, ¶¶ 83, 110.) They similarly make the unfounded claim that the business practices about which the CWs complain—for example, "product bundling, cross-selling, and changes in Clarivate's sales structure"—were "artifices" that Defendants used "to conceal the lack of growth from investors." (¶ 117.) These alleged practices are at the core of both the Section 10(b) claims and the Section 11 and Section 12 clams. Where, as here, the "wording and imputations of the complaint are classically associated with fraud" and "the gravamen of the complaint is fraud," the Securities Act claims sound in fraud and must comply with Rule 9(b). *Rombach*, 355 F.3d at 172 (internal quotation marks and citation omitted); *accord Chembio I*, 2022 WL 541891, at *13 (claims sound in fraud where "gravamen of plaintiffs' factual claims is fraud" and the fraud and non-fraud claims "share a nucleus of operative facts").

The Complaint's allegations of Section 10(b) securities fraud are also intertwined with the allegations supporting the Section 11 and Section 12 claims—another tell-tale sign that the claims sound in fraud. *Chembio I*, 2022 WL 541891, at *13. Plaintiffs allege, for example, that Clarivate and its executives violated their disclosure duties under Item 303 by knowingly failing to disclose the various practices described by the CWs—allegations that undergird Plaintiffs'

Section 10(b) fraud claim *as well as* their Section 11 and Section 12 claims. (*See* ¶¶ 189, 278, 358, 361, 364.)  In fact, the portions of the Complaint that set forth Plaintiffs' Item 303-based Securities Act claims specifically incorporate by reference allegations accusing Defendants of omitting "material information *that was known to management*" (¶ 189 (emphasis added) (cited in ¶¶ 357, 361, 364))—the same allegations that Plaintiffs elsewhere assert "contribute to a strong inference of scienter" (¶ 297 (attempting to allege scienter based on Defendants' purported "hands-on" management style and awareness of "the current state of the Company's revenues, pipeline, and product offerings")).

Similarly, the allegation that Clarivate and certain of its executives falsely certified the adequacy of the Company's internal controls also forms a basis for both Plaintiff's Section 10(b) fraud claims *and* their Securities Act claims under Sections 11 and 12.  (*See* ¶¶ 197-205, 282-83, 287-88, 291-92, 295-96, 307, 357, 360, 363, 365.)  Indeed, Plaintiffs allege that these same purportedly false SOX certifications "underscore[]" "Defendants' scienter" and "further establish[]" that Defendants "knowingly misled the market."  (¶¶ 308-09.)  To the extent that Plaintiffs Securities Act claims are based on Clarivate's Restatement (¶ 365), the Complaint likewise expressly ties them to the Exchange Act claims, alleging that "Clarivate's filing of the Restatement supports an inference of scienter" and that "[t]his extensive Restatement further supports an inference that Defendants knowingly misled the market, or were reckless in making public statements, regarding the identified financial statements" (¶ 307).  These types of intertwined and incorporated fraud allegations also demonstrate that the Complaint "sounds in fraud."  *See Axis*, 456 F. Supp. 2d at 598.

Having made "broad averments portraying a pervasive and overarching scheme of fraud," Plaintiffs may not now rely on a "one-sentence disavowment of fraud" to side-step Rule 9(b)'s

particularity requirements. *Axis*, 456 F. Supp. 2d at 598; *see also In re Marsh & McClennon Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 492 (S.D.N.Y. 2006) ("Allowing plaintiffs to allege fraud over [hundreds of] paragraphs and then withdraw those claims for eight paragraphs in order to state a Section 11 claim eviscerates Rule 9(b)'s mandate to 'safeguard a defendant's reputation from improvident charges of wrongdoing.'" (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). Plaintiffs' Section 11 and Section 12 claims thus fail for the same reasons as their corresponding Section 10(b) claims.

Moreover, insofar as Plaintiffs' Section 11 and Section 12 claims are based on alleged omissions under Item 303, those claims should independently be dismissed because Plaintiffs have failed to adequately plead any breach of a disclosure duty, for the reasons explained above. *See supra* at Point II.E. Insofar as the claims are based on Clarivate's and Messrs. Stead's and Hanks's statements and certifications regarding the adequacy of internal controls, those are inactionable opinion statements. *See supra* at Point II.D. And for the reasons set forth *supra* at Point I, Plaintiffs have failed to adequately plead scienter as to *any* of its claims, and thus fail to plead actual knowledge as required for its claims based on Item 303, and as to its claims based on statements of opinions relating to internal controls.[25]

---

[25] Plaintiffs' Section 12 claims against Mr. Roy, Ms. von Blucher and Mr. Hanks as "Selling Shareholders" in the two common stock offerings independently fail because plaintiffs have not adequately alleged that those Defendants were "statutory sellers"—i.e., those who "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security].'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (alterations in original) (quoting *Pinter v. Dahl*, 486 U.S. 622, 643-47 & n. 21 (1988)). Here, Plaintiffs do not allege that they bought directly from any of Mr. Roy, Ms. von Blucher or Mr. Hanks, or that any of them "passed title" to them. Indeed, Plaintiffs' allegations are facially deficient because they allege nothing about whom they purchased their securities from. *See In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010) (dismissing Section 12 claims where "the complaint and attached exhibits fail to clearly identify . . . from whom plaintiffs bought those securities" because a Section 12 plaintiff "must identify a particular purchase from a particular defendant"). Nor do Plaintiffs allege that Mr.

**IV.      Plaintiffs Fail to State a Claim for Control Person Liability Under Section 20(a) or Section 15.**

To state a "secondary" claim under Section 20(a) or Section 15, a plaintiff must show a primary violation of the federal securities laws by the alleged controlled person.  *See Rombach*, 355 F.3d at 177-78.  Because Plaintiffs fail to plead a primary violation of Section 10(b) of the Exchange Act, or of Section 11 or Section 12(a)(2) of the Securities Act, their Section 20(a) and Section 15 "control person" claims necessarily also fail.  *See Campo*, 371 F. App'x at 217-18 ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person . . . ." (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996))).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint.

---

Roy, Ms. von Blucher or Mr. Hanks successfully solicited their purchases.  Indeed, Plaintiffs do not allege that Mr. Roy made any statement whatsoever in connection with either offering, and the only allegations as to Ms. von Blucher and Mr. Hanks in connection with the offerings is that they signed the registration statements, which is plainly not enough.  *See Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 259 (E.D.N.Y. 2019) (collecting cases).

Dated:   New York, New York
        October 7, 2022

DAVIS POLK & WARDWELL LLP

By:   */s/ Brian S. Weinstein*
     James P. Rouhandeh
     Brian S. Weinstein
     Daniel J. Schwartz
     Chui-Lai Cheung
     450 Lexington Avenue
     New York, New York 10017
     (212) 450-4000
     brian.weinstein@davispolk.com

*Attorneys for Defendants Clarivate Plc, Jerre Stead, Richard Hanks, Christie Archbold, Mukhtar Ahmed, Jeffrey Roy, Steen Lomholt-Thomsen, Gordon Samson, Sheryl von Blucher, Kosty Gilis, Balakrishnan S. Iyer, Nicholas Macksey, Anthony Munk, Jane Okun Bomba, Charles J. Neral, Richard W. Roedel, Valeria Alberola, Usama N. Cortas, Adam T. Levyn, and Roxane White*

SHEARMAN & STERLING LLP

By:   */s/ Daniel C. Lewis*
     Daniel C. Lewis
     Agnès Dunogué
     Elizabeth Stewart
     Benjamin Klebanoff
     599 Lexington Ave.
     New York, New York 1022
     (212) 848-4000
     daniel.lewis@shearman.com
     agnes.dunogue@shearman.com
     elizabeth.stewart@shearman.com
     benjamin.klebanoff@shearman.com

*Attorneys for Defendant Citigroup Global Markets Inc.*