UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— x

KEVIN PAROT, Individually and on Behalf of : 
All Others Similarly Situated,

                       Plaintiff,

    vs.

CLARIVATE PLC, JERRE STEAD,
RICHARD HANKS, CHRISTIE
ARCHBOLD, MUKHTAR AHMED,
JEFFREY ROY, STEEN LOMHOLT-
THOMSEN, GORDON SAMSON, SHERYL
VON BLUCHER, KOSTY GILIS,
BALAKRISHNAN S. IYER, NICHOLAS
MACKSEY, ANTHONY MUNK, JANE
OKUN BOMBA, CHARLES J. NERAL,
RICHARD W. ROEDEL, VALERIA
ALBEROLA, USAMA N. CORTAS, ADAM
T. LEVYN, ROXANE WHITE,
PRICEWATERHOUSECOOPERS LLP,
CITIGROUP GLOBAL MARKETS INC.,
ONEX CORPORATION, THE BARING
ASIA PRIVATE EQUITY FUND VI, L.P.1,
THE BARING ASIA PRIVATE EQUITY
FUND VI, L.P.2, and ELGIN INVESTMENT
HOLDINGS LIMITED,

                       Defendants.

———————————————————————— x

Civil Action No. 1:22-cv-00394-EK-RLM

(Consolidated with Case Nos.:
1:22-cv-01371-CBA-RER and
1:22-cv-01372-EK-MMH)

<u>CLASS ACTION</u>

**JURY TRIAL DEMANDED**


AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................1

II.   JURISDICTION AND VENUE .............................................................2

III.  PARTIES ...............................................................................................3

IV.   VIOLATIONS OF THE SECURITIES ACT.........................................15

     A.   The June 2021 Offerings...............................................................16

     B.   The September 2021 Offering .......................................................17

     C.   The Restatement............................................................................18

     D.   The Restatement Is an Admission that the GAAP Violations Were Materially Misleading ..................................................................20

     E.   Defendants' Materially Misleading Financial Results.............................22

          1.   Q4 2020 Financial Results ................................................22

          2.   First Amended Q4 2020 and FY 2020 Financial Results .............23

          3.   Q1 2021 Financial Results ................................................23

          4.   Q2 2021 Financial Results ................................................24

          5.   The Offering Materials Incorporated by Reference the Materially Misleading Financial Information ...............................25

     F.   Securities Act Counts....................................................................26

V.    VIOLATIONS OF THE EXCHANGE ACT ...........................................30

     A.   Background to the Class Period.................................................30

          1.   Clarivate Goes Public Through a SPAC ........................................30

          2.   Clarivate's Revenue Types and Revenue Recognition Processes ...............................................33

          3.   Metrics for Tracking Completed Sales .........................................35

               a.   Backlog ...............................................35

               b.   Annualized Contract Value, or ACV ...............................37

**Page**

4.    Defendants Introduce New Internal Infrastructure ........................39

5.    Promises of Growth from the "Jerre Stead Playbook" .................42

6.    Defendants Implement Price Increases, Transition to Inside
      Sales, and Slash Costs to Appear Profitable ..................................45

7.    Defendants' Changes Drive Away Customers and Staff,
      Hampering Revenue Growth ........................................................47

B.    Defendants' Scheme and Fraudulent Course of Business ........................51

1.    Inflating ACV and Backlog to Create the Appearance That
      Future Revenues Were Nearly Certain When They Were
      Not.................................................................................................51

2.    Defendants Use ACV to Mislead Investors About
      Likelihood of Hitting 2020 Organic Growth Targets and
      String Investors Along By Setting Aggressive Growth
      Targets for 2021 ...........................................................................57

3.    Cannibalizing DRG's Q4 2021 Transactional Sales to
      Show Revenue Growth Earlier in the Year....................................61

4.    Defendants Use Backlog and Cannibalized Q4 Revenues to
      Mislead Investors About the Likelihood of Hitting 2021
      Organic Growth Targets While They Sell Stock ...........................64

C.    Defendants' Misleading Statements and Omissions..................................73

1.    Statements Regarding Revenue Growth ........................................74

      a.    ACV Growth Statements and Statements Regarding
            Clarivate's Organic Growth Rate Exiting 2020.................74

      b.    ACV Growth and Backlog Statements, Statements
            Denying Cannibalizing DRG's Q4 Transactional
            Revenue, and Statements Regarding Clarivate
            Organic Growth Rate for Full Year 2021 and
            Exiting 2021........................................................................77

2.    Statements Regarding Product Quality Driving Growth ..............86

**Page**

D.    Defendants Failed to Disclose "Known Trends or Uncertainties" in Violation of Item 303 of Regulation S-K ...................................................88

    1.    Following the DRG and CPA Global Acquisitions, Clarivate Made Major Structural Changes to Its Business Model and Sales Practices ...........................................91

        a.    Cost-Cutting Restructuring Programs...............................91

        b.    Shift to an Inside Sales Model ..........................................92

        c.    Transition from One-Off Transactional Sales to Subscription Sales...............................................................92

    2.    Unbeknownst to Investors, These Changes to the Business Had a Significant Negative Impact on Clarivate's Revenue Trends .......................................................................94

        a.    Significant Reduction to Outside Sales Force ..................95

        b.    Inside Sales Force Had Limited Sales Capabilities ..........96

        c.    Pulling Forward Transactional Sales Negatively Impacted Fourth Quarter Revenues ...................................98

    3.    Changes to the Sales Force and Sales Model Contributed to Clarivate's Disappointing Q4 2020 and Q4 2021 Revenue Targets and Reduced 2022 Revenue Guidance ............................99

    4.    Defendants Failed to Disclose the Reasonably Likely Impact that the Significant Business and Sales Model Changes Would Have on Clarivate's Revenues, in Violation of Item 303 .................................................................100

E.    Defendants Acted with Scienter............................................................102

    1.    Defendants Were Hands-On Executives Who Closely and Frequently Tracked and Spoke About Sales and Revenue Metrics ..............................................................................102

        a.    Sales and Pipeline Reports...............................................102

        b.    Product Quality Reports...................................................104

4889-3735-6399.v1

**Page**

   c. Invoice Quality Control Reports ..................................... 104

   d. Collections and Accounts Receivable Reports ............... 105

  2. CW-6's Personal Interactions With Defendants ........................ 106

  3. Stead's Role as a SPAC Sponsor and Talisman of Organic Growth ................................................................................. 107

  4. High-Level Departures and Reorganization of Clarivate's Leadership ............................................................................. 107

  5. Defendants' SOX Certifications ................................................. 108

  6. Insider Stock Sales Support a Motive to Commit Fraud ............. 109

 F. Confidential Witness Accounts ............................................................. 115

 G. Loss Causation .................................................................................... 128

 H. Applicability of the Presumption of Reliance and the FOTM Doctrine ............................................................................................... 131

 I. Exchange Act Counts .......................................................................... 133

VI. CLASS ACTION ALLEGATIONS ................................................................ 138

VII. PRAYER FOR RELIEF ............................................................................... 139

VIII. DEMAND FOR TRIAL BY JURY ................................................................ 140

4889-3735-6399.v1

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs Pension Trust Fund for Operating Engineers, City of Birmingham Retirement and Relief System, Michigan Laborers' Pension Fund, and Town of Davie Police Pension Fund (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clarivate PLC ("Clarivate" or the "Company"), analysts' reports and advisories about the Company, statements by percipient witnesses, and other publicly available information.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.    This amended complaint is alleged in two parts.  The first part alleges non-fraud claims under §§11 and 15 of the Securities Act of 1933 ("Securities Act"), on behalf of all persons or entities that purchased:

(a)    Clarivate's common stock in the public offering conducted on or about June 10, 2021 ("June 2021 Ordinary Shares Offering");

(b)    Clarivate's 5.25% Series A Mandatory Convertible Preferred Shares in the public offering conducted on or about June 10, 2021 ("June 2021 Preferred Shares Offering," and with the June 2021 Ordinary Shares Offering, the "June 2021 Offerings"); and/or

- 1 -

(c)      Clarivate's common stock in the public offering conducted on or about

September 13, 2021 ("September 2021 Offering").

3.      The second part of this complaint alleges fraud and scheme claims under §§10(b) and

20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated

thereunder, on behalf of all persons or entities that purchased or acquired Clarivate common stock

between July 30, 2020, and February 2, 2022, inclusive (the "Class Period"), and who were damaged

thereby.

## II.    JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to (i) §§11 and 15 of the

Securities Act (15 U.S.C. §§77k and 77o), and (ii) §§10(b) and 20(a) of the Exchange Act (15

U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.

§240.10b-5).

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331, §22 of the Securities Act, and §27 of the Exchange Act.

6.      Venue is proper in this Judicial District pursuant to §22 of the Securities Act, §27 of

the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Clarivate's common and preferred

shares trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably

hundreds, if not thousands, of investors in Clarivate common stock and its preferred shares located

across the United States, some of whom likely reside in this Judicial District.

7.      In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

8.     Lead Plaintiff Pension Trust Fund for Operating Engineers ("Pension Trust Fund") is a multiemployer defined benefit pension plan established in 1959 for the purpose of providing pension and death benefits to eligible participants and beneficiaries.  During the Class Period, the Pension Trust Fund purchased Clarivate common stock and Clarivate ordinary shares pursuant or traceable to the September 2021 Offering, as set forth in the certification previously filed (*see* ECF 8-2) and incorporated herein, and was damaged thereby.

9.     Plaintiff City of Birmingham Retirement and Relief System ("City of Birmingham") is a public pension fund that was organized for the benefit of current and retired public employees of the City of Birmingham, Alabama.  During the Class Period, City of Birmingham purchased Clarivate common stock, as set forth in the certification previously filed (*see* ECF 30) and incorporated herein, and was damaged thereby.

10.     Plaintiff Michigan Laborers' Pension Fund ("Michigan Laborers") is a defined benefit pension plan providing pension and death benefits to eligible participants and beneficiaries. During the Class Period, Michigan Laborers purchased Clarivate common stock and 5.25% Series A mandatory convertible preferred shares pursuant or traceable to the June 2021 Preferred Shares Offering, as set forth in the certification previously filed (*see* ECF 30) and incorporated herein, and was damaged thereby.

11.     Plaintiff Town of Davie Police Pension Fund ("Davie Police") is a defined benefit pension plan that provides pensions to eligible retirees and beneficiaries.  During the Class Period, Davie Police purchased Clarivate common stock and Clarivate ordinary shares pursuant or traceable to the June 2021 Ordinary Share Offering, as set forth in the certification previously filed (*see* ECF 30) and incorporated herein, and was damaged thereby.

- 3 -

12.     Defendant Clarivate is an information services and analytics company.  Clarivate became a publicly traded company in 2019 through a merger with Churchill Capital Corp ("Churchill"), a special purpose acquisition company, or "SPAC."  Clarivate's ordinary shares and 5.25% Series A mandatory convertible preferred shares trade on the NYSE under the tickers "CLVT" and "CLVT-PA," respectively.  Until February 1, 2021, Clarivate's ordinary shares traded on the NYSE under the ticker "CCC."

13.     Defendant Jerre Stead became Executive Chairman of Clarivate's Board of Directors ("Board") in May 2019 and the Chief Executive Officer ("CEO") in June 2019.  Prior to becoming CEO of Clarivate, Stead had led the special purpose acquisition company known as Churchill Capital Corp.  Throughout the Class Period, Stead made materially false and misleading statements and omissions contained in SEC filings and made during investor conferences, as alleged herein. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Stead signed and certified the Company's Forms 10-Q, 10-K, and 10-K/A (Amendment No. 1) filed with the SEC.  Stead also signed the Form S-3 filed with the SEC on June 19, 2020 (the "2020 Shelf Registration Statement") used for the June 2021 Offerings and the September 2021 Offering, and signed the Form S-3 filed with the SEC on July 1, 2021 (the "2021 Shelf Registration Statement") used for the September 2021 Offering.  On July 11, 2022, the Company announced that Stead would be stepping down from his role as Clarivate's CEO.

14.     Defendant Richard Hanks was Clarivate's Chief Financial Officer ("CFO") starting in March 2017.  Throughout the Class Period, Hanks made materially false and misleading statements and omissions contained in SEC filings and made during investor conferences, as alleged herein. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Hanks signed and certified the Company's Forms 8-K, 10-Q, 10-K, and 10-K/A (Amendment No. 1) filed with the SEC.  Hanks

also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and signed the 2021 Shelf Registration Statement used for the September 2021 Offering.  On December 1, 2021, Clarivate announced Hanks was departing the Company.

15.     Defendant Christie Archbold was Clarivate's Chief Accounting Officer starting in December 2019.  Throughout the Class Period, Archbold made materially false and misleading statements and omissions contained in SEC filings, as alleged herein.  Archbold also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the 2021 Shelf Registration Statement used for the September 2021 Offering.  During the Class Period, Archbold made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K, 2020 Form 10-K/A (Amendment No. 1), the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and signed the 2021 Shelf Registration Statement used for the September 2021 Offering.  The Company announced that effective October 5, 2021, Archbold was taking a temporary leave of absence.  On March 7, 2022, Archbold stepped down from her role at the Company.

16.     Defendant Mukhtar Ahmed became Clarivate's President of the Science Group in January 2019, having joined the Company in January 2018 as President of Life Sciences.  During the Class Period, Ahmed made materially false and misleading statements and omissions during Clarivate's investor calls and conferences, as alleged herein.  On January 10, 2022, Clarivate announced that Ahmed would be leaving the Company.

17.     Defendant Jeffrey Roy was Clarivate's President of the Intellectual Property ("IP") Group.  During the Class Period, Roy made materially false and misleading statements and omissions during Clarivate's investor calls and conferences, as alleged herein.  On July 6, 2021, Clarivate announced that Roy would be leaving the Company.

- 5 -

18.     Defendant Steen Lomholt-Thomsen became Clarivate's Chief Revenue Officer in August 2021.  During the Class Period, Lomholt-Thomsen made materially false and misleading statements and omissions during Clarivate's investor calls and conferences, as alleged herein.  On May 9, 2023, Clarivate announced that Lomholt-Thomsen would be leaving the Company.

19.     Defendant Gordon Samson, who was previously head of Clarivate's APAC Strategy & Growth, became President of Clarivate's IP Group on July 6, 2021.  During the Class Period, Samson made materially false and misleading statements and omissions during Clarivate's investor calls, as alleged herein.

20.     Defendant Sheryl von Blucher became a member of Clarivate's Board in May 2019. During the Class Period, von Blucher made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K, 2020 Form 10-K/A (Amendment No. 1), the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 221 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

21.     Together, defendants Clarivate, Stead, Hanks, Archbold, Ahmed, Roy, Lomholt-Thomsen, Samson, and Von Blucher are referred to herein as the "Exchange Act Defendants."

22.     Defendant Kosty Gilis became a member of Clarivate's Board in January 2019.  Gilis was also a Managing Director of Onex, defined below, which he joined in 2004.  During the Class Period, Gilis made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and the September 2021 Offering.  Gilis also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

- 6 -

23.     Defendant Balakrishnan S. Iyer became a member of Clarivate's Board in May 2019. During the Class Period, Iyer made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Iyer also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

24.     Defendant Nicholas Macksey became a member of Clarivate's Board in October 2016.  Macksey was also a Managing Director of Baring, defined below, a company he joined in 2006.  During the Class Period, Macksey made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Macksey also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

25.     Defendant Anthony Munk became a member of Clarivate's Board in October 2016. During the Class Period, Munk made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Munk also signed the 2020 Shelf Registration Statement used in for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

26.     Defendant Jane Okun Bomba became a member of Clarivate's Board in May 2020. During the Class Period, Bomba made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Bomba also signed the 2020

- 7 -

Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

27.     Defendant Charles J. Neral became a member of Clarivate's Board in July 2017. During the Class Period, Neral made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Neral also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

28.     Defendant Richard W. Roedel became a member of Clarivate's Board in May 2020. During the Class Period, Roedel made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  Roedel also signed the 2020 Shelf Registration Statement used for the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

29.     Defendant Valeria Alberola became a member of Clarivate's Board in May 2021. During the Class Period, Alberola made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and the September 2021 Offering.  Alberola also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

30.     Defendant Usama N. Cortas became a member of Clarivate's Board in October 2020. During the Class Period, Cortas made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by

reference in the June 2021 Offerings and September 2021 Offering.  Cortas also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

31.    Defendant Adam T. Levyn became a member of Clarivate's Board in October 2020. During the Class Period, Levyn made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and the September 2021 Offering.  Levyn also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

32.    Defendant Roxane White became a member of Clarivate's Board in May 2021. During the Class Period, White made materially false and misleading statements and omissions, as alleged herein, by signing Clarivate's 2020 Form 10-K/A (Amendment No. 1), incorporated by reference in the June 2021 Offerings and September 2021 Offering.  White also signed the 2021 Shelf Registration Statement used for the September 2021 Offering.

33.    The Defendants identified above in ¶¶13, 22-32 are referred to herein as the "Director Defendants."

34.    Defendant PricewaterhouseCoopers LLP ("PwC") is the U.S. member firm of PricewaterhouseCoopers International Ltd., an international firm that provides independent audit, tax, and advisory services.  PwC has served as Clarivate's outside auditor since 2016.  PwC certified Clarivate's 2020 financial statements in its Report filed on February 26, 2021 with Clarivate's 2020 Form 10-K.  With the exception of the Company's treatment of the private placement warrants and the Company's "lack of an effectively designed control over the evaluation of settlement features used to determine the classification of warrant instruments," PwC consented to the incorporation by reference of its Report dated February 26, 2021 into the 2020 Shelf Registration Statement used for

the June 2021 Offerings and the September 2021 Offering, and the 2021 Shelf Registration Statement used for the September 2021 Offering.

35.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as Sole Global Coordinator and Joint Book-Running Manager for the June 2021 Ordinary Shares Offering on or about June 10, 2021 of 44,230,768 ordinary shares of Clarivate and the June 2021 Preferred Shares Offering on or about June 10, 2021 of 14,375,000 of Clarivate's 5.25% Series A Mandatory Convertible Preferred Shares.  Citigroup further acted as representative of the underwriters in the June 2021 Offerings.  Citigroup represented itself and the other participating underwriters, which were identical in both the June 2021 Offerings: BofASecurities, Inc., RBC Capital Markets, LLC, Barclays Capital Inc., HSBC Securities (USA) Inc., and J.P. Morgan Securities LLC.  On June 14, 2021, Clarivate filed with the SEC an Underwriter Agreement for the June 2021 Offerings that was confirmed and accepted by Citigroup "[f]or themselves and as representative of the other [u]nderwriters," and in which it was agreed and understood that the other participating underwriters in the offering had "authorized the Representative [Citigroup], for its account, to accept delivery of, receipt for, and make payment of the purchase price" the shares in the offerings.  According to the Prospectus Supplements for both the June 2021 Offerings: "The underwriters expect[ed] to deliver the ordinary shares to purchasers on or about June 14, 2021 through the book-entry facilities of The Depository Trust Company."  Additionally, Citigroup participated in the drafting and dissemination of the June 2021 Offering Materials, as well as in the sale of the ordinary and preferred shares offered to Plaintiffs and the Class.  As an underwriter and the Global Coordinator of the June 2021 Offerings, Citigroup was responsible for ensuring the completeness and accuracy of the statements contained in or incorporated by reference into the June 2021 Offering Materials.

- 10 -

36.     On June 10, 2021, the underwriters exercised in full an option granted by the Selling Shareholders to purchase up to an additional 5,769,230 ordinary shares of Clarivate, bringing the total number of shares sold in the June 2021 Ordinary Shares Offering to 44,230,768.  Citigroup was paid approximately $19.9 million in connection with the June 2021 Ordinary Shares Offering.

37.     On June 10, 2021, the underwriters exercised in full an option granted by Clarivate to purchase up to an additional 1,875,000 preferred shares of Clarivate, bringing the total number of shares sold in the June 2021 Preferred Shares Offering to 14,375,000.   Citigroup was paid approximately $24.9 million in connection with the June 2021 Preferred Shares Offering.

38.     Citigroup also served as Joint Book-Running Manager and "representative of the underwriters" in the September 2021 Offering on or about September 13, 2021 of 25,000,000 ordinary shares of Clarivate.  Citigroup represented itself and the other participating underwriter, which was Barclays Capital Inc.  On September 14, 2021, Clarivate filed with the SEC an Underwriter Agreement for the September 2021 Offering that was confirmed and accepted by Citigroup "[f]or themselves and as [r]epresentative of the other [u]nderwriters," and in which it was agreed and understood that the other participating underwriters in the offering had "authorized the Representative [Citigroup], for its account, to accept delivery of, receipt for, and make payment of the purchase price" the shares in the offering.  According to the Prospectus Supplement for the September 2021 Offering: "The underwriters expect[ed] to deliver the ordinary shares to purchasers on or about September 14, 2021 through the book-entry facilities of The Depository Trust Company."  The Prospectus Supplement also specified that there was no set offering price for the September 2021 Offering; rather, the underwriters would "offer the ordinary shares from time to time for sale in one or more transactions on the [NYSE], in the over-the-counter market, through negotiated transactions or otherwise, at market prices prevailing at the time of sale, at prices related

- 11 -

to such prevailing market prices or negotiated prices, subject to their right to reject any order in whole or in part."  Additionally, Citigroup participated in the drafting and dissemination of the September 2021 Offering Materials, as well as in the sale of the ordinary shares offered to Plaintiffs and the Class.  As an underwriter of the September 2021 Offering, Citigroup was responsible for ensuring the completeness and accuracy of the statements contained in or incorporated by reference into the September 2021 Offering Materials.

39.     Defendant Onex Corporation, together with various affiliated partnerships, including Onex Partners IV LP, Onex Partners IV PV LP, Onex Partners IV Select LP, Onex Partners IV GP LP, Onex Camelot Co-Invest LP, Onex US Principals LP, Onex Partners Holdings LLC, and New PCo A LP ("Onex") were record holders of Clarivate's ordinary shares.  Onex Corporation, a private equity firm, was deemed the beneficial owner of the ordinary shares of Clarivate.  Together, Onex held 71,418,266 ordinary shares of Clarivate before the June 2021 Ordinary Shares Offering.  During the June 2021 Ordinary Shares Offering, Onex sold 10,562,882 of its ordinary Clarivate shares, or 14.8% of its holdings, and earned proceeds of $266,395,885, before expenses.  Total expenses for the offering were expected to be $1.8 million.

40.     Before the September 2021 Offering, Onex held 60,855,384 ordinary shares of Clarivate.  During the September 2021 Offering, Onex sold 18,000,000 ordinary shares, or 29.6% of its holdings, and earned proceeds of $454,500,000.  Estimated expenses for the offering were $790,000.

41.     Defendant The Baring Asia Private Equity Fund VI, L.P.1, ("LP1") is an affiliate of Baring Private Equity Asia Group Limited ("Baring Group"), which was an independent alternative asset management platform based in Asia. and its affiliated partnerships.

42.     Defendant The Baring Asia Private Equity Fund VI, L.P.2 ("LP2") is an affiliate of Baring Group.

43.     Defendants Elgin Investment Holdings Limited ("Elgin," and together with LP1 and LP2, "Baring") is an affiliate of Baring Group.

44.     Baring held 27,773,769 ordinary shares of Clarivate before the June 2021 Ordinary Shares Offering.  During the June 2021 Ordinary Shares Offering, Baring sold 4,107,787 of its ordinary Clarivate shares, or 14.8% of its holdings, and earned proceeds of $103,598,388.14, before expenses.  Total expenses for the offering were expected to be $1.8 million.

45.     Before the September 2021 Offering, Baring held 23,665,982 ordinary shares of Clarivate.  During the September 2021 Offering, Baring sold 7,000,000 ordinary shares, or 29.6% of its holdings, and earned proceeds of $176,750,000.  Estimated expenses for the offering were $790,000.

46.     On June 9, 2021, Onex and Elgin signed the Underwriting Agreement that, pursuant to the June 19, 2020 Form S-3 Registration Statement ("2020 Shelf Registration Statement"), was "incorporated by reference" into the June 2021 Ordinary Shares Offering Materials.

47.     On September 9, 2021, Onex and Elgin signed the Underwriting Agreement that, pursuant to the 2020 Shelf Registration Statement  and the July 1, 2021 Form S-3 Registration Statement ("2021 Shelf Registration Statement"), was "incorporated by reference" into the September 2021 Offering Materials.

48.     Onex and Baring were identified as "selling shareholders" in the June 2021 Ordinary Shares Offering Materials and the September 2021 Offering Materials, and played essential roles in the actual distribution of Clarivate common stock.  Onex and Baring were granted registration rights in connection with the closing of Clarivate's reverse merger with Churchill Capital Corp on or about

- 13 -

May 13, 2019.  Onex and Baring were identified as "Company Owners" in the merger proxy statement dated April 26, 2019.  The merger proxy statement further specified that "[a]s consideration for all the outstanding shares of the Company, the Company Owners will receive 217.5 million ordinary shares of Clarivate," which resulted in Onex and Baring holding "approximately 74% of the issued and outstanding ordinary shares of Clarivate."  According to the merger proxy statement, at the closing of the merger, the Company Owners "will be granted certain rights, pursuant to the Registration Rights Agreement which will be entered into at or prior to the closing of the [merger] Transactions," and that pursuant to the Registration Right Agreement, they are "entitled to have registered, in certain circumstances, the resale of the ordinary shares of Clarivate held by them."  Specifically, "Onex will be entitled to request that Clarivate register its ordinary shares on one or more occasions in the future, which registrations may be 'shelf registrations.'  In addition . . . Baring shall be entitled to three such requests."  Furthermore, "[t]he parties to the Registration Rights Agreement will also be entitled to participate in certain registered offerings by Clarivate or demand registrations by the other parties to the Registration Rights Agreement, subject to certain limitations and restrictions."

49.    The Registration Rights Agreement dated October 1, 2020, and in effect at the time of the June 2021 Ordinary Shares Offering and the September 2021 Offering,[1] specifically enumerated Onex and Baring's participation in distributing Clarivate common stock through the Offerings.  The Registration Rights Agreement provided that:

- Onex and Baring could "make a written request" to Clarivate "for Registration of all or any portion of the Registrable Securities" they held;

---

[1]    The Registration Rights Agreement was filed as Exhibit 10.2 to Clarivate's Form 10-Q for 3Q 2020.  Clarivate also subsequently filed Amendment No. 1 to the Registration Rights Agreement on May 17, 2021, which affected only certain provisions of the Registration Rights Agreement not relevant here.

- If Clarivate proposes to conduct an underwritten offering, then it must provide notice so that Onex and Baring could request to include their Clarivate shares in the offering;

- Any expenses in connection with the registration or offering of Clarivate shares "shall be divided pro rata" among Clarivate, Onex, Baring, and another party to the agreement if they sold securities in connection with that registration or offering;

- For an underwritten offering, Clarivate had to make available to Onex and Baring "all financial and other records, pertinent corporate documents of [Clarivate] . . . as shall be reasonably necessary or desirable to enable them to exercise their customary due diligence responsibility";

- For an underwritten offering, Clarivate had to "use reasonable best efforts to furnish" Onex and Baring opinions of Clarivate's counsel and a comfort letter from Clarivate's independent public accountants, "each in customary form and covering such matters of the kind customarily covered by opinions or comfort letters"; and

- Onex and Baring were indemnified by the Company against claims caused by "any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus . . . [or] any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading."

50. Together, Clarivate, Stead, Hanks, Archbold, the Director Defendants, PwC, Citigroup, Onex, and Baring are referred to herein as the "Securities Act Defendants."

## IV.   VIOLATIONS OF THE SECURITIES ACT

51. In this section of the Complaint, Plaintiffs assert strict liability and negligence claims against the Securities Act Defendants pursuant to the Securities Act on behalf of those who acquired ordinary shares and/or preferred shares pursuant or traceable to three offerings: the June 2021 Ordinary Shares Offering, the June 2021 Preferred Shares Offering, and the September 2021 Offering (the "Offerings").  Plaintiffs expressly disclaim any allegations of knowing or reckless misconduct.

52. The offering materials for each of the Offerings incorporated by reference the annual report for 2020 and the first three quarterly reports for 2021.  As alleged herein, the financial

- 15 -

statements incorporated by reference into the relevant offering materials contained untrue statements of material fact, or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

53.     On February 3, 2022, Clarivate restated several previously reported financial statements in its annual report for 2020 and its quarterly reports for the first three quarters of 2021 (the "Restatement").   By doing so, Defendants have ***admitted*** that statements in the offering materials – which incorporated the restated financial statements by reference – were false at the time they were issued.   As a result of the accounting errors, Clarivate admitted that it had materially understated its previously reported expenses by more than $120 million and materially overstated net income and earnings-per-share ("EPS") during these periods.

### A.     The June 2021 Offerings

54.     On or about June 8, 2021, Clarivate announced that it would commence the June 2021 Ordinary Shares Offering – a $750 million offering of ordinary shares, alongside a $250 million offering of ordinary shares by its selling shareholders, beneficially-owned affiliates of Onex and Baring.

55.     Also on or about June 8, 2021, Clarivate announced that it would commence the June 2021 Preferred Shares Offering – a $1.25 billion offering of Series A Mandatory Convertible preferred shares.

56.     The June 2021 Offerings were conducted pursuant to the 2020 Shelf Registration Statement.   Under the shelf registration process, Clarivate could sell any combination of the securities described in the 2020 Shelf Registration Statement in one or more offerings.   The securities described in the 2020 Shelf Registration Statement were ordinary shares, preferred shares, debt securities, warrants, purchase contracts, and units.   On July 1, 2020, the SEC issued a Notice of

- 16 -

Effectiveness of the 2020 Shelf Registration Statement. The 2020 Shelf Registration Statement was signed by defendants Stead, Hanks, Archbold, von Blucher, Gilis, Iyer, Klein, Macksey, Munk, Bomba, Neral, and Roedel.

57. On May 10, 2021, as part of Clarivate's Form 10-K/A (Amendment No. 1), PwC provided its consent to the incorporation by reference in the 2020 Shelf Registration Statement of its report dated February 26, 2021, except for the items specified in the Form 10-K/A (Amendment No. 1), that related to the accounting treatment of private placement warrants. PwC also consented to the reference to them as "Experts" in the 2020 Shelf Registration Statement.

58. In addition to the 2020 Shelf Registration Statement, the June 2021 Ordinary Shares Offering was conducted pursuant to preliminary prospectus supplements filed with the SEC on June 8, 2021 and June 10, 2021, and a prospectus supplement filed on June 11, 2021. Likewise, the June 2021 Preferred Shares Offering was conducted pursuant to preliminary prospectus supplements filed with the SEC on June 8, 2021 and June 10, 2021, and a prospectus supplement filed on June 11, 2021. The prospectus supplements incorporated by reference Clarivate's Form 10-K/A (Amendment No. 1), filed on May 10, 2021, and Form 10-Q, filed on May 10, 2021. Collectively with the 2020 Shelf Registration Statement, these filings are referred to as the "June 2021 Offering Materials."

**B.    The September 2021 Offering**

59. On or about September 9, 2021, Clarivate announced the September 2021 Offering – a $631 million public offering of ordinary shares by Onex and Baring.

60. The September 2021 Offering was conducted pursuant to the 2020 Shelf Registration Statement and the 2021 Shelf Registration Statement. On July 9, 2021, the SEC issued a Notice of Effectiveness of the 2021 Shelf Registration Statement. The 2021 Shelf Registration Statement was

signed by Stead, Hanks, Archbold, von Blucher, Alberola, Cortas, Gilis, Iyer, Levyn, Macksey, Munk, Neral, Bomba, Roedel, and White.

61.     On June 9, 2021, as part of Clarivate's Form S-3, PwC provided its consent to the incorporation by reference in the 2021 Shelf Registration Statement of its report dated February 26, 2021, except for the effects of the items specified in the Form 10-K/A (Amendment No. 1), which related to the accounting treatment of private placement warrants.  PwC also consented to the reference to them as "Experts" in the 2021 Shelf Registration Statement.

62.     In addition to the 2020 Shelf Registration Statement and 2021 Shelf Registration Statement, the September 2021 Offering was conducted pursuant to preliminary prospectus supplement filed with the SEC on September 13, 2021, which included the prospectus dated July 9, 2021.  The prospectus supplement incorporated by reference Clarivate's Form 10-K/A (Amendment No. 1) filed on May 10, 2021, Form 10-Q filed on May 10, 2021, and Form 10-Q filed on July 29, 2021.  Collectively with the 2020 Shelf Registration Statement and 2021 Shelf Registration Statement, these filings are referred to as the "September 2021 Offering Materials."  The June 2021 Offering Materials and the September 2021 Offering Materials are collectively referred to herein as the "Offering Materials."

## C.     The Restatement

63.     On December 27, 2021, Defendants filed a Form 8-K with the SEC disclosing that Clarivate's previously issued financial statements for the year ended December 31, 2020 (both a 10-K and a 10-K/A (Amendment No. 1)), and quarterly periods ended March 31, 2021, June 30, 2021, and September 30, 2021 (the "Affected Periods"), should no longer be relied upon because of material accounting errors in those financial statements.  Defendants further disclosed that as a result of the accounting errors, Clarivate had materially understated its previously reported expenses by

- 18 -

more than $120 million during the Affected Periods.  The Form 8-K also stated that to correct the errors, each of Clarivate's previously issued financial statements for the affected periods would need to be restated in accordance with FASB ASC Topic 250, *Accounting Changes and Error Corrections*.

64.     On February 3, 2022, Defendants finalized and issued the Restatement, filing an amended annual report on Form 10-K/A (Amendment No. 2) with the SEC for the year ended December 31, 2020 and amended quarterly reports on Forms 10-Q/A for the quarters ended March 31, June 30, and September 30, 2021.  The Restatement identified and corrected the following accounting errors:

(a)     Clarivate incorrectly accounted for an equity plan included in the CPA Global business combination, which was consummated on October 1, 2020.  In the affected financial statements, certain awards made by CPA Global under such equity plan and a related trust were incorrectly included as part of the acquisition accounting for the CPA Global transaction.  The Company concluded that the majority of the expenses associated with such equity plan should have been recognized as share-based compensation charges ranging primarily from the vesting period of October 1, 2020 to October 1, 2021, with only a portion of the liability recorded as part of acquisition accounting.  In addition, ordinary shares that were transferred to an Employee Benefit Trust established for the CPA Global Equity Plan should have been excluded from the purchase price consideration in the amount of $196,038,000, or 6,325,860 ordinary shares; and

(b)     The Company understated deferred tax liabilities, with an offset to goodwill, relating to the CPA Global acquisition opening balance sheet on October 1, 2020 and the Decision Resources Group ("DRG") acquisition opening balance sheet on February 28, 2020.

65.     These accounting errors had a material impact on Clarivate's reported financial results during the Affected Periods.  In total, Clarivate overstated its net income by more than $120 million from Q4 2020 through Q2 2021.  The disclosures of the accounting errors and the attendant damage to Defendants' reputation and loss of investor confidence caused the price of Clarivate securities to decline.

66.     As detailed in the chart below, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated in each of the Affected Periods:

|  | **FY 2020** | **Q4 2020** | **Q1 2021** | **Q2 2021** |
|---|---|---|---|---|
| Expenses (as reported) | $     1,251,242 | $     426,064 | $     462,637 | $     457,397 |
| Restatement Impact | $     39,152 | $     39,152 | $     35,303 | $     52,018 |
| Expenses (restated) | $     1,290,394 | $     465,216 | $     497,940 | $     509,415 |
| **% understated** | **3.1%** | **9.2%** | **7.6%** | **11.24%** |
|  |  |  |  |  |
| Net Income (Loss) (as reported) | $     (311,869) | $     25,031 | $     (23,954) | $     (82,210) |
| Restatement Impact | $     (38,756) | $     (38,756) | $     (31,997) | $     (49,357) |
| Net Income (Loss)  (restated) | $     (350,625) | $     (13,725) | $     (55,951) | $     (131,567) |
| **% overstated** | **12.4%** | **>100%** | **133.6%** | **60.0%** |
|  |  |  |  |  |
| EPS (as reported) | $     (0.73) | $     0.04 | $     (0.04) | $     (0.13) |
| Restatement Impact | $     (0.09) | $     (0.09) | $     (0.05) | $     (0.08) |
| EPS (restated) | $     (0.82) | $     (0.05) | $     (0.09) | $     (0.22) |
| **% overstated** | **12.3%** | **>100%** | **125.0%** | **61.5%** |

## D.     The Restatement Is an Admission that the GAAP Violations Were Materially Misleading

67.     The fact that Clarivate has restated its financial results, including its expenses, net income, and EPS, is an admission that its prior financial statements for the Affected Periods were materially false and not prepared in accordance with GAAP.[2]  In accordance with Accounting

---

[2]     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) ("Regulation S-X") states that financial statements filed

Standards Codification Topic 250, *Accounting Changes and Error Corrections* ("ASC 250"), GAAP

provides that financial statements should only be restated in limited circumstances, *i.e.*, there is a

change in reporting entity, there is a change in accounting principles used, or ***to correct an error in***

***previously issued financial statements***.  Further, under ASC 250, a restatement of previously issued

financial statements is only allowed when a Company makes:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that ***existed at the time the financial statements were prepared***.

ASC 250-10-20.

68.     Thus, the Restatement is an admission by Defendants that Clarivate's previously

issued financial results, including its Form 10-K and Form 10-K/A (Amendment No. 1) for the fiscal

year ended December 31, 2020 and Forms 10-Q for the quarters ended March 31, June 30, and

September 30, 2021, and Defendants' public statements regarding those results, were materially false

and misleading.

69.     The Restatement is also an admission that the accounting errors were material.  Under

ASC 250, GAAP provides that financial statements should only be restated in limited circumstances,

*i.e.*, ***to correct a material error in previously issued financial statements***.   As part of the

---

with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*.  FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.

Restatement, Defendants stated "that the impacts **were material** to the Company's financial statements prepared according to U.S. generally accepted accounting principles." The correction of the accounting errors had a material impact on numerous balance sheet line items during each of the Affected Periods, including restricted cash, prepaid expenses, goodwill, accrued expenses, other current liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit.

### E.   Defendants' Materially Misleading Financial Results

#### 1.   Q4 2020 Financial Results

70.     On February 25, 2021, the Company issued a press release announcing its financial results for Q4 2020 and FY 2020, followed by a conference call the same day to discuss those results. On the following day, February 26, 2021, the Company filed a Form 10-K with the SEC reporting its financial results for the year ended December 31, 2020. In the press release and in the Form 10-K, Defendants made materially false and misleading statements and omitted material facts regarding the Company's Q4 2020 financial results.

71.     As detailed above in ¶64, *supra*, the Company later restated the Q4 2020 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP. As described in ¶¶67-69, *supra*, the Restatement was an admission that the Q4 2020 financial results were materially false, and in violation of GAAP, when originally reported. The accounting errors caused numerous financial statement line items to be materially misstated as of December 31, 2020, including restricted cash, prepaid expenses, goodwill, accrued expenses, other current liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit. In addition, as detailed in the chart above at ¶66, the accounting errors

caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q4 2020.

### 2.  First Amended Q4 2020 and FY 2020 Financial Results

72.     On May 10, 2021, the Company filed a Form 10-K/A (Amendment No. 1) with the SEC reporting its amended financial results for the fourth quarter and year ended December 31, 2020.  The amended results corrected an accounting error related to the classification of warrants.  In the Form 10-K/A (Amendment No. 1), Defendants made materially false and misleading statements and omitted material facts regarding the Company's amended Q4 2020 financial results.

73.     As detailed above, the Company later restated the amended Q4 2020 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP.  As described above, the Restatement was an admission that the first amended Q4 2020 financial results were materially false, and in violation of GAAP, when originally reported.  As a result of the accounting errors and the resulting Restatement, the following statement in the Form 10-K/A (Amendment No. 1) was materially false:

> [M]anagement has concluded that our audited financial statements included in this Annual Report on Amended Form 10-K/A are fairly stated in all material respects in accordance with GAAP for each of the periods presented herein.

74.     The accounting errors also caused numerous financial statement line items in the Form 10-K (Amendment No. 1) to be materially misstated as of December 31, 2020.  In particular, as detailed in the chart above at ¶66, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q4 2020.

### 3.  Q1 2021 Financial Results

75.     On April 29, 2021, the Company issued a press release announcing its financial results for Q1 2021, followed by a conference call the same day to discuss those results.  On May 10,

2021, the Company filed a Form 10-Q with the SEC reporting its financial results for the quarter ended March 31, 2021.  In the press release and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts regarding the Company's Q1 2021 financial results.

76.     As detailed above, the Company later restated the Q1 2021 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP.  As described above, the Restatement was an admission that the Q1 2021 financial results were materially false, and in violation of GAAP, when originally reported.   The accounting errors caused numerous financial statement line items to be materially misstated as of March 31, 2021 including restricted cash, prepaid expenses, goodwill, accrued expenses, other current liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit.  In addition, as detailed in the chart above at ¶66, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q1 2021.

### 4.     Q2 2021 Financial Results

77.     On July 29, 2021, the Company issued a press release announcing its financial results for Q2 2021, followed by a conference call the same day to discuss those results.  On the same day, the Company filed a Form 10-Q with the SEC reporting its financial results for the quarter ended June 30, 2021.  In the press release and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts regarding the Company's Q2 2021 financial results.

78.     As detailed above, the Company later restated the Q2 2021 financial results on February 3, 2022 to correct material accounting errors that were in violation of GAAP.  As described above, the Restatement was an admission that the Q2 2021 financial results were materially false,

and in violation of GAAP, when originally reported.  The accounting errors caused numerous financial statement line items to be materially misstated as of June 30, 2021 including restricted cash, prepaid expenses, goodwill, accrued expenses, other current liabilities, other non-current liabilities, treasury shares, and accumulated other comprehensive income (loss) and accumulated deficit.  In addition, as detailed in the chart above at ¶66, the accounting errors caused Clarivate's reported expenses to be materially understated and its net income and EPS to be materially overstated as of Q2 2021.

> **5.    The Offering Materials Incorporated by Reference the Materially Misleading Financial Information**

79.    The June 2021 prospectus supplements contained "Summary Historical Financial Information," including financial results for the year ended December 31, 2020 and the quarter ended March 31, 2021.  As detailed above ¶64, the Company has admitted that due to accounting errors, Clarivate's reported financial results for these periods were materially misstated, in violation of GAAP, and were required to be restated.

80.    The September 2021 prospectus supplements incorporated by reference the financial results for the year ended December 31, 2020, the quarter ended March 31, 2021 and the quarter ended June 30, 2021.  As detailed above ¶¶67-69, the Company has admitted that due to accounting errors, Clarivate's reported financial results for these periods were materially misstated, in violation of GAAP, and were required to be restated.

81.    As registrant, Clarivate is strictly liable for misstatements and omissions in the Offering Materials and statements incorporated therein.  Moreover, none of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.

Had they exercised reasonable care, these Defendants could have known of the material misstatements and omissions alleged herein.

**F.**    **Securities Act Counts**

**COUNT I**
**For Violations of §11 of the Securities Act**
**(Against the Securities Act Defendants)**

82.    Plaintiffs repeat and reallege each and every allegation in ¶¶1-81 above relating to the Securities Act claims as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.  Plaintiffs do not allege, and do not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

83.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is asserted against the Securities Act Defendants.

84.    This Count is asserted by Plaintiffs and members of the Class who purchased or acquired Clarivate securities traceable to the Offering Materials.

85.    The Offering Materials were defective and inaccurate, contained untrue statements of material fact and omitted to state facts necessary to make the statements in the Offering Materials made not misleading, and omitted to state material facts required to be stated therein.

86.    Clarivate is the registrant for the Offering Materials.  As such, Clarivate is strictly liable for the materially inaccurate statements contained in the Offering Materials and the failure of the Offering Materials to be complete and accurate.  By virtue of the Offering Materials containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Clarivate is liable under §11 of the Securities Act to Plaintiffs and the Class.

- 26 -

87.     The Securities Act Defendants caused the issuance of the Offering Materials and/or signed the Offering Materials, either personally or through an Attorney-in-Fact.  The Securities Act Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading.  The Securities Act Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omission of any material facts, and/or were not misleading.  Because the Securities Act Defendants besides Clarivate, who is strictly liable as alleged above in ¶81, did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omission of any materials facts, and/or were not misleading, the Securities Act Defendants are liable under §11 of the Securities Act to Plaintiffs and the Class.

88.     None of the untrue statements or omissions of material fact in the Offering Materials alleged herein were forward-looking statements.  Rather, each such statement concerned existing facts.  Moreover, the Offering Materials did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

89.     At the time they purchased shares in the June 2021 Offerings and September 2021 Offering, neither Plaintiffs nor any member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements and omissions alleged herein.

90.     In connection with the June 2021 Offerings, the September 2021 Offering, and sale of Clarivate common stock and preferred shares, the Securities Act Defendants, directly or indirectly,

- 27 -

used the means and instrumentalities of interstate commerce, the United States mails, and a national securities exchange.

91.     This claim was brought within one year after the discovery of the untrue statements in the Registration Statement and within three years after the Clarivate securities were sold to Class members in connection with the June 2021 Offerings and September 2021 Offering.

92.     By reason of the misconduct alleged herein, the Securities Act Defendants violated §11 of the Securities Act and are liable to Plaintiffs and the members of the Class who acquired Clarivate securities in the June 2021 Offerings and September 2021 Offering, each of whom has been damaged as a result of such violations.

**COUNT II**
**For Violations of §15 of the Securities Act**
**(Against Clarivate, Stead, Hanks, Archbold,**
**and the Director Defendants (the "Section 15 Defendants"))**

93.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, excerpt for any allegations of fraud, recklessness, or intentional misconduct.  Plaintiffs do not allege, and do not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

94.     This Count is brought against the Section 15 Defendants pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiffs and other members of the Class who purchased or otherwise acquired Clarivate securities pursuant to the June 2021 Offerings and September 2021 Offering and who were damaged thereby.

95.     The Offering Materials included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

- 28 -

96.     Plaintiffs and the members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Offering Materials.

97.     Stead, Hanks, Archbold, and the Director Defendants acted as controlling persons of Clarivate within the meaning of §15 of the Securities Act by virtue of their positions as a director and/or senior officer of Clarivate.  By reason of their senior management positions and/or directorships at the Company, as alleged above, Stead, Hanks, Archbold, and the Director Defendants, individually and acting pursuant to a common plan, had the power to influence and exercise the same to cause Clarivate to engage in the conduct complained of herein.

98.     Clarivate had the power to control and influence Stead, Hanks, Archbold, the Director Defendants, and other Company executives through its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations.  By virtue of the foregoing, Clarivate had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Individual Defendants, including the content of their public statements.

99.     The Section 15 Defendants were able to and did control the contents of the Offering Materials, which contained materially false statements and omitted material financial information. By reason of such conduct, the Securities Act Defendants are liable pursuant to §15 of the Securities Act to Plaintiffs and other members of the Class.

100.     The Section 15 Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  The Section 15 Defendants did not make a reasonable

- 29 -

investigation or possess reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.

101.    This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Materials and within three years after the June 2021 Offerings and September 2021 Offering.

## V.    VIOLATIONS OF THE EXCHANGE ACT

102.    The Complaint alleges that throughout the Class Period, Defendants engaged in a fraudulent scheme through various means and methods that operated as a deception on the investing public in violation of the Exchange Act.  The Complaint also alleges that Defendants made fraudulent statements and omissions of material facts in violation of the Exchange Act.

### A.    Background to the Class Period

#### 1.    Clarivate Goes Public Through a SPAC

103.    Clarivate became a public company through a reverse merger with a "special purpose acquisition company," or a "SPAC."  In recent years, companies that have gone public via SPACs – because of the pressure to go public, the lack of due diligence, and the misaligned incentives among SPAC sponsors and investors – have unsurprisingly become synonymous with financial underperformance, financial restatements, and outright fraud.  Unfortunately for investors in this case, Clarivate was no different.

104.    Clarivate is an information services and data analytics company that serves the scientific research, intellectual property, and life sciences industries.  Clarivate sells its products to customers such as universities, government agencies, pharmaceutical corporations, and law firms. The Company operates as a software-as-a-service ("SaaS") business.

- 30 -

105. Clarivate's predecessor companies date back to the 1950s – Derwent World Patent Index was a British patent database founded in 1951, and Institute for Scientific Information was a database of scientific research founded in 1957. Thomson Reuters acquired these companies in 1984 and 1992, respectively.

106. In 2015, Thomson Reuters decided to divest these companies and related divisions providing intellectual property and science services. Thomson Reuters sold the divisions to a pair of private equity firms, Onex and Baring, who formed Clarivate in 2016 out of the former Thomson Reuters divisions. From 2016 to 2019, under Onex and Baring's ownership, Clarivate built a new senior executive management team, completed a number of acquisitions, and worked on fully transitioning the business away from reliance on Thomson Reuters.

107. On September 11, 2018, Churchill, a SPAC founded by Michael Klein, a well-known investment banker and banking executive, completed its IPO on the NYSE. Churchill's IPO raised a total of $690 million. Like all SPACs, Churchill completed its IPO as nothing more than an executive management team and investment vehicle in search of a company to run. Churchill's executive management team – and co-founders – were defendants Stead and von Blucher, who had worked together for many years running a company called IHS (later, IHS Markit). Stead was IHS's and IHS Markit's Chairman and Chief Executive Officer from 2000 through 2017. Von Blucher was initially Senior Vice President of Planning and Corporate Development and later Advisor to the Chairman & CEO (*i.e.*, to Stead). Churchill was formed specifically for the purpose of effecting a merger with a company – like Clarivate – in the information services segment of the broader technology services and software industry.

108. On January 14, 2019, Clarivate and Churchill announced their reverse merger. The announcement was made only one quarter after Churchill's IPO. Thus, Churchill identified

- 31 -

Clarivate as a potential target company, performed due diligence to determine whether Clarivate – a large, complex company with nearly $1 billion in annual revenues – was a suitable target, and negotiated a merger agreement in only four months. Clarivate still had not completed its carve out from Thomson Reuters when the reverse merger with Churchill was announced, meaning that it had never had a single quarter of standalone operations.

109.    According to the Proxy Statement filed April 26, 2019, prior to the consummation of Churchill's IPO, neither Churchill, nor anyone on its behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with Churchill. After its IPO, Churchill's officers and directors commenced an active search for prospective businesses or assets to acquire in its initial business combination. During this search process, Churchill reviewed several business combination opportunities and evaluated five potential transactions. According to the Proxy Statement, Churchill's board of directors did not obtain a third-party valuation of the target company, Clarivate, and investors would be relying solely on the judgment of Churchill's board of directors and advisors.

110.    The reverse merger provided a perfect opportunity for Churchill and for both of Clarivate's private equity owners, Onex and Baring. For Churchill, Clarivate was a willing target in the right industry at the right time – as Churchill's "Success Story" web page notes: "Investors in Churchill Capital Corp's initial public offering who held the stock and warrants through May 13, 2019, the closing date of the initial business combination, saw a total return of approximately 51% and a 1.5x multiple on their invested capital over the 8 month hold period." For Onex and Baring, the reverse merger offered a perfect exit. Churchill bought Clarivate at a valuation of $4.2 billion – Onex and Baring had bought the company from Thomson Reuters for approximately $3.5 billion – and Onex and Baring, having secured in the reverse merger the right to sell their Clarivate shares

- 32 -

pursuant to the Registration Rights Agreement, were enabled to sell hundreds of millions of dollars' worth of shares in a series of offerings over the next several years, reducing their ownership from more than 70% initially to less than 10% by the end of 2021. As Stead plainly put it: "This was so interesting because it was a totally cooperative due diligence if you think about it because we both had so much to gain."

111. On May 14, 2019, Clarivate became a publicly traded company on the NYSE after the completion of the merger with Churchill. During the Class Period, Clarivate's business was divided into two main segments or "Groups," loosely based on the original two businesses dating back to the 1950s: the Intellectual Property Group and the Science Group (later called the Life Science & Healthcare Group). All of Clarivate's various products fall under these Groups. Each Group was led by a President, a high-level executive who was considered part of Clarivate's executive management team and who would often speak directly to investors on conference calls.

### 2. Clarivate's Revenue Types and Revenue Recognition Processes

112. When Defendants took over Clarivate in May 2019, they immediately began to overhaul the Company's product delivery systems. One important change was to migrate all of Clarivate's products to an SaaS model. Chief Technology Officer Randy Harvey stated at the Company's Investor Day on November 14, 2019: "Now let's talk about what the company's really been up to. As mentioned earlier, we've really took [sic] all of these business systems and moved everything to a SaaS-based, Cloud-based solution; so software as a service." SaaS companies like Clarivate primarily operate by selling users subscriptions to connect to and use cloud-based software over the Internet. Subscription revenues made up roughly 80% of Clarivate's total revenue during the Class Period.

113.     Clarivate's focus on subscription revenues was a key part of the Company's value proposition for investors, as the subscription model was supposed to generate highly predictable free cash flow that could be directed towards growth.  Clarivate stated in its SEC filings throughout the Class Period that its "revenues are primarily subscription based, which leads to high revenue predictability."  For example, if Clarivate were to sell a year-long subscription for one of its products to a customer, the customer would typically sign a contract for the full year, but would pay on a monthly basis.  For this customer, Clarivate would deliver the product – *e.g.*, access to the software – each month, and would recognize the revenue for that product ratably per month as the customer paid.  The revenue for the remaining months of the contract term would not be recognized until the software was delivered and the customer's payment received, but Clarivate – and investors – would have a very high degree of confidence that the revenue would be recognized in the future because the sale was already made and the customer had already contractually agreed to buy the service over the coming months.

114.     Clarivate described its subscription model in its 2020 10-K:

> Subscription-based revenues are recurring revenues that are earned under annual, evergreen or multi-year contracts pursuant to which we license the right to use our products to our customers. Revenues from the sale of subscription data and analytics solutions are typically invoiced annually in advance and recognized ratably over the year as revenues are earned.

The Company's 2021 10-K similarly noted:

> Subscription-based revenues are recurring revenues that are earned under annual, multi-year, or evergreen contracts, pursuant to which we license the right to use our products to our customers or provide maintenance services over a contractual term. Revenues from the sale of subscription data, maintenance services, continuing service fees related to our perpetual access license ("PALs"), and analytics solutions are recognized ratably over the contractual term as revenues are earned. Subscription revenues are driven by annual revenue renewal rates, new subscription business, price increases on existing subscription business and subscription upgrades and downgrades from recurring customers.

- 34 -

4889-3735-6399.v1

115.    Clarivate also earned transactional revenues during the Class Period.  Transactional revenues are earned at a given point in time from the discrete sale of, for example, a data set, professional service, or other specific product.  Although transactional revenues tend to have less of a lag between a sale and the eventual delivery of product and recognition of revenue than subscription revenues, revenue is still not recognized instantly after a sales contract is signed with a customer.  For example, a transactional sale might be made for a time in the future when the customer will need the service.  The Company described its transactional revenues in its 2021 10-K:

> Transactional revenues are earned under contracts for specific deliverables that are typically quoted on a product, data set or project basis and often derived from repeat customers, including customers that also generate subscription-based revenues.  Transactional content revenues are usually delivered to the customer instantly or in a short period of time, at which time revenues are recognized. Transactional revenues may involve sales to the same customer on multiple occasions but with different products or services comprising the order.

### 3.    Metrics for Tracking Completed Sales

116.    For both subscription and transactional revenues, Clarivate tracked its completed sales for which revenue was yet to be recognized throughout the Class Period using certain specific metrics.  Two of these metrics were "backlog" and "Annualized Contract Value" ("ACV").  These metrics were also referred to generally as "order book" or "book of business."  These metrics provided the Company and investors with important information about the Company's future revenues because the sales were already completed and all that needed to occur for revenue to be recognized was the delivery of product and/or services rendered.  Thus, these metrics communicated to the market future revenues with near certainty, rendering them highly material to investors.

### a.    Backlog

117.    "Backlog" is a term of art that refers to the amount of product sold but for which delivery has not yet occurred, and thus revenue has not yet been recognized.  For example, a

- 35 -

salesperson might sign a deal with a customer for Clarivate to deliver a healthcare data set on a designated date in the future.  The sale would be complete and could be booked as such, but the revenue would not be recognized until the data set was delivered, and would be quantified as backlog until that occurred.  Backlog is a useful and material metric because it indicates future revenues with near certainty, given that the sale has already been completed.

118.  Clarivate defined backlog in its SEC filings.  For example, the Company's 2021 10-K provides, "Backlog primarily consists of orders and contracts received for which performance has not occurred . . . ."

119.  Clarivate's officers also discussed backlog in conference calls subsequent to the Class Period.  The discussion makes clear that Clarivate used backlog as an important indicator of future revenues.  For example, current CFO Jonathan Collins explained during the conference call for the Company's Q1 2023 financial results on May 9, 2023, "the fact that our first quarter results came in right where we expected was enabled or supported by the fact that we had a nice backlog for some of our transactional business."  An analyst followed up, asking, "But you're not seeing anything kind of leak out of that backlog or order book that you kind of referenced on the fourth quarter?"  Collins replied, "No, not materially.  No.  We're encouraged by how that's held up and the predictability it affords us."  Similarly, Collins explained during the conference call for the Company's Q4 2022 financial results on March 1, 2023:

> [O]ne of the real benefits of last year's sales execution campaign with our real-world evidence in Life Science & Healthcare is building a backlog.  So last year, almost everything that we recognized as revenue we sold in the year.  This year, we come in with a very nice proportion of this year's revenue already sold that has to be delivered in 2023.  So that helps to derisk and reduce the volatility in that segment of the business.

- 36 -

### b.   Annualized Contract Value, or ACV

120.   ACV was another metric Clarivate used to track contracted-for but not yet recognized revenue.  Unlike backlog, ACV is specific to subscription revenue.  Clarivate defined ACV in its SEC filings.  For example, the Company's 2021 10-K provides:

> Annualized Contract Value ("ACV"), at a given point in time, represents the annualized value for the next 12 months of subscription-based client license agreements, assuming that all expiring license agreements during that period are renewed at their current price level.  License agreements may cover more than one product and the standard subscription period for each license agreement typically runs for no less than 12 months.  The renewal period for our subscriptions starts 90 days before the end of the current subscription period, during which customers must provide notice of whether they intend to renew or cancel the license agreement.
>
> An initial subscription period for new customers may be for a term of less than 12 months, in certain circumstances.  Most of our customers, however, opt to enter into a full 12-month initial subscription period, resulting in renewal periods spread throughout the calendar year.  Customers that license more than one subscription-based product may, at any point during the renewal period, provide notice of their intent to renew only certain subscriptions within the license agreement and cancel other subscriptions, which we typically refer to as a downgrade.  In other instances, customers may upgrade their license agreements by adding additional subscription-based products to the original agreement.  Our calculation of ACV includes the impact of downgrades, upgrades, price increases, and cancellations that have occurred as of the reporting period.  For avoidance of doubt, ACV does not include fees associated with transactional and re-occurring revenues.

121.   Like backlog, ACV is a useful and material metric because it indicates future revenues with near certainty, given that the sale has already been completed.  For example, Clarivate's 2021 10-K notes:

> We monitor ACV ***because it represents a leading indicator of the potential subscription revenues that may be generated from our existing customer base over the upcoming 12-month period***.  Measurement of subscription revenues as a key operating metric is particularly relevant because a majority of our revenues are generated through subscription-based and re-occurring revenues, which accounted for 79.1%, 76.9% and 82.6% of our total revenues for the years ended December 31, 2021, 2020 and 2019, respectively.  We calculate and monitor ACV for each of our segments, and use the metric as part of our evaluation of our business and trends.

122.     The Company reported its ACV to investors every quarter and touted the metric as indicative of future success.  As CFO Hanks explained at the Company's first Investor Day, on November 12, 2019:

> In terms of annual contract value.  So as you know, we measure this as a point in time, we measure this every month.  We report it publicly every quarter. And what we're looking at here is the annualized value of our book of business, of our subscription contracts.  And you can see here that we pretty much have sequential quarterly growth in our ACV book.

> \*     \*     \*

> What we're now doing is we're now transitioning from that internal sort of mechanistic approach to really focusing on the outside world, the outside markets, providing great, great product experiences for our clients and driving growth.

> \*     \*     \*

> [Y]ou're starting to see that underlying book of business growing at over 4%, and that's important to us because we gave a public commitment that we would grow this business exiting 2020 in the 4% to 6% growth range.  So we're starting to get up to that level for our subscription book.

123.     Market participants also looked to the Company's reported ACV as an indicator of future revenues.  For example, on July 27, 2020 Barclays initiated coverage on Clarivate with an "Overweight" rating, noting the Company had "a recurring and *highly visible* financial framework. This model benefits from its annual contract value, which has been increasing steadily since the spinout from [Thomson Reuters]."  William Blair issued an analyst report on July 30, 2020 (the first day of the Class Period), noting, "while transaction revenue was a bit weaker than we expected in the second quarter, activity should pick up as the year progresses and *organic ACV growth of 5.0% in the quarter bodes well* for subscription revenue in the second half."  A Jefferies analyst report on March 31, 2021 similarly noted, "*ACV is a forward look on revenue* 12 months out."

### 4.  Defendants Introduce New Internal Infrastructure

124.    Another key change that Defendants implemented when they took over Clarivate in May 2019 was to overhaul the Company's internal infrastructure.  Defendants changed the legacy systems that were in place to new software-based products for all of the Company's business processes.  Chief Technology Officer Randy Harvey stated at the Company's Investor Day on November 12, 2019:

> If I look at the organization that came out of the separation from [Thomson Reuters], as you would expect, being part of a large organization there's a lot of siloed development activities.  Our content systems tended to be separated.  Even in our business information systems; we had multiple ERP [enterprise resource planning] systems, we have multiple CRM [customer relationship management] systems.  We didn't really have the concept of shared platforms; I'll talk about that a little bit later on  and we really didn't have the concept of a kind of a central set of analytics and data scientists capabilities.
>
> *       *       *
>
> We have migrated a number of legacy systems into our ERP systems.  Obviously big focus on our financial systems, ERP systems and then just as importantly a huge focus on our CRM systems.  Once again, migrating a lot of different solutions over there and duplicate systems that we had and really if you think of CRM there's three periods that we're really looking to support.  One is sales automation, the second is the whole order to billing process or order management and then the third is customer care.

125.    The slide below was shown with Harvey's presentation, demonstrating the business processes to which the Company's CRM tools were applied (the "core capabilities").

4889-3735-6399.v1



126.    Throughout the Class Period, Clarivate's salespeople used the Company's CRM systems, including Salesforce, to track sales throughout their life cycle, *i.e.*, from a sale's inception as a lead, prospect, or opportunity through its completion as a signed contract with the customer. Clarivate's CRM systems organized this sales pipeline process into "stages."  Thus, an initial prospect or opportunity is entered at Stage 1, and once certain activities that indicate a sale is likely to occur take place – such as an interested response from the prospect, negotiations over price, etc. – the deal is advanced through the various stages.  Multiple confidential witnesses ("CW") confirmed this account of Clarivate's processes.

127.    According to CW-6 (Director, Order to Cash – one level below executive management), once a sale was ready for invoicing, the data from the CRM was sent to an "Invoice Review Desk" in Penang, Malaysia to confirm there was complete information before processing

- 40 -

invoices.  Thus, at this point, the Company should have all of the information necessary to invoice the customer.  The sale is complete, and (as described above) the product can be delivered and revenue for the sale recognized according to the contracted-for schedule.

128.    Multiple CWs who worked as salespeople for Clarivate during the Class Period confirmed that they tracked all of their own sales and pipeline in a CRM, and that all of the Company's sales and pipeline during the Class Period were tracked in a CRM.  CW-4 (a Commercial Account Manager at Clarivate during the Class Period) explained that sales representatives moved their customers through the various stages in Salesforce, including through to the final stage to "close out" the sale once a contract was signed with the customer.  CW-1, CW-3, CW-4, and CW-5 (sales representatives in various geographies and positions at Clarivate during the Class Period) all confirmed that all of the Company's sales and pipeline were tracked in real time in CRM, including Salesforce, throughout the Class Period.

129.    Furthermore, throughout the Class Period, the Company created reports of various sales metrics, including backlog and ACV, based on the information stored in the CRM systems.  Multiple CWs confirmed that sales and pipeline reports (such as backlog and ACV reports) were based on the data stored in the CRM systems.  CW-5 (Senior Director, Global Accounts – two levels below executive management) explained that part of their role was to consolidate data from the CRM systems in another software program called Tableau, and that reports from this software were presented to their Vice President ("VP") and President who in turn rolled them up to the executive management team.  CW-5 also reported that, "at least once a week, all the information from the Company's CRM reports are loaded into Tableau," and that "everyone had visibility into Tableau's dashboards including the executive management team."  They said this process was called "roll-ups."

130.    Similarly, CW-1, CW-3, and CW-4 (sales representatives in various geographies and positions at Clarivate during the Class Period) explained that sales and pipeline reports were generated from Salesforce and that they frequently met with their supervisors to go over these reports.  CW-4 stated that an "in-the-bag" report of booked sales would have come from Salesforce data.  CW-6 explained that sales were entered by salespeople in Clarivate's CRM systems.  CW-6 reported that information on booked sales was housed in the Company's CRMs and that information for invoices, such as purchase order numbers, was housed in the CRMs.  Because backlog and ACV track booked sales and Clarivate used CRM systems to track all of its sales data, Defendants necessarily relied on the CRM data to track backlog and ACV and produce backlog and ACV reports throughout the Class Period.  CW-6 confirmed that any reports of booked sales or pipeline were based on data entered by salespeople in the Company's CRM systems.

### 5.    Promises of Growth from the "Jerre Stead Playbook"

131.    "Organic" growth refers to growth a company achieves through methods other than mergers and acquisitions, *i.e.*, by increasing revenues generated by legacy business.  Organic growth is a desirable trait in a company from an investor's perspective because growth from mergers and acquisitions is not sustainable over the long term, but a company can theoretically continue to grow organically more or less in perpetuity.  Clarivate ostensibly segregated growth from acquisitions for one full year; thus, an acquired company's revenues would not "anniversary" into Clarivate's general revenues until one full year after the acquisition was completed.

132.    From the initial announcement of the reverse merger that would take Clarivate public, the Company was billed to investors as a growth machine, with particular emphasis placed on organic growth.  Stead announced on the January 15, 2019 conference call about the merger: "I'd like you to think about Clarivate as a fantastic platform for us to grow from," and, "[c]onsistent sales

- 42 -

growth, one of the things I'm most excited about is the work that Jay [Nadler, then-CEO of Clarivate] and his team have done to prepare us for ever increasing revenue sales growth."  The presentations shown to investors at the announcement of the merger and on the roadshow touted Clarivate as a "[n]ewly focused company ramping up its topline growth – expecting 4% to 6% annual organic growth by 2020E exit," with a "Foundation Set for Attractive Growth: Organic Topline and Acquisitions."  At this point, Clarivate still had not yet fully separated from Thomson Reuters to become a full standalone company.

133.    Furthermore, Stead himself was an important selling point.   The investor presentations for the announcement of the reverse merger and the roadshow contain slides touting, "Jerre Stead's Track Record," "Clarivate Delivers on the Jerre Stead Playbook," and "Strong Operating Performance Drove Significant Value Creation at IHS."  The presentations told investors, "Jerre Stead has delivered significant shareholder value through strong operational performance, organic growth and margin expansion, resulting in strong cash flow generation to fuel business growth."  Elsewhere, the presentations again noted the "4.0% - 6.0% Organic Revenue Growth" for "Expected 2020E Exit Rate," and compared this to "IHS Markit: 6.0% - 7.0%."

134.    This organic growth projection – of 4%-6% organic growth exiting 2020 – was meant to attract investors, whom Defendants enticed with promises of running the "Jerre Stead Playbook" for growth.  Defendants had no realistic basis for this level of growth.  However, as intended, Stead's involvement and the promises of running his "Playbook" of revenue growth at Clarivate did attract investors.  For example, in a report dated December 11, 2019, RBC Capital Markets initiated coverage on Clarivate with an "Outperform" rating, commenting: "Hitch a ride to Jerre's Wagon; initiate Outperform," and:

>           We rate Clarivate Analytics Outperform.   We like the potential for the
> company to show improving revenue, EBITDA, and cash flow growth now that it is

unshackled from its prior parent and under new management, which includes well-respected industry veteran Jerre Stead.

Over time, we see solid/improving mid-single-digit (or better) organic revenue growth.

Similarly, in a report dated May 15, 2019, William Blair initiated coverage on Clarivate with an "Outperform" rating, commenting: "Improving Growth Story with Proven Management and Strong Business Model; Initiating Coverage with Outperform Rating," and "Clarivate's growth was modest in the past, but management's goal is 4%-6% organic growth by the end of 2020."

135. On May 20, 2019, the newly-public Clarivate issued a press release informing investors that Stead would "expand his role at the company and become Chief Executive Officer (CEO) effective June 30." Stead's expanded role doubled down on the Company's promise of growth based on the "Jerre Stead Playbook." The press release noted that: "As CEO, Jerre will focus on accelerating growth and profitability for Clarivate." It quoted Stead as saying:

> Clarivate has enormous potential for high levels of sustainable, profitable growth . . . . I am excited to join this talented executive team as we continue to identify and act upon the multitude of new opportunities for growth and profitability . . . . [T]hrough the due diligence process and merger with Clarivate, I have learned a lot about the current state of the business and the even greater opportunities that exist for growth. . . . We remain focused on driving profitable growth.

136. Defendants reiterated the target of 4%-6% organic growth exiting 2020 on *every single conference call in 2020*. At the Company's November 10, 2020 Investor Day, Defendants announced a 5.5%-6.5% organic growth projection for the full year of 2021 and 6%-8% organic growth projection for exiting 2021. Defendants reiterated these projections on nearly every conference call throughout 2021.

- 44 -

### 6.    Defendants Implement Price Increases, Transition to Inside Sales, and Slash Costs to Appear Profitable

137.    Defendants laid out how they planned to achieve the promised revenue growth in a series of conference calls on November 12 and 13, 2019.  Two of the main factors were "price realization" (*i.e.*, raising prices) and shifting customers from field sales teams to inside sales.

138.    Regarding pricing, Stead stated at the November 12 call that "as we teach our sales folks how to do a value selling, this business deserves 4.5% to 5% price realization year after year because it's that good, and it's valued that much."  The next day, he reiterated that he expected price increases to contribute "4%, 4.5% a year – so just use 4" to the Company's organic revenue growth. Hanks added on the November 12 call that in the near term, the Company was "looking for 100 basis points improvement on pricing in 2020."  In other words, Clarivate said it would increase revenue over the next year, and perpetually into the future, by charging its customers more for its products.

139.    Inside sales are simply sales made remotely, *e.g.*, over the phone.  Defendants set up three regional "Global Business Centers," which were, essentially, call centers.  At the November 12, 2019 call, Stead explained, "[s]o, 13,000+ customers and then you'll see, far and away, the majority of the customers, almost 80% of our customers are small.  Those will be shifted to inside sales.  Those will come to inside sales as quick as we can get them."  Hanks elaborated, "We have this very long tail of customers that is uniquely positioned to be supported by an inside sales organization.  We'll have more touch points with customers, we'll have better pricing, and we'll get better retention rates, simply by touching those customers through an inside sales model more frequently."  Thus, most of Clarivate's customers – some 80%, the "long tail" of smaller customers that accounted for only 20% of the Company's revenue – transitioned to being serviced by representatives from these centers, rather than having a dedicated field sales person.  Hanks

- 45 -

concluded at the 2019 Investor Day, "this is all focused on getting us to that commitment of 4% to 6% revenue growth, sustained revenue growth exiting 2020."

140.    The shift to inside sales was well underway by 2020.  At a conference call with investors on September 10, 2020, for example, Hanks provided an update on this process:

> [W]e've had a relatively traditional go-to-market model, firstly, through a field force – through an account management field force organization.  We've now pivoted that through the establishment of inside sales in 3 global business centers in Chandler, Arizona for the Americas, London for EMEA and Penang, Malaysia for Asia Pac. . . .  So that's now in place.

141.    Defendants said these changes would improve customer experiences for those customers transitioned to the inside sales model, keeping them happy and willing to renew their subscriptions at higher prices.  As Hanks explained on the Q3 2020 earnings call:

> The expectation is that, that will increase the velocity of new business because we'll have a broader interface with the market.  And we'll also have more regular touch points with the long tail of those – the long tail in the account base, and that will hypothesis that will [sic] absolutely improve the retention rate as well, simply because we'll have more frequent interactions with our clients.  So that pivot will drive organic subscription growth, and it also complement[s] our renewal rates as well.

142.    In addition to the promised revenue growth, Defendants also promised to increase the Company's profits by decreasing costs.  For example, on the Company's Q4 2019 earnings call on February 27, 2020, Stead stated: "We took a series of steps to improve our margins and cash flow through organizational efficiency initiatives, actions which will deliver $70 million to $75 million of annual run rate cost savings exiting 2020."  Hanks echoed: "As Jerre mentioned, we are focused on improving margins and expect to see them to continue to improve in 2020 as we deliver on our revenue targets and realize the benefits of our cost-saving initiatives."  At the Company's 2020 Investor Day on November 10, 2020, Hanks stated:

> We reviewed our cost base at the very beginning of March in anticipation of potential headwinds in our transactional revenue stream.  That was the area of the business

- 46 -

which we felt could be impacted by the COVID pandemic.  We responded by examining our cost base, in particular, discretionary costs, and we made budget adjustments as a consequence.  That was so important to ensure that we continue to deliver to our investors the commitments we gave in respect of adjusted EBITDA, adjusted EPS and adjusted free cash flow for this year.

143.    Defendants continued to slash costs throughout the Class Period in an effort to show investors they were performing well in key profitability metrics, such as earnings before interest, taxes, depreciation, and amortization ("EBITDA").  In fact, the shift to inside sales was essentially a cost-cutting measure that Defendants spun as a driver of revenue growth.

144.    Defendants also cut costs by simply firing or laying people off, failing to backfill vacated positions, and failing to adequately invest in product quality and new products.  For example, CW-4 specifically noted that Clarivate "failed to backfill vacated positions" in the sales force, and CW-1 and CW-5 stated that Clarivate did not reinvest in its product lines, leading to a loss of sales people.  CW-2 (Senior Director, Data Analytics, whose job involved the construction of analytical platforms for clients and interfacing regularly with clients and partnering with engineers to execute new product features) specifically reported that Clarivate's executive management "wanted to cut costs," that "an emphasis was placed on reducing costs," and that "Clarivate increased profits through cost cutting measures."  CW-2 added that the cost cutting measures included failing to backfill vacant positions in key go-to-market teams and not providing teams with funding needed to maintain and improve product quality, noting, "when presented with an opportunity to invest in the products, Clarivate's executive management chose to cut costs."

### 7.    Defendants' Changes Drive Away Customers and Staff, Hampering Revenue Growth

145.    Unfortunately for investors, the accelerated implementation of drastic changes at Clarivate created chaos and stagnated sales – precipitating a mass exodus of the Company's subject

matter experts and sales force and alienating the Company's existing customers, which hampered Clarivate's ability to grow revenues.

146.    As universally reported by confidential witnesses, Defendants' changes left the Company disorganized and drove away key sales people, subject matter experts, and the analysts needed to provide strategic insights to Clarivate's customers.  Defendants failed to backfill these important positions, leading to significant "brain drain" at the Company.  Defendants also terminated a significant number of employees following acquisitions in an effort to achieve promised cost-cutting measures.  This meant that Clarivate lacked the resources to drive revenues and create the promised level of growth.

147.    All of the confidential witnesses reported that the changes Defendants wrought at Clarivate – including unrealistic sales quotas, unjustifiable price increases that sales representatives had to pass on to customers to receive commission, and an inside sales approach that made relationship-building impossible – drove away employees and hurt the Company's ability to generate revenue growth.  CW-5 (Senior Director, Global Accounts, who had a high-level view of whole-Company sales trends) stated: "The sales quotas were unrealistic throughout the sales units and as a result of these unworkable target quota goals, Clarivate lost a lot of sales personnel."  CW-3 (Key Account Director, Strategic Partnerships, who regularly interacted with clients and sales people) reported that, "a lot of attrition occurred in the sales groups," and that many of the "individuals who left the company were subject matter experts in their respective disciplines and assigned product lines," which naturally had a "negative impact on the company's organic growth" and caused "revenue losses."  CW-4 (Commercial Account Manager) reported, "a lot of my sales colleagues also left like I did; they jumped ship and had a major impact on sales and revenues."  CW-4 further described that with the process of shifting to inside sales in the Chandler, Arizona location, sales

- 48 -

people were directed by executive management to stop going out into the field in order to reduce the submission of expense reports.  Instead, CW-4 explained that "we were now required to smile and dial," and that this approach did not allow sales representatives to build relationships with customers, making sales more difficult.  CW-4 noted that many of the employees hired for inside sales were inexperienced and ineffective "rookies."  CW-4 also stated that the sales team was asked to handle collections, and that hindered the ability to retain clients because seeking collections "kills the relationship."  And CW-4 reported that Clarivate's executive management required sales people to renew contracts at 4%-7% higher prices or else they faced not receiving any commission at all, even if they were able to renew the account.  CW-1 (Commercial Account Manager and an Inside Account Manager) noted that as a result of these conditions, sales people "started leaving in multitudes."  CW-2 (Senior Director, Data Analytics) confirmed that they and many other data analytics professionals left the Company and that this contributed to a "brain drain."

148.    Additionally, Defendants' cost-cutting included inadequately investing in new products that could drive organic revenue growth.  The failure to invest in Clarivate's products resulted in losing customers (and revenues from those customers) and made things more difficult for the sales staff, contributing to their exodus.  This point was also echoed by every confidential witness.  CW-1 reported that Clarivate's executive management "did not provide the sales teams with the desired products, assigned unworkable target quota goals, didn't reinvest in their product lines, and neglected to create new products, which led to sales people leaving."  CW-5 echoed this sentiment: Clarivate "didn't reinvest in [its] product lines."  CW-3 reported that, "a lot of the employees who originally worked in the product sections at DRG left shortly after the merger with Clarivate," and "Clarivate did not reinvest in their product lines or create new products," which negatively impacted sales and led to a reduction of sales personnel.  CW-4 reported that Clarivate

- 49 -

did not reinvest in their product lines and did not sufficiently improve products, stating that Clarivate "had very little upgrades in its product and technology platforms." CW-2, whose job at Clarivate included working with clients and engineers to execute new product features and monitoring the quality of the Company's current product offerings, reported that "there was a deterioration of Clarivate's product quality" and Clarivate's executive management "neglected to create new products, which led to loss of clients."

149.    At the same time Defendants degraded customer service by gutting the sales and go-to-market teams and failing to invest in new products or product improvements, they also immediately began arbitrarily increasing prices for Clarivate's customers to prop up the Company's lagging growth. These price increases were not sustainable – they angered Clarivate's customers, many of whom left the Company, further hindering the Company's efforts to drive organic growth. CW-4 reported: "Clarivate had a huge problem with pricing," and "every client had different prices for the same or similar services and products. Believe me, clients talk amongst themselves." CW-1 noted: "Clarivate had a huge problem with price rates and billing matters," which caused the Company to "lose major clients and experience a decrease in new subscribers." CW-5 reported that the price increases "that executive management projected to the Street" were "not going to come about," and that "Clarivate's rate increases as compared to similar companies and competitors in the industry were unrealistic and much higher than what the market supported."

150.    CW-6 (Director, Order to Cash, who regularly interacted with Hanks and reported directly to Kathy Sullivan, Chief Tax and Revenue Operations Officer, who reported to Stead) recalled meetings with executive management at which they heard the message: "we need the revenue so bring in the cash." CW-6 reported there was no organic growth at Clarivate, and that Clarivate was trying to implement organic growth, but was unsuccessful. CW-6 noted that although

- 50 -

they increased collections by approximately $240 million in 2021 over 2020, sales had declined. CW-6 further stated they tracked the order book as it came in and there was a 7% sales decrease in 2021 from the prior year.  CW-6 further recalled: "I never saw a significant boost in sales and Clarivate continued to be a financial nightmare."  CW-6 reported that subscription clients were leaving as they decided not to renew.  CW-6 maintained that they repeatedly informed Sullivan and other members of Clarivate's executive management that sales were declining.

>       **B.      Defendants' Scheme and Fraudulent Course of Business**

151.    Throughout the Class Period, Defendants engaged in a fraudulent scheme to convince the market that Clarivate was delivering on the organic revenue growth story sold to investors, despite their knowledge that the promised growth was not materializing and that the Company would not meet the projections it had issued to attract investors.  Defendants conveyed that the Company would meet the projections by creating the misleading impression that the Company's sales were on track to meet the projections and that the sales reflected in backlog and ACV would be converted into revenue in time to meet the projections.  Defendants employed various deceptive artifices – and misleading statements and omissions – to string along investors in the fledgling Company while numerous Defendants bailed out of their holdings of Clarivate stock at artificially inflated prices, collecting millions of dollars in ill-gotten gains along the way.

>       **1.      Inflating ACV and Backlog to Create the Appearance That**
>               **Future Revenues Were Nearly Certain When They Were Not**

152.    Defendants' primary artifice involved inflating reported ACV and backlog metrics throughout the Class Period to create the appearance that the Company was on track to meet its revenue targets.  Defendants knowingly fostered and condoned a practice of encouraging and pressuring salespeople to push potential sales – including renewing subscription customers – through the CRM stages and close them out before obtaining sufficient information or even sign-off from the

customer to ensure invoices would be paid.  Per the Company's processes, these incomplete sales would then be sent to the Invoice Review Desk in Malaysia, which would flag the invoices for failing to meet quality control parameters due to missing information, such as a purchase order from the customer.  The Invoice Review Desk would circulate a list of these incomplete invoices to the entire sales team every two weeks.  The salespeople responsible for the incomplete invoices were supposed to fix the issues, but would not be able to do so because they did not yet have the necessary information from the customer.

153.    Crucially, instead of holding back the invoices and downgrading the sales to an earlier, incomplete stage in the CRM, Defendants would push the invoices out anyway – despite knowing that, because the invoices were incomplete, they should not have been finalized and reported in backlog and/or ACV.  Nevertheless, these incomplete sales would then appear as booked sales in the CRM, and thus would appear in the Company's ACV and backlog metrics.  This practice rendered the ACV and backlog metrics misleading because investors viewed the metrics as near-certain indicators of future revenues, but the metrics were inflated by incomplete "sales" that the Company was far from certain of being able to convert into revenue.  Even for sales that were not fully closed out, when salespeople moved potential deals to later CRM stages without a realistic basis for doing so, this inflated the Company's pipeline, which Defendants also tracked and used to convey confidence in future revenues to investors.

154.    Multiple CWs described this practice from various vantage points within the Company.  Most notably, CW-6 had exceptional visibility into this practice because they ran the Company's Order to Cash department.  The Order to Cash (or "lead to cash") department was generally responsible for all of the steps involved from processing an order through when payment is received and applied to accounts receivable.  CW-6's job thus put them in a position to know when

- 52 -

the Company's invoices were going unpaid, and why.  CW-6 reported to Kathy Sullivan, Chief Tax and Revenue Operations Officer, who reported directly to Stead.  CW-6 explained that Order to Cash departments usually fall under accounting, but that Stead had carved out the department at Clarivate and placed it under Sullivan's authority.   Indeed, Stead referenced this arrangement at the Company's November 12, 2019 Investor Day, stating:

> We are optimizing the infrastructure systems.  Kathy Sullivan, who stood up over there has one of the most exciting jobs I've ever assigned to anybody, which is lead through cash on a horizontal every step of that process. . . .  [I]t's an incredibly important job for us.  And that's the part that will help us get to where we want to get with the back room that's been put together.

155.   CW-6 reported that they were hired in October 2020 and they were told they were "coming into a mess" in which "sales were booked but not collected."  CW-6 confirmed that the Company was experiencing difficulty turning booked sales into revenue in 2020, before they were hired.  CW-6 stated that when they joined the Company, the Company's systems were in such disarray that FP&A (financial planning and analysis) executives were unable to produce an accounts receivable report, and asked CW-6 for their collections report to serve this function.  CW-6 began circulating the accounts receivable report they had created for collections weekly to senior executives, including Hanks.  CW-6 said that Hanks dubbed this report the "tapestry report" because it contained multiple rows and columns of color-coded data on the accounts receivable for every business in the Company.

156.   CW-6 explained that they investigated why invoices were going unpaid and discovered that much of the lack of payment was due to invoices that were incomplete – *i.e.*, missing key information that was required before customers would to pay the invoices.  CW-6 stated that they explained to Hanks in a series of "face-to-face conversations" in early 2021 that the lack of payment was because of incorrect invoicing and lack of quality control over invoices.  CW-6 stated

that he repeatedly told Sullivan and others in executive management that the "invoices were not fit for payment."

157.    CW-6 said the invoices were not fit for payment because sales representatives were not getting committed sales from customers and were uploading "disorganized notes" and "garbage" into the Company's CRM systems.  Thus, complete invoices could not be generated based on the data from the CRMs.  CW-6 explained that per Clarivate's processes, these incomplete invoices would be flagged by the "Invoice Review Desk" in Malaysia.  CW-6 stated that every two weeks, the Invoice Review Desk generated a report sent to the entire sales organization listing the invoices that did not pass and the issues that needed to be addressed.  CW-6 further explained that ***hundreds*** of invoices did not pass this quality assurance step (and thus appeared on this report) because there was insufficient documentation or the sales representatives had not noted the required information.  CW-6 said that Sullivan – who told CW-6 she was acting on Hanks' orders – said to push all of these invoices through anyway.  CW-6 detailed that Sullivan told them to push through the invoices since Hanks "wants to make our forecast, so have to make numbers, and need revenue."

158.    Additionally, CW-6 reported that the Company tracked invoices that were "pushed through" in this manner on a separate report, which they characterized as an "incomplete invoices pushed through" report.  CW-6 detailed that this report was created and circulated by the manager of the Invoice Review Desk, Rupinder Kaur.  Thus, the Company actually quantified the amount of incomplete invoices that were marked as completed sales, and, therefore, the amount of inflation in the backlog and ACV metrics.  CW-6 said Sullivan and the collections team received the "incomplete invoices pushed through" report because executive management knew that these invoices were less likely to be paid, and so flagged them for collections to do extra follow up with the customer and try to turn the invoices into revenue – work that should have been done by

- 54 -

salespeople before the sales were marked closed.  CW-6 added that this report was circulated every month and that they tracked how many of these incomplete invoices were ultimately paid with a scoreboard.  CW-6 stated that only about 30% of these incomplete invoices were ever paid.

159.    Reports from multiple other CWs from throughout the Class Period corroborate CW-6's account of these misleading practices.  Numerous former salespeople reported that they experienced top-down pressure to move potential sales through the CRM stages before obtaining the necessary information or sign-off from the customers:

(a)    CW-1, a Commercial Account Manager and an Inside Account Manager, reported that executive management encouraged salespeople to record whitespace (whitespace refers to addressable market) in the CRM and that executive management "put things in commit status [*i.e.*, marked them as sales that customers had committed to] to show revenues" before Clarivate had a signed contract with the customer, resulting in an inaccurate picture of sales and revenues;

(b)    CW-3, a Key Account Director, Strategic Partnerships, stated that executive management directed sales people to record potential opportunities to help them meet their quotas and to help with Clarivate's forecasts – CW-3 commented, "***garbage in, garbage out***."  CW-3 advised that as a result of the unattainable target quota goals, sales personnel were required to "back into the number (sales quotas) in order to meet the sales goals assigned";

(c)    CW-4, a Commercial Account Manager, stated that there was top-down pressure to move sales through the stages quicker, from "whitespace" to "closed."  CW-4 described that "executive management [*i.e.*, C-level executives and Group Presidents] ***counted their chickens before the eggs were hatched*** and recorded whitespace business opportunities to help meet quotas, forecasts, and projections which misled the investors."  CW-4 also stated that they were encouraged to invoice with incomplete information or without a purchase order.  CW-4 explained that sales

- 55 -

representatives entered the data into Salesforce, and whether a client fit the next stage was subjective, so sales representatives had the freedom to move clients through the stages even if reality did not match.  CW-4 further explained that they received pressure from supervisors to show a "healthy" amount of business to close each month.  CW-4 noted that there was a culture of "not taking no for an answer" that was also "passive aggressive," and that sales representatives faced being put on a "performance improvement plan" if deals were not shown moving through the Salesforce stages.  CW-4 further noted that contract renewal occurred automatically and that they were told not to warn customers about the contract expiration and automatic renewal.  CW-4 explained that when they warned clients about the automatic renewal, CW-4 was placed on a "performance improvement plan."  CW-4 recalled that as they sought payment from clients on existing licenses, they were told to sign the clients up for further licenses – only to learn from the clients that they had not known they had licenses for which CW-4 was seeking payment.  CW-4 further recalled conversations with clients who complained that they were billed for products they had never bought; and

(d)     CW-5, Senior Director, Global Accounts, explained that executive management directed sales people to record potential whitespace opportunities, and that sales people used this feature of the Company's CRM to help them meet unrealistic sales quotas.

160.    As described above, Defendants – by assigning unrealistic sales quotas and exerting top-down pressure on salespeople to report sales by any means necessary, even when told that sales were not materializing – inflated the Company's sales figures.  CW-6 demonstrates that Defendants were aware of and condoned the salespeople's practice of marking sales as closed without a realistic basis for doing so:  Defendants capitalized on the practice by pushing the incomplete invoices

through despite knowing they were incomplete.  This inflated ACV and backlog metrics, which Defendants used to mislead investors as described below in §V.C.

161.    Because they closely tracked the Company's pipeline, sales, and revenues, Defendants knew in real time that Clarivate was not on track to meet its revenue growth targets and that booked sales would not reliably be converted to revenue in the coming months – yet they continued to assure investors that, based on the knowingly inflated ACV and backlog metric, organic revenue growth was just around the corner and that the Company would meet the targets.

**2.    Defendants Use ACV to Mislead Investors About Likelihood of Hitting 2020 Organic Growth Targets and String Investors Along By Setting Aggressive Growth Targets for 2021**

162.    The first three quarters of 2020 went by with below-expectations growth, but Defendants continued to assure investors that the Company would meet its organic growth target for exiting 2020.  Defendants gave investors misplaced confidence that the Company would meet this target by reporting in-range ACV growth for the second and third quarters of 2020, indicating that organic revenue growth should concomitantly begin to pick up as the sales represented by the ACV figure were converted to revenue over the coming months.

163.    For example, the Company reported its results for Q2 2020 on July 30, 2020 – the first day of the Class Period.  The Company reported organic subscription revenue growth for that quarter of 3.6% and overall organic net revenue growth of only 1.2% – well below the goal of 4%-6%.  But the Company also reported ACV growth of 5%, "driven by organic growth and annual price increases."  William Blair issued an analyst report on the same day noting, "[w]hile transaction revenue was a bit weaker than we expected in the second quarter, activity should pick up as the year progresses and ***organic ACV growth of 5.0% in the quarter bodes well for subscription revenue in the second half***."  In a report dated August 2, 2020, RBC Capital Markets maintained its

- 57 -

"Outperform" rating and commented: "Clarivate, on July 30, reported 2Q20 results and reaffirmed its 2020 outlook.  We view the result/outlook as solid . . . .  Annual contract value was up a strong 5% ongoing CC [constant currency], an acceleration from 1Q."  Similarly, at its October 29, 2020 Q3 2020 results conference call, Clarivate reported "on an ongoing basis, ACV increased by 4% and was primarily driven by organic growth and annual price increases."

164.    Defendants continued to direct investors' attention to the future, leading the market on by announcing even more aggressive new targets at the Company's November 10, 2020 Investor Day of 6-8% organic growth exiting 2021 and 5.5%-6.5% organic growth for the full year of 2021. Stead also reassured investors about the Company meeting its organic growth target for exiting 2020, stating, "I expect us to end in the 4% to 6%."  Stead made this statement nearly halfway through the fourth quarter, with only a month and a half remaining in the year.

165.    Analysts reacted positively to Defendants' statements of confidence regarding the projections at the 2020 Investor Day conference call.  For example:

(a)    In a report dated November 11, 2020, William Blair maintained its "Outperform" rating and commented: "The medium- and long-term outlooks for growth were largely in line with our expectations . . . ."  William Blair also noted: "Stead has strong conviction in reaching the high end of the 6%-8% organic growth range exiting 2021"; and

(b)    In a report dated November 10, 2020, RBC Capital Markets maintained its "Outperform" rating and commented: "Messaging from the 2020 Investor Day was consistent with our expectations.  Clarivate is on track with its transformation to deliver accelerating organic rev growth . . . ."  The report also noted: "Clarivate anticipates 6-8% organic rev growth rate exiting 2021, inc 4%+ pricing."

166.    The Company missed its organic revenue growth targets for exiting 2020.  On February 25, 2021, the Company filed a Form 8-K with the SEC and issued a press release, both reporting that organic revenue grew only 1% in Q4 2020 and 1.2% for the full year – well below the 4%-6% exit rate that Defendants were still promising as late as November 2020.  Defendants blamed the miss on an unexplained "deferred revenue adjustment" to buy time, putting even more pressure on the Company to deliver on its organic growth promises in 2021.

167.    The Form 8-K indicated that the Company's:

[O]rganic revenues increased 2.6% on a reported basis, and up 1.0% on a constant currency basis, due to higher transactional and subscription revenues.  The increase in organic revenue was partially offset by a one-time $3.5 million deferred revenue adjustment not related to the purchase accounting adjustment, which decreased fourth quarter revenue by 1.4%, for which there was no comparable amount in the prior year period.

The press release indicated that the Company's *organic subscription revenues grew only 0.3%*, while organic transactional revenues grew 4.1%, and overall organic net revenues grew 1.2%.

168.    The miss caused Clarivate's stock price to decline significantly on February 26, 2021.  Morgan Stanley noted in a February 26, 2021 analyst report, "4Q20 organic growth underwhelmed, *particularly on subscriptions*, raising investors concerns about CLVT reaching its 6-8% target by the end of 2021."

169.    The subscription revenue miss was notable because the Company's revenues are heavily skewed toward subscription revenues, and those revenues were supposed to give Clarivate a "highly visible financial framework."  In other words, investors pay a premium for companies with primarily subscription-based revenues exactly because these revenues are supposed to be highly predictable.  Indeed, Clarivate's own SEC filings throughout the Class Period stated: "Our revenues are primarily subscription based, which leads to high revenue predictability."

- 59 -

170.    Additionally, the Company's reports of on-target ACV growth for Q2 and Q3 of 2020 had suggested that the Company would experience in-range organic subscription revenue growth in Q4 2020, given that the ACV metric is a measure of subscription sales that should reliably be converted to revenue over the next 12 months.  Clarivate's SEC filings throughout the Class Period describe ACV as a "leading indicator of the potential subscription revenues that may be generated from our existing subscription base over the upcoming 12-month period."

171.    As CW-6 – who was hired in October 2020 to "clean up a mess" caused by "sales being booked but not collected" – makes clear, this gap between the Company's contracted-for subscription sales represented by the previous quarters' ACV growth and the Company's poor organic subscription revenue growth in Q4 2020 was caused by a breakdown between Clarivate's sales and revenue recognition, *i.e.*, ACV ceased to be a good predictor of future subscription revenues.  As explained above, this problem was caused by the Company's undisclosed practice of inflating sales figures with incomplete invoices that were unlikely to be paid.

172.    Analysts noted the stock price decline, but reacted positively to Defendants' statements made at the Q4 2020 earnings call, particularly Defendants' reiteration of their aggressive organic growth targets for 2021.  For example:

(a)    In a report dated February 26, 2021, William Blair maintained its "Outperform" rating and commented: "Stock Sell-off Signals Investor Frustration, but We Believe Patience Will Be Rewarded as We Progress Into the Second Half," noting: "[W]e believe the sharply negative reaction in the stock price (-16%) was driven by investors' frustration with a lack of tangible progress on the organic growth front," and concluding:

> While we understand investors' frustration with middling organic growth throughout 2020, and the jump from 2.4% growth (adjusted for the one-time deferred revenue write-down) in fourth quarter 2020 to the 6%-8% target range exiting 2021 appears ambitious at first glance, ***we remain believers in the wide array of growth***

*initiatives in place heading into 2021* and recommend adding to positions in Clarivate on Thursday's weakness.

William Blair's analyst was thus persuaded by Defendants' misrepresentations regarding Clarivate's ability to deliver on Defendants' organic growth projections for 2021, even though the Company had just missed its organic growth target for exiting 2020;

> (b)    In a report dated February 25, 2021, Barclays maintained its "Overweight" rating and commented:

> [T]he pullback in the shares (-12.5% vs. SPX +0.6%) is primarily due to the organic growth miss of 1% vs. our 4% expectation; most of it came from Science, where even after some 1x adjustments, +2.4% was short of our +4-5% expectation. Several moving pieces and perhaps lack of specific guidance can be blamed here, *but importantly, FY21's 6-8% exit rate (likely 5-6% reported) was re-confirmed* . . . .;

and

> (c)    In a report dated March 8, 2021, Morgan Stanley upgraded Clarivate to an "Overweight" rating and commented: "We upgrade CLVT to OW post a 24% pullback because *we see levers to accelerating organic revenue growth*."  The report added:

> Shares dropped as organic growth slowed to 2.4% – missing management's 4Q20 organic growth target of 4%.  This has brought increased skepticism of whether CLVT will be able to achieve its 6-8% organic growth target exiting 2021, leading to a 24% decline in the stock price following its earnings announcement.  *We believe this is an over-reaction, and expect CLVT to be able to achieve the low end of its target this year.*

173.    As one analyst put it at the Company's Q4 2020 earnings call on February 25, 2021, "this year [i.e., 2021] is really where the rubber is supposed to meet the road in terms of getting the organic growth to accelerate."

### 3.    Cannibalizing DRG's Q4 2021 Transactional Sales to Show Revenue Growth Earlier in the Year

174.    Defendants changed tactics slightly in 2021 and deployed additional artifices to misleadingly convince investors that the Company was on track to, and would, meet its revenue

growth projections at the end of the year.   One such tactic, described by multiple CWs and corroborated by Defendants' own self-contradictory statements, took place primarily within a company Clarivate had acquired in February 2020, DRG.   DRG anniversaried in February 2021, becoming part of Clarivate's legacy assets and organic growth calculations.   When Clarivate first purchased DRG, roughly 70% of the company's revenues were subscription or reoccurring, and 30% were transactional.   Moreover, 36% of DRG's total revenue came in Q4.

175.     Defendants indicated from the start that they intended to restructure DRG's business so that the transactional revenues would become more predictable and cost-efficient subscription revenues.   At the conference call for the announcement of the DRG acquisition on January 17, 2020, for example, Hanks noted: "We have a plan to, over time, migrate some of the reoccurring and onetime revenues onto a platform capability, which will be subscription-based."   An analyst followed up on this during the Company's Q2 2020 earnings call on July 30, 2020, asking: "[C]an you comment on the progress of continuing to transition the revenue to more of a subscription base than the kind of transactional base that they have had beforehand that was ongoing before you guys bought them?"   Ahmed answered:

> [S]o as part of that shift, we started really taking a number of the assets, particularly that customers use, our analytical tools and software products in particular.   And we're shifting those over to 100% cloud subscription.   And we'll continue with that effort as we build out the products and we productize those various use cases.

176.     By Q4 2021, Defendants were claiming to have already accomplished this transition. At the Company's November 9, 2021 Investor Day call, for example, Ahmed noted:

> [W]e have rolled out a number of analytical products that our customers can use on a Saas [software as a service] and subscription basis.   This will allow those customers that have typically procured the data and procured those assets in the manner that we've just described.   It will allow them to smooth[] that out through the year through a subscription process.   So as more of those tools are adopted by our customers, we'll see that even out through the course of the year.

Ahmed repeated this at the Company's December 7, 2021 conference call, noting:

> [W]hat we've done here since we've acquired them is we've invested in particularly the data assets.  So ***rather than onetime at the end of the year***, we move them more into a Data-as-a-service offering.  We've laid on analytics.
>
> So it's not a one-time transactional deal in Q4 to meet that budgeting cycle, but we try and provide that intelligence through the form of our software, which – as a service and to the Data-as-a-service.  So ***that means that we can bring that forward.  It becomes equalized through the year*** so that we are part of the strategy planning in pharma.

177.   Multiple CWs reported that these efforts cannibalized DRG's Q4 transactional revenues.  Indeed, CW-2 (a Senior Director, Data Analytics who came to Clarivate from DRG, where they had worked since 2017) reported that because of Clarivate's attempts to transition this business to a subscription model earlier in 2021, some of this business was lost.  CW-2 stated "***we knew that this transactional revenue would not come through in the fourth quarter***."  Similarly, CW-3 (a Key Account Director, Strategic Partnerships who came to Clarivate from DRG, where they had worked since 2016) stated that there were signs that the merger with DRG was problematic from the inception of the merger due to concerns from the employees that Clarivate used a subscription-based model and "tried to shoe horn our company [DRG] into their model which did not work."  CW-3 explained that certain deals that were typically closed at year-end were no longer available to meet sales targets because they had been converted to subscription services earlier in the year.

178.   None of this was disclosed.  Quite the opposite – in response to direct questions from analysts, Defendants specifically assured the market that the shift to subscription-based sales would not affect the late-in-the-year transaction sales.  Although Defendants knew that DRG's typical Q4 transactional revenues were cannibalized – because they transitioned the revenues on purpose, and indeed touted this to the market – and thus would no longer be available in Q4, they misleadingly

- 63 -

continued to assure investors that the Q4 transactional revenues would come through and produce the revenue needed to meet Defendants' aggressive organic growth targets for 2021.

### 4. Defendants Use Backlog and Cannibalized Q4 Revenues to Mislead Investors About the Likelihood of Hitting 2021 Organic Growth Targets While They Sell Stock

179.    In the first half of 2021, Defendants did manage to post in-range organic growth numbers; organic growth was 7% overall in Q1 and 5% overall in Q2, for an average of 6% in the first half of 2021.  Defendants continued to assure investors that the second half of the year, and Q4 in particular, would be even better.  Additionally, as the Company's stock was inflated by Defendants' statements that growth would continue and that the Company would meet its 2021 growth targets, many Defendants sold large quantities of stock at suspicious times.  Notably, Clarivate insiders were not required to disclose their sales of Clarivate stock throughout 2020 because the Company was listed as a Foreign Private Issuer until January 1, 2021, and so Defendants may well have capitalized on the stock price inflation caused by their fraudulent scheme and misleading statements and omissions in 2020 as well.  But in 2021 alone:

(a)    Science Group President Ahmed sold *over 90%* of his holdings in March of 2021, for proceeds of well over $4 million;

(b)    CFO Hanks sold *65%* of his holdings on a single day in June 2021, for proceeds of $3.2 million;

(c)    IP Group President Roy sold *78%* of his holdings in the first half of 2021, for proceeds of well over $4 million – shortly before his sudden and suspicious resignation from the Company in July 2021; and

(d)      Director von Blucher, one of the leaders of the Churchill SPAC and an advisor to Stead, sold 14% of her holdings as part of the June 2021 Ordinary Shares Offering while the stock price was high in June 2021 for proceeds of *$13 million*.

180.      Analysts were surprised by the Company's strong organic growth in the first half of 2021, especially given that Clarivate's business tended to be seasonally weighted to the second half of the year.  Thus, the first question on the Q1 2021 earnings call asked whether the solid growth had come from a change in the timing of when Clarivate recognized revenue, and whether that shift should be accounted for in the analysts' models of Clarivate's growth for the rest of the year:

> [O]rganic constant currency revenue growth accelerated to 7% in the quarter from 2.4% in 4Q.  Can you elaborate on what drove the significant acceleration in growth?  And if there were any unusual onetime benefits to organic growth?

Hanks responded:

> [N]othing onetime.  We executed very well in the first quarter, particularly with subscription renewals, 93% renewal rate, but we renewed more of the book as compared to, as I said in my script, last year.  And transactional growth, 10% in Q1 as compared to 6% in Q4 last year.  So we're seeing sequential quarterly improvements in transactional volumes.  And I think that bodes well for the rest of the year for Q2 and Q3 and Q4, rest of year.

An incredulous analyst doubled down:

> Let me ask the first question in a different way.  The 10% growth in science was clearly above what we thought.  And I think what you had guided us to.  So maybe one-time is not the right way to ask the question, but perhaps it's timing.  And if you could just help us what the cadence for the growth in the next quarter should be otherwise, like I don't think we should be modeling 10% for the rest of the year.

Stead answered: "Just as a reminder, we said we'd do 6% to 6.5% all in organic for all of 2021.  We're a bit ahead of that, that's why we raised the guidance from the bottom a bit on revenue . . . ."  Hanks added: "I think what's really important is the revenue profile, 48% H1 [first half], 52% H2 [second half].  So I think that's what – in terms of the models, that's what you should be using. . . .  And we're confident in execution rest of the year."

- 65 -

181.    Similarly, on July 29, 2021, at the Company's Q2 2021 earnings call, an analyst said:

> I noticed there's a change in kind of the 1 half, 2 half fallout of the EBITDA. It was supposed to be at 42-58.  It is now moving to 44-56.  Is there something changing operationally in the business that's making it that you're having more of the EBITDA in the first half of the year than expected?  Or is there just some kind of timing issues that are happening?  I'm trying to understand, because like the strong EBITDA in the quarter, it implies a little bit on the forward basis that maybe things would go down a little bit.  I'm trying to understand if there's a pull forward or a shift or just what the dynamics are there.

Stead denied the existence of such a timing shift, answering: "What you should have heard from my comments was Q3 will be pretty close to where we are – with where we were with Q2.  ***And Q4 will be very strong as we exit***."  He continued:

> [T]hanks for asking because that shift in place is one that will really reflect in Q4. You're going to see what this business model can do when we get the kind of top line growth that we expect to get.  And you'll see very significant improvement with the margins as we exit 2021.

182.    Thus, despite knowing that DRG's Q4 transactional revenues were being cannibalized, Defendants misleadingly continued to reiterate their 2021 organic growth projections and visibility into the future revenues necessary to meet these targets.  Defendants' statements conveying confidence that DRG's traditional Q4 transactional revenue spike would help the Company meet Defendant's projections were misleading because Defendants knew that the cannibalization of DRG's Q4 transactional revenue meant these revenues would not fuel organic growth in Q4 2021.

183.    Defendants also began referencing Clarivate's backlog and an "in-the-bag" report that Defendants used to track backlog on calls with investors.  For example, on a March 4, 2021 call, Hanks stated: "I would add this, that in terms of DRG, Jerre and I get the – what we call the in-the-bag report each Sunday night, ***which shows what have we sold and contracted for delivery for rev rec purposes*** in 2021."  Like ACV, backlog is a metric that, if properly calculated, provides near

- 66 -

certainty as to future revenues because it purportedly reflects completed sales for which the Company need only deliver product to recognize revenue.  Unlike ACV, backlog includes completed transactional sales as well as subscription sales.  Thus, Defendants' statements regarding backlog and the "in-the-bag" report conveyed to investors that Defendants had near-certain, current knowledge of future revenues.  For example, in a report dated March 5, 2021, Morgan Stanley maintained its "Equal-weight" rating and commented: "Clarivate's 'in the bag' report, which management reviews every weekend, reflects new sales that it has completed or near completion, is trending above 2020, *leaving CLVT confident in its 2021 targets*."

184.    In the third quarter of 2021, however, transactional revenues started to dry up. Clarivate posted transactional revenue organic growth of 10% and 16% in the first two quarters of 2021, respectively, for a first half average of 13%.  But transactional revenue organic growth in the third quarter of that year was only 3%, bringing the year-to-date average down to 9%.  Additionally, IP Group President Jeff Roy's resignation was abruptly announced on July 6, 2021.

185.    In the face of these issues, Defendants reassured the market on nearly every conference call throughout the second half of 2021 that growth – transactional revenue organic growth in particular – would accelerate again in the fourth quarter because of the Company's traditional and oft-touted seasonality.  In reality, Defendants had reduced this seasonality feature by transitioning transactional revenues to subscriptions earlier in the year.  Defendants also gave investors confidence in their promises of Q4 growth and 2021 projections by repeatedly referencing the Company's backlog and pipeline to convey that they had good visibility into revenues for the end of the year.

186.    For example, at the Q2 2021 earnings call, on July 29, 2021, Stead announced:

Organic revenue in the first half was up almost 6%.  We currently expect to deliver 6.5% to 7% plus in the second half of this year, with a big pickup in fourth quarter compared to the second and third quarters.  What's driving the increase?

As an important reminder, ***60% of DRG's business comes in the second half of the year, with 60% of this in the fourth quarter***. . . .  Additionally, transactional revenue is seasonally strongest in the fourth quarter.  ***These items together will drive our organic growth rate into the upper end of our 6% to 8% target rate exiting 2021***.

187.    On the same July 29 call, Hanks highlighted Defendants' visibility into the sales pipeline for the second half of 2021 – which, like the backlog, was inflated by Clarivate's practice of moving potential sales through the CRM stages without a realistic basis for doing so – noting: "[M]ost importantly, the pipeline for the life sciences business [mostly made up of DRG] is looking particularly strong for the second half of the year."

188.    During the Q3 2021 earnings call, on October 28, 2021, Stead again focused on the typical fourth quarter acceleration, omitting to state that those revenues had been cannibalized:

You've heard us highlight many times this year that ***we expect a strong fourth quarter*** with organic revenue growth between 6% and 8%.  We are realizing the many benefits from the transformative acquisitions of DRG and CPA Global and the many operational improvement initiatives that have been put in place, including our inside sales structure and field sales realignment.  ***With a strong fourth quarter***, organic revenue growth for the full year of 2021 is currently expected to be in the 6% to 6.5% range.

He added: "I feel really good about where we're at, the things we have going on and look forward to reporting in February next year great results that we're going to get in Q4."

189.    On the same October 28 call, Defendants repeatedly referred to the Company's backlog when stressing their confidence in meeting the 2021 projections.  Because Defendants knew that the backlog was inflated with incomplete sales that could not reliably be converted to revenue, these statements were misleading.  For example, Hanks said: "I'd add that ***we've got a good order book going into the fourth quarter***."  Stead noted: "You can believe that ***we look at it every week –***

- 68 -

*actually, every day* to make sure we're on track with new sales, et cetera," and added: "I think most important is *we get a view every week of what we got to go to hit the number that will deliver the kind of results we expect in Q4*."  Ahmed also referred to the Company's backlog and pipeline to give investors confidence that the Company would meet its targets in Q4, noting:

> [T]ypically, DRG, which, of course, now we refer to as Healthcare and Data Solutions, HDS, typically, *Q4 is very strong* in data analytics and also in consulting. *We have a consulting backlog that we typically deliver in Q4*.  And there's also typically a number of deals that are coming through that we convert in the quarter as well, and this is typical of the Healthcare segment.
>
> *              *              *
>
> *We have direct insight into the backlog.  And going into Q4, that backlog is pretty strong* as well as line of sight to key deals that upon conversion, we plan to then subsequently convert to revenue.  So that cadence, that focus, the controls, those are all in place, and *that's the reason why we have confidence in our HDS business in Q4.*

190.    Analysts were particularly impressed with Defendants' references to the DRG transactional backlog and assurances of a strong fourth quarter, and predicted that the expected conversion of the backlog into revenue would be key for Clarivate to meet Defendants' growth projections.  For example, in an October 29, 2021 report, Jefferies noted:

> Looking forward, Q4 is usually a big quarter seasonally, but when we break down the revenue needed to get to $500mm in Q4 (midpoint of guide) start with $427mm in Q3 plus $42mm sequential improvement experienced from Q3 to Q4 in 2020 which the company is assuming is the base improvement.  That leaves a $31mm gap that the company is confident will be filled with heavier weighting in life sciences than IP.  *DRG for example is expected to benefit from strong data analytics and a consulting backlog that management feels has line of sight on conversion in the quarter.*

Similarly, RBC Capital Markets noted in it October 28, 2021 report that Clarivate was "Setup for Organic Growth Acceleration Starting 4Q21" and that the company "strongly reinforced their backlog and improved visibility to deliver on the acceleration."  BofA Securities noted in its report on the same day that "Q4/21 still expected to be in upper end of 6-8% organic target range," with

"monetizing some of the Sciences consulting backlog" listed as a "key driver," and that "hitting this target will be important in order for investors to gain confidence in the Clarivate acceleration story." Morgan Stanley noted in its October 29, 2021 report, "Management is confident in its ability to deliver organic growth at the upper end of its 6%-8% target for 4Q21."  William Blair's report on October 28, 2021 noted Defendants' "expectation for reaching the upper end of its 6%-8% organic, constant-currency growth target in the fourth quarter, primarily driven by seasonal strength with a higher proportion of rapidly growing DRG revenue . . . ."

191.    At the Company's 2021 Investor Day on November 9, 2021, Defendants again shrugged off the Company's poor third quarter organic growth numbers and pointed to the fourth quarter.  Stead noted: "I just want to remind everybody, since we were fortunate enough to acquire DRG, they grow historically.  ***36% of their total revenue is fourth quarter revenue***.  And, Mukhtar, [give] a reason why and then what we expect Q4 versus Q3, please."  Ahmed responded: "[T]ypically, the latter half of the year is where there's typically a pickup.  ***It's a hockey stick effect here in terms of deals coming through in conversion into revenue***."  Stead again noted later in the call: "[R]emember, Q4, 36% of total DRG revenue comes into Q4 and always CPA is their highest quarter, most of all of that, in both cases, heavy transaction."

192.    At the Company's next conference call, on November 17, 2021, Hanks reiterated this point, noting:

> ***The pickup in Q4 is principally driven by transactional revenue growth, in particular in the Science Group***. . . .
>
> And as a reminder, the business that we acquired in February 2020, being DRG in the life sciences space, that has a significant back-end loading of revenue into Q4, where 36% of their annual revenue was booked in Q4, driven by those custom data deals and consulting.  So those are the drivers of Q4 growth in particular.

Stead added:

4889-3735-6399.v1

We said early this year that we would see 48% revenue growth in first half, 52% in the second half. *We're on target*. That's where we reaffirmed the guidance, et cetera. And that actually will be a norm for us because of what Richard described so well, truly not a hockey stick of our business, it's a hockey stick of the industries we're in.

193. As late as December 7, 2021 – almost at the end of Q4 2021 – Defendants promised a big Q4, particularly for organic growth of transactional revenue. Ahmed noted:

[T]ypically, what happens in Q4 is when they [Clarivate's Science Group customers] need access to data to drive decision-making so that they can then determine their portfolios for the subsequent calendar year. That's what typically happens. That's why Q4 is a time when there's a lot of demand for data, for reports, for expertise. And that's why with DRG, historically, you've seen that Q4 ramp up. *It all happens in Q4*.

194. Company insiders took advantage of these misleading statements and sold more of their personal holdings just before the bottom fell out: Ahmed sold another 14,500 shares on December 8, 2021 – *the next day* after assuring investors "[i]t all happens in Q4" – and new IP Group President Samson sold 20% of his holdings in November 2021 and January 2022 – almost immediately after his promotion – for proceeds of *over $5 million*.

195. As the year wore on, more suspicious executive departures signaled that all was not well. Clarivate announced Hanks' abrupt and unexplained departure in December 2021, and Ahmed's sudden exit was announced in an 8-K on January 10, 2022, before the Company's Q4 and full year 2021 results were announced. This turnover concerned investors and caused the price of Clarivate stock to decline substantially. As one analyst explained on January 24, 2022:

Mukhtar Ahmed will be stepping down from his role as President of the Science group and leaving the company in October 2022. Given the length of time he plans on staying with the company and assistance he is offering with the integration of the ProQuest deal, we think the split is amicable and not indicative of underperformance in the Science group which we think some investors were reading in to. We also point out that investors did not see this coming as the company did not telegraph any such moves. *Given that CLVT is now an organic growth show me story any unexpected changes have been viewed negatively by the market.*

- 71 -

Another analyst retrospectively noted in a February 3, 2022 report: "Over the past few weeks, several investors we spoke with voiced concerns with management turnover over the past year (in addition to Ahmed's departure, the company replaced the head of IP in July 2021 and its CFO in December 2021) . . . ."

196.    On February 3, 2022, Clarivate posted disappointing organic growth numbers for the fourth quarter of 2021 – dragging the entire year's organic growth below expectations – in part because these transactional revenues from DRG were not delivered.  RBC Capital Markets reported on February 4, 2022, "Transactional Revenues Weigh on 4Q21 Results. . . .  We believe the weakness was likely due to lower than expected DRG transaction[al] revenues, which we estimate to be ~$20mm."  The announcement of this miss sent the Company's stock price down substantially again.

197.    Despite assuring investors for months – and as late in the quarter as December 7 – that Clarivate had *already sold* the product necessary to drive organic revenue growth in Q4 2021, the Company achieved only 4% organic growth in Q4 2021 and a disappointing full year growth rate of 4.5%.  This second miss caused Clarivate's stock price to drop significantly because the market finally lost confidence in Clarivate's business, management, and value proposition as a growth company.  For example, in a report dated February 3, 2022, Barclays downgraded Clarivate's rating to "Equal weight" and commented:

> While we have been clear that the CLVT story was mostly about M&A and building scale, *we have been disappointed by the spotty organic execution* – critical for Info Services stocks and their valuations.  In particular, *missing two back-to-back 4Q expectations (CLVT's largest quarter) has lowered our confidence further*. . . .

> 2021E organic growth is now set to come i[n] at ~4.5%, well short of the 6%+ guidance; and implies *4Q21E organic growth would be ~4% vs. the 7-8% exit rate that management had so confidently guided to* (even as early as mid-December during our TMT conference).

- 72 -

198.    In the presentation for the Q4 2021 earnings call, Defendants attributed the Company's miss to the "Omicron variant creat[ing] continued uncertainty and staffing gaps in go-to-market and fulfillment teams," and the "[t]ight labor market dr[iving] higher vacancies late in the year and le[ading] to missed opportunities."  Indeed, the miss was caused by staffing issues at Clarivate, but these staffing issues were primarily caused by the cost-cutting measures and other changes Defendants had brought about.  Moreover, Defendants knew well before the miss in Q4 2021 that there had been an exodus among the sales force and subject matter experts at the Company and had been refusing to backfill these positions for years.  Instead of addressing this exodus and disclosing it to investors, Defendants attempted to conceal the materially negative effect it had on the Company's ability to generate revenue growth.

199.    As a result of investors' lost confidence in Defendants' pitch of Clarivate as an organic growth machine, the Company's stock price has continued to slump and has never regained its Class Period highs.  Stead's retirement from the Company was announced just a few months after the end of the Class Period, in July 2022.

### C.    Defendants' Misleading Statements and Omissions

200.    In addition to the fraudulent scheme and course of business described above, Defendants issued specific misrepresentations and omissions concerning the quality of Clarivate's product offerings, the Company's financial metrics, including ACV and backlog, and the Company's growth prospects.  Defendants' misstatements and omissions misrepresented the true state of affairs at the Company.  Clarivate is liable for the material misstatements and omissions of its employees alleged herein.  Likewise, Stead, Hanks, Archbold, Ahmed, Roy, Lomholt-Thomsen, Samson, and von Blucher are liable for the material misstatements and omissions of Clarivate employees alleged below.

1.      **Statements Regarding Revenue Growth**

201.    Throughout the Class Period, Defendants issued specific misrepresentations concerning Clarivate's revenue growth, including projections for organic revenue growth, statements that the Company was on track to meet those projections based on current facts available to Defendants, and reported sales metrics – including ACV and backlog – that were intended to, and did, give investors confidence in the Company's ability to meet its organic revenue growth projections.

a.      **ACV Growth Statements and Statements Regarding Clarivate's Organic Growth Rate Exiting 2020**

202.    On July 30, 2020, the Company filed a Form 10-Q with the SEC and issued a press release, both reporting its financial results for Q2 2020, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.

(a)      In the 10-Q, Clarivate reported ACV growth of 9.0%.  The 10-Q described ACV as a "leading indicator of the potential subscription revenues that may be generated from our existing customer base over the upcoming 12-month period" and stated: "Our revenues are primarily subscription based, ***which leads to high revenue predictability***."  On the conference call, Hanks stated, "ACV growth was 9% for the second quarter, which includes the addition of DRG.  Excluding acquisitions, ACV growth on an ongoing basis increased by almost 5% and was driven by organic growth and annual price increases."

(b)      During the conference call, Stead stated:

January 14, 2019, we said we expected to close 2020 between 4% to 6% organic revenue growth.  We feel very good about that target.

And:

We had said last year that we hope to be north of 3% with price realization.  ***We're very much on track with that***.  We had a great meeting in the last week or 2 with Mukhtar, Jeff, Richard, myself and others, and ***we'll be loading, as we've said consistently, our renewal information somewhere north of 4% expected growth***. And I think I don't use the word price because I don't think of it that way.  I use the word of value increase.  And just for openers, if you think of everything we provide for annual subscription base, what you get at the beginning of the year versus what you continue to receive from us at the end of the year is a significant enhancement when we talk about all the new products, et cetera, we've done.

203.    On October 29, 2020, the Company filed a Form 10-Q with the SEC and issued a press release, both reporting its financial results for Q3 2020, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.

204.    In the 10-Q, Clarivate reported ACV growth of 9.2%.  The 10-Q described ACV as a "leading indicator of the potential subscription revenues that may be generated from our existing customer base over the upcoming 12-month period" and stated: "Our revenues are primarily subscription based, ***which leads to high revenue predictability***."  On the conference call, Hanks stated, "ACV growth was 9% for the third quarter, which includes acquisitions.  Excluding divestitures, ACV growth was up 15%.  And on an ongoing basis, ACV increased by 4% and was primarily driven by organic growth and annual price increases."

205.    On November 10, 2020, the Company held its 2020 Investor Day.  Stead and other members of Clarivate's senior management gave presentations on behalf of the Company.

206.    In his prepared remarks, Stead stated:

I said in January of 2019, Richard and I announced that we were merging the 2 companies that we would exit 2020 at 4% to 6% organic.  Obviously, did not expect the pandemic.  But I got to tell you, I couldn't feel better.  We've had some softness in the transaction business.  We're starting to see that come back.  And ***I expect us to end in that 4% to 6%***.

207.     Defendants' misstatements and omissions regarding the Company's organic revenue growth prospects for exiting 2020, as set forth in ¶¶202, 204-206, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)     Defendants were aware that Clarivate's ACV metric was inflated by the practice of marking sales, including subscription renewals, as "closed" in the Company's CRM systems despite lacking sufficient information (such as a purchase order number) to generate a complete invoice for the purported sale, and issuing these incomplete invoices despite the Company's Invoice Review Desk flagging the invoices as not meeting the Company's standards;

(b)     Defendants were aware that Clarivate was experiencing difficulty converting its booked sales into revenue because customers were refusing to pay many of the incomplete invoices – which, according to CW-6, were "not fit for payment" – that the Company issued;

(c)     Defendants were aware that the Company's sales pipeline was not robust enough to create the projected growth and was inflated by the practice of upgrading potential leads or "whitespace" in the Company's CRM systems to later stages (such as the "commit" category) without a reasonable basis for doing so;

(d)     Clarivate's organic revenues were not on track to grow 4%-6% exiting 2020. Defendants had crafted this range to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate without a reasonable basis for projecting this level of growth.  Additionally, Defendants had access to and frequently reviewed current revenue data that showed organic revenue was not on track to meet their projections;

(e)     The drastic changes that Defendants made to Clarivate as soon as they acquired it (starting in May 2019) – such as moving clients to inside sales and driving away or terminating field sales agents and subject matter experts without backfilling their positions – had left

- 76 -

the Company disorganized and had driven away numerous important members of the sales and go-to-market teams, such that Clarivate lacked the resources to drive revenue to create the promised level of growth;

(f)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth; and

(g)     The price increases that Defendants used to prop up Clarivate's lagging growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth.

### b.     ACV Growth and Backlog Statements, Statements Denying Cannibalizing DRG's Q4 Transactional Revenue, and Statements Regarding Clarivate Organic Growth Rate for Full Year 2021 and Exiting 2021

208.    Defendants also used the 2020 Investor Day to announce organic revenue growth guidance of 5.5%-6.5% organic growth for the full year of 2021 and a 6%-8% organic growth rate for exiting 2021.  This misleading guidance was even more aggressive than the Company's 2020 projections, and similarly untethered from the Company's reality.

209.    On February 25, 2021, the Company filed a Form 8-K with the SEC and issued a press release, both reporting its financial results for Q4 2020, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.  On February 26, 2021, the Company filed a Form 10-K for the year ended December 31, 2020, which was signed by Stead, Hanks, Archbold, and von Blucher.

(a)     In the 8-K and the 10-K, Clarivate reported ACV growth of 14.2%.  The 10-K described ACV as a "leading indicator of the potential subscription revenues that may be generated from our existing customer base over the upcoming 12-month period" and stated: "Our revenues are primarily subscription based, *which leads to high revenue predictability*."  On the conference call,

Hanks stated: "ACV growth was 14% for the fourth quarter, which includes acquisitions.  Excluding divestitures from both periods, ACV growth was up 25%, while on an ongoing basis, ACV increased by 3.4%, driven by organic growth and annual price increases."

(b)     The press release quoted Stead as saying, "We completed operational improvements, which helped to drive organic growth."  On the conference call, Stead stated regarding the Company's 2021 organic growth projections, "I feel very good about the upside of that 6% to 8% range," and "Richard said we would see organic growth increase in the second half, *which we will*."

210.    On March 4, 2021, Stead and other members of Clarivate's senior management attended the Morgan Stanley Technology, Media and Telecom Conference and fielded questions from analysts.  Stead stated:

> If you think about the traditional Clarivate business, if you will, excluding DRG and CPA, both great assets, think about price realization [*i.e.*, price increases], think about moving us – last year, we introduced 19 new products, most of them in the second half.  Last year, we introduced ease-of-use product changes of over 50.  All of those live and well in 2021.

> And then the last piece is, that I feel so good about, as we shift - 80% will exit – of our customers into inside sales will exit 2021.  It's a huge upside for us as we move to global account bundling, all of our products into global markets that we're focused at.  *So that's why Richard and mine and our whole team's confidence level of the 5.5% to 6.5% organic for the year is as strong as it is*.

Later in the call, Stead stated: "In May of 2019, when we announced the goals, Richard and I said we'd grow – we'd exit 2021 6% to 8%.  *That's going to happen*.  And then you should think about us at that upper end of that 6% to 8% for years to come.  *It's there*."

211.    On April 29, 2021, the Company filed a Form 8-K with the SEC and issued a press release, both reporting its financial results for Q1 2021, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and

fielded questions from analysts.  On May 10, 2021, the Company filed a Form 10-Q for the quarter ended March 31, 2021.

(a)      In the 8-K and the 10-Q, Clarivate reported ACV growth of 11% and 10.9%, respectively.  The 10-Q described ACV as a "leading indicator of the potential subscription revenues that may be generated from our existing customer base over the upcoming 12-month period" and stated: "Our revenues are primarily subscription based, *which leads to high revenue predictability*." On the conference call, Hanks stated, "ACV growth at constant currency was 11% for the first quarter as compared to the same prior year period, which includes acquisitions.  Excluding divestitures, ACV growth was up 16%, while on an ongoing basis, ACV increased by 6% period-to-period, consistent with the 6% growth in organic subscription revenue growth all on a constant currency basis."

(b)      The press release quoted Stead as stating:

While the COVID pandemic impacted our business for most of 2020, we are very pleased to see a recovery in organic subscription and transactional revenue growth. With the solid start to the year, we have updated our 2021 financial outlook and *continue to see a pathway to achieving 6% to 8% organic revenue growth exiting 2021*.

During the conference call, Stead stated:

We're off to a very, very good start in 2021.  As expected, our organic revenue growth is improving following last year's challenges due to the pandemic.

\*      \*      \*

While we do expect some timing impacts on our quarterly organic revenue growth this year, our first quarter results demonstrate that *we are absolutely on the pathway to achieving 6% to 8% organic growth exiting 2021*.

Stead closed the call by stating:

If you think about what Mukhtar [Ahmed, President of the Science Group] was delivering last year in Q3 '18, '19 new products, Jeff [Roy, President of the IP Group] is doing the same, plus some.  Just couldn't be happier, couldn't be more

- 79 -

proud or more pleased of our team. *We're on track to do what we've said we're going to do*.

(c)     During the conference call, Hanks stated:

[I]n terms of the DRG acquisition end of February last year, we're frankly delighted with the performance of the business in the first quarter. *But more importantly, the outlook for the rest of [the] year*. The market is growing at 12% per annum. And our expectations are that we will grow at the double-digit rates this year, which the company delivered in 2019 pre-acquisition. Obviously, there was some impact from COVID last year, but the business is performing very well. *And importantly, our optics into the rest of the year are favorable*.

Stead later stated: "Just as a reminder, we said we'd do 6% to 6.5% all in organic for all of 2021. We're a bit ahead of that, that's why we raised the guidance from the bottom a bit on revenue."

212.    On May 10, 2021, the Company filed a Form 10-K/A (Amendment No. 1) for the year ended December 31, 2020, which was signed by Stead, Hanks, Archbold, and von Blucher. The 10-K/A reported ACV growth of 14.2%, described ACV as a "leading indicator of the potential subscription revenues that may be generated from our existing customer base over the upcoming 12-month period," and stated: "Our revenues are primarily subscription based, *which leads to high revenue predictability*."

213.    On July 29, 2021, the Company filed a Form 10-Q with the SEC and issued a press release, both reporting its financial results for Q2 2021, followed by a conference call the same day in which Stead and other members of Clarivate's senior management discussed those results and fielded questions from analysts.

(a)     In the 10-Q, Clarivate reported ACV growth of 8.4%. The 10-Q described ACV as a "leading indicator of the potential subscription revenues that may be generated from our existing customer base over the upcoming 12-month period" and stated: "Our revenues are primarily subscription based, *which leads to high revenue predictability*." On the conference call, Hanks stated, "ACV growth at constant currency was 8% for the second quarter as compared to the same

- 80 -

period prior year, which includes acquisitions.  On an organic basis, ongoing ACV increased just

over 2% at constant currency."

> (b)      During the conference call, Stead stated:

> Organic revenue in the first half was up almost 6%.  We currently expect to deliver 6.5% to 7% plus in the second half of this year, with a big pickup in fourth quarter compared to the second and third quarters.  What's driving the increase?

> As an important reminder, 60% of DRG's business comes in the second half of the year, with 60% of this in the fourth quarter.  We will also benefit from a full quarter of organic growth from CPA Global in the fourth quarter and realize the benefits of the cost synergies that will drive significant margin expansion in the fourth quarter.  Additionally, transactional revenue is seasonally strongest in the fourth quarter.  ***These items together will drive our organic growth rate into the upper end of our 6% to 8% target rate exiting 2021***.

> (c)      Later in the call, Stead stated:

> Just I'd add one thing to that because what we've tried to point out is that fourth quarter is the way this model plays out, our strongest quarter will be.  That's why ***we've got the high confidence in ending – exiting 2021 at the upper end of the 6% to 8% organic.  We're tracking that by the day, and confidence increases each day***.

Hanks added, "most importantly, ***the pipeline for the life sciences business*** [mostly made up of

DRG] ***is looking particularly strong for the second half of the year***."

214.      On October 28, 2021, the Company filed a Form 10-Q with the SEC and issued a

press release, both reporting its financial results for Q3 2021, followed by a conference call the same

day in which Stead and other members of Clarivate's senior management discussed those results and

fielded questions from analysts.

> (a)      In the 10-Q, Clarivate reported ACV growth of 8.8%.  The 10-Q described

ACV as a "leading indicator of the potential subscription revenues that may be generated from our

existing customer base over the upcoming 12-month period" and stated: "Our revenues are primarily

subscription based, ***which leads to high revenue predictability***."  On the conference call, Hanks

stated, "ACV growth at constant currency was 9% for the third quarter as compared to the same

- 81 -

period prior year, which includes acquisitions.  On an organic basis, ongoing ACV increased at 3% at constant currency."

      (b)      During the conference call, Stead stated:

> You've heard us highlight many times this year that we expect a strong fourth quarter with organic revenue growth between 6% and 8%.  ***We are realizing the many benefits from the transformative acquisitions of DRG and CPA Global and the many operational improvement initiatives that have been put in place***, including our inside sales structure and field sales realignment.  With a strong fourth quarter, organic revenue growth for the full year of 2021 is currently expected to be in the 6% to 6.5% range.

An analyst asked: "I was just hoping – obviously, fourth quarter, I think, seasonally is usually a big quarter.  I was just hoping you could help us just bridge to get a little bit more comfortable with both the organic growth and kind of the EBITDA number."  Stead responded:

> Our fourth quarter is always up significantly.  Last year, it was up $42 million.  So that's the base that we will operate with as we move forward.  It's the first time that we'll include the CPA in our organic revenue all-in, and that will add - that happens to be CPA's largest quarter for many reasons. . . .
>
> And DRG if you remember, ***35% of their total revenue is a Q4 delivery***. . . . So ***that will put us right smack on*** as we would expect to have at the $500 million to go in Q4, which would be the midpoint of the range.

      (c)      During the question-and-answer portion of the call, an analyst asked: "On an organic constant currency basis, the transaction revenue growth moderated to 2.7% year-over-year in 3Q.  Can you elaborate on the factors other than seasonality that contributed to the deceleration in growth?"  Hanks responded: "The principal drivers were slightly lighter Life Sciences and DRG transactional revenues [this] quarter.  I'd add that ***we've got a good order book going into the fourth quarter***."

Ahmed added:

> [T]ypically, DRG, which, of course, now we refer to as Healthcare and Data Solutions, HDS, typically, Q4 is very strong in data analytics and also in consulting.  ***We have a consulting backlog that we typically deliver in Q4***.  And there's also

- 82 -

typically a number of deals that are coming through that we convert in the quarter as well, and this is typical of the Healthcare segment.

An analyst asked:

> [J]ust mathematically, I think it's important that DRG does very well in the fourth quarter just given that it is sort of weighted towards back half and especially fourth quarter. So I guess can you talk about how - DRG growth, what it was in the third quarter, how it's trended this year? Just to give us some increased confidence in the fourth quarter performance.

Ahmed responded:

> **We have direct insight into the backlog. And going into Q4, that backlog is pretty strong as well as line of sight to key deals that upon conversion, we plan to then subsequently convert to revenue**. So that cadence, that focus, the controls, those are all in place, and that's the reason why we have confidence in our HDS [Clarivate's new name for DRG] business in Q4.

Regarding the Company's pipeline, Lomholt-Thomsen added:

> [W]e are obviously very, very focused on the strategic transactions that's going to drive the revenue outcome that we're looking for as well. And we have a very targeted list of opportunities that both Gordon [Samson], Mukhtar and I are following with the sales force on a daily basis to make sure that we close the deals that's going to maximize revenues for Q4.

215.    On November 17, 2021, Stead and other members of Clarivate's senior management attended the RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference and fielded questions from analysts.

216.    During the conference, an analyst opened the question-and-answer portion of the event by asking the following question about Clarivate's organic growth:

> That's a great introduction, Jerre. And then as you highlighted, we see very strong momentum in the business going into the fourth quarter. And the organic growth is expected to accelerate to 6% to 8% in '21. We've received a number of inbound questions from investors just trying to better understand the growth acceleration from 3% in the third quarter to 6% to 8%. And I was wondering if you could help - if you or Richard could help us with the revenue bridge, how should we think about particularly the contribution from the acquisition, all of those things?

Hanks responded:

- 83 -

So the objective is, as we said consistently, to get to 6% to 8% organic growth in the fourth quarter. *The pickup in Q4 is principally driven by transactional revenue growth, in particular in the Science Group*. So that is custom data sales in life sciences. It is in academic and government. It is backfile sales, where we sell chronological slices of information and also in professional services and consulting as we close out delivery of projects naturally consistent with the end of the year. So it's very much driven by those elements of our revenue stream.

And as a reminder, the business that we acquired in February 2020, being *DRG in the life sciences space, that has a significant back-end loading of revenue into Q4, where 36% of their annual revenue was booked in Q4*, driven by those custom data deals and consulting. So those are the drivers of Q4 growth in particular.

217.    On December 7, 2021, Stead and other members of Clarivate's senior management attended the Barclays Global Technology, Media and Telecommunications Conference and fielded questions from analysts.

218.    During the conference, an analyst posed the following question regarding Clarivate's expected fourth quarter organic growth:

Jerre, the other question we get a lot about, and perhaps you can help - with the help of Gordon and Mukhtar, help us appreciate it, is the big fourth quarter ramp that's required to meet the guidance that you set for this year, for 2021.

And part of that obviously is the heavy weight to fourth quarter or second half from DRG, part of that is, I think, the transaction business from CPA Global. But maybe, if you can just give us the high level, and if I could just ask Gordon and Mukhtar, from their perspective, to help us appreciate why – or at least appreciate the visibility that you guys have for that.

Ahmed responded:

So typically, what happens in Q4 is when they need access to data to drive decision-making so that they can then determine their portfolios for the subsequent calendar year. That's what typically happens. That's why Q4 is a time when there's a lot of demand for data, for reports, for expertise. And that's why *with DRG, historically, you've seen that Q4 ramp up. It all happens in Q4*.

Samson added: "The IP team are always very jealous of Mukhtar's quarter 4 big one-off deals. We're delighted, but we're very envious of those big one-off deals."

- 84 -

219.     Defendants' misstatements and omissions regarding the Company's organic revenue growth prospects for exiting 2021 and for full year 2021, as set forth in ¶¶208-214, 216-218, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)     Defendants were aware that Clarivate's ACV and backlog metrics were inflated by the practice of marking sales, including subscription renewals, as "closed" in the Company's CRM systems despite lacking sufficient information (such as a purchase order number) to generate a complete invoice for the purported sale, and issuing these incomplete invoices despite the Company's Invoice Review Desk flagging the invoices as not meeting the Company's standards;

(b)     Defendants were aware that Clarivate was experiencing difficulty converting its booked sales into revenue because customers were refusing to pay many of the incomplete invoices – which, according to CW-6, were "not fit for payment" – that the Company issued;

(c)     Defendants were aware that the Company's sales pipeline was not robust enough to create the projected growth and was inflated by the practice of upgrading potential leads or "whitespace" in the Company's CRM systems to later stages (such as the "commit" category) without a reasonable basis for doing so;

(d)     Defendants were in the process of or had completed the process of changing DRG's revenue profile by pulling DRG's historically Q4-weighted transactional revenues forward and transitioning these customers to a subscription model.  Defendants were aware that this cannibalized DRG's fourth quarter revenues and prevented DRG from delivering the promised fourth quarter revenue growth;

(e)     Clarivate's organic revenues were not on track to grow 5.5%-6.5% for the full year 2021 and 6%-8% exiting 2021.  Defendants had crafted this range to attract investors, who they enticed with promises of running the "Jerre Stead Playbook" for organic growth at Clarivate without

- 85 -

a reasonable basis for projecting this level of growth. Additionally, Defendants had access to and frequently reviewed current revenue data that showed organic revenue was not on track to meet their projections;

(f)     The drastic changes that Defendants made to Clarivate as soon as they acquired it (starting in May 2019) – such as moving clients to inside sales and driving away or terminating field sales agents and subject matter experts without backfilling their positions – had left the Company disorganized and had driven away numerous important members of the sales and go-to-market teams, such that Clarivate lacked the resources to drive revenue to create the promised level of growth;

(g)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive revenue growth; and

(h)     The price increases that Defendants used to prop up Clarivate's lagging growth numbers angered customers, many of whom left Clarivate, further hindering the Company's efforts to drive growth.

### 2.     Statements Regarding Product Quality Driving Growth

220.     On July 30, 2020, Stead and other members of Clarivate's senior management participated in a Q2 2020 conference call. In his prepared remarks, Hanks stated: "[W]e are enjoying the benefits of the product renovations *flowing through to even higher renewal rates*."

221.     On September 10, 2020, Defendants attended a Citi Global Technology Conference. During the conference, Stead stated:

> We've then also done a great job of introducing the new products that we laid out. Just as a reminder, there wasn't – when Richard arrived, there was not a new product pipeline. Built that, have most of those products in place and now are adding a lot more and have done the work that we needed to on user enface – user interface. So that's significant. *Those pieces, like I said, I think you can count on 3% organic growth year after year with that, plus the new products being introduced*.

- 86 -

222.    On February 25, 2021, Stead and other members of Clarivate's senior management participated in a Q4 2020 earnings call.  In his prepared remarks, Hanks stated:

> Capital expenditures in 2020 were $108 million, an increase of $38 million over 2019.  The increase is a combination of the addition of DRG and CPA Global as well as a *higher level of product application development as we accelerated the delivery of new products to our clients and drove improvements across the product portfolio*.

Stead also added: "And so the renewal rates, particularly, I think you can see *plus all the other changes we've made in the new products offering*, we're going to see pretty excited about 2021."

223.    On November 9, 2021, Stead and other members of Clarivate's senior management participated in Clarivate's 2021 Investor Day.  In prepared remarks, Hanks stated:

> Now as we look ahead to our near-term outlook, we see our renewal rates increasing to between 92% and 93%, so at least 100 basis points improvement in the renewal rates that we've enjoyed in the trailing 12-month period.  *That stems from the continued investment we've made in products*, the reorganization of the front office, in particular, the investment in inside sales, which broadens our interface with the client – with the customers that we serve as well as the investment in regional customer care that Kerri also covered.

He continued: "Management has real conviction of delivering price realization of at least 4% on our subscription book in 2022.  *We've made significant investments in product, significant investments in capabilities and that is what we expect to deliver*."

224.    On November 17, 2021, Stead and other members of Clarivate's senior management participated in the RBC Capital Markets Global Technology, Internet, Media and Telecommunications conference.  During the conference, Hanks stated:

> And just back to Jerre's earlier remarks around the product innovation, absolutely right, we've got a – in terms of our product platforming, our product road maps, it is absolutely night and day compared to where we were 3 years ago, 4 years ago.  So we've *got extensive road maps to drive growth, good road maps to drive improved retention rates up to that 92.5%, 93% level that Jerre quoted earlier*.

- 87 -

225.     Defendants' misstatements and omissions regarding the quality of their product offerings, as set forth in ¶¶220-224, *supra*, were materially false and misleading and omitted material facts for the following reasons:

(a)     Since taking over Clarivate in May 2019, Defendants had not invested in new products that could drive organic revenue growth;

(b)     Since Defendants took over Clarivate in May 2019, the quality of Clarivate's existing products declined due to a lack of investment and the exodus of key product team personnel;

(c)     Defendants' failure to sufficiently invest in Clarivate's new or existing products resulted in lost customers and sales, negatively impacting revenue growth; and

(d)     Since taking over Clarivate in May 2019, Defendants had been arbitrarily raising prices on Clarivate's customers but not providing sufficient additional value through improved product offerings to justify the raised prices, resulting in unhappy customers and lost sales, and negatively impacted revenue growth.

### D.     Defendants Failed to Disclose "Known Trends or Uncertainties" in Violation of Item 303 of Regulation S-K

226.     Clarivate's SEC filings, including the Forms 10-Q and Forms 10-K filed during the Class Period, failed to disclose information required to be disclosed therein under Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303 ("Item 303").  Item 303 requires certain revenue disclosures in the "Management's Discussion and Analysis of Financial Condition and Results of Operations," or MD&A, section of a public company's SEC filings.  The SEC created specific rules governing the content of MD&A disclosures to provide material historical and prospective disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.  The SEC has stated:

4889-3735-6399.v1

"The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

. . . It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

227.    Among other things, Item 303(a)(3) required Clarivate to disclose the following in the

MD&A of its Class Period SEC filings:

(a)    [M]aterial events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;

(b)    [A]ny known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations; and

(c)    If . . . events that are reasonably likely to cause a material change in the relationship between costs and revenues . . . , the change in the relationship must be disclosed.

17 C.F.R. §229.303.[3]

---

[3]    In November 2020, the SEC adopted certain amendments to simplify and enhance the financial disclosure requirements in Regulation S-K including Item 303. The November 2020 release (No. 33-10890) codifies the MD&A objectives from the SEC's 2003 and 1989 interpretive releases as 303(a), requiring that a registrant must provide a discussion and analysis that allows an investor to see the company "from management's perspective." Such a disclosure must, on the basis of "management's assessment," address matters that are reasonably likely to have a material impact on future operations. The November 2020 release also codifies Item 303(b)(2)(ii) which requires a registrant to disclose: (1) any known trends or uncertainties that have had or are reasonably likely to have a material impact on revenues or income; and (2) any known events that are "reasonably likely to cause a material change in the relationship between costs and revenues." 17 C.F.R. §229.303(b)(2)(ii). Under the "reasonably likely" requirement, the registrant must disclose a known trend or uncertainty if it: (1) is reasonably likely to occur; and (2) would be material to the registrant if it did occur.

4889-3735-6399.v1

228.    As detailed above in §V.B., during the Class Period, Clarivate made significant structural changes to its business model and the business models of the companies it had acquired, namely DRG and CPA Global.  These changes included: (1) cost-cutting restructuring plans, totaling hundreds of millions of dollars, that included material reductions to outside sales force; (2) shifting 80% of Clarivate's customer base to the new "inside sales" model that materially differed from the historical sales practices of Clarivate and DRG; and (3) modifying its transactional sales model, whereby certain one-off transactional data sales were pulled forward and sold as new cloud-based subscription products.  These changes constituted: (i) "known trends and uncertainties" that management reasonably expected to have a material negative impact on Clarivate's revenues; and (ii) events that were likely to cause a material change in the relationship between Clarivate's costs and revenues, including the seasonality of such revenues.  Accordingly, Clarivate had an affirmative obligation under Item 303 to disclose information relating to these trends, uncertainties, and events.

229.    Defendants' omissions, in violation of Item 303 rendered the following Class Period SEC filings materially false and misleading:

(a)    July 30, 2020 Form 10-Q for the quarter ended June 30, 2020;

(b)    October 29, 2020 Form 10-Q for the quarter ended September 30, 2020;

(c)    February 26, 2021 Form 10-K for the year ended December 31, 2020;

(d)    May 10, 2021 Form 10-K/A for the year ended December 31, 2020;

(e)    May 10, 2021 Form 10-Q for the quarter ended March 31, 2021;

(f)    July 29, 2020 Form 10-Q for the quarter ended June 30, 2021; and

(g)    October 28, 2021 Form 10-Q for the quarter ended September 30, 2021.

1. **Following the DRG and CPA Global Acquisitions, Clarivate Made Major Structural Changes to Its Business Model and Sales Practices**

230.     Following the announcements of the DRG and CPA Global acquisitions in 2020, Defendants announced several major restructuring initiatives as well as material changes to Clarivate's historical sales model.  The changes were designed to slash costs, primarily through reducing head count, and boost the Company's profitability.  The Company also announced its plan to transition data sales that were previously recorded as one-off "transactional" deals to cloud-based products that would be recorded as subscription sales.  By instituting the restructuring changes, Defendants introduced the risk that significantly-reduced outside sales forces would disrupt the long-standing business models – especially at the newly acquired DRG and CPA Global – and negatively impact revenue.  Meanwhile, by changing the transactional sales model, Defendants were likely to deviate from the Company's historical revenue trends and, in particular, negatively impact the fourth quarter revenue spike that Defendants repeatedly promised to investors.  Rather than disclose these known risks and trends, Defendants assured investors that the restructuring actions, shift to inside sales, and transactional sales model change would boost, rather than hurt, the Company's revenue prospects.

a.     **Cost-Cutting Restructuring Programs**

231.     During the Class Period, Clarivate announced numerous cost-cutting restructuring programs designed to cut hundreds of millions of dollars of expenses and make the business more profitable.  Following each acquisition that was announced, Clarivate quickly moved to strip out as many costs as possible.  The primary source of cost savings generated by the restructuring plans were centered around headcount reduction, including the elimination of outside sales personnel. Clarivate described the cost-cutting programs as follows:

- 91 -

During 2020 and 2019, we engaged a strategic consulting firm to assist us in optimizing our structure and cost base. As a result, we have implemented several cost-saving and margin improvement programs designed to generate substantial incremental cash flow including the Operation Simplification and Optimization Program, the DRG Acquisition Integration Program and the CPA Global Acquisition Integration and Optimization Program. During 2021, we approved the One Clarivate restructuring plan, which streamlines operations within targeted areas of the Company and the ProQuest Acquisition Integration Program. The programs are expected to result in a reduction in operational costs, with ***the primary driver of the cost saving being from a reduction in workforce***.

232. Defendants highlighted the success of the cost-cutting restructuring programs throughout the Class Period and assured investors that the significant cost-cutting would not negatively impact Clarivate's ability to grow revenues. For example, on September 16, 2020, Hanks stated: "[W]e have a very methodical integration process, and we're very thorough during due diligence of quantifying where we can take out costs. But at the same time, ***making sure that we're preserving growth and in fact, making sure we've got the investments in place to propel growth forward***."

### b.  Shift to an Inside Sales Model

233. Meanwhile, as part of the cost-cutting restructuring plans and salesforce reduction, Clarivate announced that it was shifting the vast majority of its accounts from traditional outside, go-to-market sales to a new "inside sales" structure that would be run out of three global business centers. This shift represented a major change to Clarivate's historical sales practices, and the sales practices of the companies it had recently acquired, including DRG and CPA Global. Defendants highlighted the shift and provided updates throughout the Class Period.

### c.  Transition from One-Off Transactional Sales to Subscription Sales

234. When Clarivate first purchased DRG, roughly 70% of DRG's revenues were subscription or reoccurring, and 30% were transactional. Defendants indicated from the start that

- 92 -

they intended to restructure the sales model so that some of the transactional revenues would become more predictable subscription revenues. At the conference call for the announcement of the DRG acquisition on January 17, 2020, Hanks noted: "We have a plan to, over time, migrate some of the reoccurring and onetime revenues onto a platform capability, which will be subscription-based." But Defendants assured that the shift to subscription-based sales would not negatively impact transactional revenues.

235.    On the July 30, 2020 conference call, an analyst asked: "[C]an you comment on the progress of continuing to transition the revenue to more of a subscription base than the kind of transactional base that they have had beforehand that was ongoing before you guys bought them?" Ahmed responded:

> So as part of that shift, we started really taking a number of the assets, particularly that customers use, our analytical tools and software products in particular. And we're shifting those over to 100% cloud subscription. And we'll continue with that effort as we build out the products and we productize those various use cases. So over time, we'll see some of that recurring revenue shift over to cloud subscription.

236.    Importantly, Defendants concealed from investors the significant impact of the change to the sales model. Specifically, as a result of the change, sales that would have otherwise been recorded as one-off transactional sales later in the year were being pulled forward and recorded as subscription sales earlier in the year, which negatively impacted and meaningfully changed the Company's historical revenue trends. Nevertheless, Defendants routinely assured investors that they could still expect the Company's customary spike in fourth quarter revenues, with a particular emphasis on transactional sales. On February 25, 2021, Hanks stated:

> As we've previously stated, DRG **revenue is much more heavily weighted to the back half of the year**. Approximately 60% of its revenues occur in the second half, with about 60% of that occurring in the fourth quarter or, said differently, more than 35% of DRG revenue for the year comes in the fourth quarter.

- 93 -

*Transactional revenue typically has seasonality within the portfolio, with the fourth quarter historically being the strongest.* Budgets reset at the beginning of the year so we normally see a pullback in backfile sales and volumes at the start of the year, and then it picks up as we transition through 2021.

*We expect organic revenue growth to be back half weighted* as the operational improvements really start to take hold, and we begin to realize the benefits of the strategic acquisitions. Additionally, we currently believe we will start to see some economic recovery from the COVID pandemic later in 2021.

Taking all of these factors into consideration and including the recent addition of CPA Global, our full year revenue profile is weighted at approximately 47% first half and approximately 53% second half.

237. On the July 29, 2021 earnings call, an analyst questioned whether the strong results for the first two quarters of fiscal year 2021 were an indication that revenues had been pulled forward from later in the year, causing expected revenues to be lower in the second half of the fiscal year. The analyst asked:

[I]s there just some kind of timing issues that are happening? I'm trying to understand, because like the strong EBITDA in the quarter, it implies a little bit on the forward basis that maybe things would go down a little bit. I'm trying to understand if there's a pull forward or a shift of just what the dynamics are there?

Stead denied the existence of such a pull forward, answering: "What you should have heard from my comments was Q3 will be pretty close to where we are – with where we were with Q2. *And Q4 will be very strong as we exit*." He continued: "[T]hanks for asking because that shift in place is one that will really reflect in Q4. You're going to see what this business model can do when we get the kind of top line growth that we expect to get."

## 2. Unbeknownst to Investors, These Changes to the Business Had a Significant Negative Impact on Clarivate's Revenue Trends

238. Unbeknownst to investors – due to Defendants' assurances to the contrary – the significant cost-cutting restructuring plans, reduction of the outside sales force, and the shift to an inside sales model had a negative impact on Clarivate's revenue-generating capabilities and eventually caused its revenue trends to decline. Meanwhile, the changes to the transactional sales

model in order to pull forward revenues had a negative impact on, and meaningfully altered, Clarivate's historically strong fourth quarter revenues.

### a.      Significant Reduction to Outside Sales Force

239.    The cost-cutting restructuring plans and shift to an inside sales model resulted in a significant reduction in the outside sales forces of Clarivate and the companies it had recently acquired, including DRG and CPA Global.  The abrupt reduction in the outside sales teams caused a steep drop-off in Clarivate's revenue-generating capabilities and resulted in lost sales opportunities across the Company.  As detailed below, the outside sales force (also referred to as field sales force), including those in charge of "Key Accounts" and "Field Accounts," was responsible for generating high growth revenue opportunities.

240.    Meanwhile, the shift to inside sales converted more and more customers who had traditionally been served by outside sales teams to the hands-off inside sales model.  In early 2021, Stead touted: "[It's] really important to understand, . . . almost *80% of our total worldwide customers, existing 30,000 base, that will be managed by inside sales*."  According to CW-4, this shift to less experienced inside sales representatives was akin to ineffective "smil[ing] and dial[ing]" for sales.  CW-4 added that many of the employees hired for inside sales were inexperienced and ineffective "rookies."

241.    Defendants ultimately admitted at the end of the Class Period that the lack of sufficient outside and field sales personnel caused a significant revenue miss.  Notably, the Company's plans to reverse the sales decline following the Class Period included "hiring aggressively."

**b.      Inside Sales Force Had Limited Sales Capabilities**

242.     In combination with the reduction in the outside sales force, Clarivate shifted the vast majority of its customers to a new inside sales model.  Inside sales had significantly diminished sales capabilities, as compared to the outside sales force model that Clarivate, DRG, and CPA Global had traditionally employed.  In particular, the inside sales force was not designed to focus on cross-selling sales opportunities or high-value consulting sales opportunities – sales that Defendants had repeatedly emphasized as key drivers of revenue growth following the DRG and CPA Global acquisitions.  For example, in October 2020, Jeffrey Roy stated: "So we're very excited about that and ***a big part of our strategy is cross-sell*** and upsell as we move forward."  On February 25, 2021, Stead stated: "One of the many appealing attributes of this addition to our industry-leading portfolio of products is the abundant ***opportunities we have for cross-selling*** and upselling across our entire customer base."

243.     Meanwhile, following the announcement of the DRG acquisition on January 17, 2020, Defendants touted DRG's strength in consulting services and emphasized to investors that the combined entity would generate further consulting revenue growth from cross-selling as it leveraged DRG's consulting customer relationships.  Defendant Hanks stated:

> So on the revenue mix . . . 30% transactional, partly from the consulting services business that they have.  I mean this is an organization that has very deep and tenured relationships with the top 50 global pharmaceutical and biotech companies.  We're at the view that ***we can expand that consulting services channel*** . . . .  ***So we're very confident about the growth outlook.***
>
> ***In terms of consulting services, I think that, number one, that enables us to capture a greater share of wallet***.  And secondly, it enables us to pull through the sale of other products and services within the portfolio, ***not just DRG's, but I think very importantly, Clarivate***.

244.     Despite the importance of these revenue growth areas, the inside sales force, which covered 80% of Clarivate's total customer base, was not designed to maximize cross-selling

opportunities or consulting sales opportunities, which were to be the drivers of the promised revenue growth.  In fact, as shown in the slide below (notations in red added), the Company acknowledged in a Class Period investor presentation that that critical high-value consulting revenues and cross-selling revenues were of "low focus" to the inside sales team:



Indeed, the same presentation stated that the Company's strategy was to "[a]llow [outside] Field Sales to concentrate on high growth opportunities" and to "[d]rive further growth revenue amongst very largest accounts" that were covered by the outside "[k]ey [a]ccounts" sales force.  Thus, the Company's most important revenue growth areas were the responsibility of a greatly diminished outside sales force, while the inside sales team, which had grown to cover over 30,000, or 80%, of the Company's total customers, was not focused on cross-selling or high-value consulting.  As a result, the Company's cost-cutting strategy and drastic sales force changes had devastating effects on Clarivate's ability to grow revenues.

### c.  Pulling Forward Transactional Sales Negatively Impacted Fourth Quarter Revenues

245.  The transition of the transactional sales model to a subscription-based model allowed Clarivate to pull forward revenues earlier in the fiscal year, which Defendants reasonably expected to have a negative impact on fourth quarter revenues – particularly transactional revenues. Defendants attempted to have it both ways by pulling forward revenue earlier into the fiscal year but also continuing to claim that 53% of the Company's revenues would occur in the second half of the year, and 36% of DRG's revenues would occur in the fourth quarter due to strong year-end transactional sales as Clarivate capitalized on customers' spending the remainder of their fiscal budgets.  In reality, however, Defendants had already cannibalized much of DRG's fourth quarter transactional revenue, and exhausted its customers' fiscal budgets, by pulling forward the revenue as subscription sales throughout the year.  As expected, the revenue split between the first half of the year and the second half of the year in 2021 was 49% vs. 51%, a stark contrast from Defendants' earlier assurances of 47% vs 53% – the difference amounted to a shortfall in the second half of the year totaling tens of millions of dollars in sales.[4]  Late in the Class Period, Ahmed contradicted Stead's earlier representation that revenue had not been pulled forward into the first half of the year, acknowledging:

> [W]hat we've done here since we've acquired them is we've invested in particularly the data assets. *So rather than onetime at the end of the year, we move them more into a Data-as-a-Service offering*.  We've laid on analytics.
>
> *So it's not a one-time transactional deal in Q4 to meet that budgeting cycle*, but we try and provide that intelligence through the form of our software, which – as a service and to the Data-as-a-Service.  *So that means that we can bring that forward*.  It becomes equalized through the year so that we are part of the strategy planning in pharma.

---

[4]  Excluding impact of ProQuest acquisition in Q4 2021.

- 98 -

3. **Changes to the Sales Force and Sales Model Contributed to Clarivate's Disappointing Q4 2020 and Q4 2021 Revenue Targets and Reduced 2022 Revenue Guidance**

246.    The reduction in critical outside sales personnel stemming from the significant cost-cutting programs and significant shift in sales model to inside sales negatively impacted Clarivate's revenue trends.   In addition, the pull-forward of transactional revenues negatively impacted Clarivate's fourth quarter revenue trends.

247.    First, on February 26, 2021, Clarivate announced disappointing Q4 2020 revenues, including organic revenue growth of only 1.1%.  The impact of the cost-cutting measures and shift to the inside sales model was even more significant to DRG's results.  DRG's Q4 2020 revenues declined from the prior year, when it had been a standalone company.[5]  By contrast, Defendants stated at the time of the acquisition of DRG that DRG would grow meaningfully following the acquisition.[6]

248.    On February 3, 2022, Clarivate announced a significant miss on its Q4 2021 revenue target and slashed revenue guidance for the following year, 2022, by $65 million.  The Q4 miss was blamed primarily on a decline in one-off transactional sales in the life sciences space, with a focus on disappointing DRG transactional sales in particular.  The cause of the sales miss was attributed to not having enough outside sales representatives in the field.  In particular, the Company cited

---

[5]    Specifically, DRG's full year 2019 revenues were $207 million.  According to Defendants, 35%-36% of that revenue came in the fourth quarter, meaning that Q4 2019 DRG revenues were approximately ***$73.5 million***.  By contrast, full year 2020 revenues were $186.4 million and Defendants reported year-to-date DRG revenues through Q3 2020 of $113.2 million, meaning DRG's Q4 2020 revenue was only ***$73.2 million***.  DRG generated 9% revenue growth as a standalone company in 2019.

[6]    For example, on the January 17, 2020 call announcing the DRG acquisition, Defendants stated "we expect to see this double-digit growth for the years to come" and "good growth in 2019, great momentum in the business going into 2020, we're very confident with double-digit sustained growth rates."

- 99 -

"staffing gaps in [the] go-to-market and fulfillment teams" and "higher [sales force] vacancies late in the year" that "led to missed opportunities."[7]  Defendants also blamed the miss on customers not having room in their "year-end budgets for transactional purchases (*i.e.* data sets)."[8]

249.   Notably, the Company's plan to remediate the sales shortfall was to "[h]ir[e] aggressively in 2022," thereby acknowledging that the significant sales force reduction over the prior 18 months had negatively impacted revenues.  The new hiring plan included "more than 100 new business sellers . . . to drive new business and to drive strategic cross-sell by industry and by vertical. And through that collaboration between account managers and sales specialists, we have a dedicated engine to drive the growth that we're looking for, especially around cross-sell."  On March 10, 2022, CFO Collins further acknowledged the need for additional sales force representatives:

> So we're taking some unprecedented actions.  We are hiring for positions that aren't vacant yet, taking some different approaches to bringing people in to really get those staffing levels up.
>
> Because *as Jerre touched on, that is a key element of getting those deals closed or converted from the pipeline to a real sale, is having people that are building these relationships and driving these deals to closures.  And we've got to have people in those positions*.

**4.    Defendants Failed to Disclose the Reasonably Likely Impact that the Significant Business and Sales Model Changes Would Have on Clarivate's Revenues, in Violation of Item 303**

250.   Defendants violated the affirmative disclosure duties imposed by Item 303, and thus §10(b) of the Exchange Act, by failing to disclose, in the Company's Forms 10-Q and 10-K filed during the Class Period, the following material information that was known to management:

---

[7]   Defendants blamed the lack of outside sales personnel on the COVID-19 pandemic rather than Clarivate's own cost-cutting actions.

[8]   Defendants blamed the lack of space in customers' budgets to make customary year-end transactional data set purchases on "[a]ccelerating inflation," rather than Clarivate's own decision to accelerate the same data sales earlier in the fiscal year.

(a)      The significant cost-cutting restructuring programs that resulted in drastic cuts to the outside sales forces of Clarivate and of DRG and CPA Global, following their acquisitions by Clarivate, were reasonably expected to adversely impact Clarivate's revenues, and caused a material change in the relationship between Clarivate's costs and revenues;

(b)      The rapid shift to an inside sales model covering 80% of the Company's 30,000 customers, and the limitations of the inside sales force's sales capabilities in generating high-value cross-selling and consulting sales, were reasonably expected to adversely impact Clarivate's revenues, and caused a material change in the relationship between Clarivate's costs and revenues;

(c)      The abrupt shift and resulting disruption to the long-standing sales models of Clarivate and of DRG and CPA Global, following their acquisitions by Clarivate, were reasonably expected to adversely impact Clarivate's revenues; and

(d)      The transition of the transactional sales model to a subscription-based model in order to pull forward revenues earlier in the fiscal year was reasonably expected to adversely impact Clarivate's seasonal revenue trends, negatively impacting fiscal fourth quarter revenues in particular.

251.    The foregoing concealed facts regarding the adverse revenue impacts stemming from: (i) the significant cost-cutting restructuring programs; (ii) the drastic cuts to the outside sales force; (iii) the shift to an inside sales model that was not designed to focus on high-value revenue growth opportunities; (iv) the abrupt shift and resulting disruption to the long-standing sales models of Clarivate and the companies it acquired; and (v) the pull forward of revenues associated with shifting year-end transactional sales to subscription sales, were required to be disclosed in accordance with SEC MD&A disclosure rules, because they were, among other things:

(a)     "material events and uncertainties known to management [that would] cause [Clarivate's] reported financial information not to be necessarily indicative of future operating results or of future financial condition";

(b)     "known trends or uncertainties that [Defendants] reasonably [expected] to have a material . . . unfavorable impact on [Clarivate's] net sales or revenues"; and

(c)     "events that [were] likely to cause a material change in the relationship between [Clarivate's] costs and revenues."

### E.     Defendants Acted with Scienter

#### 1.     Defendants Were Hands-On Executives Who Closely and Frequently Tracked and Spoke About Sales and Revenue Metrics

252.     Defendants were, by their own admissions and from descriptions provided by CWs, hands-on executives who were intimately involved in the Company's operations and aware of the current state of the Company's pipeline, sales, revenues, and product offerings.  Furthermore, Defendants spoke about Clarivate's product quality and growth prospects during nearly every single earnings call and investor conference throughout the Class Period, demonstrating that the topic was high on Defendants' radar and a key concern for analysts – and that Defendants knew or were reckless in not knowing that Clarivate's products and growth were not as represented.  Accordingly, Defendants' hands-on management style and their role as spokespeople for the subject of the alleged fraud supports a strong inference of scienter.

#### a.     Sales and Pipeline Reports

253.     CW-1, CW-3, CW-4, and CW-5 reported that sales and pipeline were tracked in real time in the Company's CRM systems, including Salesforce, and that reports from this software were frequently generated and presented to executive management.  CW-5 noted that part of their role was

- 102 -

to consolidate financial data and information on customers' activities in another software program called Tableau, and that reports from this software were presented to their VP and President who in turn rolled them up to the executive management team.  CW-5 also reported that, "at least once a week, all the information from the Company's CRM reports are loaded into Tableau," and that "everyone had visibility into Tableau's dashboards including the executive management team." They said this process was called "roll-ups."

254.    CW-1, CW-4, and CW-5 also reported that they met frequently with their supervisors to go over these sales and pipeline reports, and that they understood that such meetings were held up the chain of command all the way to the executive management team.  CW-1 reported that "at the beginning of each year, a detailed portfolio account review was conducted by the bosses with their subordinates and addressed each sales person's clients' portfolio accounts."  CW-1 explained that there "were intense discussions held about the strength of each account as well as potential whitespace opportunities that could facilitate additional revenues.  The detailed portfolio account reviews were revisited each quarter in order to update the customers' activity accounts."  CW-5 stated that executive management was "hands on" and reviewed reports to keep track of the operational activities.  According to CW-5, executive management knew that new subscriptions, renewals, and transactional revenues were going down and Clarivate would not meet its forecasts.

255.    Defendants' own statements throughout the Class Period corroborate the confidential witnesses' accounts.  On the March 4, 2021 call, Hanks stated: "I would add this, that in terms of DRG, *Jerre and I get the – what we call the in-the-bag report each Sunday night, which shows what have we sold and contracted for delivery for rev rec purposes* in 2021.  And we obviously compare that each week to the same period prior year."  On the Company's October 28, 2021 Q3 2021 earnings call, Lomholt-Thomsen stated: "And then last but not least, we continue to improve

- 103 -

our operational rigor and control so that *we can track our execution on a daily basis and make sure that we can take any corrective actions to drive the outcome we're looking for in Q4*."  Stead added: "You can believe that *we look at it every week – actually, every day to make sure we're on track with new sales*, et cetera," and, "I think most important is *we get a view every week of what we got to go to hit the number that will deliver the kind of results we expect in Q4*."  And Ahmed stated, *"[w]e have direct insight into the backlog*."  At the Company's 2021 Investor Day on November 9, 2021, Stead stated: "We – with the tools we use, we know exactly what it takes to grow organic growth, actually by product and by customer.  And we see what we've done."  At a conference call on November 17, 2021, Stead stated: "*We review everything every week, upside-down and backwards*."

### b.      Product Quality Reports

256.    CW-2 stated that they "provided weekly reports to their manager that showed there was a deterioration of Clarivate's product quality."  CW-2 explained that their "reports were combined in a consolidated report and forwarded up the chain of command."

### c.      Invoice Quality Control Reports

257.    CW-6 stated that every two weeks, the Invoice Review Desk generated a report sent to the entire sales organization listing the invoices that did not pass the quality control review and the issues that the sales representative needed to address.  CW-6 further explained that hundreds of invoices did not pass the quality assurance step because there was insufficient documentation or the sales representatives had not noted the information needed.  CW-6 reported that Chief Tax and Revenues Operations Officer Kathy Sullivan – who indicated she was acting on Hanks's orders – insisted on pushing the faulty invoices through anyway.

258.     Additionally, CW-6 explained that the Company tracked invoices that were "pushed through" in this manner on a separate report, which they characterized as an "incomplete invoices pushed through" report.  CW-6 detailed that this report was created and circulated by the manager of the Invoice Review Desk, Rupinder Kaur.  CW-6 said Sullivan and the collections team received the "incomplete invoices pushed through" report because executive management knew that these invoices were less likely to be paid, and so flagged them for collections to do extra follow up with the customer and try to turn the invoices into revenue – work that should have been done by salespeople before the sales were marked closed.  CW-6 added that this report was circulated every month and that they tracked how many of these incomplete invoices were ultimately paid with a scoreboard.  CW-6 added that only about 30% of these incomplete invoices were ever paid.

### d.     Collections and Accounts Receivable Reports

259.     CW-6 disclosed that to track collections, they created a spreadsheet detailing accounts receivable in January 2021.  CW-6 stated that FP&A did not have reliable consolidated reports on accounts receivable, and so turned to the report CW-6 had created for collections.  CW-6 said they sent this report on a weekly basis to the FP&A team and executive management, including Hanks, and that the report was due every Monday by 2:00 p.m. Eastern so that it could be reviewed by executive management.  CW-6 described this report as a "tapestry report" – which was a term coined by Hanks – because it contained multiple rows and columns of color-coded data on the accounts receivable for every business in the Company.

260.     CW-6 also said that executive management, including Hanks, received a monthly tracking report of cash collections which detailed clients that were not paying their bills.  CW-6 detailed that this report was compiled each week and delivered to Sullivan on Friday so that she could request any changes on Monday and the report could be presented to the C-suite executives,

*i.e.*, executive management, every Tuesday.  CW-6 stated that these reports alerted executive management that customers were not paying their bills.

### 2.   CW-6's Personal Interactions With Defendants

261.    CW-6's role at Clarivate involved numerous personal interactions with Defendants and other C-level executives, including virtual and in-person meetings and face-to-face conversations, during which CW-6 discussed subjects relevant to the alleged fraud with Defendants or with other C-level executives who attributed certain actions to Defendants.  These allegations support a strong inference of scienter.

262.    For example, CW-6 recalled having meetings with executive management about revenue declines and being told that "we need the revenue so bring in the cash."  CW-6 explained that Chief Tax and Revenues Operations Officer Kathy Sullivan insisted that incomplete invoices be "pushed through" and indicated that Sullivan mentioned she had spoken with Hanks about doing so. CW-6 detailed that Sullivan told them to push through the invoices since Hanks "wants to make our forecast, so have to make numbers, and need revenue."  CW-6 maintained that they repeatedly informed Sullivan and other members of Clarivate's executive management that sales were declining.

263.    CW-6 stated that they were responsible for creating one standardized system to enable C-Suite executives to assess accounts receivable during the meetings that CW-6 had with them.  CW-6 stated that executive management knew invoices weren't being paid, and they also knew this was because invoices were going out with inaccurate or incomplete information.  CW-6 reported that they had face-to-face meetings with Hanks regarding the collections and invoicing issues throughout 2021, and that Hanks asked CW-6 to look into the collection and invoicing issues at their first face-to-face meeting in early 2021.  CW-6 recalled investigating the issue and reporting

- 106 -

the results of the inquiry to Hanks.  CW-6 told Hanks that a significant reason for the lack of payments was "because we're not invoicing them correctly."  CW-6 stated that they repeatedly told Sullivan and others on the executive management team that the "invoices were not fit for payment."

### 3. Stead's Role as a SPAC Sponsor and Talisman of Organic Growth

264. Stead was a founder or "sponsor" of the Churchill SPAC that brought Clarivate public through a reverse merger process in 2019.  Stead's involvement and role in the SPAC from its inception support a strong inference of scienter.  As explained above, Churchill was not even permitted to begin looking for a company for Stead to run until after it had completed its IPO, at which point Stead faced time pressure and financial pressure to successfully acquire a company. Once Churchill combined with Clarivate, Stead faced even more pressure to deliver investors the success that was intricately linked to his professional reputation – Clarivate's purported recipe for growth was literally billed as the "Jerre Stead Playbook."

265. Furthermore, as Stead told investors at the Company's 2020 Investor Day, "all of my shares are at risk entirely.  They're performance-based shares on 3 years and a large part of our top executives are, too, that are based on 3-year goals that the Board sets."  Thus, Stead needed the Company to perform well so that he could profit from the fraudulent scheme and false statements and omissions described herein.  These professional and financial pressures to succeed gave Stead a motive to defraud investors and therefore support a strong inference of scienter.

### 4. High-Level Departures and Reorganization of Clarivate's Leadership

266. The resignations of four of Clarivate's top personnel – Richard Hanks, Mukhtar Ahmed, Jeffrey Roy, and Christie Archbold – further support a strong inference of scienter.  Hanks served as CFO and Executive Vice President until Clarivate announced his abrupt and unexplained

- 107 -

departure on December 1, 2021.  Roy served as President of the Intellectual Property Group until July 6, 2021, when Clarivate announced his sudden resignation.  Ahmed served as President of the Science Segment until January 10, 2022, when Clarivate announced that he would be leaving the Company.  According to Clarivate's announcement, Ahmed was to work with Samson on the transition until April 1, 2022, and remain in an advisory role until October 1, 2022.  However, Ahmed's separation agreement with Clarivate states that Ahmed is not to attend his place of work and shall not contact or deal with any employee without prior written consent.  Additionally, Ahmed is bound to keep the circumstances surrounding the termination of his employment strictly confidential.  Archbold served as Chief Accounting Officer until Clarivate announced on October 5, 2021 that Archbold had taken a temporary leave of absence, and then on March 7, 2022, announced her unexplained departure from the Company.  Additionally, Clarivate announced on May 9, 2023 that Chief Revenue Officer Steen Lomholt-Thomsen would be departing, and Clarivate announced on July 11, 2022 that Stead would be retiring from his role as CEO.

## 5. Defendants' SOX Certifications

267.    Defendants' scienter is also underscored by the Sarbanes-Oxley certifications signed by Stead and Hanks, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Clarivate was made known to them and that the Company's disclosure controls were operating effectively.

268.    During the Class Period, Stead and Hanks repeatedly certified that they had undertaken an assessment and evaluation of the Company's disclosure controls to ensure that their SEC filings did not contain any false information, including controls designed to ensure all relevant and material information is reviewed by Stead and Hanks prior to certifying those filings pursuant to

Sarbanes-Oxley.  This further establishes that Stead and Hanks knowingly misled the market, or were reckless in making such representations and executing such certifications.

### 6.    Insider Stock Sales Support a Motive to Commit Fraud

269.    It is unknown whether any Defendants sold Clarivate shares prior to January 1, 2021. Clarivate qualified as a foreign private issuer until December 31, 2020, and thus, was not required to file Forms 4 when there was a material change in the holdings of company insiders.  Clarivate filed dozens of Forms 3 on behalf of insiders, including Defendants, on December 31, 2020, all of which indicated:

> Clarivate Plc currently qualifies as a foreign private issuer ("FPI") and the directors, officers and shareholders of Clarivate Plc are currently exempt from Section 16 of the Securities Exchange Act of 1934 pursuant to Rule 3a12-3(b) thereunder.  As such, this is an informational and voluntary report only, which shall not be deemed an admission that the filing person is required to report beneficial ownership of and transactions in Clarivate Plc securities, or that the filing person is subject to any liabilities or duties under Section 16.  Clarivate Plc anticipates that it will no longer retain FPI status after December 31, 2020.

270.    Defendants were motivated to engage in the alleged fraudulent course of conduct in order to collectively sell 1,221,675 shares of their personally-held Clarivate common stock during the Class Period, for gross proceeds of approximately **$30.5 million**, under circumstances that were unusual and suspicious, as set forth below:

| Insider | Date | Price | Shares Sold | Proceeds | Est. Profit | % Sold |
|---|---|---|---|---|---|---|
| **Richard Hanks** (CFO, Executive VP) | 6/14/2021 | $26.00 | **124,297** | **$3,231,722** | $2,410,119 | **65.02%** |
| **Mukhtar Ahmed** (President, Science Segment) | 3/11/2021 | $22.88 | 107,616 | $2,462,254 | | |
| | 3/12/2021 | $23.28 | 41,573 | $967,819 | | |
| | 3/15/2021 | $26.29 | 43,913 | $1,154,473 | | |
| | 12/8/2021 | $24.80 | 14,578 | $361,534 | | |
| | | | 207,680 | $4,946,080 | $3,239,400 | 96.19% |

| **Insider** | **Date** | **Price** | **Shares Sold** | **Proceeds** | **Est. Profit** | **% Sold** |
|---|---|---|---|---|---|---|
| **Jeffrey Roy** (President, Intellectual Property Group) | 3/11/2021 6/14/2021 | $22.70 $26.00 | 86,050 89,648 | $1,953,335 $2,330,848 | | |
| | | | **175,698** | **$4,284,183** | $2,904,761 | **78.40%** |
| **Gordon Samson** (Head of Asia-Pacific & President, Intellectual Property Group) | 11/1/2021 11/1/2021 11/4/2021 11/15/2021 11/16/2021 1/3/2022 1/3/2022 | $23.27 $23.23 $24.00 $23.48 $24.00 $23.51 $24.46 | 90,000 25,000 25,000 33,000 33,000 1,600 6,400 | $2,094,300 $580,750 $600,000 $774,840 $792,000 $37,616 $156,544 | | |
| | | | **214,000** | **$5,036,050** | $5,036,050 | **20.12%** |
| **Sheryl von Blucher** (Director) | 6/14/2021 | $26.00 | **500,000** | **$13,000,000** | $7,250,000 | **14.00%** |
| | **Total:** | | **1,221,675** | **$30,498,035** | | |

271.     Three of the five insiders who sold stock during the Class Period – Hanks, Ahmed, and Roy – sold the *majority* of their available shares at artificially inflated prices, for substantial proceeds, before unexpectedly leaving the Company:

(a)     Hanks, who served as CFO and Executive Vice President until Clarivate announced his abrupt and unexplained departure on December 1, 2021, sold *65%* of his personally-held Clarivate common stock during the Class Period, for proceeds of $3.232 million;

(b)     Roy, who served as President of the Intellectual Property Group until July 6, 2021, when Clarivate announced his sudden resignation, sold *78.4%* of his personally-held Clarivate common stock during the Class Period, for proceeds of $4.284 million; and

(c)     Ahmed, who served as President of the Science Segment until January 10, 2022, when Clarivate announced that he would be leaving the Company, sold **96.2%** of his personally-held Clarivate common stock during the Class Period, for proceeds of $4.946 million.

272.    Not only did these insiders' stock sales represent significant portions of their holdings, but they also resulted in unusually large profits – both objectively, and relative to their annual non-stock compensation:

(a)     Hanks' estimated net profit on his $3.232 million in stock sales was approximately $2.410 million – more than two-and-a-half times the $871,742 that Hanks had received in non-stock compensation in 2020;

(b)     Roy's estimated net profit on his $4.284 million in stock sales was approximately $2.905 million – more than three-and-a-half times the $775,101 that Roy had received in non-stock compensation in 2020; and

(c)     Ahmed's estimated net profit on his $4.946 million in stock sales was approximately $3.239 million, nearly triple the $1,084,015 that Ahmed had received in non-stock compensation in 2020.[9]

273.    In addition, just four months after he replaced Roy as President of the Intellectual Property Group, Samson began selling his personally-held Clarivate common stock, selling a total of 20.1% of his available shares during the Class Period, for proceeds of $5.036 million.  Because Samson acquired his shares at $0, his net profits were likewise $5.036 million – more than seven times the $686,490 that Samson received in non-stock compensation in 2021.

---

[9]    Non-stock compensation for 2020 is used for comparison purposes, because these insiders' 2021 non-stock compensation was impacted by their departures from Clarivate, and because the insiders knew the amount of their 2020 (but not their 2021) compensation at the time of their stock sales.

274.    Finally, von Blucher, who served as a Director of Clarivate during the Class Period, sold 14% of her personally-held Clarivate common stock in the June 2021 Ordinary Shares Offering, for proceeds of $13 million.  Von Blucher's estimated net profit on the sale was approximately $7.25 million – an amount that dwarfed the $105,000 that she received in non-stock compensation in 2021.

275.    The fact that four of the five insiders who sold stock during the Class Period – Hanks, Roy, Ahmed, and von Blucher – did not make ***any of*** their sales pursuant to Rule 10b5-1 trading plans further underscores the unusual and suspicious nature of the sales.

276.    While Samson did make insider sales pursuant to a Rule 10b5-1 trading plan, his first Class Period sale was ***not*** made pursuant to a trading plan.  On November 1, 2021, Samson made a discretionary sale of 90,000 shares – approximately three times as many shares as his next-largest Class Period sales.   Samson's proceeds on that sale, of $2.094 million, also represented approximately two-fifths of his total Class Period insider sales proceeds of $5.036 million.  While the Forms 4 for Samson's remaining Class Period insiders sales indicate that those sales were made pursuant to a Rule 10b5-1 trading plan, the Forms 4 do not disclose when the plan was adopted. Thus, it is plausible that Samson's trading plan was adopted during the Class Period – possibly on November 1, 2021 – and therefore the trading plan does not provide a defense to his insider trading.

277.    In addition, the timing of the sales was unusual and suspicious in that they were made in the course of the fraudulent scheme and oftentimes shortly after Defendants issued materially false and misleading statements while in possession of material, non-public information concerning, *inter alia*, Clarivate's financial results, product quality, and organic growth.

278.    For example, during the Morgan Stanley Technology, Media and Telecom Conference on March 4, 2021, Stead falsely assured investors that the "whole team's confidence level" in Clarivate's ability to achieve "5.5% to 6.5% organic [growth] for the year" was "strong" –

despite knowing, but failing to disclose, that Defendants were pulling sales from the second half of the year, particularly within DRG, in order to achieve their organic growth projections. During the conference, Stead also falsely represented that Clarivate was "providing [its] customers [with] truly new product," when in truth, according to CW-2, Clarivate's executive management had "neglected to create new products, which led to loss of clients." The following week, on March 11, 2021, Ahmed and Roy capitalized on these false statements by selling shares, with Ahmed making two additional sales on March 12 and 15, 2021.

279.    Similarly, Hanks, Roy, and von Blucher each cashed out their personally-held shares in the June 2021 Ordinary Shares Offering, at $26.00 per share, at a time when Defendants were, among other things: (i) managing to post in-range organic growth numbers by pulling sales from the second half of the year – a tactic they knew was unsustainable; and (ii) failing to invest in new products and allowing the quality of Clarivate's existing products to decline, resulting in lost customers and lost sales, and negatively impacting revenue growth.

280.    During Clarivate's Q3 2021 earnings call on October 28, 2021, Defendants repeatedly assured investors that a strong fourth quarter would enable the Company to achieve its expected organic growth for full year 2021. On the call, Stead also falsely represented that Clarivate was "continu[ing] to invest heavily" in product enhancements and launches. Two business days later, Samson began selling stock, making two separate sales on November 1, 2021, and an additional sale on November 4, 2021. Samson continued making insider sales shortly after the Company's November 9, 2021 Investor Day – during which Defendants reaffirmed their 2021 organic growth projections and falsely represented that they had "made significant investments in product" – selling shares on November 15 and 16, 2021.

281.    On December 7, 2021, during an investor conference, an analyst directly questioned Ahmed about "the big fourth quarter ramp that's required to meet the [organic growth] guidance . . . for 2021."   Ahmed assured investors that the "typical[] . . . Q4 ramp up" at DRG would be forthcoming, declaring that "[i]t all happens in Q4."   The following day, on December 8, 2021, Ahmed sold virtually all of his remaining available shares.

282.    Finally, Ahmed's sale on March 15, 2021, and Samson's two sales on January 3, 2022, were unusual and suspicious because they were made during "Blackout Periods" when insider sales were explicitly prohibited under Clarivate's insider trading policy.

283.    Clarivate's insider trading policy, which the Company adopted on February 3, 2021, prohibits insiders such as Defendants from purchasing or selling the Company's stock during any "Blackout Period," which "begin[s] on the 15th calendar day of the last month of each fiscal quarter of the Company and end[s] upon completion of the second full trading day after the public release of earnings data for such fiscal quarter."

284.    Thus, Ahmed made his March 15, 2021 stock sale – for which he received proceeds of over $1.1 million – during the first day of the "Blackout Period" that ran from March 15, 2021 (the 15th calendar day before the end of Q1) to "the second full trading day" after Clarivate announced its financial results for Q1 2021 on April 29, 2021 – in clear violation of Clarivate's insider trading policy.[10]  It is also unlikely that Ahmed sought and obtained "Pre-Clearance" for his sale from Clarivate's General Counsel or CFO, as required for sales not made pursuant to Rule 10b5-1 trading plans, since the General Counsel or CFO presumably would not have approved a sale during the "Blackout Period."   The absence of a required "Pre-Clearance" underscores the suspicious nature of Ahmed's sale.

---

[10]    Clarivate's fiscal quarters end on March 31, June 30, September 30, and December 31.

285.     Likewise, Samson made his two sales on January 3, 2022 – for which he received

proceeds (and profits) of $194,160 – during the "Blackout Period" that ran from December 15, 2021

to "the second full trading day" after Clarivate announced its financial results for Q4 2021 on March

10, 2022 – in clear violation of Clarivate's insider trading policy.

F.     **Confidential Witness Accounts**

286.     Several former Clarivate employees have provided information demonstrating that

Defendants' Class Period statements were false and misleading and that Defendants knew or

recklessly disregarded the falsity or misleading nature of their statements.   The CWs include

individuals formerly employed at Clarivate during the Class Period.  Their accounts corroborate one

another, other sources set forth herein, and facts now admitted by Clarivate.  The CWs provided

information to Plaintiffs' counsel and/or their investigator on a confidential basis and are particularly

described by job description, responsibility, and duration of employment, thereby providing

sufficient detail to establish their reliability and personal knowledge.   As set forth below, the

information provided by the CWs supports an inference that Defendants' Class Period statements

were false and misleading and that Defendants acted with scienter.

287.     Confidential Witness No. 1 ("CW-1") worked as a Commercial Account Manager

and an Inside Account Manager between spring 2021 and winter 2022 in the Chandler, Arizona

location.    CW-1 was responsible for promoting subscription-based services focused on

pharmaceutical, biotech, and medical venture investment intelligence.   CW-1 stated they were

required to meet assigned target quota goals, generate new subscription business, foster renewal

sales, and acquire transactional revenues.  CW-1 stated that "executive management" at Clarivate

included the CEO, CFO, Chief Operating Officer, Chief People Officer, Chief Compliance Officers,

Presidents, and Vice Presidents.   CW-1 stated that executive management based growth on

- 115 -

improperly compiled forecasts and utilized unrealistic whitespace (*i.e.*, potential) business opportunity projections. CW-1 also explained that executive management did not provide the sales teams with the desired products, assigned unworkable target quota goals, did not reinvest in their product lines, and neglected to create new products, which led to sales people leaving. CW-1 explained that sales people "started leaving in multitudes." CW-1 added that Clarivate's executive management fired numerous sales people and members of the Company's go-to-market teams. CW-1 noted: "Clarivate had a huge problem with price rates and billing matters," which caused the Company to "lose major clients and experience a decrease in new subscribers." CW-1 noted that Clarivate "didn't reinvest in their product lines." CW-1 also noted that executive management did intensive portfolio pipeline account reviews with sales people at the beginning of each quarter, a process Clarivate called "Review and Planning." CW-1 reported that executive management encouraged sales people to record whitespace in the Company's customer relationship management ("CRM") system and that executive management "put things in commit status [*i.e.*, marked them as sales that customers had committed to] to show revenues" before Clarivate had a signed contract with the customer, resulting in an inaccurate picture of sales and revenues. CW-1 also confirmed that they were assigned both legacy Clarivate clients and products and those from newly acquired companies. CW-1 reported that sales and pipeline were tracked in real time in the Company's CRM software and that reports from this software were frequently generated and presented to executive management. CW-1 also reported that they met frequently with their supervisors to go over the reports, and that they understood that such meetings were held up the chain of command all the way to the executive management team. CW-1 explained that "at the beginning of each year, a detailed portfolio account review was conducted by the bosses with their subordinates to address each sales person's clients' portfolio accounts." CW-1 added that there "were intense discussions held about

the strength of each account as well as potential whitespace opportunities that could facilitate additional revenues.  The detailed portfolio account reviews were revisited each quarter in order to update the customers' activity accounts."

288.    Confidential Witness No. 2 ("CW-2") was Senior Director, Data Analytics at Clarivate and DRG between 2017 and April 2021.  CW-2 worked with the commercial life science group and concentrated on the pharmaceutical and biotech areas.  CW-2 assisted in the construction of analytical platforms for clients and interfaced regularly with clients and partnered with engineers to execute new product features.  CW-2 confirmed that they and many other data analytics professionals left the Company and that this contributed to a "brain drain."  CW-2, whose job at Clarivate included working with clients and engineers to execute new product features and monitoring the quality of the Company's current product offerings, reported that "there was a deterioration of Clarivate's product quality" and Clarivate's executive management "neglected to create new products, which led to loss of clients."  CW-2 specifically reported that Clarivate's executive management "wanted to cut costs," that "an emphasis was placed on reducing costs," and that "Clarivate increased profits through cost cutting measures."  CW-2 added that the cost cutting measures included failing to backfill vacant positions in key go-to-market teams and not providing teams with funding needed to maintain and improve product quality, noting, "when presented with an opportunity to invest in the products, Clarivate's executive management chose to cut costs."  CW-2 added that "because of these cost savings approaches, Clarivate lost numerous customers."  CW-2 stated that they saw no organic growth at Clarivate.  CW-2 also stated that after the acquisition of DRG, Clarivate started trying to transition some of DRG's transactional deals to a subscription model.  Because of Clarivate's attempts to transition this business to a subscription model, some of this business was lost and CW-2 stated "we knew that this transactional revenue would not come

through in the fourth quarter."  CW-2 stated that executive management was "hands on" and continuously reviewed and assessed the day-to-day operations.  According to CW-2, executive management knew that subscriptions and renewal revenues were going down.  CW-2 added that they "provided weekly reports to their manager that showed there was a deterioration of Clarivate's product quality."  CW-2 explained that their "reports were combined in a consolidated report and forwarded up the chain of command."

289.  Confidential Witness No. 3 ("CW-3") was Key Account Director, Strategic Partnerships at Clarivate and DRG between June 2016 and October 2021.  CW-3 worked with the commercial life sciences access team and identified new prospects and business opportunities and implemented territory-based strategies using Clarivate's products and services.  CW-3 stated that there were signs that the merger with DRG was problematic from the inception of the merger due to concerns from the employees that Clarivate used a subscription-based model and "tried to shoe horn our company [DRG] into their model which did not work."  CW-3 explained that certain deals that were typically closed at year-end were no longer available to meet sales targets because they had been converted to subscription services earlier in the year.  CW-3 explained that executive management had a "gross misunderstanding" of DRG's business model.  CW-3 reported that "a lot of attrition occurred in the sales groups," and that many of the "individuals who left the company were subject matter experts in their respective disciplines and assigned product lines," which had a "negative impact on the company's organic growth" and caused "revenue losses."  CW-3 also reported that, "a lot of the employees who originally worked in the product sections at DRG left shortly after the merger with Clarivate," and "Clarivate did not reinvest in their product lines or create new products," which negatively impacted sales and led to a reduction of sales personnel. CW-3 stated that Clarivate "did not provide us with the desired products."  CW-3 explained that

- 118 -

executive management did not hire sufficient employees and did not backfill positions when employees left the company, which had a "negative impact on the company's future business operations." CW-3 stated that executive management directed sales people to record potential opportunities to help them meet their quotas and to help with Clarivate's forecasts – CW-3 commented, "garbage in, garbage out." CW-3 stated that because of unattainable target quota goals, Clarivate not reinvesting in their product lines, and Clarivate not creating new products, a lot of attrition occurred in the sales groups. CW-3 advised that as a result of the unattainable target quota goals, sales personnel were required to "back into the number (sales quotas) in order to meet the sales goals assigned." Finally, CW-3 reported that sales and pipeline were tracked in real time in the Company's CRM software and in sales manager spreadsheets and CW-3 believed that these reports were frequently generated and presented to executive management.

290.     Confidential Witness No. 4 ("CW-4") was a Commercial Account Manager between June 2020 and January 2021. CW-4 worked with the commercial life science group concentrating on the pharmaceutical and biotech areas where they promoted subscription-based services focused on pharmaceutical and biotech intelligence and identified new clients, subscriptions, and business opportunities. CW-4 stated that Clarivate did not invest in its product lines and did not create new products. CW-4 said that Clarivate "had very little upgrades in its product and technology platforms." According to CW-4, many clients began to question what they were getting from the subscription services provided by Clarivate. CW-4 reported, "a lot of my sales colleagues also left; they jumped ship and had a major impact on sales and revenues." CW-4 noted that Clarivate "failed to backfill vacated positions" in the sales force. CW-4 added that Clarivate's executive management fired numerous field sales people and members of the Company's go-to-market teams. CW-4 reported: "Clarivate had a huge problem with pricing," and, "every client had different prices for the

- 119 -

same or similar services and products.  Believe me, clients talk amongst themselves."  CW-4 stated

that from the inception of acquisitions, there were concerns from the employees.  CW-4 indicated

that growth was based on poorly constructed projections and the utilization of unrealistic whitespace

business opportunities reported by the sales people and embellished by executive management.  CW-

4 reported that "executive management counted their chickens before the eggs were hatched and

recorded whitespace business opportunities to help meet quotas, forecasts and projections which

misled the investors."  CW-4 described the process of shifting to inside sales in the Chandler,

Arizona location, explaining that sales people were directed by executive management to stop going

out into the field in order to reduce the submission of expense reports.  Instead, CW-4 explained that

"we were now required to smile and dial."  CW-4 noted that many of the employees hired for inside

sales were inexperienced and ineffective "rookies."  CW-4 stated that sales quotas were unrealistic

and "client retention was an issue."  CW-4 said that executive management was "hands on" and

continuously reviewed and assessed reports and documents to keep track of the internal activities

and transactions at the company.  According to CW-4, there was "absolutely no way management

would not have an idea that subscriptions and renewals revenues were going down."  CW-4 reported

that sales were tracked in real time in Salesforce.  CW-4 also reported that they met frequently with

their supervisors to go over the reports, and that they understood that similar meetings were held by

the executive management team.  CW-4 also stated that an "in-the-bag" report of booked sales

would have come from Salesforce data.  CW-4 further reported that referencing the Salesforce

reports, they and other sales representative met at least once a month to present to their supervisor

the status of their sales targets and which deals they expected to turn into sales.  According to CW-4,

the file review "process was always 90% BS."  CW-4 explained that deals moved through Salesforce

through a series of approximately seven stages, starting with "Stage 1," which was described as the

initial prospect, target, or whitespace opportunity, then "Stage 2," when the prospect, after displaying interest or asking questions, became a "lead," with the deal moving through the stages until the final stage when the contract was sent and returned, and deal was "closed out."  CW-4 stated that there was top-down pressure to move sales through the stages quicker, from "whitespace" to "closed."  CW-4 also stated that they were encouraged to close sales with incomplete information or without a purchase order.  CW-4 explained that sales representatives entered the data into Salesforce, and whether a client fit the next stage was subjective, so sales representatives had the freedom to push deals through the stages even if they had no basis for doing so.  CW-4 further explained that neither the management team nor the sales team members cared about accuracy in the pipeline; rather, the sales team received pressure from supervisors to show a "healthy" amount of business to close each month.  CW-4 noted that there was a culture of "not taking no for an answer" that was also "passive aggressive," and that sales representatives faced being put on a "performance improvement plan" if they did not meet unrealistic quota goals or show their deals moving through the Salesforce stages.  CW-4 recalled that there was top-down pressure to boost their numbers and so sales people recorded whitespace opportunities for possible sale when there really were no such opportunities.  CW-4 also explained that there was no standard pricing but their direct order was to charge 4%-7% over what was charged the previous year or else they would receive no commission, even if they had successfully renewed the account.  CW-4 further noted that contract renewal occurred automatically and that executive management told the sales team "to let it lapse for auto renewal."  CW-4 explained that when they warned clients about the automatic renewal, CW-4 was placed on a "performance improvement plan."  CW-4 also stated that the sales team was asked to handle collections, and that hindered the ability to retain clients because seeking collections "kills the relationship."  CW-4 recalled that as they sought payment from clients on existing licenses, they

- 121 -

were told to sign the clients up for further licenses – only to learn from the clients that they had not known they had licenses for which CW-4 was seeking payment.  CW-4 further recalled customers reporting: "You are billing me for something that I did not want or order" and "you've been billing us for this and we never even bought it."  CW-4 concluded that a lot of information could be found by the customers on their own through "a Google search" without having to buy Clarivate's products.

291.    Confidential Witness No. 5 ("CW-5") was Senior Director, Global Accounts between December 2020 and February 2022.  CW-5 was responsible for managing consulting teams and worked with commercial organizations to develop solutions and provided IP innovation services to clients.  CW-5 was also responsible for analyzing financial data and customer activity and presenting that information to the Vice President and President, who would then roll up the data to executive management.  CW-5 stated that the "growth rate issued to the public by Clarivate was unrealistic" and that "what representatives at Clarivate said to the public versus what the current market rates and industry standard percentages dictated was very different."  CW-5 stated that "there was no organic growth at Clarivate; it was all just wishful thinking by executive management."  CW-5 stated: "The sales quotas were unrealistic throughout the sales units and as a result of these unworkable target quota goals, Clarivate lost a lot of sales personnel."  CW-5 added that Clarivate fired numerous employees.  CW-5 stated that executive management told the market what it wanted to hear and not what the marketplace dictated.  CW-5 stated that "the information provided to the Street by executive management was not built on facts."  CW-5 said that the price increases "that executive management projected to the Street" were "not going to come about," and that "Clarivate's rate increases as compared to similar companies and competitors in the industry were unrealistic and much higher than what the market supported."  CW-5 stated that Clarivate "didn't reinvest in their

- 122 -

product lines." CW-5 explained that executive management directed sales people to record potential whitespace opportunities, and that sales people used this feature of the Company's CRM to help them meet unrealistic sales quotas. CW-5 stated that executive management was "hands on" and reviewed reports to keep track of the operational activities. According to CW-5, executive management knew that new subscriptions, renewals, and transactional revenues were going down and Clarivate would not meet its forecasts. CW-5 reported that revenues and pipeline were tracked in real time in the CRM and that reports from this software were frequently generated and presented to executive management. CW-5 noted that part of their role was to consolidate financial data and information on customers' activities in another software program called Tableau, and that reports from this software were presented to their VP and President who in turn rolled them up to the executive management team. CW-5 also reported that, "at least once a week, all the information from the Company's CRM reports are loaded into Tableau," and that "everyone had visibility into Tableau's dashboards including the executive management team." They said this process was called "roll-ups." Finally, CW-5 also reported that they met frequently with their supervisors to go over the reports, and that they understood that executive management had similar meetings.

292.     Confidential Witness No. 6 ("CW-6") was a former Director, Order to Cash, Multi-National Accounting, Billing & Collections, FP&A at Clarivate between October 2020 and September 2022. CW-6 managed 200 employees through 8 direct reports across 17 countries and was responsible for company-wide collections, billing and invoicing, and cash posting. CW-6 stated that their immediate supervisor was Kathy Sullivan, Chief Tax and Revenues Operations Officer, who reported to Stead. CW-6 explained the "order to cash" group typically falls under a company's accounting function, but at Clarivate, Stead had separately carved out the "order to cash" group. CW-6 further explained that when Jonathan Collins succeeded Hanks as CFO after Hanks'

departure, Sullivan began reporting to Collins.  According to CW-6, when they joined Clarivate, they were told they were "coming into a mess."  CW-6 confirmed that was the case, and noted that sales were "booked but not collected," and invoices were not always sent out, or sent out with incorrect information only be to rejected by the customers.  CW-6 confirmed that the Company was experiencing difficulty turning booked sales into revenue in 2020, before they were hired.  CW-6 advised that Clarivate was trying to implement organic growth, but was unsuccessful.  CW-6 further stated they tracked the order book as it came in and there was a 7% sales decrease in 2021 from the prior year.  CW-6 reported there was no organic growth at Clarivate.  CW-6 stated that the Chandler, Arizona office where they worked also housed a lot of salespeople, and that they frequently discussed these issues with salespeople.  CW-6 stated that Clarivate's acquisitions of DRG and CPA Global had doubled the size of the Company, but to deliver the synergies promised to Wall Street, employee headcount was eliminated as the collections function was consolidated under the corporate umbrella.  CW-6 recalled that there was intense pressure to collect.  CW-6 further recalled having meetings with executive management about revenue declines and being told that "we need the revenue so bring in the cash."  CW-6 noted that although collections increased by approximately $240 million in 2021 over 2020, sales had declined.  CW-6 noted that there was huge turnover in the sales department and these individuals were not immediately replaced.  CW-6 further recalled: "I never saw a significant boost in sales and Clarivate continued to be a financial nightmare."  CW-6 reported that subscription clients were leaving as they decided not to renew.  CW-6 also reported that numerous clients who used Clarivate's services were not paying their bills, and there were sales that were recorded in the Company's books and records for which payment was never collected.  CW-6 explained that the sales entries were entered and tracked in Clarivate's CRM systems.  CW-6 also stated that there were pipeline reports, which showed the deals on the books and what stage the deal

- 124 -

was at, and recalled there being eight or nine stages in the Company's pipeline process. CW-6 confirmed that any reports of booked sales or pipeline were ultimately based on data entered by salespeople in the Company's CRM systems. CW-6 also recalled that a significant issue they faced in collections was that the sales representatives maintained poor notes and there was "garbage" in the CRMs, and thus invoices could not be generated because there was missing or wrong information. CW-6 stated that the sales people were not getting committed sales contracts or entering the required paperwork to clear invoices. CW-6 noted that there was a low conversion rate in closing out deals. CW-6 also detailed that once a deal reached the next-to-last stage before closing the deal, there was a process to confirm that there was complete information before processing invoices. CW-6 explained that Clarivate had an "Invoice Review Desk" in Penang, Malaysia that used a checklist to conduct quality control and ensure the sales representative for each deal had entered the information necessary for proper invoicing. CW-6 stated that every two weeks, the Invoice Review Desk generated a report sent to the entire sales organization listing the invoices that did not pass the quality control review and the issues that the sales representative needed to address. CW-6 further explained that hundreds of invoices did not pass the quality assurance step because there was insufficient documentation or the sales representatives had not noted the information needed. Sullivan insisted on pushing the faulty invoices through anyway. CW-6 indicated that Sullivan mentioned she had spoken with Hanks about doing so. CW-6 detailed that Sullivan told them to push through the invoices since Hanks "wants to make our forecast, so have to make numbers, and need revenue." According to CW-6, because of Clarivate's numerous acquisitions, there were at least seventeen different legacy systems from the acquired companies that each had their own CRM, billing system, and accounts receivable platform. CW-6 stated that they were responsible for creating one standardized system to enable C-Suite executives to assess accounts receivable during

- 125 -

the meetings that CW-6 had with them.  CW-6 maintained that they repeatedly informed Sullivan and other members of Clarivate's executive management that sales were declining.  CW-6 recalled that when they asked Sullivan about the incomplete and faulty invoices issued, Sullivan said that "if you bring up those issues again, you will be placed on a performance plan" and that she was going to "manage you out of here if you ask questions again."  CW-6 stated that numerous invoices had inaccurate or incomplete information, had not passed the quality-control test, and should not have been issued because they were not going to be collected.  CW-6 further detailed that the Company should have set an accounts receivable current expected loss reserve for those invoices with incomplete information.  CW-6 stated that they discussed solutions to the collections issues with Sullivan but Sullivan refused to stop the practice of pushing invoices through and also refused to disable the products for clients who were not making payments after the clients were warned and given time to cure.  CW-6 disclosed that to track collections, they created a spreadsheet detailing accounts receivable in January 2021.  CW-6 stated that FP&A did not have reliable consolidated reports on accounts receivable, and so turned to the report CW-6 had created for collections.  CW-6 said they sent this report on a weekly basis to the FP&A team and executive management, including Hanks, and that the report was due every Monday by 2:00 p.m. Eastern so that it could be reviewed by executive management.  CW-6 described this report as a "tapestry report" – which was a term coined by Hanks – because it contained multiple rows and columns of color-coded data on the accounts receivable for every business in the Company.  CW-6 stated that executive management knew invoices weren't being paid, and they also knew this was because invoices were going out with inaccurate or incomplete information.  CW-6 also stated executive management insisted on issuing the incomplete invoices because "we need the revenue."  CW-6 recalled that Sullivan said to push the invoices through even though the invoices could not be collected on.  CW-6 reported that they

- 126 -

had face-to-face meetings with Hanks regarding the collections and invoicing issues. CW-6 detailed that they had a series of face-to-face meetings with Hanks throughout 2021, and that Hanks asked CW-6 to look into the collection and invoicing issues at their first face-to-face meeting in early 2021. CW-6 recalled investigating the issue and reporting the results of the inquiry to Hanks. CW-6 told Hanks that a significant reason for the lack of payments was "because we're not invoicing them correctly." CW-6 stated that they repeatedly told Sullivan and others on the executive management team that the "invoices were not fit for payment." CW-6 also said that executive management, including Hanks, received a monthly tracking report of cash collections which detailed clients that were not paying their bills. CW-6 detailed that this report was compiled each week and delivered to Sullivan on Friday so that she could request any changes on Monday and the report could be presented to the C-suite executives, *i.e.*, executive management, every Tuesday. CW-6 stated that these reports alerted executive management that customers were not paying their bills. Additionally, CW-6 reported that the Company tracked invoices that were "pushed through" in this manner on a separate report, which they characterized as an "incomplete invoices pushed through" report. CW-6 detailed that this report was created and circulated by the manager of the Invoice Review Desk, Rupinder Kaur. CW-6 said Sullivan and the collections team received the "incomplete invoices pushed through" report because executive management knew that these invoices were less likely to be paid, and so flagged them for collections to do extra follow up with the customer and try to turn the invoices into revenue – work that should have been done by salespeople before the sales were marked closed. CW-6 added that this report was circulated every month and that they tracked how many of these incomplete invoices were collected on with a scoreboard. CW-6 added that only about 30% of these incomplete invoices could be collected on.

- 127 -

G.     **Loss Causation**

293.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss.  Plaintiffs' claims for securities fraud are asserted under the fraud-on-the-market and *Affiliate Ute* theories of reliance.  The markets for Clarivate's common stock were open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a scheme and made materially misleading statements and omissions regarding Clarivate's products, growth, and its key financial metrics. Defendants' conduct artificially inflated the price of Clarivate common stock and operated as a fraud or deceit on the Class.

294.   The Class Period inflation in Clarivate's stock price was removed when information concealed by Defendants' scheme and misleading statements and omissions was revealed to the market.  The information was disseminated through partial disclosures that revealed the nature and effect of Defendants' alleged conduct.  These disclosures, as more particularly described below, removed artificial inflation from Clarivate common stock, causing economic injury to Plaintiffs and other members of the Class.

295.   The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued scheme and misleading statements and omissions that continued to conceal the true nature of Defendants' fraud.  Each partial disclosure did not on its own fully remove the inflation from Clarivate's stock price, because it only partially revealed the nature and extent of the fallout from Defendants' previously misrepresented and concealed conduct.  Defendants' continued scheme and misrepresentations and omissions maintained the price of Clarivate common stock at a level that was inflated by fraud, inducing

- 128 -

members of the Class to continue purchasing shares in Clarivate even after Defendants' partial disclosures.

296.     The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors. The following stock price declines and descriptions thereof are not necessarily comprehensive because fact and expert discovery are not complete.

297.     A partial disclosure entered the market on February 25, 2021, when Clarivate filed disappointing Q4 2020 financial results and disclosed disappointing Q4 2020 revenue and organic growth of just 1% due to weakness in subscription and Science Group revenue, raising concerns about Clarivate's revenue prospects and ability to reach its stated organic growth target of 6%-8% exiting 2021.  As a result of this partial disclosure, the price of Clarivate stock declined 19% on volume of more than 14.6 million shares to close at $22.75 per share on February 26, 2021. Analysts commented on this disappointing news and attributed Clarivate's stock price decline to disappointing revenues.  In contrast to the 19% decline in Clarivate common stock, the Standard & Poor's Composite Stock Index ("S&P 500 Index") declined a modest 2.9% during this period.[11]

298.     On January 10, 2022, Clarivate issued a press release on Form 8-K announcing that Ahmed would step down from his position as President of the Science Group.  As a result of the announcement of this termination, the price of Clarivate stock declined 19.5% on volume of more than 37.3 million shares to close at $18.00 per share on January 14, 2022.  Analysts attributed the declines in Clarivate's stock price to the abrupt departure of Ahmed and the failure to reiterate fiscal

---

[11]   For purposes of comparing its stock performance vis-à-vis its peers and relevant market, Clarivate referred investors to the S&P 500 Index.

year 2021 or fiscal year 2022 guidance.  For example, an analyst at Barclays stated that the termination could indicate weak Q4 2021 financial results.  In contrast to the 19.5% decline in Clarivate common stock, the S&P 500 Index was flat during this period.

299.    On February 3, 2022, before the market opened, Clarivate filed disappointing 2021 financial results and revised 2022 revenue guidance downward by $65 million.  Clarivate also announced disappointing 2021 organic growth of 4.5%, well below its previously announced 6%-8% organic range, due in part to disappointing transaction revenues in the DRG business.  As a result of this disclosure, the price of Clarivate stock declined 16.4% on volume of more than 22.2 million shares to close at $14.81 per share on February 3, 2022.  Analysts commented on this disappointing news and attributed Clarivate's stock price decline to disappointing Q4 2021 revenue and organic growth, reduced fiscal 2022 revenue guidance, and a loss of confidence in Defendants' credibility given the repeated financial misses.  For example, an analyst at Barclays stated: "[O]rganic growth is now set to come [in] at ~4.5%, well short of the 6%+ guidance; and implies that 4Q21E organic growth would be ~4% vs. the 7-8% exit rate that management had so confidently guided to (even as early as mid-December during our TMT conference)."  An analyst at Morgan Stanley highlighted the disappointing growth rates, stating: "This is the second year in a row CLVT has failed to achieve its organic growth exit rates."  And according to *Bloomberg*, an analyst at Citi downgraded Clarivate stock: "[S]tating that he was 'surprised and disappointed' by the company's revised guidance" and noting that due to "the 'inconsistent communication in recent weeks,' he sees 'credibility clouded' and thinks investors will question if management has appropriate visibility into underlying trends." In contrast to the 16.4% decline in Clarivate common stock, the S&P 500 Index declined a modest 2.4% during this period.

- 130 -

**H.      Applicability of the Presumption of Reliance and the FOTM Doctrine**

300.    A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

301.    A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Plaintiffs and other members of the Class (defined in ¶325 below) purchased or otherwise acquired the Company's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Clarivate, and have been damaged thereby.

302.    At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)    as a regulated issuer, Clarivate regularly made public filings with the SEC and related press releases;

- 131 -

(b)     Clarivate regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)     Clarivate was followed by several securities analysts employed by major brokerage firms, such as William Blair and Company, RBC Capital Markets, BofA Securities, Morgan Stanley, Jefferies, and Barclays, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace; and

(d)     Clarivate's common stock met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

303.    As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding Clarivate from all publicly available sources and reflected such information in the prices of the Company's common stock.

304.    Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices.

305.    At the times they purchased or otherwise acquired the Company's common stock, Plaintiffs and other members of the Exchange Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

306.    As a result of the above circumstances, the presumption of reliance applies.

307.     In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations during the Class Period;

(b)     the misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## I.     Exchange Act Counts

### COUNT I
### Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against the Exchange Act Defendants)

308.     Plaintiffs repeat and reallege each and every allegation in ¶¶1-50, 102-307 above as if fully set forth herein.

309.     This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

310.     During the Class Period, the Exchange Act Defendants, during the time with which they held their positions at Clarivate, engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

- 133 -

misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Clarivate securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Clarivate securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

311.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Clarivate securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Clarivate's finances and business prospects.

312.     By virtue of their positions at Clarivate, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

313.     Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Clarivate, the Exchange Act Defendants had knowledge of the details of Clarivate's internal affairs.

314.     The Exchange Act Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Defendants were able to and did, directly or indirectly, control the content of the statements of Clarivate.  As officers and/or directors of a publicly held company, the Exchange Act Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Clarivate's businesses, operations, future financial condition, and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Clarivate securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Clarivate's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Clarivate securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

315.     During the Class Period, Clarivate securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Clarivate securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased

- 135 -

or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Clarivate securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Clarivate securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

316.    By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

317.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**
**Violations of §20(a) of the Exchange Act**
**(Against the Exchange Act Defendants)**

318.    Plaintiffs repeat and reallege each and every allegation in ¶¶1-50, 102-317 above as if fully set forth herein.

319.    During the Class Period, the Exchange Act Defendants, during the time with which they held their positions at Clarivate, participated in the operation and management of Clarivate, and conducted and participated, directly and indirectly, in the conduct of Clarivate's business affairs. Because of their senior positions, they knew the adverse non-public information about Clarivate's business as alleged herein.

- 136 -

320.    As officers and/or directors of a publicly owned company, the Exchange Act Defendants had a duty to disseminate accurate and truthful information with respect to Clarivate's financial condition and results of operations, and to correct promptly any public statements issued by Clarivate which had become materially false or misleading.

321.    Clarivate had the power to control and influence the other Exchange Act Defendants, and other Company executives through its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations.  By virtue of the foregoing, Clarivate had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Exchange Act Defendants, including the content of their public statements.

322.    Because of their positions of control and authority as senior officers, the Exchange Act Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Clarivate disseminated in the marketplace during the Class Period concerning Clarivate's business and results of operations.  Throughout the Class Period, the Exchange Act Defendants exercised their power and authority to cause Clarivate to engage in the wrongful acts complained of herein.  The Exchange Act Defendants, therefore, were "controlling persons" of Clarivate within the meaning of §20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Clarivate securities.

323.    Each of the Exchange Act Defendants, therefore, acted as a controlling person of Clarivate.  By reason of their senior management positions and/or being directors of Clarivate, each of the Exchange Act Defendants had the power to direct the actions of, and exercised the same to cause, Clarivate to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Defendants exercised control over the general operations of Clarivate and possessed

- 137 -

the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

324.    By reason of the above conduct, the Exchange Act Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Clarivate.

## VI.    CLASS ACTION ALLEGATIONS

325.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Clarivate securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

326.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Clarivate securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Clarivate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

327.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.

- 138 -

328.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

329.    Common questions of law and fact predominate and include: (i) whether Defendants violated the Exchange Act and Securities Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false and misleading; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of Clarivate securities and the extent and appropriate measure of damages.

330.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action is a proper class action, and certifying Lead Plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Plaintiff's counsel as Class Counsel;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

- 139 -

D.      Awarding such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  July 14, 2023                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         SCOTT H. SAHAM
                                         DARRYL J. ALVARADO
                                         ASHLEY M. PRICE
                                         MEGAN A. ROSSI


                                         DARRYL J. ALVARADO

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         scotts@rgrdlaw.com
                                         dalvarado@rgrdlaw.com
                                         aprice@rgrdlaw.com
                                         mrossi@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         ERIN W. BOARDMAN
                                         T. ALEX B. FOLKERTH
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         eboardman@rgrdlaw.com
                                         afolkerth@rgrdlaw.com

                                         Lead Counsel for Lead Plaintiff

- 140 -

WATKINS, PAWLICK, CALATI & PRIFTI, PC
LAUREN CRUMMEL
1423 E. Twelve Mile Road
Madison Heights, MI  48071
Telephone:  248/658-0797
248/658-0801 (fax)
lcrummel@wpcplaw.com

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
STUART A. KAUFMAN
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
stu@robertdklausner.com

Additional Counsel

4889-3735-6399.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 14, 2023, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  dalvarado@rgrdlaw.com

## Mailing Information for a Case 1:22-cv-00394-EK-MMH Parot v. Clarivate Plc et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com,7746777420@filings.docketbird.com

- **Karim Basaria**
  kbasaria@sidley.com,karim-basaria-6831@ecf.pacerpro.com,efilingnotice@sidley.com

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **Erin Whitney Boardman**
  eboardman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Bruce R. Braun**
  bbraun@sidley.com,nyefiling@sidley.com,efilingnotice@sidley.com,bruce-braun-9612@ecf.pacerpro.com

- **Chui-Lai Cheung**
  chui-lai.cheung@davispolk.com

- **Andrew Brian Clubok**
  andrew.clubok@lw.com,andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com,new-york-managing-attorney-8224@ecf.pacerpro.com

- **Agnes Dunogue**
  agnes.dunogue@shearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Timothy A.B. Folkerth**
  afolkerth@rgrdlaw.com

- **Richard Frohlichstein**
  richard.frohlichstein@lw.com

- **J. Alexander Hood**
  ahood@pomlaw.com,tprzybylowski@pomlaw.com,jlopiano@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **Benjamin Klebanoff**
  benjamin.klebanoff@shearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Daniel Craig Lewis**
  daniel.lewis@shearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,mtjohnston@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **James Michael LoPiano**
  jlopiano@pomlaw.com

- **Meredith R. Aska McBride**
  meredith.mcbride@sidley.com,nyefiling@sidley.com,meredith-mcbride-3881@ecf.pacerpro.com,efilingnotice@sidley.com

- **Kevin Metz**
  kevin.metz@lw.com

- **Ashley M Price**
  aprice@rgrdlaw.com,aprice@ecf.courtdrive.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,2879289420@filings.docketbird.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com,bengfelt@rgrdlaw.com

- **Megan Allison Rossi**
  mrossi@rgrdlaw.com

- **James Paul Rouhandeh**
  rouhande@dpw.com,ecf.ct.papers@davispolk.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Daniel J. Schwartz**
  daniel.schwartz@davispolk.com,ecf.ct.papers@davispolk.com,zohaib.chida@davispolk.com

- **Brian Stryker Weinstein**
  brian.weinstein@davispolk.com,ecf.ct.papers@dpw.com,chui-lai.cheung@davispolk.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)